UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STATE OF ILLINOIS,<br><br>                Plaintiff,<br><br>    v.<br><br>CITY OF CHICAGO,<br><br>                Defendant. | Case No. 1:17-cv-06260<br><br>Hon. Rebecca R. Pallmeyer |

**PLAINTIFF'S POSITION STATEMENT REGARDING
ACTIVATION OF CPD OFFICERS' BODY-WORN CAMERAS
AFTER AN OFFICER-INVOLVED SHOOTING OR DEATH**

After a Chicago Police Department ("CPD") officer shoots someone, CPD policy directs the officer to turn off their body-worn camera while an on-scene supervisor questions the officer about the incident. This practice violates the Law Enforcement Officer-Worn Body Camera Act ("the Act") and the Consent Decree, both of which require officers to record law enforcement-related activities to ensure transparency, accountability, and public trust. Plaintiff, the State of Illinois ("the State"), files this position statement regarding CPD policy as to officers' use of body-worn cameras in the immediate aftermath of an officer-involved shooting or death. As laid out more fully below, the Act and the Consent Decree require CPD officers' body-worn cameras to remain activated and recording during Public Safety Briefings and other law enforcement-related activities on the scene of these incidents.

**I.    PROCEDURAL HISTORY**

Both the Act and the Consent Decree require CPD to adopt and maintain a written policy governing officers' use of body-worn cameras. 50 ILCS 706/10-20(a); Consent Decree ¶238, Dkt.

1

703-1. Pursuant to Paragraph 627 of the Consent Decree, which permits the Monitor and the Office of the Illinois Attorney General ("OAG") to review and comment on all CPD policies that are required by the Consent Decree, OAG has reviewed and commented on numerous drafts of CPD's Special Order S03-14, "Body Worn Cameras," since 2021.[1] CPD and OAG successfully resolved many points of disagreement regarding the substance of the policy over the course of those reviews. However, OAG has consistently objected to the provisions of S03-14 and other related policies that require CPD officers to deactivate their body-worn cameras during Public Safety Briefings, which are prescribed questions posed by a CPD supervisor to an involved officer immediately after an officer-involved shooting or death. The parties were unable to come to an agreement regarding this provision.

As such, on January 22, 2024, the State filed Plaintiff's Motion for Judicial Resolution Under Paragraph 630 of the Consent Decree Regarding CPD's Body-Worn Camera Policy. Dkt. No. 1144. The parties fully briefed the motion and, on July 1, 2024, this Court issued a ruling directing the City and the CPD to provide revised drafts of S03-14 and related policies to the State and the Monitor by August 30, 2024 and to thereafter again follow the review and comment process laid out by Paragraphs 626-637 of the Consent Decree. Order Regarding the Chicago Police Department's Body Worn Cameras Policy and Public Safety Investigations 4, Dkt. No. 1190. Accordingly, CPD provided the relevant revised policies to the State and the Monitor on August 30, 2024, and the parties subsequently engaged in the Consent Decree policy review process. Between December 2024 and June 2025, the parties engaged in settlement discussions before this Court regarding the contested provisions of the policies. Although the issues in dispute

---

[1] For a more detailed discussion of the procedural history pre-dating the State's request for judicial intervention, refer to Plaintiff's Motion for Judicial Resolution Under Paragraph 630 of the Consent Decree Regarding CPD's Body-Worn Camera Policy. Pl.'s Mot. Judicial Resolution 3-6, Dkt. No. 1144.

2

have been narrowed, the parties have been unable to fully resolve their disagreement. As such, on June 10, 2025, this Court ordered the parties to submit written position statements regarding their remaining disagreements.

## II. RELEVANT CPD POLICY PROVISIONS[2]

### A. General Order G03-06-01, Firearm Discharge and Officer-Involved Death Incident – Immediate Response[3]

After an incident involving a CPD officer in which a person is shot or killed, involved officers must immediately notify the Office of Emergency Management and Communications ("OEMC"), and a CPD supervisor must immediately respond to the scene. *See* G03-06-01, Firearm Discharge and Officer-Involved Death Incident – Immediate Response §§ II.A, III.C.2, May 19, 2025 (Ex. 1). Upon arrival, the responding supervisor is required to conduct a "Public Safety Briefing" with the involved officer.[4] Ex. 1 § IV. According to policy, a Public Safety Briefing is only to be conducted "in the immediate aftermath of the incident up until the time that the incident scene is determined to be 'safe and secure' by an on-scene supervisor and an incident scene investigation can commence." Ex. 1 § IV.A.3. The briefing is typically required to be conducted "near or in close proximity to the incident scene." Ex. 1 § IV.A.4.

The Public Safety Briefing consists of a list of specific, prescribed questions, including questions about the existence and location of injured individuals; the number of rounds fired, in

---

[2] CPD policies that are currently in effect are available on CPD's public website. *See* CHI. POLICE DEP'T DEP'T DIRECTIVES SYS., https://directives.chicagopolice.org/ (last visited Aug. 21, 2025). In general, however, this position statement discusses and cites to CPD's most recent proposed revised versions of these policies, which CPD has shared with the Monitor and OAG. These draft revised policies are appended to this position statement as exhibits.
[3] OAG continues to object to certain other provisions of CPD's draft Firearm Discharge and Officer-Involved Death Incident policy suite, G03-06 et al., on other grounds unrelated to activation of body-worn cameras on the scene of such an incident. On July 11, 2025, pursuant to Paragraph 630 of the Consent Decree, the Monitor issued a proposed resolution to the parties' remaining disagreements regarding the draft G03-06 policy suite. The parties continue to discuss resolution of those disagreements.
[4] While referred to in the most recent proposed revisions of CPD policy as a "Public Safety Briefing," earlier iterations of CPD policy referred to this questioning as a "public safety investigation." *See, e.g.,* S03-14, Body Worn Cameras § V.C.2 (Aug. 8, 2024), https://directives.chicagopolice.org/#directive/public/6120.

3

what direction, and by whom; the existence, description, and direction and method of travel of at-large subjects; the existence and location of perishable evidence; and a catch-all question requesting any other information the supervisor may "need to know to ensure public safety, preserve perishable evidence, or secure the incident scene." *See* Ex. 1 § IV.C. The draft policy indicates that the purposes of a Public Safety Briefing are to "ensure public safety, preserve perishable evidence, and secure the incident scene when a continuing threat to public safety may exist." Ex. 1 § IV.A.1. The policy disclaims that the purpose of the briefing is investigatory. Ex. 1 § IV.A.2.

While the supervisor is questioning the involved officer, both are required to deactivate their "Department-issued recording equipment," including their body-worn cameras. Ex. 1 § IV.B. Once the briefing is complete, the supervisor is required to take possession of the involved officer's body-worn camera; the policy requires the supervisor, however, to reactivate their own body-worn camera and continue recording all other law enforcement-related activities. Ex. 1 §§ IV.B.1.a, IV.B.1.b. Meanwhile, all other officers on the scene who are not participating in the briefing do not deactivate their body-worn cameras but continue recording and deactivate their cameras only when instructed to by an on-scene supervisor, or at "the conclusion of the incident." Ex. 1 §§ IV.B.2.a, IV.B.2.b.

Based on the supervisor's assessment of the scene and the information from the Public Safety Briefing, the supervisor determines "when it is appropriate to declare the incident scene 'safe and secure,'" and is to notify OEMC when they make that determination. Ex. 1 §§ III.C.7, III.C.7.a. The scene may be considered safe and secure "when all of the following conditions are met: all offenders are in custody or otherwise not in the area, medical aid has been requested/administered or the Chicago Fire Department (CFD) is on the scene, the involved

4

officers have been identified, and the crime scene has been established." Ex. 1 § III.C.7.b.

### B. General Order G03-06-02, Firearm Discharge and Officer-Involved Death Incident – Investigation

Whereas G03-06-01 governs "the immediate notifications required, the immediate responsibilities of Department members, and the post-incident responsibilities of Department members for firearm discharge and officer-involved death incidents" (Ex. 1 § I), a separate written policy outlines the "investigative responsibilities of firearm discharge and officer-involved death incidents." G03-06-02, Firearm Discharge and Officer-Involved Death Incident – Investigation, § I.A, July 24, 2025 (Ex. 2).

Under the policy, a Street Deputy—a deputy chief assigned to the Street Operations Unit in the Office of the First Deputy Superintendent—should respond to the scene, take command of the scene, and personally conduct an investigation into the incident. *See* Ex. 2 §§ I.A, II.A.1, II.A.3. Upon arrival at the scene, the Street Deputy confers with the supervisor who conducted the Public Safety Briefing, and if "additional clarification" is deemed necessary in light of other available evidence, the Street Deputy may conduct a walk-through with any of the involved officers. Ex. 2 § II.A.4. Prior to conducting the walk-through, the Street Deputy must inform the involved officer that they could face administrative discipline if they fail to participate in the walk-through as ordered and that nothing they say may be used against them in a criminal proceeding. Ex. 2 § II.A.4.c.(1). Any walk-through is limited to "obtaining information needed for clarification of the incident and the immediate on-scene response" and is "conducted by the Street Deputy with any involved Department member individually, outside the presence of any other individual." Ex. 2 §§

5

II.A.4.c.(2), II.A.4.c.(3).[5] The walk-through is not recorded on the Street Deputy's body-worn camera. Ex. 2 § II.A.4.c.(4).

Finally, when personnel from the Civilian Office of Police Accountability ("COPA") arrive on scene, the Street Deputy is required to "provide a briefing of the incident to the COPA investigators," including walking through the incident scene and providing information obtained from the Public Safety Briefing and any walk-through of the incident conducted with the involved members. Ex. 2 §§ II.B, II.B.2, II.B.2.a, II.B.2.b, II.B.2.c.

### C. Special Order S03-14, Body Worn Cameras

CPD policy requires officers to "record all law-enforcement-related activities" on body-worn camera, except for the "limited exceptions specifically indicated in the law (50 ILCS 706/10) and Item V" of the policy. Special Order S03-14, Body Worn Cameras § V.A.1, May 16, 2025 (Ex. 3). Officers are required to activate their cameras at the beginning of an incident and continue recording "the entire incident for all law-enforcement-related activities." Ex. 3 § V.A.2. Officers are not permitted to deactivate their cameras until "the entire incident has been recorded and the member is no longer engaged in a law-enforcement-related activity." Ex. 3 § V.C.1.a.

The policy identifies four circumstances that constitute the conclusion of law enforcement-related activity, when officers are consequently permitted to deactivate their body-worn cameras: (1) when the officer has cleared the assignment (Ex. 3 § V.C.1.a.(1)); (2) when the officer has left the scene of the incident (Ex. 3 § V.C.1.a.(2)); (3) when transport of an arrestee has concluded (*see* Ex. 3 §§ V.C.1.a.(3), V.C.1.a.(3)(a), V.C.1.a.(3)(b)); and, (4) for a use of force, firearm discharge,

---

[5] A "Note" indicates that "[w]hile the questions asked during the walk-through may be similar to the initial Public Safety Briefing, the Street Deputy is not required to ask the same questions, in the same sequence, in their entirety, as the initial briefing." Ex. 2 § II.A.4.c.(2)NOTE. The policy does not limit the questions the Street Deputy may ask of the involved member during the walk-through.

6

or officer-involved death incident, when the scene has been declared "safe and secured" (Ex. 3 § V.C.1.a.(4)).

As noted above, the policy also recognizes four "exceptions" (Ex. C § V.A.1) when an officer is permitted to deactivate their body-worn camera: (1) when requested by a victim of a crime (Ex. 3 § V.C.1.b); (2) when requested by someone who wishes to report a crime (Ex. 3 § V.C.1.c); (3) when the officer is interacting with a confidential informant (Ex. 3 § V.C.1.d); and (4) when participating in a Public Safety Briefing on the scene of an officer-involved shooting or death incident (Ex. 3 § V.C.1.e). Finally, when an officer deactivates their camera "prior to the conclusion of an incident," pursuant to one of the exceptions in the policy described above, the officer is required to "reactivate their BWC after completing the necessary unrecorded activities and returning to other law enforcement-related activities regarding the incident. This may include but is not limited to . . . reactivating to return to crime scene processing by a supervisor after the completion of the Public Safety Briefing." Ex. 3 § V.C.4.b.

### III. GOVERNING LEGAL AND CONSENT DECREE PROVISIONS

#### A. Legal Standards

A consent decree is "essentially a contract" for purposes of construction, so principles of state contract law apply in a dispute over its terms. *Holmes v. Godinez*, 991 F.3d 775, 780 (7th Cir. 2021) (quoting *United States v. Alshabkhoun*, 277 F.3d 930, 934 (7th Cir. 2002)). Under Illinois law, the "'primary objective in construing a contract is to give effect to the intent of the parties,' which is best shown by the language of the contract itself." *Sterling Nat'l Bank v. Block*, 984 F.3d 1210, 1217 (7th Cir. 2021) (quoting *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007)). "All portions of a contract should be 'construed as a whole, viewing each part in light of the others.'" *Id.* (quoting *Gallagher*, 874 N.E.2d at 58). Accordingly, courts should "give meaning to every

provision of the contract and avoid rendering any provisions superfluous." *Id*.

When interpreting a statute, "a court's primary goal is to ascertain the intent of the legislature." *Land v. Bd. of Educ.*, 781 N.E.2d 249, 254 (Ill. 2002). The best evidence of the legislature's intent is the statute's language, which is given its plain and ordinary meaning. *Id*. Courts should view all the provisions of a statute together and construe words and phrases in light of other relevant statutory provisions. *People v. Gutman*, 2011 IL 110338, ¶ 12. When a statute is "susceptible to more than one equally reasonable interpretation, the court may look to additional sources to determine the legislature's intent." *Brucker v. Mercola*, 886 N.E.2d 306, 313 (Ill. 2007). Finally, courts presume that the legislature did not intend to create absurd results. *People v. Gutman*, 2011 IL 110338 ¶ 12; *People v. Collins*, 2020 IL App (1st) 181746 (holding that the Act did not create a hearsay exception because that would cause absurd results).

### B. Relevant Consent Decree and Statutory Provisions

Paragraphs 236-242 of the Consent Decree set forth the requirements for CPD's body-worn camera policy. Paragraph 236 requires CPD to maintain a body-worn camera policy that is "designed to increase officer accountability" and "improve trust and CPD legitimacy in the community." Consent Decree ¶236. Paragraph 238 requires that CPD's body-worn camera policy comply with the Law Enforcement Officer-Worn Body Camera Act. Consent Decree ¶238. That paragraph further specifies that, "subject to limited exceptions specified in writing," officers must activate their cameras when responding to calls for service and during all law enforcement-related activities and "continue recording until the conclusion of the incidents(s)." Consent Decree ¶238(b).

The Act requires that officers' "cameras must be turned on at all times when the officer is in uniform and is responding to calls for service or engaged in any law enforcement-related

8

encounter or activity that occurs while the officer is on duty." 50 ILCS 706/10-20(a)(3). The Act indicates that law enforcement-related encounters or activities include, but are not limited to:

> traffic stops, pedestrian stops, arrests, searches, interrogations, investigations, pursuits, crowd control, traffic control, non-community caretaking interactions with an individual while on patrol, or any other instance in which the officer is enforcing the laws of the municipality, county, or State. "Law enforcement-related encounter or activities" does not include when the officer is completing paperwork alone, is participating in training in a classroom setting, or is only in the presence of another law enforcement officer.

*Id.* § 706/10-10. Conversely, the Act requires officers' cameras to be turned *off* when the victim of a crime requests it, when a witness of a crime or a community member who wishes to report a crime requests it, when the officer is interacting with a confidential informant, and for certain activities by officers of the Department of Revenue. *Id.* § 706/10-20(a)(4).

IV.     **ARGUMENT**

This position statement addresses three unresolved issues with respect to the relevant CPD policies. First, CPD policy provisions that require body-worn cameras to be deactivated prior to Public Safety Briefings conflict with the Act and the Consent Decree, because the briefings are law enforcement-related encounters or activities and, relatedly, the briefings occur before the end of the "incident," as understood by the Consent Decree and CPD policy. Second, the Act and the Consent Decree require any subsequent "walk-through" conducted by an on-scene Street Deputy with an involved officer to be recorded on body-worn camera. Finally, by contrast, the Act and the Consent Decree do not require the on-scene Street Deputy to record on body-worn camera any briefing or walk-through provided to COPA personnel.

    A. **CPD policy, in requiring officers' body-worn cameras to be deactivated prior to a Public Safety Briefing, violates both the Act and the Consent Decree.**

The law and the Consent Decree prohibit CPD officers from deactivating their body-worn cameras for Public Safety Briefings, both because the briefing is a law enforcement-related

9

encounter or activity and because the "incident" remains ongoing at the time of the briefing. The Act requires officers to record on body-worn camera all law enforcement-related encounters or activities, and the Consent Decree specifies that, once an officer's camera has been activated during a law enforcement-related activity, it must "continue recording until the conclusion of the incident(s)." Consent Decree ¶238(b). Notably, although the Consent Decree acknowledges "limited exceptions specified in writing" when officers may *not* be required to continue recording until the end of the incident (*id.*), the Consent Decree cannot and does not permit officers to deactivate their cameras in a circumstance when the Act would require activation. *Cf.* Consent Decree ¶237 ("CPD will continue to require all officers . . . to wear body-worn cameras and microphones with which to record law-enforcement related activities as outlined in the Illinois Law Enforcement Officer-Worn Body Camera Act."). Thus, the "limited exceptions specified in writing" contemplated by Paragraph 238(b) only encompass those exceptions specifically permitted by the Act.

       1. *Public Safety Briefings are law enforcement-related encounters or activities.*

A CPD Public Safety Briefing is a law enforcement-related activity. CPD officers engaged in these briefings are enforcing the law, because many of the questions aim to apprehend and collect evidence against individuals suspected of a crime. *See, e.g., Hudson v. City of Chi.*, 378 Ill. App. 3d 373, 392-93 (2007) (attempting to apprehend a suspect is enforcing the law); *Jackson v. Kane Cty.*, 2021 IL App (2d) 210153, ¶ 13 (officers enforce the law when engaging in an investigation in order to enforce laws); *Fitzpatrick v. Chi.*, 492 N.E.2d 1292, 1296 (Ill. 1986) (enforcing the law means engaging "in a course of conduct designed to carry out or put into effect any law"); *Agwomoh v. Vill. of Dolton*, 2022 IL App (1st) 210892 ¶¶ 63–66 (officer enforced the law by accompanying DUI arrestee to hospital to maintain custody of him). In addition, a

conclusion that the briefings are law enforcement-related activities is reinforced by: (1) the definition of "law enforcement-related encounters or activities" in the Act; (2) CPD policy, and (3) ordinary, common-sense understanding.

First, the Act's definition supports that CPD Public Safety Briefings are "law enforcement-related encounters or activities." The Act defines law enforcement activities expansively, so as to bring more, rather than fewer, activities within its purview. The definition includes a long list of specific activities but also makes clear that the list of activities in the definition is illustrative and non-exclusive. *See* 50 ILCS 706/10-10 ("'Law enforcement-related encounters or activities' include, *but are not limited to*, traffic stops, pedestrian stops, arrests, searches, interrogations, investigations, pursuits, crowd control, traffic control, non-community caretaking interactions with an individual while on patrol, or *any other instance* in which the officer is enforcing the laws of the municipality, county, or State." (emphases added)). Thus, activities that are not precisely one of the activities listed in the definition but that resemble one of those activities should be considered to fall within the scope of the definition.

A Public Safety Briefing—one sworn officer asking another individual officer questions in an effort to secure evidence and apprehend at-large suspects—resembles both an interrogation and an investigation, both of which are included in the definition of law enforcement-related activities. The briefing is similar enough to activities specifically included in the Act's definition for the briefing itself to fall within the Act's ambit. Indeed, while CPD policy asserts that the briefing "is strictly used for the on-scene supervisor's immediate assessment and actions" (Ex. 1 § IV.A.1), the policies later make clear that the information gleaned from the Public Safety Briefing is shared with the on-scene Street Deputy (*see* Ex. 2 § II.A.4) and COPA personnel (Ex. 2 § II.B.2.b), both of whose roles are investigatory, highlighting that the briefing itself plays an investigatory role.

11

Additionally, the plain text of CPD policy avers that Public Safety Briefings are law enforcement-related encounters or activities. Special Order S03-14 establishes that, on the scene of an officer-involved shooting or death, the "conclusion of a law-enforcement-related activity" is when the scene is determined to be "safe and secured." Ex. 3 § V.C.1.a.(4). Meanwhile, General Order G03-06-01 *requires* Public Safety Briefings to take place *before* the scene is declared to be safe and secure and, thus, before the conclusion of law enforcement-related activities. *See* Ex. 1 § IV.A.3. Indeed, those officers participating in the Public Safety Briefing—the officer who discharged their firearm and the questioning supervisor—are the only officers on the scene of an officer-involved shooting or death subject to a different timeframe for body-worn camera deactivation. *See* Ex. 1 §§ IV.B.2, IV.B.2.a, VI.B.2.b ("On-scene Department members not participating in a Public Safety Briefing will: [ ] continue to electronically record all law-enforcement-related activities using their BWC while on-duty . . . " and will "not deactivate" their body-worn camera "until so directed by an on-scene supervisor or until the conclusion of the incident."); *see also* Ex. 3 §§ V.C.2.b, V.C.2.b.(1), V.C.2.b.(2). CPD policy has seemingly created an exception for officers participating in the Public Safety Briefing out of whole cloth. By contrast, every other exception in S03-14 when an officer is permitted or required to deactivate their body-worn camera despite being engaged in a law enforcement-related encounter or activity is an exception specifically authorized by the Act. *Compare* Ex. 3 §§ V.C.1.b (corresponding to 50 ILCS 706/10-20(a)(4)(A)), V.C.1.c (corresponding to 50 ILCS 706/10-20(a)(4)(B)), *and* V.C.1.d (corresponding to 50 ILCS 706/10-20(a)(4)(C)), *with* Ex. 3 § V.C.1.e (no analogous statutory provision).

Finally, a common-sense understanding of the functions of law enforcement agencies and officials supports that a Public Safety Briefing immediately after a police shooting or officer-

involved death is a law enforcement-related activity. Ensuring public safety—the first purpose of the Public Safety Briefing emphasized in G03-06-01 (*see* Ex. 1 § IV.A.1)—is one of the core functions of law enforcement that distinguishes sworn law enforcement officers from non-sworn civilians. The other stated purposes of the Public Safety Briefing—preserving perishable evidence and securing the incident scene (*see id.*)—are also activities firmly within the purview of law enforcement officers. In fact, CPD policy makes clear that COPA investigators—who are civilians, not law enforcement officers—are not granted access to the incident scene until the scene is safe and secure. *See* Ex. 2 § II.B.1. Thus, the Public Safety Briefing occurs on the incident scene at a point in time (before the scene is safe and secure) when only those engaged in law enforcement-related activities are permitted to be present.

The Act's definition of law enforcement-related encounters or activities, CPD policy, and common sense all make clear that CPD Public Safety Briefings are law enforcement-related activities. Consequently, the Act requires CPD officers' body-worn cameras to remain activated and continue recording during the briefings.

2. *Public Safety Briefings occur before the end of the "incident."*

CPD policy emphasizes that officers must not deactivate their body-worn cameras until "the entire incident has been recorded" (Ex. 3 § V.C.1.a; *see also* Ex. 3 § V.A.2), but the policy does not explicitly state when the "incident" ends. However, CPD policy implies that the "incident" is coextensive with "law enforcement-related encounters or activities," even using the terms interchangeably. *See, e.g.,* Ex. 3 §§ V.A.2, V.A.3 ("[T]he Department has identified the following circumstances as *the beginning of a law-enforcement-related activity*: . . . ."; ". . . if exigent circumstances prevent activating the BWC at *the beginning of an incident as defined above* . . . .") (emphases added).

As such, CPD policy implies that the "incident" ends at the moment that a scene is declared to be "safe and secure." The policies elucidate a distinctive shift that happens on the scene of an officer-involved shooting or death when the scene is declared safe and secure. Before that determination, officers are in "emergency mode"—requesting and providing medical attention, establishing an incident scene perimeter, ensuring public safety, and securing perishable evidence. *See* Ex. 1 §§ III.B, III.C, III.D; *cf.* Ex. 3 § V.C.1.a(4)(a). After the declaration that the scene is safe and secure, activities on the scene have a different focus. *See* Ex. 1 § IV.A.3 ("Public Safety Briefings will only be conducted . . . up until the time that the incident scene is determined to be 'safe and secure' by an on-scene supervisor *and an incident scene investigation can commence*." (emphasis added)). Additionally, as discussed above, S03-14 identifies the "safe and secure" declaration as the "conclusion of a law-enforcement-related activity" for the purpose of body-worn camera deactivation for use of force, police shooting, and officer-involved death incidents. *See* Ex. 3 § V.C.1.a(4). And of course, if the "safe and secure" determination represents the end of the "incident," Public Safety Briefings must occur before the end of the incident, since G03-06-01 requires them to take place before the scene has been declared safe and secure. *See* Ex. 1 § IV.A.3. Thus, since the Public Safety Briefing must occur before the conclusion of the "incident," Paragraph 238(b) of the Consent Decree requires the briefing participants' body-worn cameras to remain activated during the briefing.

       3. *Recording Public Safety Briefings on body-worn camera would not conflict with CPD officers' rights under any applicable collective bargaining agreement.*

Any argument that recording of the Public Safety Briefing would violate an officer's administrative proceedings rights or any applicable collective bargaining agreement is without merit. The State acknowledges that a CPD officer involved in a shooting or death is entitled to certain rights during the administrative investigation of that incident. But the recording or non-

14

recording of the Public Safety Briefing does not influence whether the briefing is part of an administrative investigation; the questions and responses that make up the briefing are the same whether or not they are recorded.[6] After all, under the Act, officers' body-worn cameras will have been recording all along up until the point that the briefing occurs—cameras are not being activated merely for the purpose of recording the briefing. Rather, there is no justification for *deactivating* cameras that would otherwise be recording.

      Under current CPD policy and under various previous iterations of CPD policy, Public Safety Briefings have been administered without any requirement that the administering supervisor advise the involved officer of their administrative proceedings rights prior to the briefing. Thus, through its policies and practices, the City and CPD have conceded that officers need not be advised of their administrative proceedings rights prior to the Public Safety Briefing. Indeed, the entity conducting the briefing—CPD—does not even have jurisdiction over the administrative investigation of an incident during which a Public Safety Briefing occurs. *See* MUN. CODE CHI. §§ 2-78-120(c), 2-78-120(d), 2-78-120(e). Finally, although the Consent Decree is not intended to alter the collective bargaining agreements between the City and its police unions or impair the rights of employees under those agreements, such allowance necessarily extends "unless such terms [of the collective bargaining agreements] violate the U.S. Constitution, Illinois law, or public policy." Consent Decree ¶711.

---

[6] Similarly, recording the Public Safety Briefing on body-worn camera has no effect on officers' rights under *Garrity v. New Jersey*, 385 U.S. 498 (1967). *Garrity* prevents a public employee's compelled statements from being used against them in a criminal proceeding. But again, the recording of the Public Safety Briefing, or lack thereof, does not affect whether the briefing is compelled or is made as part of a disciplinary investigation. Nor does recording of the briefing render admissible in any subsequent criminal case a statement that would be inadmissible had it not been recorded.

15

### B. The Act requires any "walk-through" conducted by an on-scene Street Deputy with an involved officer to be recorded on body-worn camera.

For largely the same reasons articulated above, any walk-through that a Street Deputy deems necessary to conduct with an involved officer is a law enforcement-related activity that should be recorded on body-worn camera. CPD policy is clear that the Street Deputy's role on the scene of an officer-involved shooting or death incident is investigatory. *See, e.g.,* Ex. 2 §§ II.A.1 (The Street Deputy is responsible for "ensur[ing] a complete and thorough on-scene investigation of the incident is conducted."), II.A.3 (The Street Deputy will "personally conduct and document an investigation into the circumstances surrounding the involved member's use of force."), II.A.12 (The Street Deputy will "direct additional investigatory actions."). Moreover, the policy makes clear that the circumstance under which a Street Deputy might order an involved officer to participate in a walk-through is when "additional clarification of [sic] incident" is necessary "to ensure a complete and thorough on-scene investigation." Ex. 2 § II.A.4. The Street Deputy's walk-through with the involved officer is an attempt to fact-find and is intended to inform the on-scene investigation. For these reasons, the walk-through is a law enforcement-related activity within the Act's definition and is required to be recorded on body-worn camera.

### C. Officers need not record on body-worn camera any briefing or walk-through provided to personnel from the Civilian Office of Police Accountability (COPA).

Although the Street Deputy provides a "briefing of the incident" to COPA investigators, including "walking through the incident scene" and "providing [them with] information obtained from the Public Safety Briefing" (Ex. 2 §§ II.B, II.B.2.a, II.B.2.b), this process is distinct from the Public Safety Briefing and walk-throughs conducted by CPD supervisors with the involved officer(s). When interacting with COPA, the Street Deputy is not engaged in a law enforcement-related activity, because they are conveying information to civilian members of COPA as part of

16

COPA's *administrative* investigation, as opposed to gathering information, as CPD officers do when engaged in a law enforcement investigation. As such, neither the Act nor the Consent Decree require briefings or walk-throughs conducted with COPA investigators to be recorded on body-worn camera.

## V.     CONCLUSION

CPD policy provisions that require body-worn cameras to be deactivated prior to Public Safety Briefings conflict with the Law Enforcement Officer-Worn Body Camera Act and the Consent Decree, because the briefings are law enforcement-related activities and occur before the end of the "incident," as contemplated by the Consent Decree and CPD policy. In addition, the Act and the Consent Decree require any "walk-through" conducted by an on-scene Street Deputy with an involved officer to be recorded on body-worn camera. As such, the State asks this Court to rule that CPD is required to revise its policies to require officers' body-worn cameras to remain activated and recording during Public Safety Briefings and walk-throughs conducted between on-scene supervisors and involved officers after an officer-involved shooting or death.

Dated: August 22, 2025

Respectfully submitted,

KWAME RAOUL
Attorney General for the State of Illinois

By: /s/ *Katherine Pannella*
      Senior Assistant Attorney General

Karyn L. Bass Ehler
*Assistant Chief Deputy Attorney General*
Chris Wells
*Chief, Public Interest Division*
Mary Grieb
*Deputy Chief, Civil Rights Bureau*
115 S. LaSalle Street
Chicago, Illinois 60603
katherine.pannella@ilag.gov
773-590-7083

17