# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:19-CV-00146-GNS-HBB

STEPHEN MAYES                                                        PLAINTIFF

v.

SIG SAUER, INC.                                                      DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion to Exclude Evidence and Opinions
of Plaintiff's Expert, Timothy M. Hicks (DN 70); Defendant's Motion to Exclude Evidence and
Opinions of Plaintiff's Expert, Peter Villani (DN 71); and Defendant's Motion for Summary
Judgment (DN 72). The motions are ripe for adjudication. For the reasons outlined below, the
motions are **GRANTED**.

## I.   STATEMENT OF FACTS

On October 30, 2018, Stephen Mayes ("Mayes") was shooting his new Sig Sauer P320 X
Carry 9MM pistol, which was designed and manufactured by Defendant Sig Sauer, Inc. ("Sig
Sauer"). (Compl. ¶¶ 7-8, 11, DN 1; Mayes Dep. 92:2-4, Mar. 31, 2021, DN 72-2). Mayes had the
gun in a holster on his hip and was preparing to draw the gun when it discharged, shooting Mayes
in the thigh. (Compl. ¶ 8-9; Mayes Dep. 97:8-12). Mayes alleges the pistol discharged without a

trigger pull, which Sig Sauer refutes.  (Compl. ¶ 8; Answer ¶ 9, DN 11; *see* Mayes Dep. 100:4-101:1).

Mayes initiated this action against Sig Sauer, alleging product liability claims sounding in strict liability, negligence, and breach of express and implied warranties, as well as claims under the Kentucky Consumer Protection Act.  (Compl. ¶¶ 43-48).  Sig Sauer moves to exclude two of Mayes' experts and for summary judgment, which Mayes opposes.  (Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert, DN 70 [hereinafter Def.'s Mot. Exclude Hicks]; Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert, DN 71 [hereinafter Def.'s Mot. Exclude Villani]; Def.'s Mot. Summ. J., DN 72; Pl.'s Resp. Def.'s Mots. Summ. J. & Exclude Pl.'s Experts, DN 83 [hereinafter Pl.'s Mem.]).

## II.      JURISDICTION

The Court has subject-matter jurisdiction of this dispute based upon diversity of citizenship.  *See* 28. U.S.C. § 1332(a)(1).

## III.      DISCUSSION

### A.      Defendant's Motions to Exclude Evidence and Expert Opinions

Sig Sauer contends that Timothy Hicks ("Hicks") and Peter Villani ("Villani") should be precluded from testifying as expert witnesses on the grounds that they are unqualified and their testimony is unreliable.  (Def.'s Mot. Exclude Hicks; Def.'s Mot. Exclude Villani).  Fed. R. Evid. 702 governs expert witness testimony and provides that an expert's opinion is admissible if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b)     the testimony is based on sufficient facts or data;
(c)     the testimony is the product of reliable principles and methods; and
(d)     the expert has reliably applied the principles and methods to the facts of the case.

The trial court must act as a gatekeeper and ensure that expert testimony is both relevant and reliable, as required by Fed. R. Evid. 104 and 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th. Cir. 2002). "It is the proponent of the testimony that must establish its admissibility by a preponderance of proof," and "[a]ny doubts regarding the admissibility . . . should be resolved in favor of admissibility." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10); *Commins v. Genie Indus., Inc.*, No. 3:16-CV-00608-GNS-RSE, 2020 U.S. Dist. LEXIS 43123, at *8 (W.D. Ky. Mar. 12, 2020) (alteration in original) (quoting *In re E.I. Du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 337 F. Supp. 3d 728, 739 (S.D. Ohio 2015)). "[R]ejection of expert testimony is the exception, rather than the rule," as "[t]he Court's gatekeeping role does not supplant the traditional adversarial system and the jury's role in weighing evidence." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (citation omitted); *Certain Underwriters at Lloyd's v. Morrow*, No. 1:16-CV-00180-GNS-HBB, 2019 U.S. Dist. LEXIS 130113, at *21 (W.D. Ky. Aug. 5, 2019) (citing *Rogers v. Detroit Edison Co.*, 328 F. Supp. 2d 687, 691 (E.D. Mich. 2004); *Stotts v. Heckler & Koch, Inc.*, 299 F. Supp. 2d 814, 819 (W.D. Tenn. 2004)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

### 1. *Qualifications*

The Court's role is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (citation omitted). "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are

not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (internal citation omitted) (citations omitted). "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* (internal citation omitted). Still, the "liberal interpretation of this requirement 'does not mean that a witness is an expert simply because he claims to be.'" *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citation omitted).

### a.  Timothy M. Hicks

Sig Sauer argues Hicks is not qualified to offer opinions about the alleged manufacturing or design defects in the pistol because (1) his engineering experience is primarily in automobiles; (2) "he had never fired, examined, or otherwise familiarized himself with the P320 model pistol," prior to this case and; (3) his only experience with firearms aside from personal experience is his certification to test the mechanical functioning of firearms for sale in California and Massachusetts. (Def.'s Mot. Exclude Hicks 10-11).

Hicks is a Principal Engineer who has nearly forty years of experience and is licensed in multiple states. (Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert Ex. G, at 1-3, DN 70-7 [hereinafter Hicks CV]). He holds a master's degree in engineering sciences and a bachelor's degree in mechanical engineering, as well as experience in mechanical design and system evaluations, having led advanced engineering teams. (Hicks CV 2; Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert Ex. F, at 1, DN 70-6 [hereinafter Hicks Report]). In his current role, Hicks conducts numerous investigations and certification tests on firearms and firearm safety devices. (Hicks Report 1). In addition to his work, Hicks is a member of the National Society of Professional Engineers, the American Society of Mechanical Engineers, and the Society of Automotive Engineers, of which he currently serves as the Chair of the Chicago section. (Hicks

Report 1).  Hicks also holds two patents regarding rear suspension in automobiles and has given two presentations about testing techniques for structural integrity and failure analysis to members of a variety of industries. (Hicks CV 4; Hicks Dep. 225:15-226:1, Mar. 9, 2022, DN 70-8).

Sig Sauer contends that because the bulk of Hicks' mechanical engineering experience is related to automobiles, he is not sufficiently qualified to offer opinions on the manufacturing or design of firearms.  (Def.'s Mot. Exclude Hicks 3).  The Sixth Circuit has previously held that an expert's "skill, education, and training in mechanical engineering render[ed] him competent to offer opinions on a variety of mechanical topics" despite the fact that he did not have any specialized knowledge specific to firearms.  *Palatka v. Savage Arms, Inc.*, 535 F. App'x 448, 455 (6th Cir. 2013); *see Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 294 (6th Cir. 2007) (holding that although an expert's proffered experience was not specific to a particular industry, his background and experience made him "well-positioned to 'assist the trier of fact' to make sense of" the evidence); *cf. Guay v. Sig Sauer, Inc.*, No. 20-cv-736-LM, 2022 U.S. Dist. LEXIS 121360, at *20 (D.N.H. July 11, 2022) ("[T]here is no indication that mechanics of guns are so specialized that a person requires a lifetime of experience specifically with guns or a particular gun to be able to opine about its design or manufacturing flaws.").  In his current role, Hicks "[p]erforms engineering investigations and failure analysis from a mechanical engineering perspective," which involves "design analysis, product liability, intellectual property, manufacturing, accident investigation and reconstruction, fire cause and origin, and component testing." (Hicks CV 1).  In these analyses, he has experience with vehicles, but also non-vehicles such as "medical, athletic, and wheelchair accessibility equipment," "consumer products," and "other mechanical systems." (Hicks CV 1).  Hicks' wide breadth of engineering experience and capabilities demonstrate that, like the expert in *Palatka*, he is "competent to offer opinions on a

variety of mechanical topics," including the mechanics of the pistol at issue. *Palatka*, 535 F. App'x at 455; *see Faughn v. Upright, Inc.*, No. 5:03-CV-00237-TBR, 2007 U.S. Dist. LEXIS 19341, at *12 (W.D. Ky. Mar. 15, 2007) ("[C]ourts have held that an expert witness need not have experience working in the specific industry he testifies about." (citing *Surles*, 474 F.3d at 294; *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997); *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991))); *Commins*, 2020 U.S. Dist. LEXIS 43123, at *12 (determining that "an engineer who intends to testify about . . . engineering aspects of a particular machine[]" was qualified (citation omitted)).  Any lack of direct firearm experience is more suitably addressed at cross-examination. *See Daubert*, 509 U.S. at 596.

Sig Sauer also contends Hicks' lack of familiarity with firearms in a professional setting renders him unqualified to offer opinions regarding any design or manufacturing defects of Mayes' pistol.  Sig Sauer asserts Hicks has never been involved with or witnessed the design and manufacture of a firearm, never published articles related to such topics, and never inspected or tested a P320 or a comparable firearm before this case.  (Def.'s Mot. Exclude Hicks 3).  Hicks' lack of involvement in the manufacture and design of a firearm is immaterial to his ability to assess Mayes' firearm for defects, considering his general design and manufacturing experience.  *See Palatka*, 535 F. App'x at 454-55 (determining an expert was qualified even though "he [was] not a firearms expert and ha[d] not consulted in the design or manufacture of a firearm."); (Hicks Dep. 226:6-15, 226:21-227:4, DN 70-8).  It is also immaterial that Hicks has not published articles about the design and manufacture of firearms.  *See Faughn*, 2007 U.S. Dist. LEXIS 19341, at *9-10 (determining that an expert was qualified to testify despite the fact that he had not "authored reports, texts, or articles" about the subject matter to which he was meant to testify).  Furthermore, the fact that Hicks has not inspected a P320 or a comparable firearm before this case does not

render him unqualified to testify as an expert.  Hicks has significant mechanical engineering experience as well as familiarity with the component parts of firearms and is certified to identify malfunctions.  (Hicks CV 1-4; Hicks Report 1; Hicks Dep. 57:18-58:14, DN 70-8).  These qualifications are sufficient to overcome the purported shortcomings, as "[t]he law does not require that [an expert] be the most qualified expert conceivable, only that he will 'assist the trier of fact in understanding and disposing of issues relevant to the case.'"  *Faughn*, 2007 U.S. Dist. LEXIS 19341, at \*10 (quoting *Pride*, 218 F.3d at 578).

Finally, Sig Sauer argues that Hicks' certifications to test firearms in California and Massachusetts are insufficient to demonstrate that he is qualified to testify as an expert.  (Def.'s Mot. Exclude Hicks 11).  California's certification process required Hicks to apply, subject his facilities to an inspection, demonstrate for the certifying body that he could conduct firearm tests, and then produce a report compliant with its procedures.  (Hicks Dep. 56:23-57:2, DN 70-8).  With this certification, Hicks evaluates firearms and determines whether a specific model can be certified for sale in California, which he accomplishes by identifying that a firearm model meets certain loaded-round indicator requirements, firing six hundred rounds through each sample with incremental inspections, recording evident malfunctions, "field stripping" the model to look at the component parts, checking if all fasteners are tight, and conducting a drop test.  (Hicks Dep. 57:20-58:12, DN 70-8).  This experience alongside Hicks' engineering career and education is sufficient to render him qualified in identifying any alleged defects in Mayes' pistol.  *See Faughn*, 2007 U.S. Dist. LEXIS 19341, at \*10.

Sig Sauer cites to *Whybark v. Synthes, Inc.*, No. 5:15-CV-00084-GNS-LLK, 2017 U.S. Dist. LEXIS 67988 (W.D. Ky. May 4, 2017), to support its contention that Hicks is not qualified. (Def.'s Mot. Exclude Hicks 11-12).  The facts in *Whybark*, however, are distinguishable from the

7

present action.  In *Whybark*, the plaintiff sought to present a physician who would testify that a broken bone screw potentially had a defect, but the physician had no manufacturing or engineering experience.  *Whybark*, 2017 U.S. Dist. LEXIS 67988, at *9, *12.  Ultimately, the physician was excluded because his "opinion as to a defect in manufacture of the bone screw relate[d] to a field entirely different from his medical background."  *Id.* at *12.  Hicks is not being proffered to offer his opinion regarding a field outside of his own; he is an engineer seeking to testify about engineering defects.  Additionally, he has general design and manufacturing experience, unlike the doctor in *Whybark*.  (Hicks Dep. 226:6-15, 226:21-227:4, DN 70-8).

Therefore, Sig Sauer's arguments regarding Hicks' qualifications are unavailing at this stage, as "[g]aps in [his] qualification or knowledge generally go to the weight of the . . . testimony, not its admissibility."  *Faughn*, 2007 U.S. Dist. LEXIS 19341, at *12 (first alteration in original) (citation omitted); *see Daubert*, 509 U.S. at 596 (citation omitted).[1]

### b.   Peter Villani

Sig Sauer similarly maintains that Villani is not qualified to opine about alleged manufacturing or design defects in the pistol because he is not an engineer, has never taken any engineering coursework, and does not have any experience in firearm design and manufacturing. (Def.'s Mot. Exclude Villani 2).

Villani is a former police officer currently employed as an operations officer for the United States Department of Veteran Affairs Police.  (Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert

---

[1] Sig Sauer alleges that Mayes conceded Hicks is not qualified to offer opinions regarding design defects, as Mayes stated that Hicks "limits his report to how this specific product, the Sig P320, has failed due to manufacturing defects."  (Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert 3, DN 86 (quoting Pl.'s Mem. 23)).  Interpreting this statement as a concession of Hicks' qualifications is attenuated at best, as it is merely an effort to explain the scope of Hicks' report. (*Cf.* Hicks Report 3, 5-7 (noting both design and manufacturing defects); Hicks Dep. 226:6-15, DN 70-8 (discussing Hicks' general design experience)).

Ex. I, DN 71-9 [hereinafter Villani CV]).  He has worked as a manager at a gun range where he taught gun safety courses and performed cleaning and maintenance on customers' firearms, including replacement of broken components.  (Villani CV; Villani *Guay*[2] Dep. 46:18-23, 47:17-20, Mar. 1, 2022, DN 71-10).   These responsibilities required him to fully disassemble the pistols and remove the components.  (Villani *Guay* Dep. 50:17-25).  Villani performs similar tasks in his current role with the Veteran Affairs Police.  (*See* Villani *Guay* Dep. 54:24-55:7).  He is also a certified armorer and has obtained a certification from Sig Sauer for the P320.  (Villani *Guay* Dep. 55:17-23; Pl.'s Resp. Def.'s Mots. Summ. J. & Exclude Pl.'s Experts Ex. 9, DN 83-9).

Villani's lack of design and manufacturing experience renders him unqualified to offer opinions regarding alleged design and manufacturing defects.  Villani's qualifications amount to experience in handling, assembling, and disassembling firearms, which are insufficient qualifications for him to testify about the alleged defects.  In fulfilling his responsibilities as an armorer, customers would bring Villani guns with "[b]roken firing pins, broken extractors, failures to feed, damaged magazines . . . [and] really filthy guns that wouldn't operate because they were so filthy the gun wouldn't even cycle properly," so his responsibilities were largely replacing broken parts and performing routine cleaning and maintenance.  (Villani *Guay* Dep. 47:9-16; *see* Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert Ex. F, DN 87-6).  Although this role provided Villani with the ability to identify broken parts, damage to a gun, or some other abnormality, his experience does not go so far as to qualify him to testify about the cause of such damage or abnormality.  Although he can adequately identify a problem, there is nothing in Villani's

---

[2] Plaintiff's experts were hired to offer opinions in cases in addition to the current action.  To avoid duplicative deposition questions, some generally applicable information was collected in depositions for the other cases and submitted to the record in this case.

experience that enables him to identify whether the cause of a problem is in fact a design or manufacturing defect versus damage from ordinary use or misuse by the owner of the gun.

Moreover, Villani has no relevant experience with manufacturing or designing commercial products. (Villani *Frankenberry* Dep. 120:1-7, 120:22-24, June 18, 2021, DN 87-5. *But see* Villani *Guay* Dep. 57:19-58:2 (noting that Villani has designed and manufactured a holster made out of two pieces of leather for his personal use)). This is a significant distinction because he lacks the "scientific, technical, or other specialized knowledge" to be able to opine about manufacturing and design defects given that he has no familiarity or experience to support those opinions. *See* Fed. R. Evid. 702. This is in contrast to Hicks, who has design and manufacturing experience as an engineer. Villani is more akin to the expert in *Whybark* than he is to Hicks, because if permitted to testify, he would be providing expert opinions in a field entirely different than his own. *See Whybark*, 2017 U.S. Dist. LEXIS 67988, at *12.

Mayes' contends that "Villani need not possess a degree in mechanical engineering . . . to have extensive 'specialized knowledge' in firearms . . . ." (Pl.'s Mem. 4). Indeed, he does not need to have a degree; however, he must have experience with designing and manufacturing processes to be able to opine about defects resulting from those processes. The issue with Villani's qualifications is that he possesses no experience whatsoever with designing or manufacturing products. For that reason, he is unqualified to offer expert testimony as to the existence of alleged design or manufacturing defects in Mayes' pistol.

Given that both experts opinions rely on substantially similar theories and methods, the reliability of their testimony will be jointly considered, notwithstanding Villani's lack of qualifications.

### 2.      *Reliability*

When determining the reliability of an expert's testimony, a key is "whether the reasoning or methodology underlying the testimony is sufficiently valid . . . ." *Daubert*, 509 U.S. at 592-93. The Supreme Court has advised, however, that the inquiry is flexible and that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95. Thus, there is no definitive checklist for determining whether an expert's testimony is reliable, but *Daubert* outlines a non-exhaustive list of factors for courts to consider: (1) whether the theory or method in question "can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"; (3) whether it has a "known or potential rate of error"; and (4) whether the theory or technique enjoys "general acceptance" in the "relevant scientific community . . . ." *Id.* at 593-94 (citation omitted).

Where a party challenges the testimony of a proffered expert for insufficient "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (alteration in original) (quoting *Daubert*, 509 U.S. at 592). *Daubert* involves balancing the desire to liberally admit relevant evidence against the necessity of excluding misrepresentative "junk science." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009). Ultimately, "the trial judge . . . ha[s] considerable leeway in deciding . . . whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152; *Conwood Co.*, 290 F.3d at 792; *see Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671-72 (6th Cir. 2010) ("Rule 702, we recognize, does not require anything approaching absolute certainty. And where one person sees speculation, we acknowledge, another may see knowledge, which is

why the district court enjoys broad discretion over where to draw the line." (internal citation omitted) (citation omitted)).

"The subject of an expert's testimony must be 'scientific . . . knowledge.'" *Daubert*, 509 U.S. at 589-90. The gatekeeping obligations in *Daubert* only applied to "scientific knowledge," but were later extended to include "testimony based on 'technical' and 'other specialized' knowledge." *Id.* at 592; *Kumho Tire Co.*, 526 U.S. at 141, 152. "[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. "[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably there are no certainties in science." *Id.* As the Supreme Court has noted:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and opinion offered.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted).

The Sixth Circuit has noted "[r]ed flags that caution against certifying an expert," such as "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citation omitted); *cf. Clark v. Takata Corp.*, 192, F.3d 750, 757 (7th Cir. 1999) ("We have held that a district court is required to rule out 'subjective belief or unsupported speculation' by considering 'whether the testimony has been subjected to the scientific method." (citation omitted)); *Scientific Method, Black's Law Dictionary* (11th ed. 2019) ("The process of generating hypotheses and testing them through experimentation, publication, and replication."). Ultimately, it is Mayes' burden to establish that his proffered experts' "theories are reliable and adequately supported by sound technical data, methodology and testing." *Berry v. Crown Equip. Corp.*, 108 F. Supp. 2d 743, 754 (E.D. Mich. 2000) (citation omitted).

Mayes submits Hicks' and Villani's opinions to support his claims that there are multiple defects in Mayes' pistol. Hicks and Villani were present for the inspection of Mayes' P320 and several other firearms on March 18, 2021. (Hicks Report 1; Pl.'s Resp. Def.'s Mots. Summ. J. & Exclude Pl.'s Experts Ex. 8, at 5, DN 83-8 [hereinafter Villani Suppl. Report]). Hicks' report describes the process used to inspect and examine the guns and notes tests performed by a Sig Sauer expert under laboratory conditions. (Hicks Report 2). Hicks and Villani based their opinions on their review of CT scan images of the gun, close up images of the surfaces of the striker foot and sear face inside the gun's fire control unit, a simulation of the gun's mechanics developed by an independent third party, viewing the function test performed by Sig Sauer's expert and the single cycle that Hicks performed, several other P320s allegedly containing the same defects, and the facts of the incident provided by Mayes' counsel in the form of the Complaint filed in this action. (Hicks Dep. 27:7-8, DN 70-8; Hicks Dep. 14:12-17, Mar. 9, 2022, DN 88-2; Hicks *Guay* Dep. 32:10-15, DN 70-10, Villani Suppl. Report 5-6).

According to Hicks' theory, two internal safeties within the pistol have to be overcome for the P320 to discharge without a trigger pull: (1) the striker foot-to-sear interface and (2) the safety lock. (Hicks Dep. 129:2-9, DN 70-8). Hicks opines that low friction between the striker foot and the sear can result in the disengagement of the two parts. (Hicks Dep. 117:2-8, DN 70-8). If those two parts lose connection due to the striker foot rotating enough either to the left or right to cause the striker foot to disconnect from the sear, the firearm could discharge. (Hicks Dep. 192:9-13). Hicks also claims that disengagement can occur where the striker foot moves up and the sear moves down due to the inertia from the weapon being carried. (Hicks *Jinn* Dep. 117:1-5, Mar. 10, 2022, DN 70-9). Hicks also theorizes that a defect in the safety lock, coupled with a defect in the striker foot, can lead to an uncommanded discharge if the safety lock fails to restrain the striker foot from

propelling forward to strike the loaded cartridge.  (Hicks Dep. 175:16-18, 176:5-9, DN 70-8).

Villani utilizes a similar theory, based primarily on the existence of "rollover," which is "excess

molding material left over from the manufacturing process that hasn't been removed before

installation of that part into the product."  (Villani *Guay* Dep. 90:8-11).  He contends that

"rollover" can reduce the contact area between components and thus cause them to disengage,

resulting in an uncommanded discharge.  (Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert Ex.

H, at 12, DN 71-8 [hereinafter Villani Report]; *see* Villani Dep. 12:21-25, DN 71-11).

Based on his review, Hicks identified five allegedly defective conditions in Mayes' P320.

First, there was no secondary processing of the surface of the interface between the sear and striker

foot, resulting in diminished quality of the interface.  (Hicks Report 10).  He alleges that these

components, which are produced using a Metal Injection Molding ("MIM") process, are usually

secondarily processed to eliminate any variation on critical surfaces, such as the interface here.

(Hicks Report 3; *see* Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert, Ex. C, at 38, DN 87-3

[hereinafter Watkins Report]).  Mayes' firearm allegedly had inconsistencies on the surface area

of the interface and a raised area around the periphery of the interface surface ("rollover")  which

minimized the contact area and increased the likelihood that the components would disengage,

leading to a discharge.  (Hicks Report 4).  Second, Hicks identified an "[a]xial variation of the

striker pin after each slide movement causing misalignment of [the] safety lock tab to striker pin,

and the striker foot lateral position to the sear step face."  (Hicks Report 10).  These misalignments

similarly resulted in a less secure interface between the components, making an uncommanded

discharge more likely.  (Hicks Report 7).  Hicks also discussed a third defective condition,

specifically the "[a]bility of the slide (and therefore the strike assembly) to move vertically relative

to the sear reducing the interfacing surface contact area even further."  (Hicks Report 10).  He

opined that a minimal amount of overlap between the components means that the striker could move forward and discharge a round with only minor trigger movement. (Hicks Report 5). The fourth defect Hicks identified was that "[t]he sear is unable to fully rotate forward to allow flat engagement of the striker foot." (Hicks Report 10). The final defect discussed is that the pistol does not have a safety lever return spring, which "allows the lever to rotate out of position when the pistol is carried in a muzzle down orientation." (Hicks Report 10). Villani identified similar defects, as well as others, all contributing to contact surface area deficiency that resulted in an uncommanded discharge. (Villani Report 10, 12-13; Villani Suppl. Report 1-3).

Sig Sauer's main contention is that Hicks' and Villani's opinions should be excluded as unreliable because they have done no testing to support their theories. (Def.'s Mot. Exclude Hicks 2, 6-8, 14). Sig Sauer notes that Hicks' determinations are based on only visual inspections of the subject pistol and exemplar pistols. (Def.'s Mot. Exclude Hicks 4). Thus, Sig Sauer maintains these experts cannot prove the defects identified can cause a discharge without a trigger pull because they conducted no physical testing to replicate a P320 discharge. (Def.'s Mot. Exclude Hicks 8; *see* Hicks Dep. 117:2-13, 234:5-10, DN 70-8).

Indeed, Hicks admitted that no testing has been conducted to confirm that the sear and striker can lose connection due to the striker foot rotation; he has no calculations regarding the extent to which contact surface area is needed to prevent a loss of engagement or how much inertia would be required to move the sear down. (Hicks Dep. 117:14-17, 192:14-19, DN 70-8; Hicks *Jinn* Dep. 117:18-21, DN 70-9). Villani similarly conceded that he had conducted no testing to support his theories. (Villani *Guay* Dep. 83:24-25, Mar. 1, 2022, DN 87-1; *see* Villani *Guay* Dep. 101:1-4, 102:6-10, 109:13-19; Villani Dep. 14:16-19). In response, Hicks contends that the striker foot had to have "walked off" the sear, as there is no other means besides pulling the trigger for

the firearm to discharge.  (Hicks Dep. 129:19-22, DN 70-8).  Further, he supports his theories by citing his review of videos of other P320 discharges, although he was not aware of any such discharge occurring without trigger movement.  (Hicks Dep. 169:4-9, DN 70-8; *see* Hicks *Jinn* Dep. 103:7-20, Mar. 10, 2022, DN 86-4 (noting that Hicks conducted no independent analysis regarding the cause of the recorded discharges); *see also* Knox Decl. ¶¶ 6, 8, DN 86-6; Burmester Decl. ¶ 2, DN 86-7).

"[H]ands-on testing is not an absolute prerequisite to the admission of expert testimony, but the theory here easily lends itself to testing and substantiation by this method, such that conclusions based only on personal opinion and experience do not suffice."  *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) (citation omitted); *accord Johnson ex rel. Gilfeather v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 431 (6th Cir. 2007) (quoting *Dhillon*, 269 F.3d at 870).  Furthermore, opinions amounting to no more than a hypothesis are not reliable, despite how convincing they may appear.  *Ada-Es, Inc. v. Big Rivers Elec. Corp.*, No. 4:18-CV-00016-JHM, 2020 U.S. Dist. LEXIS 219073, at *9 (W.D. Ky. Nov. 23, 2020).  Opinions that are based solely on the occurrence of an accident or on "conjecture and speculation" are unreliable and should be excluded.  *Berry*, 108 F. Supp. 2d at 755 (citation omitted).

Both Hicks' and Villani's opinions are insufficiently reliable to warrant admission in this case, as they are not based on tested or otherwise corroborated theories.  Neither of the experts have conducted physical testing on Mayes' pistol specifically, nor any other pistol to support their theory regarding the amount of rollover needed to cause an uncommanded discharge.  (Hicks Dep. 117:2-13, 192:14-19, DN 70-8; Villani *Guay* Dep. 101:1-4, 102:6-10, 109:13-19; *see* Villani *Frankenberry* Dep. 127:18-21 (admitting that he did not adhere to a specific methodology)).  They also do not offer any calculations to support their theories.  (Hicks Dep. 117:14-17, DN 70-8;

Hicks *Jinn* Dep. 117:18-21, DN 70-9).  Plainly, both experts opine that a raised surface on the interface between components of the gun *could* result in an uncommanded discharge in theory. But neither Hicks nor Villani offers any evidence suggesting that such an uncommanded discharge occurs generally or that it did in this case.  Mayes has offered the bare hypotheses of both Hicks and Villani, which fall short of admissibility.

To be sure, it is not required that the experts conduct a litany of tests on Mayes' specific pistol, but rather, they must demonstrate that their theories have some empirical evidence to support the assertion that the alleged defects have been found to cause uncommanded discharges. *See Reynolds v. Freightliner LLC*, No. 05-70-GFVT, 2006 U.S. Dist. LEXIS 97244, at *28 (E.D. Ky. June 21, 2006) ("Absent some formulaic process involving engineering or other mathematical principles, the [c]ourt is unable to determine how [an expert] could have surmised or even began to calculate the forces involved [and] reach his conclusions.").  Hicks' and Villani's theories have no such support; they have identified no publications recognizing their theory, they have not subjected their opinions to peer review, and they have not demonstrated that their theories are generally accepted in the relevant communities. *See Daubert*, 509 U.S. at 593-94.  As presented, Hicks and Villani offer no more than "conjecture and speculation." *See Berry*, 108 F. Supp. 2d at 755.  Ultimately, there is an "analytical gap" between the theories proffered and the assertion that the alleged defects cause uncommanded discharges. *Gen. Elec. Co.*, 522 U.S. at 146 (citation omitted).  Therefore, both experts must be excluded as their opinions are unreliable.

Mayes does not dispute that neither Hicks nor Villani have tested their theories.  Instead, he argues that the *Daubert* factors are not stringent, and any testing would be too dangerous for the experts to conduct.  (Pl.'s Mem. 13, 23).  Indeed, *Daubert* is a flexible test, but that contention cannot overcome the necessity that expert opinions be more than a "subjective belief or

unsupported speculation," which is all that these opinions amount to. *Daubert*, 509 U.S. at 590; *see id.* at 594-95. Furthermore, Mayes has not met his burden to demonstrate that possible testing is so dangerous that his experts could not have attempted to undertake any empirical assessment of their theories. *See generally Berry*, 108 F. Supp. 2d at 754 (stating that it is the Plaintiff's burden to demonstrate that an expert's opinion is reliable). Indeed, Hicks stated that drop testing[3] could create inertial forces causing "the sear to lose its grip on the striker foot[,]" although not a direct comparison. (Hicks *Guay* Dep. 37:4-18; *see* Hicks *Jinn* Dep. 106:15-18, DN 83-6). Additionally, vibration testing can be utilized to test these theories, considering Sig Sauer has conducted such tests. (Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert 10, DN 87 ("Sig has produced testing conducted by Dayton T. Brown, Inc. . . . demonstrating that the P320 will not fire due to vibration or jostling without trigger actuation." (emphasis omitted) (footnote omitted))); *see* Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert Ex. H, DN 87-8).

Based upon the foregoing, Hicks and Villani cannot testify as expert witnesses in this matter. As such, Sig Sauer's motions to exclude are granted.

### B. Defendant's Motion for Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thereafter, the burden shifts to the nonmoving party to present specific facts indicating a genuine issue of a disputed material fact essential to the

---

[3] Drop testing is a testing method Hicks uses when certifying firearms, which consists of a "pneumatic clamp-grip system set up where the firearm is inserted . . . and once it's ready, [he] activate[s] the switch to drop the weapon into a . . . 6-by-6 piece of concrete that is at least three inches or three and a half inches thick." (Hicks Dep. 58:19-23, DN 70-8).

case, beyond "some metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The nonmoving party must present facts demonstrating a material factual dispute that must be presented to "a jury or judge to resolve the parties' differing versions of the truth at trial[;]" the evidence, however, is "not required to be resolved conclusively in favor of the party asserting its existence . . . ." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). When considering the evidence, the Court must view it in the light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). If the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, the motion should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

"The [Kentucky Product Liability Act] applies to all damage claims arising from the use of products, regardless of the legal theory advanced." *Monsanto Co. v. Reed*, 950 S.W.2d 811, 814 (Ky. 1997); *see* KRS 411.300(1); *see also Thacker v. Ethicon, Inc.*, 47 F.4th 451, 459 (6th Cir. 2022). A plaintiff may advance a product liability action under theories of strict liability, negligence, and breach of warranty. *Prather v. Abbott Lab'ys*, 960 F. Supp. 2d 700, 705 (W.D. Ky. 2013) (citing *Williams v. Fulmer*, 695 S.W.2d 411, 413 (Ky. 1985)). The Kentucky Product Liability Act recognizes claims based on defective design and manufacture and failure to warn. *Id.* (citing *Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 251 (Ky. 1995)); *cf. Red Hed Oil, Inc. v. H.T. Hackney Co.*, 292 F. Supp. 3d 764, 772 (E.D. Ky. 2017) (noting that each theory constitutes separate and distinct claims (citing *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 79 (Ky. 2010))). In such actions, the plaintiff must show that the product had a defect and that the defect caused the alleged damages. *Prather*, 960 F. Supp. 2d at 706 (citing *McCoy v. Gen. Motors Corp.*, 47 F. Supp. 2d 838, 839 (E.D. Ky. 1998); *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1995)).

### 1.    *Existence of Defects*

Sig Sauer's motion for summary judgment must be granted because there is no genuine issue of material fact regarding the existence of a design or manufacturing defect in the P320. Under Kentucky law, expert witnesses are "generally necessary" to prove the presence of a defect in a products liability action. *Honaker v. Innova, Inc.*, No. 1:04-CV-132(M), 2007 U.S. Dist. LEXIS 30225, at *4 (W.D. Ky. Apr. 23, 2007) (quoting William S. Haynes, *Kentucky Jurisprudence: Torts* §§ 21-28 (1987)).  As the Sixth Circuit has explained,

> Expert testimony may be required in cases in which the question is of a complex and technical nature such that a lay juror could not, without the aid of the expert, infer that a defective condition of the product caused the product's failure and caused the injury to the plaintiff.

*Stevens v. Keller Ladders*, 1 F. App'x 452, 458 (6th Cir. 2001) (citation omitted).  By contrast, "matters of general knowledge" do not require expert testimony.  *Honaker*, 2007 U.S. Dist. LEXIS 30225, at *5; *accord Commonwealth, Dep't of Highways v. Robbins*, 421 S.W.2d 820, 824 (Ky. 1967) ("[A] proper understanding of that which requires scientific or specialized knowledge and which cannot be determined intelligently from testimony on the basis of ordinary knowledge gained in the ordinary affairs of life, expert testimony is needed." (citation omitted)).  Accordingly, expert testimony is necessary unless a defect is of the type that the jury can comprehend "as well as a specially trained expert could . . . ."  *Burgett v. Troy-Bilt LLC*, 970 F. Supp. 2d 676, 681 (E.D. Ky. 2013) (citation omitted), *aff'd*, 579 F. App'x 372 (6th Cir. 2014).  "[C]ourts permit[] inferences of defects premised on . . . circumstantial evidence *only* when the plaintiffs [are] able to eliminate all other reasonable explanations for the accident, thereby leaving manufacturing defect as the only reasonabl[e] possibil[ity] . . . ."  *Siegel v. Ky. Farm Bureau Mut. Ins. Co.*, No. 3:08CV-00429-S,

2010 U.S. Dist. LEXIS 74876, at *11-12 (W.D. Ky. July 26, 2010) (citations omitted), *aff'd sub nom. Siegel v. Dynamic Cooking Sys., Inc.*, 501 F. App'x 397 (6th Cir. 2012) (emphasis added).

The inner workings and mechanics of the P320 are not "matters of general knowledge," but instead involve a complex and technical understanding of firearms, engineering, and physics to fully determine whether a defect exists.  *See Honaker*, 2007 U.S. Dist. LEXIS 30225, at *5; *Stevens*, 1 F. App'x at 458.  Furthermore, any circumstantial evidence offered by Mayes cannot eliminate all other reasonable explanations for the accident because there remains a dispute as to whether Mayes pulled the trigger, given there were no witnesses to the accident.  (Mayes Dep. 92:2-5.  *Compare* Mayes Dep. 100:21-101:4 (stating that Mayes did not pull the trigger), *with* Watkins Report 3 (asserting that "[n]o physical or empirical evidence . . . suggests the subject pistol was capable of discharging absent a trigger pull in a manner consistent with Mr. Mayes' testimony.")).

Fed. R. Civ. P. 56 requires entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element for which that party will bear the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322.  Given that Hicks and Villani are Mayes' only witnesses to testify about the P320's alleged defects and they have been excluded as experts, Mayes is left with no expert witnesses to testify regarding the alleged defect with Mayes' P320. Sig Sauer correctly asserts that Mayes did not meet his burden of demonstrating causation between the alleged defect and Mayes' injury.  (Def.'s Mot. Summ. J. 6-8.)  As "expert witnesses are generally necessary, indeed essential, in products liability cases . . . to prove such matters as a product defect *and* proximate causation[.]"  *Fimbres v. Garlock Equip. Co.*, No. 3:11-CV-226-

CRS-JDM, 2014 U.S. Dist. LEXIS 79384, at *10-11 (W.D. Ky. June 11, 2014) (alteration in original) (emphasis added) (citation omitted).

Thus, with no evidence to establish a defect or causation with respect to the P320, Mayes cannot establish an essential element of his product liability claims for negligence or defective design and manufacture.  Accordingly, Sig Sauer's motion must be granted.

### 2. *Breach of Express and Implied Warranties*

Sig Sauer also moves for summary judgment on Mayes' product liability claims based on breach of express and implied warranties.  (Def.'s Mot. Summ. J. 9-10).  Mayes has not attempted to argue a breach of express or implied warranty in his response to Sig Sauer's motion for summary judgment, nor has Mayes otherwise furthered these claims, which are therefore dismissed. *Alexander v. Carter*, 733 F. App'x 256, 261 (6th Cir. 2018) ("When a plaintiff 'fails to address [a claim] in response to a motion for summary judgment,' the claim is deemed waived.  Where claims are so waived, district courts in this Circuit grant summary judgment as a matter of course." (alteration in original) (internal citation omitted)).[4]

### IV.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows: Defendant's Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Timothy M. Hicks (DN 70) is **GRANTED**; Defendant's Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Peter Villani (DN 71) is **GRANTED**; and Defendant's Motion for Summary Judgment (DN 72) is

---

[4] In addition to the claims addressed, two causes of action asserted in the Complaint were not argued in Sig Sauer's motion for summary judgment.  Mayes has also asserted claims based on a failure to warn as well as violation of the Kentucky Consumer Protection Act.  (Compl. ¶¶ 47-48).  As neither of these causes of actions were substantively addressed in the motions considered here, those claims remain.

**GRANTED**.  Plaintiff's failure to warn and Kentucky Consumer Protection Act claims are still

pending.

Greg N. Stivers, Chief Judge

United States District Court

March 29, 2023

cc:     counsel of record

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Derick Ortiz

     v.

                             Case No. 19-cv-1025-JL

Sig Sauer, Inc.

JUDGMENT


     In accordance with the Order by District Judge Joseph N. Laplante, dated March 23, 2020, and the Stipulation of Dismissal filed by counsel on January 23, 2024, judgment is hereby entered.


                               By the Court:


                               /s/ Daniel J. Lynch
                               Daniel J. Lynch
                               Clerk of Court


Date: January 24, 2024

cc:  Counsel of Record

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Thomas Frankenberry and Sansani Frankenberry, | ) ) ) | Case No. 4:19-cv-02990-JD |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **ORDER** |
| Sig Sauer, Inc., | ) ) | |
| Defendant. | ) ) ) | |

This is a products liability case wherein Plaintiffs Thomas Frankenberry and Sansani Frankenberry, (collectively "Plaintiffs") allege Defendant Sig Sauer, Inc. ("Defendant" or "Sig Sauer") designed and/or manufactured a defective and unsafe P320 model pistol, which discharged without a trigger pull.  Before the Court are several motions by the parties; however, there are two dispositive motions by the Defendant 1) Motion to Exclude Evidence and Opinions of Plaintiffs' Expert, Peter Villani and 2) Motion for Summary Judgment, which the Court will address herein. The parties have briefed the motions; and therefore, the motions are ripe for review and decision. After reviewing the motions and memoranda submitted, the Court grants Defendant's Motion to Exclude Evidence and Opinions of Plaintiffs' Expert Peter Villani (DE 37) and grants Defendant's Motion for Summary Judgment (DE 38) for the reasons stated herein.

## BACKGROUND

Plaintiff Thomas Frankenberry ("Frankenberry"), a retired New York City Police Officer, purchased a Sig Sauer P320 handgun ("Pistol") from a gun shop in Myrtle Beach, South Carolina, for personal protection, on April 7, 2015. (DE 43-1, pp. 2:6-4:16, 10:25, 11:8-14:6, 15:7-11.) During the year and a half that Frankenberry owned the Pistol, he carried it almost every day,

without issue. (DE 43-1, pp. 5:18-6:7.) On October 11, 2016, Frankenberry was working as a kitchen manager at a local Chick-fil-a while carrying his Pistol "appendix style," inside the waistband on his trousers secured by a leather belt. (DE 43-1, pp. 16:5-6, 17:7-10.) Frankenberry entered the Chick-fil-A restroom while carrying his Pistol. The Pistol was secured by the tension of Frankenberry's pants and belt. (DE 37-2, p. 3:18-21.) After Frankenberry finished using the restroom in one of the stalls, he claims as he was leaving his Pistol discharged a round into his leg. (DE 1-1, ¶ 10.) Frankenberry asserts that his pants and belt remained buckled as he used the restroom and his hand was not on the trigger when the pistol discharged. (DE 37-2, pp. 4:23-5:8.)

Nobody else was in the restroom when the Pistol discharged; however, immediately after the incident, several of Frankenberry's co-workers and a Department of Natural Resources (DNR) police officer entered the restroom and found Frankenberry in the stall, bleeding from his leg. Frankenberry's boss, Nate MacDonald ("MacDonald") testified that when he got to the restroom— five-to-ten seconds after hearing the gunshot—Frankenberry's "pants were down and he was trying to put them back on." (DE 37-3, pp. 4:23-5:20.) MacDonald recalled that Frankenberry's pants were not buckled because he saw the wound on Frankenberry's thigh. (DE 37-3, p. 5:14-23 ("I know for a fact that his pants weren't buckled, zipped up and belt buckled. There was some unfastening there. And I saw his boxer briefs and the wound.").) Further, MacDonald testified that Frankenberry said he had moved the subject pistol from his waistband into his pocket while he was using the restroom, and Frankenberry stated that "when he was zipping up his pants and going to reach for it, the gun went off, and that's what he said." (DE 37-3, pp. 5:24-7:22.)

DNR Officer Joe Ard ("Officer Ard") was eating lunch in the Chick-fil-A restaurant when the accident occurred. (DE 37-4, pp. 3:20-4:2.) Officer Ard was seated at a booth near the restroom when he heard a loud noise coming from the restroom. (DE 37-4, pp. 5:9-15, 6:10-12,

6:23-7:19.)  Officer Ard did not know it was a gunshot at the time, but the noise sounded like

something unexpected, so he went to the restroom to investigate.  (DE 37-4, pp. 6:23-7:19.)  When

Officer Ard entered the restroom, he saw Frankenberry standing in the stall with the Pistol in his

hand, and Frankenberry said "I shot myself." (DE 37-4, pp. 8:16-10:9.)  However, Frankenberry

claims that:

> After urinating, he zipped his pants back up, bent down to flush the toilet, stood
> back up, and began to turn to his right to exit the stall when he heard a sudden bang.
> (citation omitted). His Sig Sauer P320 had just fired a round into his upper thigh.
> (see Summons and Complaint…. Plaintiff did not pull the trigger or contact the
> handgun, in any way. (citation omitted). Confused as to how his P320 could fire,
> Plaintiff stated "I think I'm shot," as several coworkers and bystanders entered the
> restroom to inquire about the noise. (citation omitted).

(DE 43, p. 2.)  After the incident, Plaintiff was taken to an employee office where he sat and

waited for emergency medical services to arrive.  He was transported by ambulance to the hospital

for treatment.

On September 16, 2019, Plaintiffs, filed the instant suit against Defendant alleging the

Pistol carried by Frankenberry suffers from a manufacturing defect, which caused Plaintiffs'

injuries.  Plaintiffs retained Peter Villani ("Villani") to examine the Pistol and to investigate their

claims.  Villani serves as an Operations Officer for the United States Department of Veteran's

Affairs and has for the last twenty years.  (DE 44-2.)  He has more than a decade of experience

serving as a police officer as well as experience in the firearm consumer market, having served as

a firing range manager, salesman, and instructor.  (DE 44-2.)  During his time as an officer, he

received training on safe firearm use, ranging from handguns to advanced combat shotguns.  (Id.)

He has been trained and certified as an armorer in Sig Sauer P320, Sig Sauer 239, Sig Sauer 229,

Beretta 92 handguns, as well as AR15 rifles, resulting in a thorough understanding of the

innerworkings of each firearm, and weapon components. (DE 44-3, p. 2:11-17.)

However, Villani's work in this case is limited to his visual inspections of the Pistol as well as inspections of three other "exemplar" P320 pistols not involved in Frankenberry's incident. Villani was tasked solely to determine whether the Pistol could have discharged without a trigger pull—not whether it actually did so in this case. (DE 37-5, p. 2.) Based on his visual observations, Villani described various "manufacturing and design defects" associated with the four guns. (DE 37-5.) However, Villani has not done any testing to confirm any of his opinions. (DE 37-8, p. 24:16-23.)

According to Villani, the main defect which could have contributed to the Pistol firing without a trigger pull is what he calls "rollover." According to Villani, rollover is "excess material … left over from the manufacturing process that should have been removed prior to installation of a part." (DE 37-8, p. 7:9-25.) Villani testified that rollover is the major contributing factor to the Pistol discharging without a trigger pull. (DE 37-8, p. 10, 16-22 (A: "I don't think none of us would be talking today if there was no rollover.").) Notwithstanding that this "rollover" was, according to Villani, the key factor in allegedly allowing the Pistol to fire without a trigger pull, Villani did not measure or quantify the extent of this rollover in any way. Rather, during his deposition he estimated that the rollover—the difference in height between the edges of certain components and their center—was "a quarter of a millimeter maybe little less." (DE 37-8, pp. 26-27.) However, Villani stated he "would just be guessing just by looking at it" when he gave this measurement. (Id.)

# LEGAL STANDARD

**Expert Witness/Fed. R. Evid. 702**

District courts "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579, 589 (1993). Rule 702 was amended in response to Daubert and its progeny and now provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of an expert witness's testimony bears the burden of proving that such testimony meets the requirements of Rule 702 by a preponderance of evidence. See Daubert, 509 U.S. at 592 n. 10. District courts serve as gatekeepers for expert testimony and carry a "special obligation" to ensure that expert testimony is reliable and relevant. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). The Court must therefore ensure that an expert's testimony is based on "scientific knowledge," and "will assist the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at 592. The first inquiry asks "whether the reasoning or methodology underlying the testimony is scientifically valid." Id. at 592-93. District Courts are guided by several factors in determining the reliability of a particular scientific theory or technique: whether it (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and (4) has attained general acceptance in the pertinent scientific community. See id. at 593-94. These factors are not exclusive; what factors are relevant to the analysis "depend[] upon the particular circumstances of the particular case at issue." Kumho Tire, 526 U.S. at 150. In conducting the reliability inquiry,

the focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595.

The second inquiry "goes primarily to relevance." Id. at 591. Relevance is determined by ascertaining whether the testimony is sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute. Id. at 593. "A review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee's Note to 2000 Amendments. "Daubert did not work a 'seachange over federal evidence law,' and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" Id. (quoting United States v. 14.38 Acres of Land Situated in Leflore Cnty., 80 F.3d 1074, 1078 (5th Cir. 1996)).

**Federal Rule of Civil Procedure 56**

The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." Wai Man Tom v. Hosp. Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020) (citation omitted). Once the movant has made this threshold demonstration, the nonmoving party, to survive the motion for summary judgment, must demonstrate specific, material facts that give rise to a genuine issue. Celotex Corp., 477 U.S. at 323. Under this standard, 'the mere existence of a scintilla of evidence' in favor of the non-movant's position is insufficient to withstand the summary judgment motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." Wai Man Tom, 980 F.3d at 1037.

"Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015) (quoting 10A Charles A. Wright et al., Federal Practice & Procedure § 2728 (3d ed. 1998)).  The court may grant summary judgment only if it concludes that the evidence could not permit a reasonable jury to return a favorable verdict.  "Therefore, courts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted and alterations adopted).  A court improperly weighs the evidence if it fails to credit evidence that contradicts its factual conclusions or fails to draw reasonable inferences in the light most favorable to the nonmoving party.  Id. at 659-60.

## DISCUSSION

**Admission of Villani as an Expert**

Defendant challenges the admission of Villani as an expert on Plaintiffs' design and/or manufacturing defect claim pursuant to the Court's "gatekeeper function" raising two main concerns.  See Sardis v. Overhead Door Corp., 10 F.4th 268, 283 (4th Cir. 2021) ("'[T]he importance of [the] gatekeeping function cannot be overstated[,]' Rule 702 grants experts 'wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation,' '[e]xpert evidence can be both powerful and quite misleading.'").  First, Defendant contends that Villani is not qualified to offer any opinions about design or manufacturing defects in the Pistol.  (DE 37-1, p. 11.)  Defendant also challenges whether Villani's opinions are reliable

because they rely solely on his *ipse dixit*[1] and are not corroborated by any testing or other support. (Id.)  First, as to Defendant's argument that Villani is not qualified to offer an opinion about design or manufacturing defects in the Pistol, Defendant contends that Villani has no experience in firearms design, nor has he ever manufactured a firearm or firearm component or worked for a firearm manufacturer.  Rather, Defendant contends that Villani is trained as an armorer for multiple firearm models, including the P320, which means that he can take apart and identify worn or damaged parts on a P320 pistol that need to be replaced with parts ordered from the manufacturer. (DE 37-1, p. 11.)  Accordingly, Defendant argues that "[t]his general experience in handling and assembling/disassembling firearms, without more, does not in any way qualify Villani to render opinions on the design or manufacture of the P320 model pistol in this action.  (DE 37-1, p. 12.) This Court agrees.

Federal Rule of Evidence 702 requires an expert to be qualified "by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  "[A] witness'[s] qualifications to render an expert opinion are [] liberally judged by Rule 702.  Inasmuch as the rule uses the disjunctive, a person may qualify to render expert testimony in any one of the five ways listed:  knowledge, skill, experience, training, or education."   Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993). "Accordingly, a challenge based on lack of qualifications alone must demonstrate that 'the purported expert [has] neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered.'"   In re Pella Corp. Architect & Designer Series Windows Mktg., Sales Practices & Prods. Liab. Litig., 214 F. Supp. 3d 478, 496 (D.S.C. 2016) (quoting Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989)).  "If, again in

---

[1]    Latin for "he said it himself".

the disjunctive, the proposed testimony will recount or employ 'scientific, technical, or other specialized knowledge,' it is a proper subject." Kopf, 993 F.2d at 377.

Villani's training and experience is in the field of an armorer and not a gunsmith.[2]  (DE 37-8, p. 22.)   As an armorer Villani replaced damaged components with new components and evaluated firearms for resale.  (DE 37-8, p. 23.)  However, there is nothing in the record to indicate that Villani has any scientific, technical, or other specialized knowledge to test or compare finished work to specification or to modify or repair component parts.  It is well established that "an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise."  In re Pella Corp. Architect & Designer Series Windows Mktg., Sales Practices & Prods. Liab. Litig., 214 F. Supp. 3d 478, 496 (D.S.C. 2016) (while expert may be able to opine on observations of wood deterioration based on experience, expert was not qualified to go beyond that and discuss manufacturing processes and product testing); see also Redman v. John D. Brush & Co., 111 F.3d 1174, 1179 (4th Cir. 1997) (finding that a "metallurgic engineer," who was "undoubtedly qualified to testify about the properties and characteristics of metal," was not qualified to testify about industry standards governing safe manufacturing industry).   Having reviewed the record, the Court is convinced that Villani's opinions regarding manufacturing defects extend beyond the scope of an armorer and venture into issues of firearm design and manufacturing.  Since Villani's opinion enters a different field of knowledge, Plaintiffs cannot rely on his knowledge, skill, experience, training, or education to validate his qualification in the mechanical components and component interactions of the Pistol and to explain the manufacturing defect that caused the Pistol to fail.

---

[2]        A gunsmith among other things repairs, modifies, designs, or makes guns and/or gun parts.

9

Nevertheless, Plaintiffs argue that "Villani has practical experience examining and troubleshooting weapons and their safe use through his time as an officer, shooting range manager, and armorer, experiences that demand he develop a familiarity with the innerworkings of firearms." (DE 44, p. 6.) While it appears Villani is qualified to troubleshoot gun malfunctions and give instructions on their safe use, if gun design and manufacturing defects were solely based on familiarity of firearms malfunctions or troubleshooting the same, his qualifications might be sufficient. However, "[w]here a purported expert witness has neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered, that witness's testimony may be excluded." In re Pella Corp. Architect & Designer Series Windows Mktg., Sales Practices & Prods. Liab. Litig., 214 F. Supp. 3d 478, 497 (D.S.C. 2016). Thus, Plaintiffs have failed to carry their burden to establish by a preponderance of the evidence that Villani is qualified to testify as an expert on the manufacturing defect that caused the Pistol to fail.

Next, assuming arguendo that Villani was qualified to testify as an expert on the manufacturing defect that caused the Pistol to fail, Defendant also challenges whether Villani's opinions are reliable because they rely solely on his ipse dixit and are not corroborated by any testing or other support. The Court equally agrees. "An expert's opinion is relevant if it has 'a valid scientific connection to the pertinent inquiry.'" Sardis v. Overhead Door Corp., 10 F.4th 268, 281 (4th Cir. 2021). "But even if relevant, an opinion must also be sufficiently reliable. Reliability is a 'flexible' inquiry that focuses on 'the principles and methodology' employed by the expert." Id. One of the factors District Courts are guided by in determining the reliability of a particular scientific theory or technique is whether it can be and has been tested. Id.

Plaintiffs contend that "Villani's opinions are reliable because he has conducted sufficient testing on the subject P320 to identify its manufacturing defects and opine as to their effect on the function of the handgun." (DE 44, p. 9.) Plaintiffs advance the following testing methodology:

> Villani conducted testing in this case by performing a forensic examination of the subject handgun through various means: (1) Villani field stripped the gun and examined its internal components with his naked eye; (2) he examined the gun and its internal components through the use of X-ray imaging; and (3) he examined the gun through the use of CT scanning.

(DE 44, p. 9.) However, Villani's testing was limited to the disassembly of the Pistol – which was performed by Defendant's expert, and Villani's visual examination of the internal components along with a review of unclear X-ray images, and CT-scan images of the Pistol. (DE 45, p. 9.) Villani also took measurements of the internal components of the Pistol and compared them to the measurements of components from exemplar pistols. Moreover, as to Villani's "rollover" theory, he has not confirmed that this condition could cause components that are engaged – specifically the striker foot and the sear – to lose that engagement without a trigger pull. Therefore, Villani has not done any testing to demonstrate how any defects could allow the Pistol to fire without the trigger being pulled. (DE 45-1, pp. 5-6) (Villani testified that "I wasn't hired to do any testing or attempting to make it fire uncommanded. I was just told to examine the firearm to find any potential defects."); see also Nease v. Ford Motor Co., 848 F.3d 219, 232 (4th Cir. 2017) (finding that a failure to test a hypothesis renders an opinion unreliable because "scientific methodology involves 'generating hypotheses and testing them to see if they can be falsified.'"). Accordingly, Plaintiffs have not met the Daubert standard on this factor.

Furthermore, as to the remaining factors: peer review and publication, potential rate of error, and general acceptance in the relevant community, Defendant argues these factors are not satisfied. Notably, Plaintiffs do not dispute Defendant's claim that "Villani has not identified a single peer-reviewed study, article, or published test supporting his theory," or that because he has

"conducted no testing, there is no technique or process against which to measure the error rate." (DE 37, pp. 15-16.) Equally, Plaintiffs do not challenge Defendant's claim that Villani's opinions have never even been raised before or accepted in the firearms community. Rather, Plaintiffs argue that Villani's conclusions are unique to this case and that the <u>Daubert</u> factors are non-mandatory; and therefore, its consideration by the Court is discretionary. The Court notes that "<u>Daubert</u> is a flexible test and no single factor, even testing, is dispositive." <u>Nease v. Ford Motor Co.</u>, 848 F.3d 219, 232 (4th Cir. 2017). In this instance, the Plaintiffs lack of testing to show a causal connection between the purported defects and the alleged discharge without a trigger pull, coupled with not meeting the other <u>Daubert</u> factors, suggests Villani's testimony would be unreliable. Accordingly, Villani should be precluded from testifying in this case because he is unqualified to give any opinions on firearm design and/or manufacturing defects, and none of his theories have been tested or otherwise supported.

**Summary Judgment**

Given this Court's ruling on the Plaintiffs' expert witness, Defendant contends that Summary Judgment is warranted because Plaintiffs cannot prove the prima facie elements of their product liability claim as a matter of law. The Court agrees. In any product liability action, a plaintiff must establish that: (1) he was injured by the product; (2) the product was in essentially the same condition at the time of the accident as it was when it left the hands of the defendant, and (3) the injury occurred because the product 'was in a defective condition unreasonably dangerous to the user. <u>Graves v. CAS Med. Sys., Inc.</u>, 401 S.C. 63, 79, 735 S.E.2d 650, 658 (2012) (quoting <u>Madden v. Cox</u>, 284 S.C. 574, 579, 328 S.E.2d 108, 112 (Ct. App. 1985)). A plaintiff must establish these three elements regardless of whether the theory under which he seeks to recover is

strict liability, breach of warranty, or negligence.  See Dema v. Shore Enterprises, Ltd., 312 S.C. 528, 530, 435 S.E.2d 875, 876 (Ct. App. 1993).

As a threshold matter, the Court concludes that Plaintiffs' claims fall short as a matter of law without the benefit and support of expert testimony on the ultimate issue of liability.  Absent expert testimony, Plaintiffs cannot establish that either the Pistol's defects or its inadequate warnings proximately caused Frankenberry's injuries.  See Sunvillas Homeowners Ass'n, Inc. v. Square D Co., 301 S.C. 330, 391 S.E.2d 868, 871 (S.C.Ct.App.1990) ("A products liability case may be brought under several theories including negligence, warranty, and strict liability.  In each theory the plaintiff must establish the product was in a defective condition." (citing Madden, 284 S.C. 574, 328 S.E.2d 108)).  To establish defectiveness in a technically complex case, a plaintiff must come forward with relevant and reliable expert testimony. See Graves, 735 S.E.2d at 659 (discussing the need for expert testimony in complex cases).

Nonetheless, Plaintiffs claim this case does not require an expert because it is a manufacturing not a design defect case and that they have presented sufficient evidence to create a genuine issue of material fact as to whether the Pistol was manufactured in a deficient and defective manner.  See Watson v. Ford Motor Co., 389 S.C. 434, 699 S.E.2d 169 (2010) (holding that in a design defect case "expert evidence is required where a factual issue must be resolved with scientific, technical, or any other specialized knowledge.").  However, the requirement "of presenting expert testimony to meet the burden of proof on subjects beyond the knowledge and understanding of lay jurors is by no means new." 5 Star, Inc. v. Ford Motor Co., 395 S.C. 392, 718 S.E.2d 220, 224 n.3 (Ct. App. 2011).  While South Carolina jurisprudence does not go so far as to require that plaintiffs *always* present expert testimony in manufacturing defect cases in this case, given the nature of Plaintiffs' manufacturing defect claim, expert testimony is required.

Here, among other things, Plaintiffs' defect theory (that excess material creates a lack of engagement between internal parts of a pistol and overrides two internal safety features in the Pistol) is outside the knowledge of an ordinary layperson.  Plaintiffs' manufacturing defect theories would require scientific, specialized, or technical testimony to resolve any factual disputes.  Since Plaintiffs have not offered any reliable testimony on their defect theory, their lack of reliable expert testimony on the issue of liability is fatal to their claim.  See Oglesby v. Gen. Motors Corp., 190 F.3d 244, 249 (4th Cir.1999) ("[A] plaintiff may not prevail in a products liability case by relying on the opinion of an expert unsupported by any evidence such as test data or relevant literature in the field." (quoting Alevromagiros v. Hechinger Co., 993 F.2d 417, 422 (4th Cir.1993) (internal quotation marks omitted)).  Accordingly, the Court concludes that Plaintiffs have failed to demonstrate that the Pistol was defective, or its inadequate warnings proximately caused Frankenberry's injuries.[3]

## CONCLUSION

For the foregoing reasons, the Court grants Defendant's Motion to Exclude Evidence and Opinions of Plaintiffs' Expert Peter Villani (DE 37) and grants Defendant's Motion for Summary

---

[3]     Although this conclusion alone warrants entry of summary judgment in favor of Defendant as to all of Plaintiffs' claims, the Court also notes that without expert testimony linking Frankenberry's injuries to the manufacturing defect that caused the Pistol to discharge without a trigger pull, Plaintiffs have not established causation. Moreover, Plaintiffs also advance allegations of a design defect in their pleading but appear to abandon this assertion here.  Nevertheless, the Court finds that Plaintiffs have also failed to present the requisite evidence of a feasible, or reasonable, alternative design. "[T]he exclusive test in a products liability design case is the risk-utility test with its requirement of showing a feasible alternative design." Branham v. Ford Motor Co., 390 S.C. 203, 220, 701 S.E.2d 5, 14 (2010). Thus, with design-defect claims, an expert must not only point to a design flaw in the product, but must also "show how his alternative design would have prevented the product from being unreasonably dangerous." Holland ex rel. Knox v. Morbark, Inc., 407 S.C. 227, 237, 754 S.E.2d 714, 720 (Ct. App. 2014).  Here, Plaintiffs have not offered, through Villani or otherwise, evidence of a feasible alternative design for the Pistol.  Rather, Villani points to alleged design flaws and fails to propose any alternative design.  Simply stating that certain features should be changed is insufficient to establish a feasible alternative design.  See Holland at 720 ("[A] conceptual design is insufficient to establish a reasonable alternative design. . . .").

Judgment (DE 38); and therefore, the parties pending motions are denied as moot and Plaintiffs'

case is dismissed.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

February 4, 2022
Greenville, South Carolina

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

|                          |     |                    |
|--------------------------|-----|--------------------|
| JOHN TYLER HERMAN,       | )   |                    |
|                          | )   |                    |
| Plaintiff,               | )   |                    |
|                          | )   |                    |
| v.                       | )   | No. CIV 21-1038-R  |
|                          | )   |                    |
| SIG SAUER INC.,          | )   |                    |
|                          | )   |                    |
| Defendant.               | )   |                    |

## ORDER

Before the Court is Defendant's Motion for Summary Judgment [Doc. No. 71], Defendant's Motion to Exclude Causation Evidence and Opinions of Plaintiff's Expert William Vigilante [Doc. No. 73], and Defendant's Motion to Exclude Causation Evidence and Opinions of Plaintiff's Expert James Tertin [Doc. No. 74]. Each motion is fully briefed [Doc. Nos. 77, 78, 79, 71, 81, 82, 83] and at issue. A hearing was held on August 24, 2023 at which the Court heard arguments of counsel regarding whether the experts' causation opinions should be excluded [Doc. No. 89]. After considering all the submissions and the arguments of counsel, the Court finds as follows.

## INTRODUCTION

Plaintiff was seriously injured when his Sig Sauer P320 handgun unintentionally discharged while he was trying to remove his holster. Plaintiff asserts claims for strict products liability, negligence, breach of the implied warranty of merchantability, breach of express warranty, negligent infliction of emotional distress, and intentional infliction of

emotional distress against Defendant Sig Sauer, the manufacturer of the gun. *See* Compl. [Doc. No. 1].

In support of these claims, Plaintiff offers expert testimony from James Tertin, a gunsmith, and William Vigilante, a human factors engineer. The version of the P320 involved in this case does not come with an external manual safety, such as a tabbed trigger or a thumb safety. Mr. Tertin and Mr. Vigilante both opine that the failure to incorporate a manual safety into the P320 caused Plaintiff's injuries. Defendant seeks to exclude these causation opinions under Fed. R. Evid. 702. Defendant also moves for summary judgment, arguing that Plaintiff's claims necessarily fail without admissible evidence of causation.

## FACTUAL BACKGROUND

Plaintiff was trying on a new soft leather holster with his loaded Sig Sauer P320 handgun in the holster. Depo of Plaintiff [Doc. No. 77-2] at 60:2-7. When he tried to remove the holster, the gun discharged into his groin, causing him severe injuries. The police officer who interviewed Plaintiff immediately following the incident included the following description in his report:

> [Plaintiff] stated he was trying to pull the gun and holster out of his waistband and the holster got hung up. [Plaintiff] stated he then pulled harder causing the pistol to come out of the holster and [Plaintiff's] finger accidentally to pull the trigger causing the firearm to discharge.

Def. Ex. 1-2 [Doc. No. 71-1]. At his deposition, Plaintiff offered the following account of the incident:

> So that morning I got up, took the holster out of the pouch, and then put the gun in the holster. Then I unbuttoned my pants, put the holster with the gun already in it on my waistband, then I just buttoned my pants. Very quickly I decided I didn't like it in the front. It was uncomfortable, and I wasn't

comfortable with a gun with a chamber -- a chambered gun just in the front, in general.

So then I went to -- reached over the gun to grab the holster, and I pulled, and it kind of got caught up, so I pulled a little harder on the holster, and just when I pulled up, that's when -- all I remember, it just went off, and then I remember falling on the ground and yelling or kind of screaming a little bit.

Depo of Plaintiff at 60:12-61:2. He later described himself as "reach[ing] over the gun" and "grabb[ing] the whole holster to take it out as one unit." *Id.* at 72:6-8. He further explained that his "hand was only on the holster on this side, and then my finger, the pointer finger, I just kind of lifted up on that clip a little bit for the holster and I pulled like that." *Id.* at 72:10-14.

At the time Plaintiff purchased his P320, Sig Sauer offered versions with and without a manual thumb safety. Def.'s Statement of Fact ¶ 12. When asked if he had a preference for carrying a gun with a manual safety, Plaintiff responded no. Depo of Plaintiff at 43:19-44:4. He further testified that a manual safety was "not something I was even thinking about." *Id.*

Plaintiff's experts opine that the P320 is defectively designed because it has a short single action trigger pull without a manual safety, making it too easy for the trigger to be accidentally actuated. Tertin Report [Doc. No. 74-6] ¶ 9; Vigilante Report [Doc. No. 73-6] ¶¶ 2, 6; Pl.'s Counter-Statement of Fact ¶ 7. Neither expert opines that the P320 can fire without a trigger pull. Pl.'s Resp. to Def.'s Statement of Fact ¶ 20. An external manual safety can include either a tabbed trigger or a thumb safety. Depo of Tertin [Doc. No. 71-1] 81:22-82:25. A tabbed trigger is "a small tab within the trigger that must be depressed for the trigger to be able to fully depress and fire the weapon." Tertin Report at 16. Mr.

3

Tertin, Plaintiff's firearms expert, opines that a tabbed trigger is able to effectively prevent accidental discharges because it requires a user's finger to be placed squarely on the center of the trigger. *Id.* A thumb safety is "a switch on the side of the pistol that can be flipped on or off with the user's thumb" and which prevents the trigger from being actuated when it is on. *Id.* at 14. Plaintiff's experts both opine that the accident would most likely not have occurred if the gun were equipped with a manual safety. Tertin Report ¶¶ 14, 14-16; Vigilante Report ¶¶ 13-14.

## DISCUSSION

### A. Motions to Exclude Expert Testimony

#### 1. Standard

Rule 702 governs the admissibility of expert testimony and "imposes upon the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). To determine whether an expert opinion is admissible pursuant to Rule 702, courts utilize a two-step analysis. *103 Invs. I, L.P. v. Square D Co.,* 470 F.3d 985, 990 (10th Cir. 2006). First, the Court determines "whether the expert is qualified by 'knowledge, skill, experience, training or education' to render an opinion." *Id.* (quoting Fed. R. Evid. 702). Second, if the expert is qualified, the Court determines whether the expert's opinion is reliable under the principles set forth in *Daubert*[1] and *Kumho Tire*,[2] and relevant, in that it will assist the trier of fact. *Id.*; *see also Ralston*, 275 F.3d at 969; Fed. R. Evid. 702.

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).
[2] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

There are a number of factors that a trial court may consider in determining whether expert testimony is reliable, although the inquiry is necessarily "a flexible one" that is highly fact specific. *Daubert*, 509 U.S. at 594. Ultimately, its purpose "is always 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Goebel v. Denver & Rio Grande W. R. Co*., 346 F.3d 987, 992 (10th Cir. 2003) (quoting *Kumho Tire*, 526 U.S. at 152). Importantly, the "appropriate means of attacking shaky but admissible evidence" is not through exclusion, but through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. The proponent of expert testimony bears the burden of showing that the testimony is admissible. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

### 2. Analysis

Defendant does not challenge Mr. Tertin's qualifications to testify as a firearms design expert or Mr. Vigilante's qualifications to testify as a human factors expert. The Court has reviewed their qualifications and finds that they each possess the knowledge, skill, experience, training, or education necessary to render opinions in their respective fields.

Defendant does, however, challenge the reliability of certain opinions offered by both experts. Qualified expert testimony is reliable, and therefore admissible, only when it is "based on sufficient facts or data," it is "the product of reliable principles and methods," and "the expert has reliably applied [those] principles and methods." Fed. R. Evid. 702.

Although this standard does not require absolute certainty on the part of the expert, it does require the proponent to show "that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts that satisfy Rule 702's reliability requirements." *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999). Expert testimony that is based on speculation or "is connected to existing data only by the *ipse dixit* of the expert" is generally not admissible. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Kieffer v. Weston Land, Inc*., 90 F.3d 1496, 1499 (10th Cir. 1996) ("An expert opinion must be based on facts that enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation but absolute certainty is not required.") (quotation marks and brackets omitted).

Defendant argues that the causation opinions offered by Mr. Tertin and Mr. Vigilante should be excluded as speculative and lacking a reliable foundation. More specifically, Defendant seeks to exclude Mr. Tertin and Mr. Vigilante from opining that Plaintiff's accident most likely would not have occurred if the gun was equipped with a thumb safety or a tabbed trigger safety. *See* Doc. No. 73 at 1; Doc. No. 74 at 1, 3.

The Court agrees with Defendant that neither Mr. Tertin nor Mr. Vigilante has a reliable factual basis for these particular opinions. Mr. Tertin and Mr. Vigilante acknowledge that a tabbed trigger will not prevent an unintentional discharge if an object squarely contacts the face of the trigger, a thumb safety will not prevent an unintentional discharge if it is not engaged, and the gun will not discharge without the trigger being fully actuated. Depo of Vigilante, Doc. No. 73-5 at 14:6-11, 13:4-12, 32:17-33:2; Depo of Tertin, Doc. No. 74-1 at 10:16-11:4, 89:12-25, 104:4-15, 105:5-17. But neither expert

knows what part of the trigger was contacted or whether a thumb safety would have been engaged. Without these critical facts, the experts' conclusion that a tabbed trigger or thumb safety would have prevented the accident is speculative.

Start with Mr. Vigilante. He testified that he does not have an opinion on what part of the trigger was contacted. Depo of Vigilante, Doc. No. 73-5 at 14:16-15:23, 17:5-9. He does not know whether it was pulled, where it was pulled, or what caused it to move. *Id.* The position of the gun in the holster or whether the trigger was accessible at the time of the incident does not matter to him. *Id.* at 19:5-19:13. He has no opinion as to whether Plaintiff's description of the incident is actually what happened.[3] *Id.* at 12:23-13:3. He does not recall Plaintiff's testimony concerning his use of a manual safety. *Id.* at 21:24-22:10. Thus, the specific circumstances surrounding this incident are not important to Mr. Vigilante. Rather, he is basing his causation opinion on his conclusion that, in general, it is unsafe to sell a gun like the P320 without a manual safety. Assuming for the sake of the argument that the P320's failure to include a manual safety is a design defect, it does not necessarily follow that the defect was the cause of Plaintiff's particular accident. Mr. Vigilante does not identify any factual basis for his conclusion that a manual safety would have most likely prevented this incident. As a result, his causation opinion is not sufficiently reliable as applied to the facts of this case.

---

[3] Mr. Vigilante did testify at one point that although he does not know if the trigger was contacted, he "do[es] know that it wasn't a full finger pressed on the front of the trigger." Depo of Vigilante Doc. No. 77-7 at 15:16-23. However, he subsequently testified that he does not have an opinion on what part of the trigger was impacted and was not asked to look at the physical evidence to determine how or if the trigger was pulled *Id.* at 15:24-19:4.

Mr. Tertin's causation opinions are similarly flawed. Mr. Tertin believes that a single action handgun without a manual safety is "inherently unsafe" and it is "common sense" that a tabbed trigger is safer.[4] Depo of Tertin, Doc. No. 74-1 at 34:21-35:3, 51:11-25. From that premise, he leaps to concluding that the lack of a manual safety caused Plaintiff's accident, even though he admits that he has no idea what happened in this incident, performed no analysis as to what may have pulled the trigger, and did not evaluate the rate of unintentional discharges for guns with tabbed triggers. *Id.* at 25:9-13, 55:22-56:17, 84:10-85:10, 103:12-16, 104:7-13, 105:5-16, 112:21-113:11. If Mr. Tertin does not know where the trigger was pulled, whether a thumb safety would have been engaged, or even whether tabbed triggers reduce the rate of unintentional discharges, his conclusion that a manual safety would likely have prevented the accident is simply speculation. *See Smith v. Sears Roebuck & Co.*, No. CIV-04-1271-HE, 2006 WL 687151, at *4 (W.D. Okla. Mar. 17, 2006), (excluding expert testimony because "[w]hile the reverse mechanism in this case did fail, there is no adequate foundation in Mr. Litwin's report for the conclusion that a design defect, as opposed to other possible factors, actually caused the failure") *aff'd*, 232 F. App'x 780 (10th Cir. 2007).

As Mr. Tertin and Mr. Vigilante recognize, a tabbed trigger would not have prevented Plaintiff's accident if his finger or an object inadvertently pressed the face of the

---

[4] Of course, if Mr. Tertin's opinion is based on nothing more than common sense, it is not the proper subject of expert testimony and is not helpful to the jury. *See Newsome v. Tull*, No. CIV-18-0791-HE, 2019 WL 5197566, at *4, n.4 (W.D. Okla. Aug. 6, 2019) ("Describing common sense reasoning in a learned way does not turn it into helpful expert testimony.").

trigger. Nor would a thumb safety have prevented the accident if it was not engaged. Although the gun could (according to Plaintiff's evidence) unintentionally discharge from a grazing pass or bump, Plaintiff's experts do not know if that is what happened here. Accordingly, their respective opinions that a manual safety most likely would have prevented the accident are speculative and inadmissible. *See Roe v. FCA US LLC*, No. CIV-19-167-SLP, 2021 WL 2640107, at *13 (W.D. Okla. May 28, 2021), *aff'd*, 42 F.4th 1175 (10th Cir. 2022) (excluding expert testimony that addition of an "out-of-park alarm" in a vehicle would have reduced risk of injury because it was "not supported by any testing or analysis" and "[e]xtrapolating that the addition of another alarm would have reduced or eliminated Plaintiff's injuries goes too far and is inadmissible"); *Taber v. Allied Waste Sys., Inc.*, No. CIV-13-773-D, 2015 WL 1119750, at *8 (W.D. Okla. Mar. 11, 2015) (excluding expert testimony in products liability case because the expert's "theory of causation cannot be tested" and the expert "agrees that it remains a mystery as to how and why Plaintiff fell").

## B. Motion for Summary Judgment

### 1. Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.... An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v.*

*Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Id*. at 670–71 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id*. at 671 (citing Fed. R. Civ. P. 56(e)).

Importantly, at this stage, the court's role is not "to weigh the evidence and determine the truth of the matter," but to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 249–52. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

## 2. Analysis

The summary judgment dispute in this case boils down to a single element: causation. Defendant argues that summary judgment in its favor is required because Plaintiff lacks admissible evidence of causation, an essential element on each of the claims. Plaintiff does not dispute that causation is an essential element but argues that his evidence is sufficient to create a genuine factual dispute as to causation.

In a products liability case such as this,[5] the plaintiff bears the burden of proving three elements: "the defect must have (1) caused the injury in question, (2) existed at the time it left the manufacturer's control, and (3) made the product unreasonably dangerous." *Braswell v. Cincinnati Inc.*, 731 F.3d 1081, 1085 (10th Cir. 2013) (citing *Kirkland v. General Motors Corp.*, 521 P.2d 1353, 1363 (Okla.1974). The plaintiff may rely on circumstantial evidence to show causation and "it is not necessary that evidence be so certain so as to support only one probability and exclude all others." *Carver v. Kia Motors Corp.*, No. 10-CV-642-JHP-PJC, 2012 WL 119587, at *4 (N.D. Okla. Jan. 12, 2012) (citing *Dutsch v. Sea Ray Boats, Inc.*, 845 P.2d 187, 191 (Okla. 1992)). However, "the mere possibility that a defect caused the injury is not sufficient." *Dutsch*, 845 P.2d at 191. A finding of liability must "be based upon probabilities, not possibilities." *Id.* (internal quotation marks omitted). Thus, to survive summary judgment, "a plaintiff must provide sufficient evidentiary material which raises a reasonable inference from which the fact finder may rationally conclude that the plaintiff's injuries 'proximately resulted from the product's failure of performance causally related to its defective condition.'" *Smith v. Sears Roebuck & Co.*, No. CIV-04-1271-HE, 2006 WL 687151, at *5 (W.D. Okla. Mar. 17, 2006), (10th Cir. 2007) (quoting *Kaye v. Ronson Consumer Prods. Corp.*, 921 P.2d 1300, 1302 (Okla.Ct.App.1996)) *aff'd,* 232 F. App'x 780.

Claims premised on negligence similarly require "the plaintiff to show…that the negligence was the proximate cause of the injury." *Gillham v. Lake Country Raceway*, 24

---

[5] Because this is a diversity action, the substantive law of the forum state applies. *MTI, Inc. v. Emps. Ins. Co. of Wausau*, 913 F.3d 1245, 1248 (10th Cir. 2019).

P.3d 858, 860 (Okla. 2001). Although a negligence claim may be established by circumstantial evidence, proximate causation "must be based on something more than mere speculation" or the fact that an accident occurred. *Id.* at 861. As the Oklahoma Supreme Court has explained:

> Where one conclusion would be as sound as another, the evidence may then be said to leave the matter wholly within the realm of mere conjecture, and any conclusion would be the result of a common speculation…. An inference of negligence must be based upon something other than mere conjecture or speculation, and it is not sufficient to introduce evidence of a state of facts simply consistent with or indicating a mere possibility, or which suggests with equal force and leaves fully as reasonable an inference of the non-existence of negligence. The inference of negligence must be the more probable and more reasonable inference to be drawn from the evidence.

*Gillham*, 24 P.3d at 860–61 (quotation marks and citation omitted).

Here, Plaintiff has provided evidence that the P320 is defectively designed because it lacks a manual safety. And no one seriously disputes that the discharge in this case was accidental in the sense that Plaintiff did not intend for the gun to fire. But, as explained above, "[i]t is not enough to merely contend that a defect existed, show that an accident occurred, and assume the two are necessarily related." *Beverly v. Wal-Mart Stores, Inc.*, 3 P.3d 163, 167 (Okla. Civ. App. 2000). There must also be some admissible evidence from which a reasonable jury could conclude that this incident was more probably than not caused by the defective product. Plaintiff argues he can make this showing in two alternative ways.

First, he argues that the causation opinions of his experts create a genuine factual dispute as to causation. This argument is foreclosed by the Court's determination that the experts' causation opinions are inadmissible.

Second, he argues that his claims can be proven through circumstantial evidence even without the benefit of expert testimony. Expert testimony as to causation is typically necessary in cases that involve complex issues of design and function. *See Rodgers v. Beechcraft Corp.,* 759 F. App'x 646, 679 (10th Cir. 2018); *Roe*, 2021 WL 2640107, at *14. Here, however, Plaintiff contends that a jury does not need expert testimony to understand that an engaged thumb safety would have prevented Plaintiff's gun from accidentally discharging. That may be, but Plaintiff has not pointed to any evidence in the summary judgment record which would permit the inference that a thumb safety would have been engaged. If anything, the limited evidence on this topic suggests the opposite – Plaintiff testified that he was not thinking about a manual safety even though a P320 with a manual safety was available. There is no evidence in the record that Plaintiff preferred a manual safety, wanted a manual safety, or always used a thumb safety. Without any evidence permitting an inference that a thumb safety would have been used, a finding that the lack of a thumb safety caused the accident is pure speculation – it is possible that it would have prevented the discharge, but equally possible that it would not have prevented the discharge. *See Downs v. Longfellow Corp.,* 351 P.2d 999, 1005 (Okla. 1960) ("[w]here [the plaintiff] relies upon circumstantial evidence to prove causation, the circumstances proved must tend to support plaintiff's theory with reasonable certainty and probability, as opposed to other causal hypotheses.").

As for the tabbed trigger, Plaintiff's admissible evidence is also insufficient to create a genuine factual dispute as to causation. Plaintiff testified that he reached over the gun, grabbed the holster, pulled upward, and then only remembers the gun going off. His

13

testimony does not indicate what caused the trigger to move[6] or where force was applied. From Plaintiff's testimony, an inference that he inadvertently caused something to push back on the trigger face is equally as valid as an inference that the trigger was grazed. This is not sufficient to survive summary judgment: there must be "evidence of probable causation in order to create a question of material fact that can be presented to a jury" as opposed to the mere possibility of causation. *Carver v. Kia Motors Corp*., No. 10-CV-642-JHP-PJC, 2012 WL 119587, at *5 (N.D. Okla. Jan. 12, 2012).

Although Plaintiff has presented a theory of possible causation, there is not sufficient evidence from which a jury could rationally conclude that the gun's alleged defect – the absence of a manual safety – caused the injuries in this case. *See Rodgers*, 759 F. App'x at 679 (affirming summary judgment because plaintiff "had no admissible expert testimony linking the loose screw to electric intermittency or voltage issues"); *Taber*, 2015 WL 1119750, at *10 (granting summary judgment in negligence case where the plaintiff did not know what caused his fall and expert causation opinions were excluded); *Carver v*, 2012 WL 119587, at *5–6 (granting summary judgment on products liability case because plaintiff only presented "a theory of *possible* causation" and failed to show that a purported defect caused the injuries) (emphasis in original); *Smith*, 2006 WL 687151, at *4 (granting summary judgment in products liability case where expert causation opinions were inadmissible and the plaintiff offered "no evidence which would permit a rational trier of

---

[6] Recall that Plaintiff's design expert indicated that the trigger must actuate for the gun to discharge.

14

fact to conclude that the accident which occurred in this case was the result of a defectively designed opener").

Although the Court is sympathetic in regard to the significant injuries Plaintiff has suffered, the Court finds summary judgment in favor of Defendant is proper on the issue of causation.

## CONCLUSION

As set forth above, Defendant's Motion to Exclude Causation Evidence and Opinions of Plaintiff's Expert William Vigilante [Doc. No. 73], Motion to Exclude Causation Evidence and Opinions of Plaintiff's Expert James Tertin [Doc. No. 74], and Motion for Summary Judgment [Doc. No. 71] are GRANTED. A separate judgment will be entered.

IT IS SO ORDERED this 8th day of September 2023.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE

# EXHIBIT 5

ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Kyle Guay

v.                                          Civil No. 20-cv-736-LM

Sig Sauer, Inc.


VERDICT FORM


# I.   Liability

**You are to answer all five questions in Section I (Question 1 through Question 5) before moving on to Section II.**


Question 1:  Do you find, by a preponderance of the evidence, that Sig Sauer is liable to Kyle Guay for strict products liability?

Yes _____                    No _✓___


Question 2:  Do you find, by a preponderance of the evidence, that Sig Sauer is liable to Kyle Guay for breach of an express warranty?

Yes _____                    No _✓___


Question 3:  Do you find, by a preponderance of the evidence, that Sig Sauer is liable to Kyle Guay for breach of an implied warranty of merchantability?

Yes _____                    No _✓___

1

Question 4: Do you find, by a preponderance of the evidence, that Sig Sauer is liable to Kyle Guay for violating the Magnuson-Moss Warranty Act?

Yes _____  No ✓

Question 5: Do you find, by a preponderance of the evidence, that Sig Sauer is liable to Kyle Guay for intentional infliction of emotional distress?

Yes _____  No ✓

*If you answered "No" to Questions 1, 2, 3, 4 and 5, then your deliberations are complete. Please have the Jury Foreperson sign and date the last page of this Verdict Form and notify the Court Security Officer that you have reached a verdict.*

*If you answered "Yes" to any of Questions 1, 2, 3, 4, or 5, please respond to the questions in Section II about damages.*

## II. Damages

**You are to answer Questions 6 and 7 only if you answered "Yes" to Question 1, 2, 3, 4 and/or 5.**

Question 6: What amount of compensatory damages do you award to Kyle Guay against Sig Sauer?

_____

(Please enter the amount in words, not numbers, as if you were writing a check.)

2

Question 7:  Do you find by a preponderance of the evidence that Kyle Guay is entitled to an award of enhanced compensatory damages?

Yes _____                                    No _____

*If your answer to Question 7 is "Yes," proceed to Question 8. If your answer to Question 7 is "No," then your deliberations are complete. Please have the Jury Foreperson sign and date the last page of this Verdict Form and notify the Court Security Officer that you have reached a verdict.*

Question 8:  What amount of enhanced compensatory damages do you award to Kyle Guay against Sig Sauer?

_____

(Please enter the amount in words, not num[ber])

Date: July 25, 2022

Foreperson

# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JIMMY S.C. JINN,

Plaintiff,

- against -

SIG SAUER. INC.,

Defendant.

**MEMORANDUM**
**OPINION & ORDER**

20 Civ. 1122 (PGG) (RWL)

PAUL G. GARDEPHE, U.S.D.J.:

In this action, Plaintiff Jimmy S.C. Jinn alleges that Defendant Sig Sauer, Inc.

designed and manufactured a firearm that unexpectedly discharged a round into Jinn's leg. The

Complaint asserts claims for strict liability, negligence, and breach of the implied warranty of

merchantability, as well as intentional and negligent infliction of emotional distress. (Cmplt.

(Dkt. No. 1) ¶¶ 6-8, 91-128)

Sig Sauer has moved for summary judgment and to preclude Plaintiff's two expert

witnesses. (Dkt. Nos. 56, 58, 60) Jinn has moved for leave to file a video exhibit in further

opposition to Sig Sauer's motions. (Dkt. No. 70) On April 12, 2023, Judge Lehrburger issued a

Report & Recommendation ("R&R") recommending that Sig Sauer's motions to exclude

Plaintiff's experts and for summary judgment be granted, and that Jinn's motion to introduce the

video exhibit be denied. (See R&R (Dkt. No. 75)) On April 26, 2023, Jinn filed objections to

Judge Lehrburger's R&R, and on May 10, 2023, Sig Sauer filed a response to Jinn's objections.

(See Pltf. Obj. (Dkt. No. 76); Def. Resp. (Dkt. No. 77))

For the reasons stated below, Jinn's objections will be overruled, and Judge

Lehrburger's R&R will be adopted in its entirety.

# BACKGROUND[1]

## I.  FACTS[2]

At the time that Jinn was injured, he was employed by the United States Department of Homeland Security ("DHS") as a special agent.  (R&R (Dkt. No. 75) at 2 (citing Def. Sum. J. Br., Ex. 1 ("Def. R. 56.1 Stmt.") (Dkt. No. 61-1) ¶ 1); Def. Sum. J. Br., Ex. 4 (Dkt. No. 61-4) at 4)[3]  In 2019, DHS issued a Sig Sauer model P320 pistol to Jinn.  As part of his

---

[1]  The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

[2]  Because the parties have not objected to Judge Lehrburger's factual statement, this Court adopts it in full.  See Silverman v. 3D Total Solutions, Inc., No. 18 Civ. 10231 (AT), 2020 WL 1285049, at *1 n.1 (S.D.N.Y. Mar. 18, 2020) ("Because the parties have not objected to the R&R's characterization of the background facts . . . , the Court adopts the R&R's 'Background' section and takes the facts characterized therein as true."); Hafford v. Aetna Life Ins. Co., No. 16 Civ. 4425 (VEC) (SN), 2017 WL 4083580, at *1 (S.D.N.Y. Sept. 13, 2017) ("The parties do not object to the Magistrate Judge's . . . recitation of the facts of this case, and the Court adopts them in full.").

[3]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."); Local Civ. R. 56.1(d) ("Each statement by the movant or opponent . . . , including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible.").  Where the non-moving party disputes the moving party's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-moving party's characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) ("In ruling on a motion for summary judgment, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.").

Because "a Rule 56.1 statement 'is not itself a vehicle for making factual assertions that are otherwise unsupported in the record', . . . 'where the record does not support the assertions in a Local 56.1 statement, those assertions [have been] disregarded and the record reviewed independently.'" Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015), aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY, 945 F.3d 83 (2d Cir. 2019) (quoting Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir. 2001)).

2

employment, Jinn "was required to qualify [to use this firearm] on a quarterly basis." (R&R (Dkt. No. 75) at 2 (citing Def. R. 56.1 Stmt. (Dkt. No. 61-1) ¶¶ 2-3))

On July 24, 2019, Jinn participated in a "speed drill exercise" with his co-workers at the Rodman's Neck Range in the Bronx. (Id. (citing Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶ 5; Pltf. Resp. R. 56.1 Stmt., Ex. 1 ("Jinn Dep.") (Dkt. No. 68-1) at 1)) Sig Sauer "describes the speed drill exercise as a 'quick-draw speed shooting competition,' a characterization that Jinn opposes to the extent it 'implies that the plaintiff . . . was handling [his] weapon in an irresponsible fashion.'" (Id. at 2 n.2 (omission and alteration in original) (quoting Def. R. 56.1 Stmt. (Dkt. No. 61-1) ¶ 5; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶ 5)) "In the speed drill, two participants stood on the firing line and, upon the instructor blowing a whistle, attempted to be the first to draw their pistol, fire, and hit a target." (Id. at 2 (citing Jinn Dep. (Dkt. No. 68-1) at 1)) "The first participant to hit the target remained on the firing line" to compete against the next participant. (Id. (citing Jinn Dep. (Dkt. No. 68-1) at 1)) Jinn won the first two rounds of the speed drill, but on his third round, "when pushing down on his pistol to remove it from a tight, new holster, the pistol fired one round into his leg." (Id. (citing Jinn Dep. (Dkt. No. 68-1) at 3; Def. R. 56.1 Stmt. (Dkt. No. 61-1) ¶ 9)

"The parties dispute how far out of the holster the gun was when it fired, as well as whether Jinn, or a foreign object inside the holster, actually pulled the trigger." (Id. at 3 (citing Def. R. 56.1 Stmt. (Dkt. No. 61-1) ¶¶ 13, 21, 28; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶¶ 13, 21, 28, at 5)) "Jinn alleges that his P320, and others like it, are designed and manufactured with defects, including a faulty striker-sear connection, that allow the gun to fire un-commanded and, in fact, caused the un-commanded discharge of his pistol." (Id. (citing Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶¶ 13, 17)) Jinn further alleges that "over 80 similar incidents

3

of P320 pistols firing without a trigger pull have occurred." (Id. (citing Pltf. Resp. R. 56.1 Stmt.

(Dkt. No. 68) ¶ 17, at 5-7))  In opposing Defendant's summary judgment motion, Jinn submitted

reports and deposition testimony from alleged experts Peter Villani and Timothy Hicks, both of

whom "identify purported defects [in the P320 pistol] and conclude that defects in the design

and/or manufacture of the P320 caused Jinn's pistol to fire without him pulling the trigger." (Id.)

## II.  **PROCEDURAL HISTORY**

The Complaint was filed on February 10, 2020.  (Cmplt. (Dkt. No. 1))  On

February 13, 2020, this Court referred this case to Magistrate Judge Lehrburger for general

pretrial supervision.  (Dkt. No. 5)  Discovery closed on March 1, 2022.  (See (Dkt. No. 33))

On August 22, 2022, Sig Sauer moved to preclude Plaintiff's two expert witnesses

and for summary judgment.  (Def. Mots. (Dkt. Nos. 56, 58, 60))  On September 30, 2022, Jinn

moved for leave to file a video exhibit in further opposition to Sig Sauer's motions.  (Sept. 30,

2022 Pltf. Ltr. (Dkt. No. 70))  On January 25, 2023, this Court referred Sig Sauer's motions to

Judge Lehrburger for an R&R.  (Dkt. No. 72)

On April 12, 2023, Judge Lehrburger issued a forty-nine-page R&R

recommending that Sig Sauer's motions to exclude and motion for summary judgment be

granted, and that Jinn's motion to introduce the video exhibit be denied.  (See R&R (Dkt. No.

75))

In recommending that Sig Sauer's motions to exclude Plaintiff's two experts be

granted, Judge Lehrburger concludes that (1) "Villani is not qualified and that, regardless, his

opinions are unreliable"; and (2) "regardless of whether Hicks is qualified, his opinions are . . .

unreliable and should be excluded."  (R&R (Dkt. No. 75) at 8, 27)

4

In recommending that Sig Sauer's motion for summary judgment be granted, Judge Lehrburger finds that, "[w]ithout expert testimony, Jinn lacks evidence establishing that the P320 is not reasonably safe, that an alleged defect caused his accident, and that an alternative safer design was feasible. As a result, Jinn cannot establish any of his alleged causes of action." Judge Lehrburger further finds that, "even if the opinions of Jinn's experts were admissible, Sig [Sauer] would still be entitled to summary judgment because there is insufficient evidence to support critical elements of Jinn's claims." (Id. at 35)

Finally, Judge Lehrburger recommends that Plaintiff's motion for leave to submit a video exhibit be denied. (Id. at 46-48)

## III.  JINN'S OBJECTIONS

On April 26, 2023, Jinn filed objections to Judge Lehrburger's R&R, and on May 10, 2023, Sig Sauer filed a response to Jinn's objections. (See Pltf. Obj. (Dkt. No. 76); Def. Resp. (Dkt. No. 77))

In his objections, Jinn complains that Judge Lehrburger (1) "omits any consideration of Sig [Sauer]'s August 4, 2017 press release stating that vibration, among other inertial forces, can make the P320's internal safety system fail resulting in a discharge without a trigger pull"; (2) "erroneously imposes a[n] 'identity' standard" in "discounting numerous videos and eyewitness statements of defective discharges involving the exact same gun . . . because they did not occur under the exact same circumstances"; (3) "faults Villani for not examining the Jinn holster," despite the fact that, according to Jinn, "there was no holster to inspect" because "DHS destroyed it shortly before the lawsuit"; and (4) notes that Plaintiff's experts have performed no laboratory testing of the P320, because "[l]aboratory testing of the P320 under realistic carrying conditions, with an adequate sample of P320s, is cost prohibitive and impractical under Daubert

[v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)),] in the face of real-life replication all over the country." (Pltf. Obj. (Dkt. No. 76) at 3, 6, 12 (emphasis omitted))

## DISCUSSION

## I.      LEGAL STANDARDS

### A.      Review of a Magistrate Judge's Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). "'The district judge evaluating a magistrate judge's recommendation may adopt those portions of the recommendation, without further review, where no specific objection is made, as long as they are not clearly erroneous.'" Gilmore v. Comm'r of Soc. Sec., No. 09 Civ. 6241 (RMB) (FM), 2011 WL 611826, at *1 (S.D.N.Y. Feb. 18, 2011) (quoting Chimarev v. TD Waterhouse Inv. Servs., Inc., 280 F. Supp. 2d 208, 212 (S.D.N.Y. 2003)).  A decision is "clearly erroneous" when, "upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been committed."  United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (quotation marks and citation omitted).

Where a timely objection has been made to a magistrate judge's recommendation, the district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, "[o]bjections that are 'merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review.'" Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) (second alteration in original) (quoting Vega v. Artuz, 97 Civ. 3775 (LTS)

6

(JCF), 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)). "To the extent . . . that the party . . . simply reiterates the original arguments, [courts] will review the Report strictly for clear error." IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., 07 Civ. 6865 (LTS) (GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008) (citing Pearson-Fraser v. Bell Atl., No. 01 Civ. 2343 (WK), 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003); Camardo v. Gen. Motors Hourly-Rate Emps. Pension Plan, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)); see also Ortiz v. Barkley, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) ("Reviewing courts should review a report and recommendation for clear error where objections are merely perfunctory responses, . . . rehashing . . . the same arguments set forth in the original petition." (quotation marks and citations omitted)).

### B.    Admissibility of Expert Testimony

Pursuant to Federal Rule of Evidence 702, opinion testimony from an expert witness who is qualified "by knowledge, skill, experience, training, or education" may be admitted where

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under Rule 702, a trial court must "'ensur[e] that an expert's testimony . . . rests on a reliable foundation and is relevant to the task at hand.'" United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (quoting Daubert, 509 U.S. at 597).

> Daubert enumerated a list of factors that, while not constituting a "definitive checklist or test," a district court might consider in evaluating whether a proffered expert opinion has the required indicia of scientific reliability: whether a theory or technique had been and could be tested, whether it had been subjected to peer

review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation.

Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005) (quoting Daubert, 509 U.S. at 593-94).

The Supreme Court has stated that

reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."

Id. (alteration in original) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002).

In considering the reliability of proffered expert testimony, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Id. at 267. "[I]n accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing Amorgianos, 303 F.3d at 267). Absent such flaws, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

C.   **Summary Judgment Standard**

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).  "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'"  Yi Fu Chen v. Spring Tailor, L.L.C., No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, a court must "'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, "'[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'"  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex,

Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). "'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" Eviner v. Eng, No. 13 Civ. 6940 (ERK), 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).  A moving party can demonstrate the absence of a genuine issue of material fact "'in either of two ways:  (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quoting Farid v. Smith, 850 F.2d 917, 924 (2d Cir. 1988)).

"'The principles governing admissibility of evidence do not change on a motion for summary judgment' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

## II.     ANALYSIS

### A.     Sig Sauer's Motion to Exclude Plaintiff's Experts

#### 1.     The R&R's Recommendation

##### a.     Peter Villani

Since 2001, "Villani has worked as an Operations Officer, Senior Firearms Instructor/Armorer, and Primary Evidence Custodian for the United States Department of Veterans Affairs Police"; "has participated in a number of firearms training courses and has worked as a Range Manager and salesman for a gun range in the past"; and "is a certified armorer for several guns, including the Sig Sauer P320." (R&R (Dkt. No. 75) at 8-9 (citing Def. Br., Ex. 7 (Dkt. No. 57-7)))

10

In his report, "Villani analyzed five P320 pistols, not including the pistol that shot Jinn." His "examination of the fifth pistol was limited to viewing photographs, as it was in evidence in another case," and his "examination of the fourth pistol was also circumscribed because it was entered into evidence in a different case." (Id. at 9 & n.6 (citing Def. Br., Ex. 5 ("Villani Report") (Dkt. No. 57-5) at 2, 10)) He first visually examined the four pistols he was able to physically access and "assigned a percentage condition based on external signs of wear," and then "'field stripped' each [firearm], made measurements of the dimensions of several components, and observed a variety of purported manufacturing and design defects."[4] He then "fired 100 rounds through the first and second pistols, disassembled them again, and observed deposits of gunpowder." (Id. at 9 (footnote omitted) (citing Villani Report (Dkt. No. 57-5) at 2, 6, 9, 10, 12)) Villani opines that "there were inconsistencies in the height of slide caps" and that "there generally 'seemed to be no consistency of dimension between the same parts between all four [P320s],' which he termed a manufacturing defect and speculated could be caused by subcontractors using different formulas in their mold injected metal ('MIM') processes." (Id. (alteration in original) (quoting Villani Report (Dkt. No. 57-5) at 13))

In the four P320 pistols that Villani physically examined, he observed that the "the MIM components were not 'finished to a tighter tolerance' and exhibited rounded areas of excess material, termed 'rollover' by Villani, which 'prevented full intended contact of the sear and striker overlaps.'" (Id. at 9-10 (quoting Villani Report (Dkt. No. 57-5) at 13)) Villani opines that "the reduced contact between components, 'with the addition of minimal movement

---

[4] Judge Lehrburger notes that "[t]o 'field strip' a weapon is to 'dismantle or disassemble (a firearm or other piece of equipment), esp[ecially] as one would in the field rather than in a workshop.'" (R&R (Dkt. No. 75) at 9 n.7 (second alteration in original) (quoting Field-strip, OED Online, Oxford University Press, https://www.oed.com/view/Entry/287186? Redirected From=%22field+strip%22& (accessed September 12, 2023)))

of the trigger/safety level/safety lock which would cause the safety to be disengaged, could lead

to an unintended discharge.'" Villani "identifie[s] as a manufacturing defect" Sig Sauer's

"discontinu[ation] [of] the use of a safety lever return spring in its current P320 production." (Id.

at 10 (quoting Villani Report (Dkt. No. 57-5) at 13))  He concludes that

> because of "the various sizes of internal parts and [the] . . . wide range of motion
> between these parts, . . . [the P320's] 'exposure to acute conditions (e.g.[,] shock,
> vibration,[ ]heavy or repeated drops) may have a negative effect on [its] safety
> mechanisms and cause them to not work as designed.'"

(Id. (fourth alteration in original) (quoting Villani Report (Dkt. No. 57-5) at 15))

      After Jinn's pistol was recovered from DHS, Villani and Defendant's expert

Derek Watkins examined Jinn's pistol on October 28, 2021.  Villani was present for Watkins's

examination and Watkins was present for Villani's examination.  Villani then prepared a

supplemental report.[5]  (Id.; see also Villani Supp. Report (Dkt. No. 57-6) at 2-4)  During

Watkins's examination of Jinn's pistol – which Villani observed – Villani noted that Jinn's pistol

"did not have a safety lever return spring, instead relying on gravity to return the safety lever to

the 'lowered' position after the pistol is fired."  He opines that Sig Sauer's "flaw in intentionally

omitting this component . . . is that when a pistol is held in a vertical position, the safety lever

can move outwards, make contact with the safety lock, and push the safety lock upwards,

rend[er]ing it unable to stop the striker from traveling forward."  (Id. at 11-12 (citing Villani

Supp. Report (Dkt. No. 57-6) at 3-4))  "Villani did not perform any tests or calculations to

determine whether and how his theory of safety lever and lock movement would actually occur[,

however]."  (Id. at 12 (citing Def. Br., Ex. 9 ("Villani Dep.") (Dkt. No. 57-9) at 9-10))

---

[5]  The parties have not introduced any report prepared by Watkins after he and Villani examined
Jinn's P320 pistol on October 28, 2021.  The only report from Watkins that is in the record is
dated August 2, 2021, and was prepared without Watkins having had the opportunity to
physically examine Jinn's firearm.  (See Def. Br., Ex. 9 (Dkt. No. 59-9) at 2-3)

With respect to Jinn's P320 pistol, Villani notes,

> as he had with the four other P320 pistols he examined, "rollover" (excess
> material) on the striker foot and a rounded edge on [the] striker stop wall, which
> he again opines can cause reduced contact between the contact surfaces of the
> striker foot and sear, allowing the striker to "walk off" the sear, and also allow the
> safety lock tab to "jump[] over" the striker stop wall.

(Id. (second alteration in original) (quoting Villani Supp. Report (Dkt. No. 57-6) at 5-6))  Villani

opines that "these two failures 'can . . . contribute' to an un-commanded discharge."  (Id.

(omission in original) (quoting Villani Supp. Report (Dkt. No. 57-6) at 5-6))  Villani also

"observed an off-center 'drag mark' on the sear, indicating that the striker is not centered on the

sear, which can further reduce the contact and cause misalignment between the striker foot and

sear."  The failure of the striker to center on the sear "could also lead the safety lock tab to fail,

in combination with the contact surface issues."  (Id. (citing Villani Supp. Report (Dkt. No. 57-6)

at 7-9))

   Villani concludes – "'to a reasonable degree of certainty [–] that a combination of

the [discussed] defects did create a "perfect storm" scenario which led to a triggerless discharge

upon inertial force and vibration on the subject gun as in many other cases involving the

[P320].'"  (Id. (second and third alterations in original) (quoting Villani Supp. Report (Dkt. No.

57-6) at 14))  "'[D]epending upon the condition of the individual [P320] components' status,

(sear/striker engagement, excess molding material, misalignment of safety lock tab, wear, etc.),

any combination of these reported designs or manufacturing defects could lead to an

uncommanded discharge.'"  (Id. at 12-13 (second alteration in original) (quoting Villani Supp.

Report (Dkt. No. 57-6) at 15))

   With respect to Villani's qualifications, Judge Lehrburger notes that Villani's

"opinions in this case go much further than 'discuss[ing] the pistols that he disassembled and

how he found what he perceived to be worn or damaged parts.'" (Id. at 15 (alteration in original)

(quoting Guay v. Sig Sauer, Inc., 610 F. Supp. 3d 423, 430 (D.N.H. 2022)))

> Nothing in Villani's qualifications or the content of his report[, however,]
> suggests [that] he has any expertise "that enables him to identify whether the
> cause of a problem is in fact a design or manufacturing defect versus damage
> from ordinary use or misuse by the owner of the gun," or to determine what effect
> any observed defects would have on the function of the gun.

(Id. (citation omitted) (quoting Mayes v. Sig Sauer, Inc., No. 19 Civ. 00146 (GNS) (HBB), 2023

WL 2730264, at *4 (W.D. Ky. Mar. 30, 2023), amended, 2023 WL 3854266 (W.D. Ky. June 6,

2023))) Judge Lehrburger therefore concludes that "Villani's qualifications are insufficient to

sustain his offering opinions both on whether the P320 is defectively designed or manufactured

and on whether any purported defect or combination of defects caused Jinn's accident." (Id. at

17)

Judge Lehrburger further concludes that "[e]ven if Villani were qualified to opine

on firearm design and manufacture, his opinions would still need to be sufficiently reliable in

order to be admissible," and Judge Lehrburger goes on to find that Villani's opinions are not

reliable. (Id. at 17-27)

Noting that "Jinn seeks to have Villani qualified based on his experience, rather

than based on any scientific testing," Judge Lehrburger points out that

> even where an expert is qualified based on specialized experience, the expert must
> still "have based that opinion on sufficient facts or data, and must explain how
> that experience leads to the conclusion reached, why that experience is a
> sufficient basis for the opinion, and how that experience is reliably applied to the
> facts, because the trial court's gatekeeping function requires more than simply
> taking the expert's word for it."

(Id. at 18 (quoting Emig v. Electrolux Home Prods. Inc., No. 06 Civ. 4791 (KMK), 2008 WL

4200988, at *8 (S.D.N.Y. Sept. 11, 2008))) And Judge Lehrburger goes on to find that "Villani

has not explained how his experience with firearms qualifies him to opine on design,

manufacture, and causation. Nor has he based his opinions on sufficient facts or data, or reliably applied any experience to the facts." (Id.)

Judge Lehrburger explains that "Villani examined [Jinn's] pistol, found rollover, and concluded that it was a defect that caused Jinn's injury without any data to support the conclusion." Villani's opinion is thus "based on his ipse dixit alone and should be excluded." (Id. at 19)

In so concluding, Judge Lehrburger notes that Villani's lack of experience and knowledge "could have perhaps been cured by testing of his theories, but Villani conducted no such testing." (Id. at 20) In rejecting Jinn's argument that "any testing would have put his experts' lives at risk" (id. at 21 (citing Pltf. Opp. (Dkt. No. 67) at 19)), Judge Lehrburger notes that

> [t]hat proposition is somewhat belied by the testing performed by Sig [Sauer]'s expert, who used a cartridge loaded with putty to test whether the lateral movement of the slide assembly identified by Villani could cause the gun's internal safety mechanisms to fail, as well as vibration testing performed by Sig Sauer purporting to demonstrate that the P320 is incapable of firing without a trigger pull.

(Id. (citation omitted) (citing Villani Supp. Report (Dkt. No. 57-6) at 2-3; Def. Reply (Dkt. No. 62) at 6; id., Ex. 13 (Dkt. No. 62-13)))

Judge Lehrburger also rejects Jinn's argument that "testing is not necessary because videos of other allegedly similar incidents of triggerless discharges of P320s corroborate [Jinn's] theories." (Id. at 22 (citing Pltf. Opp. (Dkt. No. 67) at 27-28)) Judge Lehrburger explains that "[t]he leap from the unauthenticated videos, allegedly depicting triggerless discharges of other P320s in different situations, to Villani's conclusions that Jinn's P320 was defective and that those defects caused his accident in particular, is too far for [Judge Lehrburger] to find Villani's opinions reliable." (Id. at 23)

15

Judge Lehrburger also rejects Villani's argument that "testing his hypothesis would be virtually impossible" (id. (citing Villani Supp. Report (Dkt. No. 57-6) at 2)), because that argument "only demonstrates that his opinions have no reliable foundation." (Id. at 23-24) Although "testing is not an absolute [requirement for admissibility]," Judge Lehrburger notes that "[w]ithout any testing, and without any other data or analysis to support his theories that the conditions observed rendered Jinn's pistol defective and caused his accident, Villani's opinion does not pass the threshold for admissibility." (Id. at 24)

In finding Villani's opinions unreliable, Judge Lehrburger notes that, "[i]n addition to the lack of analysis supporting his rollover theory, Villani also does not tie his causation opinions sufficiently to the facts of this case." (Id. at 25) While "Villani's opinions are based on his observation of Jinn's pistol and counsel's explanation of how the accident occurred, he did not speak to Jinn or anyone else who witnessed the accident, nor did he review any materials related to the incident, [such as] DHS's report following the accident." (Id. (citing Villani Dep. (Dkt. No. 57-9) at 5-7)) "Villani also did not examine Jinn's holster, beyond viewing two largely illegible photographs." (Id. (citing Villani Dep. (Dkt. No. 57-9) at 10)) According to Judge Lehrburger, "Villani's failure to engage with and consider the circumstances of Jinn's accident further renders his opinions unreliable." (Id.)

"Also problematic is Villani's failure to identify and analyze a feasible alternative design." (Id.) Judge Lehrburger notes that – although "the Court might infer that an alternative design would be one that omits all identified defects" – "Villani performed no testing or calculations and offers no more than his own assurances to support the implication that remedying the identified defects . . . would actually reduce the likelihood of a triggerless discharge." (Id. at 25-26) Although "Jinn offers an alternative design in his briefing – the

16

addition of an external safety[ – ] . . . neither of Jinn's experts . . . analyze either the feasibility or efficacy of this purported alternative." (Id. at 26 (citing Pltf. Sum. J. Opp. (Dkt. No. 69) at 9-10; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶ 16))

In sum, Judge Lehrburger finds that "Villani fails to 'bridge the logical gap between [the] facts' of his observations and 'his conclusion' that the observed conditions of Jinn's P320 constitute product defects which caused Jinn's injury." (Id. at 27 (alteration in original) (quoting Bocoum v. Daimler Trucks N. Am. LLC, No. 17 Civ. 7636 (JPC) (BCM), 2022 WL 902465, at *12 (S.D.N.Y. Mar. 28, 2022))) "'This is precisely the type of opinion evidence that is connected to existing data only by the ipse dixit of the expert, which courts have held inadmissible under Rule 702 and Daubert.'" (Id. (quoting Bocoum, 2022 WL 902465, at *12))

**b.** **Timothy Hicks**

Hicks "is a Professional Engineer licensed in five states and is a member of several professional associations"; "has a background in mechanical design and system evaluations, including accident reconstruction, and has 'spent close to 20 years . . . in the automotive industry, responsible for the design, manufacturing, testing, and validation of vehicle systems'"; "earned a Bachelor of Science in Mechanical Engineering from Michigan Technological University and a Master of Science in Engineering Sciences from Rensselaer Polytechnic Institute." He also "holds Certificates of Eligibility from the California Department of Justice Bureau of Firearms and Massachusetts Firearms Records Bureau for performing firearm certification testing." (Id. at 28 (quoting Pltf. Resp. R. 56.1 Stmt., Ex. 2 ("Hicks Report") (Dkt. No. 68-2) at 1; citing Def. Br., Ex. 5 (Dkt. No. 59-5) at 2-3))

"In forming his opinions, Hicks relied on the testing performed by Sig [Sauer]'s

expert [Derek Watkins, when he and Villani examined Jinn's pistol on October 28, 2021],

[Watkins's August 2, 2021 report,] [computerized tomography] scans, and Villani's observations

and photographs."[6] He "did not attend or participate in the testing and examination of Jinn's

---

[6] According to Watkins's August 2, 2021 report, he is the president and chief engineer of Nth-Level LLC. (Def. Br., Ex. 9 (Dkt. No. 59-9) at 9)  The record contains no other information concerning his qualifications.  In his report, Watkins states that Sig Sauer examined Jinn's pistol on January 29, 2020, and that this examination was video-recorded.  The opinions expressed in Watkins's report are based on his knowledge of the design of the Sig Sauer P320 pistol and his review of the video-recorded examination of Jinn's pistol.  As of August 2, 2021, Watkins had not physically examined Jinn's pistol.  (Id. at 3-4)  According to Watkins, "[t]he pistol was a 'Post Upgrade' version and shown to be in a clean condition, with no overt damage or alterations observed.  The pistol was first tested per the [following] function tests": "Magazine Catch," "Slide Catch," "Magazine Release," "Slide Release," "Trigger Function," "Disconnector Function," "Firing Pin/Striker Function," "Striker Safety Lock Function," and "Trigger Pull Actuation Force Testing."  Jinn's pistol "passed all the function tests."  (Id. at 2-3)

In his August 2, 2021 report, Watkins further states that

> NRA (National Rifle Association) hanging weights were employed to test the trigger actuation force of the pistol.  The pistol was shown to discharge at approximately five pounds.  The pistol was then field stripped, and its sub systems examined.  The pistol appeared to be very clean internally, with no significant field debris observed.  The trigger, trigger bar, disconnector, sear, and striker safety lever were all shown to be functioning properly.  When the fire control unit was removed from the pistol and visually examined during the inspection, it was observed to be relatively clean, free of overt damage and alteration, and functioning properly.  The fire control unit's components were observed to be in factory condition and the only way the pistol could be made to fire was to cock the pistol and then fully pull the trigger.  No physical or empirical evidence was observed that would suggest the subject pistol was capable of discharging absent a trigger pull in a manner consistent with Mr. Jinn's complaint.

(Id. at 3)

According to Watkins, "[a]ll physical testing of the subject pistol failed to produce a discharge absent a trigger pull," and "[t]here is no physical evidence to support an allegation that the pistol fired at the time of the incident – or any other time – in any manner other than when the pistol's chamber was loaded, the striker pin was cocked, and the trigger was actuated."  (Id.)  Watkins concludes that "[t]he design of the S[ig] Sauer P320, combined with the video examination of the subject pistol indicates Mr. Jinn caused the trigger of the subject pistol to be pulled when he was removing the pistol from the holster."  (Id. at 4)

P320[, however]; nor did he contribute to the examination or testing process." He also "did not speak with Jinn and read only two pages of his deposition." (Id. (citing Hicks Report (Dkt. No. 68-2) at 2, 9; Def. Br., Ex. 7 (Dkt. No. 59-7) 5, 9-11); see also Pltf. Opp., Ex. 7 (Dkt. No. 67-7) at 19)

According to Judge Lehrburger, "Hicks identifies essentially the same defects as Villani, without explicitly differentiating between design and manufacturing defects, and opines that '[t]hese defects explain Special Agent Jinn's report of un-commanded (no trigger pull) discharge of the firearm.'" (Id. at 28-29 (alteration in original) (quoting Hicks Report (Dkt. No. 68-2) at 3-7)) Hicks concludes,

> with "a reasonable degree of scientific and engineering certainty . . . based on engineering education, experience, and training, as well as the work conducted to date and the information available at this time" that "the physical evidence supports [Jinn's] description of the circumstances of his accident" and that "[n]ormal and expected movement and vibration while holstered can cause an accidental discharge given the defective conditions described."

(Id. at 29 (alterations and omission in original) (quoting Hicks Report (Dkt. No. 68-2) at 11))

Judge Lehrburger was "dubious about Hicks's qualifications to opine about the issues in this case," but finds that "[r]egardless of whether Hicks is qualified, his opinions, like Villani's, are not sufficiently reliable to be admitted under Fed. R. Evid. 702 and Daubert." (Id. at 32)

As to reliability, Judge Lehrburger finds that "Hicks's methodology suffers from . . . defects [similar to those seen in] Villani's," and "[f]or all the same reasons discussed regarding Villani's opinions . . . , this lack of analysis, testing, calculations, or modeling renders Hicks's testimony unreliable, regardless of his qualifications." (Id. at 33-34) Judge Lehrburger also rejects Hicks's claim that "'his investigation methods are in accordance with the generally accepted standards and practices of his field, including utilizing the scientific method.'" (Id. at

34 (quoting Hicks Report (Dkt. No. 68-2) at 1))  Judge Lehrburger notes that "'[t]here is no general acceptance in the engineering community for a methodology that omits testing of a hypothesis'" (id. (quoting Colon ex rel. Molina v. BIC USA, Inc., 199 F. Supp. 2d 53, 78 (S.D.N.Y. 2001))), and that "[w]hile Hicks 'insists in his report that he applied the scientific method in reaching his conclusions, it is . . . clear that this was not the case,' contrary to his engineering training."  (Id. (omission in original) (quoting Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC, 419 F. Supp. 3d 490, 515 (E.D.N.Y. 2019)))  Judge Lehrburger concludes that "like Villani's opinions, Hicks's opinions do not have sufficient reliability to pass through the admissibility gateway."  (Id. at 35)

### 2. Jinn's Objections to the R&R

Jinn complains that Judge Lehrburger's R&R "omits any consideration of Sig [Sauer]'s August 4, 2017 press release stating that vibration, among other inertial forces, can make the P320's internal safety system fail resulting in a discharge without a trigger pull," and that this omission constitutes "plain error."[7]  (Pltf. Obj. (Dkt. No. 76) at 3-4 (emphasis omitted))

---

[7]  The August 4, 2017 press release, entitled "SIG SAUER[] Reaffirms safety of P320[] Pistol," reads as follows:

In response to social media rumors questioning the safety of the P320 pistol, a variant of which was selected by the U.S. government as the U.S. Army's Modular Handgun System (MHS), SIG SAUER, Inc. has full confidence in the reliability, durability and safety of its striker-fired handgun platform.  There have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date.

The P320 meets and exceeds all U.S. standards for safety, including the American National Standards Institute (ANSI) and Sporting Arms and Ammunition Manufacturers' Institute, Inc. (SAANII), as well as rigorous testing protocols for global military and law enforcement agencies.

All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed.  However, like any mechanical device, exposure to acute conditions (e.g.[,] shock, vibration, heavy or repeated drops) may have a

20

According to Jinn, Sig Sauer's press release "constitutes an admission by Sig [Sauer] on the central issue in the case, i.e., that the P320 as originally designed can fire without a trigger pull." (Id. at 4 (footnote omitted))

Jinn next complains that Judge Lehrburger "erroneously imposes a[n] 'identity' standard, . . . discounting numerous videos and eyewitness statements of defective discharges involving the exact same gun . . . because they did not occur under the exact same circumstances." (Id. at 6 (emphasis omitted)) Jinn contends that the R&R's finding that "[n]one of the incidents in the videos occur in similar situations to Jinn's accident" (R&R (Dkt. No. 75) at 22) is "inaccurate, and contrary to the governing New York case law," because "[a]ll the videos [proffered by Jinn] involve the exact same product – the P320 – and the circumstances, while never identical, are highly similar and involve the same alleged defect." (Pltf. Obj. (Dkt. No. 76) at 6)

Jinn also complains that the R&R "faults Villani for not examining the Jinn holster" when "there was no holster to inspect," because "DHS destroyed it shortly before the lawsuit." (Id. at 12 (emphasis omitted))

Jinn further contends that "[l]aboratory testing of the P320 under realistic carrying conditions, with an adequate sample of P320s, is cost prohibitive and impractical under Daubert

_____

negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

As a result, individual attempts to perform drop tests outside of professionally controlled environments should not be attempted.

"SIG SAUER is committed to producing only the finest products," said Ron Cohen, President and CEO of SIG SAUER. "Safety and reliability have been and always will be paramount to the SIG SAUER brand."

(Pltf. Sum. J. Opp., Ex. 2 (Dkt. No. 69-2) at 1)

in the face of real-life replication all over the country." (Id. (emphasis omitted))  While the R&R

acknowledges that "testing, i.e., replication of trigger-less discharge in a lab setting, is 'not

required' under Daubert, the R[&]R essentially proceeds to require it absolutely."  According to

Jinn, "it is substantially on this basis that the R[&]R excludes Villani['s] and Hicks['s]"

proffered opinions.  (Id. (citation omitted) (citing R&R (Dkt. No. 75) at 24))  Jinn further argues

that "Daubert and its progeny expressly recognize that testing in some cases may be impractical

or impossible," and Jinn contends "that this is one of those cases[,] given the costs of realistic

testing that could approach seven figures, assuming it could even be done realistically with

robots."  (Id. at 14 (footnote omitted))  Jinn also argues "that laboratory replication is not

necessary given the substantial evidence of real-world replication" and – referring to the press

release – asserts that "Sig [Sauer] itself has acknowledged in writing that the product can fail in

the fashion Jinn asserts."  (Id.)

      Jinn's objections will be reviewed de novo.  See 28 U.S.C. § 636(b)(1)(C).

### 3.   Analysis

      As an initial matter, Jinn errs in arguing that the R&R "omits any consideration"

of Sig Sauer's August 4, 2017 press release.  (Pltf. Obj. (Dkt. No. 76) at 3 (emphasis omitted))

Indeed, Judge Lehrburger – in discussing Villani's report – quotes the Sig Sauer press release

language on which Jinn relies.  (See R&R (Dkt. No. 75) at 10 (quoting Villani Report (Dkt. No.

57-5) at 15) ("[Villani] ultimately concluded that because of 'the various sizes of internal parts

and having a wide range of motion between these parts, [he] concur[s] with Sig Sauer's own

assessment . . . that "like any mechanical device,[ ]exposure to acute conditions (e.g.[,] shock,

vibration,[ ]heavy or repeated drops) may have a negative effect on these safety mechanisms and

cause them to not work as designed."'" (omission and fourth and sixth alterations in original)

(emphasis added)))  In sum, Judge Lehrburger clearly considered the Sig Sauer press release.

The press release is of little assistance to Jinn, however.  While Jinn contends that

the press release "stat[es] that vibration, among other inertial forces, can make the P320's

internal safety system fail resulting in a discharge without a trigger pull" (Pltf. Obj. (Dkt. No. 76)

at 3 (emphasis omitted)), the press release makes clear that an unintended discharge occurs only

in "acute conditions (e.g.[,] shock, vibration, heavy or repeated drops)."  After emphasizing "the

reliability, durability and safety of its striker-fired handgun platform," Sig Sauer notes that

"[t]here have been zero (0) reported drop-related P320 incidents in the U.S. commercial market,

with hundreds of thousands of guns delivered to date," and "[t]he P320 meets and exceeds all

U.S. standards for safety, . . . [and reflects] rigorous testing protocols for global military and law

enforcement agencies."  (Pltf. Sum. J. Opp., Ex. 2 (Dkt. No. 69-2) at 1)

The press release goes on to state that

> [a]ll SIG SAUER pistols incorporate effective mechanical safeties to ensure they
> only fire when the trigger is pressed.  However, like any mechanical device,
> exposure to acute conditions (e.g.[,] shock, vibration, heavy or repeated drops)
> may have a negative effect on these safety mechanisms and cause them to not
> work as designed.  This language is common to owner's manuals of major
> handgun manufacturers.
>
> As a result, individual attempts to perform drop tests outside of professionally
> controlled environments should not be attempted.

(Id.)

Jinn contends that his P320 unexpectedly discharged while he was removing it

from its holster.  (See Pltf. Opp. (Dkt. No. 67) at 11 ("[A] rational jury could find based on the

evidence . . . that Jinn's P320, like so many others, fired without a trigger pull when he was

pushing it down in his new holster before drawing it."); Pltf. Sum. J. Opp. (Dkt. No. 69) at 6-8)

The circumstances of the discharge did not involve the sort of "acute conditions" cited by Sig

Sauer, whether extraordinary shock, vibration, or heavy or repeated drops. In sum, while the press release – as an evidentiary matter – constitutes an admission by Sig Sauer (see Fed. R. Evid. 801(d)(2)), it does not demonstrate that Jinn's P320 pistol spontaneously discharged under the circumstances he describes, or that P320 pistols in general spontaneously discharge under such circumstances, as Jinn contends. (See Pltf. Obj. (Dkt. No. 76) at 4 (footnote omitted) ("This statement constitutes an admission by Sig [Sauer] on the central issue in the case, i.e., that the P320 as originally designed can fire without a trigger pull.")) Finally, Sig Sauer's press release does not cure the defects in Villani's and Hicks's qualifications and methodology, which is the basis for Judge Lehrburger's recommendation that their testimony be excluded and that Sig Sauer's motion for summary judgment be granted. Accordingly, this objection will be overruled.

Jinn also complains that the R&R "erroneously imposes a[n] 'identity' standard on the issue of other similar incidents, discounting numerous videos and eyewitness statements of defective discharges involving the exact same gun . . . because they did not occur under the exact same circumstances." (Pltf. Obj. (Dkt. No. 76) at 6 (emphasis omitted))

At summary judgment, Jinn proffered five videos that he contends capture "un-commanded discharges of the P320."[8] (Pltf. Opp. (Dkt. No. 67) at 20) In reality, the videos cited by Jinn are not enlightening, because in nearly all the videos offered by Jinn, the discharge of the P320 is not shown.

---

[8] In his opposition, Jinn claims that "[a]t least six" videos depict "un-commanded discharges of the P320" pistol (Pltf. Opp. (Dkt. No. 67) at 20), but Jinn provided only five videos. (See Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶ 2, at 5; id., Exhs. 5, 7-9, 11 (Dkt. Nos. 68-5, 68-7, 68-8, 68-9, 68-11)) While Jinn references a sixth video – reflecting a March 28, 2022 incident in Houston, Texas, which Jinn states depicts a "[p]olice officer's P320 discharg[ing] as he is getting into his car" (Pltf. Opp. (Dkt. No. 67) at 22) – Jinn has not provided this video.

For example, Jinn offers February 4, 2016 body camera footage from a Roscommon, Michigan police officer. The footage depicts the officer getting out of his vehicle, followed by the sound of a gun discharging and the officer stating that his gun "[went] off." The gun itself is not visible in the video at the time of the alleged accidental discharge, however. (See Pltf. Resp. R. 56.1 Stmt., Ex. 5 (Dkt. No. 68-5))

Similarly, an August 26, 2019 video taken at a Southeastern Pennsylvania Transportation Authority ("SEPTA") train station in Philadelphia shows what appears to be footage from a police officer's body camera. The video begins with the officer reporting "an accidental discharge" of a gun, but the video does not show the discharge itself. (See Pltf. Resp. R. 56.1 Stmt., Ex. 7 (Dkt. No. 68-7))

A January 2, 2021 video from Milwaukee is security camera footage. It includes no sound. After four individuals get out of a car, they all look in the direction of one individual, who then looks towards the side of his body and then looks around the car. No gun is clearly visible, and the circumstances of what happened are not clear from the video. (See Pltf. Resp. R. 56.1 Stmt., Ex. 8 (Dkt. No. 68-8))

A December 5, 2021 video from Rose Casino in Louisiana is security camera footage. The video shows a woman moving her handbag towards what appears to be a slot machine in a casino, followed by the sound of a gun discharging. The video does not show the gun itself. (See Pltf. Resp. R. 56.1 Stmt., Ex. 11 (Dkt. No. 68-11))

Finally, an August 3, 2021 video from Saint Clare Prison in Detroit is security camera footage that includes no sound. The video shows an officer inserting a gun into his holster, making a startled movement and looking towards his holster. The video appears to show

the gun discharging in its holster.  The circumstances of the firing are not clear.  (See Pltf. Resp. R. 56.1 Stmt., Ex. 9 (Dkt. No. 68-9))

In sum, the videos have little probative value, because they do not clearly depict the circumstances of any alleged accidental discharge of a P320.

Jinn contends, however, that Judge Lehrburger erred in finding that "'[n]one of the incidents in the videos occur in similar situations to Jinn's accident.'"  (Id. at 6 (alteration in original) (quoting R&R (Dkt. No. 75) at 22))  But it is important to acknowledge that Judge Lehrburger makes this finding in the context of discussing the reliability of Villani's opinions, and in evaluating Jinn's argument that these videos render any testing unnecessary.  (See R&R (Dkt. No. 75) at 22; Pltf. Opp. (Dkt. No. 67) at 27-28)  Like Judge Lehrburger, this Court considers whether Jinn's videos depict events sufficiently similar to the alleged facts here such that they render testing of Villani's conclusions unnecessary in determining whether his opinions are sufficiently reliable.

Jinn first argues that Judge Lehrburger "invades the province of the jury by asserting that it is 'impossible to determine whether the trigger was pulled'" in the February 4, 2016 Roscommon, Michigan video and in the August 26, 2019 SEPTA video, "because the 'gun is not visible when it fires.'"  (Pltf. Obj. (Dkt. No. 76) at 7 (quoting R&R (Dkt. No. 75) at 22))  But a judge considering the admissibility of proposed expert testimony is required to closely examine the materials on which an expert relies.  Indeed, the Second Circuit has instructed that "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  Amorgianos, 303 F.3d at 267.  Accordingly,

Judge Lehrburger did not err in noting that these videos do not show whether any trigger was pulled.

In his supplemental report, Villani "conclude[s] to a reasonable degree of certainty that a combination of . . . defects did create a 'perfect storm' scenario which led to a triggerless discharge upon inertial force and vibration on the subject gun as in many other cases involving the P[]320." (Villani Supp. Report (Dkt. No. 57-6) at 15) And Jinn argues that – although Villani "did not conduct any experiments shaking a loaded P320" – "the [spring-charged foot and sear face connection] failure has been replicated in real life many times," as shown in the videos he has proffered. (Pltf. Opp. (Dkt. No. 67) at 27-28) The videos Jinn has proffered, however, do not render testing of Villani's conclusions unnecessary, because the videos do not provide a factual basis for Villani's proffered opinions. The videos do not show how the gun in each incident came to have discharged. Indeed, as discussed above, most of the videos proffered by Jinn do not even show the discharge of a firearm. In sum, Jinn's videos do not depict circumstances similar to those here.

In his objections, Jinn complains, in particular, about Judge Lehrburger's findings concerning the February 4, 2016 Roscommon, Michigan video, and the August 26, 2019 SEPTA video. But as is explained above, in the Roscommon, Michigan video, the pistol that discharges is not visible (see Pltf. Resp. R. 56.1 Stmt., Ex. 5 (Dkt. No. 68-5)), and in the SEPTA video, the footage begins after the gun discharged. (See Pltf. Resp. R. 56.1 Stmt., Ex. 7 (Dkt. No. 68-7)) These videos are "simply inadequate to support the conclusions reached" by Villani, see Amorgianos, 303 F.3d at 266, which are (1) that a P320 discharged defectively, albeit under entirely different circumstances than those alleged here; and (2) the same defects caused each alleged defective discharge. (See Villani Supp. Report (Dkt. No. 57-6) at 15) But Jinn's videos

do not clearly show defective discharges, and he offers nothing to suggest that the same defects

caused the discharges in each video and the discharge in this case.[9]  In sum, Jinn's videos are not

proper substitutes for testing, and without other indicia of reliability, Villani's proffered expert

opinions are not admissible.

       Jinn next argues that the R&R "errs in stating that [the August 3, 2021 Saint Clare

Prison video] shows an officer 'standing with a hand outside of the holster.'"  Jinn contends that

"[t]hat is merely one still frame of the video."  (Pltf. Obj. (Dkt. No. 76) at 9 (quoting R&R (Dkt.

No. 75) at 22 n.20))  According to Jinn, the Saint Clare video shows an officer "inserting [a gun]

into his holster."  (Id. at 10)  As an initial matter, Jinn's contention that the officer in the video is

shown "inserting [a gun] into his holster" is not inconsistent with the R&R's statement that, at

another point in the Saint Clare video, the officer was "standing with a hand outside of the

holster."  (R&R (Dkt. No. 75) at 22 n.20)  In any event, the circumstances of the alleged

discharge at the Saint Clare Prison are not similar to the facts alleged here, where Jinn claims

that his P320 discharged while he "was pushing [the gun] down, in the process of pulling it out"

of his holster.  (See Jinn Dep. (Dkt. No. 68-1) at 2-3)  As such, the Saint Clare video is not a

proper substitute for the testing necessary to verify the reliability of Villani's opinions.  In sum,

most of the Jinn videos do not show a discharge, and "[n]one of the videos depict a P320 firing

---

[9]  Moreover, Jinn does not object to Judge Lehrburger's finding that the videos are entirely
unauthenticated.  As Judge Lehrburger states, "Jinn has offered no testimony from anyone with
personal knowledge of the videos or the incidents depicted to authenticate the videos."  (R&R
(Dkt. No. 75) at 23)  And while Jinn cites to deposition testimony from an officer shown in one
of the videos, and an affidavit from the officer's partner – both introduced in another case (see
Pltf. Obj. (Dkt. No. 76) at 8; id., Exhs. 2, 3 (Dkt. Nos. 76-2, 76-3)) – neither the testimony nor
the affidavit establish that the video at issue depicts what Jinn claims it depicts.  See Fed. R.
Evid. 901(a).

while the user attempted to draw it from the holster." (R&R (Dkt. No. 75) at 22 n.20)

Accordingly, Jinn's objection will be overruled.

        As for Jinn's complaint that the R&R "faults Villani for not examining the Jinn

holster," when "DHS destroyed the holster" (Pltf. Obj. (Dkt. No. 76) at 12 (emphasis omitted)),

Judge Lehrburger does not "fault" or "critici[ze]" Villani for not examining the holster, as Jinn

contends. (Id.) He merely notes this fact in discussing the basis for Villani's opinions. And it is

obviously relevant that Villani's proffered expert opinions are not informed by or premised on

any examination of Jinn's holster. In sum, Judge Lehrburger's findings that "Villani . . . does not

tie his causation opinions sufficiently to the facts of this case," and that "Villani's failure to

engage with and consider the circumstances of Jinn's accident further renders his opinions

unreliable" (see R&R (Dkt. No. 75) at 25) are well supported by the record.

        In this regard, Judge Lehrburger notes that

> Villani's opinions are based on his observation of Jinn's pistol and counsel's
> explanation of how the accident occurred; he did not speak to Jinn or anyone who
> witnessed the accident, nor did he review any materials related to the incident,
> including DHS's report following the accident. . . . . Villani concludes that a
> combination of observed defects "did create a 'perfect storm' scenario which led
> to a triggerless discharge" but conceded that "[y]ou just can't tell" what
> combination of possible misalignments identified in his report were in fact present
> to cause Jinn's accident.

(Id. (alteration in original) (citations omitted) (citing Villani Dep. (Dkt. No. 57-9) at 5-7, 11;

Villani Supp. Report (Dkt. No. 57-6) at 14)) Accordingly, Jinn's objection will be overruled.

        Jinn also complains that while Judge Lehrburger acknowledges that "testing, i.e.,

replication of trigger-less discharge in a lab setting, is 'not required' under Daubert, [he]

essentially proceeds to require it absolutely." According to Jinn, "it is substantially on this basis

that the R[&]R excludes Villani[']s and Hicks['s]" proffered opinions. (Pltf. Obj. (Dkt. No. 76)

at 12 (citation omitted) (citing R&R (Dkt. No. 75) at 24))

Testing is not an absolute prerequisite for admitting an expert opinion. See Nimely, 414 F.3d at 396 (quoting Daubert, 509 U.S. at 593-94) ("Daubert enumerated a list of factors that, while not constituting a 'definitive checklist or test,' a district court might consider in evaluating whether a proffered expert opinion has the required indicia of scientific reliability," which includes, inter alia, "whether a theory or technique had been and could be tested."). However, for a proffered expert opinion to be admissible, it must otherwise be reliable. And "'[n]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.'" Id. (quoting Joiner, 522 U.S. at 146); see also Karnauskas v. Columbia Sussex Corp., No. 09 Civ. 7104 (GBD), 2012 WL 234377, at *8 (S.D.N.Y. Jan. 24, 2012) (quoting Colon ex rel. Molina, 199 F. Supp. 2d at 76) ("In design defect cases, testing, although not an absolute [prerequisite] for expert testimony to be admissible, 'is usually critical to show that an expert adhere[d] to the same standards of intellectual rigor that are demanded in their professional work.'" (second alteration in original)).

Jinn argues, however, that "the costs of realistic testing [here] could approach seven figures, assuming it could even be done realistically with robots." And according to Jinn, "laboratory replication is not necessary given the substantial evidence of real-world replication." (Pltf. Obj. (Dkt. No. 76) at 14) "Although not all expert testimony is able to be scientifically verified or examined, this lack of verification, coupled with the insufficient basis and speculation on which [Jinn's proffered expert] opinion[s] [are] based, further demonstrates that [their] opinion[s] [are] unreliable." See Ryan v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A., No. 3:03-CV-0644 (CFD), 2010 WL 2232670, at *8 (D. Conn. June 2, 2010).

Other than through ipse dixit, Jinn's proffered experts do not connect the alleged "real-world replication" data to their conclusions that Jinn's P320 pistol was defective, and that this defect led to an accidental discharge of Jinn's pistol. (See Villani Supp. Report (Dkt. No. 57-6) at 15; Hicks Report (Dkt. No. 68-2) at 12) The only alleged "real-world replication" data here are the same videos discussed earlier (see Pltf. Obj. (Dkt. No. 76) at 14; Pltf. Opp. (Dkt. No. 67) at 19-23), and as explained above, the videos do not show P320 handguns accidentally discharging, much less discharging under the circumstances here, where Jinn says the incident occurred when he "was pushing [the gun] down, in the process of pulling it out" of his holster. (Jinn Dep. (Dkt. No. 68-1) at 2-3) Jinn's experts have not shown that any defect in any gun shown or referenced in the videos was also present in Jinn's pistol, or that this defect caused each discharge. Accordingly, "'there is simply too great an analytical gap between the data'" – Jinn's videos – "'and the opinion[s] proffered'" – that Jinn's pistol discharged as a result of certain alleged defects.[10] See Nimely, 414 F.3d at 396 (quoting Joiner, 522 U.S. at 146). Accordingly, Jinn's objection will be overruled.[11]

For the reasons stated above, Jinn's objections regarding Judge Lehrburger's findings concerning Jinn's expert witnesses will be overruled.

---

[10] Judge Lehrburger also finds that Villani's "qualifications . . . [are] insufficient to sustain his offering opinions both on whether the P320 is defectively designed or manufactured and on whether any purported defect or combination of defects caused Jinn's accident." Accordingly, even if Villani's proffered opinions were reliable – which they are not – his opinions would be excluded on the independent basis of insufficient qualifications. (R&R (Dkt. No. 75) at 8, 17) Indeed, the R&R finds both proffered expert opinions unreliable for reasons independent from the lack of testing (see id. at 18-20, 33-35), and Jinn has not objected to these conclusions.

[11] Jinn asks this Court to appoint an expert "to conduct laboratory testing of an adequate sample of P320s under realistic carrying conditions." (See Pltf. Obj. (Dkt. No. 76) at 15) Jinn has not cited law supporting his request, which is denied.

### B. Sig Sauer's Motion for Summary Judgment

Judge Lehrburger goes on to find that Sig Sauer is entitled to summary judgment

on all of Jinn's claims:

> Without expert testimony, Jinn lacks evidence establishing that the P320 is not reasonably safe, that an alleged defect caused his accident, and that an alternative safer design was feasible. As a result, Jinn cannot establish any of his alleged causes of action, and summary judgment should be entered in Sig [Sauer]'s favor on all claims. But even if the opinions of Jinn's experts were admissible, Sig [Sauer] would still be entitled to summary judgment because there is insufficient evidence to support critical elements of Jinn's claims.

(R&R (Dkt. No. 75) at 35)

### 1. Products Liability and Negligence Claims

Judge Lehrburger concludes that "Jinn cannot prevail on a design defect theory."

(Id. at 38)  He reasons that "[n]either expert, nor Jinn's counsel, discusses or presents evidence

of the feasibility of an alternative design as required under New York law." Rather, "Jinn merely

contends that he does not need expert testimony to establish the existence of a safer alternative

design because the existence of a safer design, namely a pistol with an external safety, is

'obvious and understandable' to a layperson."  (Id. (quoting Pltf. Sum. J. Opp. (Dkt. No. 69) at

10))  Judge Lehrburger finds this argument "unpersuasive," because "firearms are not the type of

product for which alternative designs are 'obvious and understandable.'"  (Id.)  Judge Lehrburger

further finds that "the fact that **Jinn's employer specifically requires a pistol without an**

**external safety** suggests that the alternative design championed by Jinn would not be feasible

due to lack of utility."  (Id. (emphasis in original) (citing Def. Sum. J. Reply, Ex. 2 (Dkt. 64-2) at

9))  "Even considering [Jinn's] expert reports," Judge Lehrburger finds that "Jinn has offered

nothing analyzing the utility and cost tradeoffs of his favored alternative design," and concludes

that "[t]hat omission is fatal to his [products liability and negligence] claims." (Id. at 40)

Judge Lehrburger further concludes that "Jinn offers no evidence to establish a

manufacturing defect claim under either" negligence or strict liability. (Id. at 41) "Even if

Villani's and Hicks'[s] opinions were admissible, neither compared Jinn's P320 to any others

alleged not to be defective." (Id.) "Indeed, Jinn's entire theory is one of design defect; despite

using the words 'manufacturing defect,' Jinn suggests that the alleged defects in his P320 are

part of a widespread problem with P320 pistols in general." (Id. at 41-42 (citing Pltf. Sum. J.

Opp. (Dkt. No. 69) at 4-5; Cmplt. (Dkt. No. 1) at 2-3)) Judge Lehrburger finds that "[w]here, as

here, '[a] claim [is] devoid of allegations that a particular unit differed when compared to others

in the same product line[, a manufacturing defect claim] will be dismissed.'" (Id. at 42) (second

and third alterations in original) (quoting Guariglia v. Procter & Gamble Co., No. 2:15-cv-04307

(ADS) (SIL), 2018 WL 1335356, at *5 (E.D.N.Y. Mar. 14, 2018))). Judge Lehrburger further

finds that "[t]he exclusion of the experts' testimony identifying defects and asserting causation

also supports granting summary judgment for Sig [Sauer]" because, without any such testimony,

there is no evidence that any design defect caused Jinn's accident. (Id. at 43)

### 2. **Breach of Warranty of Merchantability Claim**

Judge Lehrburger notes that "Jinn does not differentiate between the factual bases

for any of his claims in his opposition to summary judgment," and thus concludes that "for the

same reasons that Sig [Sauer] is entitled to summary judgment on Jinn's . . . products liability

claims, Sig [Sauer] is entitled to summary judgment in its favor on Jinn's claim for breach of

[the] implied warranty of merchantability." (Id. at 44; see also id. (quoting Nemes v. Dick's

Sporting Goods, Inc., 521 F. Supp. 3d 328, 346 (S.D.N.Y. 2021)) ("'Where a plaintiff fails to

submit anything in opposition to summary judgment establishing separate factual bases for their

33

breach of implied warranty of merchantability claims and the strict products liability claim based on defective design,[] the implied warranty claim fails alongside the design defect claim.'"))

### 3. Negligent and Intentional Infliction of Emotional Distress Claims

Judge Lehrburger finds that Jinn's negligent and intentional infliction of emotional distress claims "'seek[] damages for the same circumstances and injuries, physical and emotional, that his tort claims seek.'" (Id. at 45-46 (alteration in original) (quoting Boateng v. Bayerische Motoren Werke Aktiengesellschaft, No. 17 Civ. 00209 (KAM) (SIL), 2022 WL 4357555, at *29 (E.D.N.Y. Sept. 20, 2022))) Because "[a] claim for emotional distress 'generally is not allowed if it is essentially duplicative of tort or contract causes of action'" (id. at 45 (quoting Djangmah v. Falcione, No. 08 Civ. 4027 (PAC) (FM), 2013 WL 208914, at *9 (S.D.N.Y. Jan. 18, 2013), report and recommendation adopted, 2013 WL 1195261 (S.D.N.Y. Mar. 25, 2013))), Judge Lehrburger finds that Sig Sauer is entitled to summary judgment on Jinn's negligent and intentional infliction of emotional distress claims. Judge Lehrburger further finds that even where a defendant has "'potentially . . . designed, manufactured, or failed to warn of defects in a product, [such conduct] does not rise to the "outrageous" conduct or indecent behavior that a claim of [negligent or intentional infliction of emotional distress] requires.'" (Id. at 46 (quoting Boateng, 2022 WL 4357555 at *29))

        \*        \*        \*        \*

Apart from Jinn's general objection that Judge Lehrburger's R&R "omits any consideration" of Sig Sauer's August 4, 2017 press release (Pltf. Obj. (Dkt. No. 76) at 3 (emphasis omitted)), there are no objections to the R&R's recommendation that Sig Sauer's motion for summary judgment be granted. To the extent that any of Jinn's objections apply to the portion of the R&R that discusses Sig Sauer's motion for summary judgment, they will be

34

overruled for the reasons set forth above.  The Court therefore reviews the remainder of the R&R for clear error.  See Gilmore, 2011 WL 611826, at *1.

This Court agrees with Judge Lehrburger that Jinn has not set forth evidence of a feasible alternative design for the P320 pistol, and has not proffered evidence of any manufacturing defect in Jinn's P320 pistol.  This Court likewise agrees that Jinn has not offered evidence sufficient to make out claims for breach of warranty of merchantability, or negligent or intentional infliction of emotional distress.  Accordingly, there is no clear error in Judge Lehrburger's recommendation that these claims be dismissed.  Accordingly, this Court will adopt the R&R's recommendation that Sig Sauer's motion for summary judgment be granted.

**C.**  **Jinn's Motion to File a Video Exhibit**

Judge Lehrburger concludes that, "because [he] recommends granting summary judgment for Sig [Sauer] based on Jinn's lack of critical evidence, Plaintiff's later-filed motion to introduce an additional video exhibit should be denied as moot."  (R&R (Dkt. No. 75) at 46)  Judge Lehrburger further states, however, that "[w]hether admitted or not, the [later-filed] video would have no effect on the Court's ultimate conclusion that Sig [Sauer] is entitled to summary judgment" because, among other reasons, "Jinn does not disclose any additional details of the circumstances surrounding th[e] alleged triggerless discharge" allegedly shown in the video. (Id.) Judge Lehrburger also concludes that "Plaintiff's failure to authenticate the video under the Federal Rules of Evidence is reason enough to deny his motion."  (Id. at 48)  Although experts may rely on inadmissible evidence, "neither of Jinn's experts considered the additional video in forming their opinions.  Nor could they have, as the incident depicted occurred well after their

reports were submitted in this case, and Jinn has not tendered any supplemental reports from either Villani or Hicks." (Id. (citing Fed. R. Evid. 703))

No party has objected to the R&R's recommendation that Jinn's motion for leave to file the video exhibit be denied. The Court therefore reviews that recommendation for clear error. See Gilmore, 2011 WL 611826, at *1.

This Court agrees that the video exhibit that Jinn seeks to offer in further opposition to Sig Sauer's motions has not been authenticated, and that – even if the video had been authenticated – it does not support Jinn's argument that the opinions of his proffered experts are reliable, particularly given that neither of Jinn's experts viewed the video.

To the extent that Jinn argues that this video exhibit supports his opposition to Sig Sauer's motion for summary judgment, Jinn has not shown how this video constitutes evidence of his claims. Jinn represents that the video depicts "a P320 discharging inside an officer's holster in Honesdale, Pennsylvania on February 7, 2022," and contends that "it is another substantially similar incident of a triggerless discharge of a P320 from which a rational jury should be allowed to weigh and could reasonably infer from it and others that Jinn's P320 was similarly defective." (Sept. 30, 2022 Pltf. Ltr. (Dkt. No. 70) at 1) As discussed above, Jinn has not shown that there was a defect in the design or manufacture of Jinn's P320 pistol, and has not shown a breach of the warranty of merchantability or any negligent or intentional infliction of emotional distress. Jinn likewise has not shown that this video – allegedly depicting the triggerless discharge of a different P320 firearm – alters that conclusion.

Accordingly, there is no clear error in Judge Lehrburger's recommendation, and Jinn's motion for leave to file the video exhibit will be denied.

## **CONCLUSION**

For the reasons stated above, Judge Lehrburger's R&R is adopted in its entirety. Defendant's motions to preclude Plaintiff's experts and for summary judgment are granted, and Plaintiff's motion for leave to file a video exhibit is denied.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 56, 58, 60, 70), and to close this case.

Dated:  New York, New York
           September 13, 2023

                                  SO ORDERED.

                                  _____
                                  Paul G. Gardephe
                                  United States District Judge

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| JUSTIN SCHNEIDER,<br>individually and on the behalf of<br>THE ESTATE OF WENDY SCHNEIDER<br><br>Plaintiff,<br><br>v.<br><br>SIG SAUER, INC.,<br><br>Defendant. | Civil Action No.: 1:20-cv-01190-LM |

## STIPULATION OF DISMISSAL WITH PREJUDICE

Plaintiff Justin Schneider and Defendant Sig Sauer, INC., hereby stipulate pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure that this action be dismissed with prejudice as to all claims, causes of action, and parties, with each party bearing that party's own attorney's fees and costs.

Respectfully submitted,

JUSTIN SCHNEIDER,
By his attorneys,

Dated: May 24, 2022

/s/ Benjamin T. King
Benjamin T. King, NH Bar #12888
Douglas, Leonard & Garvey,
P.C.14 South Street, Suite 5
Concord, NH 03301
(603) 224-1988
benjamin@nhlawoffice.com

Dated: May 24, 2022        /s/R. Scott Reisch

R. Scott Reisch, *pro hac vice*, CO Bar #26892
Matthew A. Schultz, *pro hac vice*, CO Bar
#45461Jessica L. Hays, *pro hac vice*, CO Bar
#53905 The Reisch Law Firm, LLC
1490 West 121st Avenue, Suite 202
Denver, CO 80234
(303) 291-0555
jessica@reischlawfirm.com

Dated: May 24, 2022        /s/ Jeffrey S. Bagnell

Jeffrey S. Bagnell, *pro hac vice*, CT Bar #408159
Jeffrey S. Bagnell, Esq., LLC
55 Greens Farm Road, #200-60
Westport, CT 06880
(203) 984-8820
jeff@bagnell-law.com

and

SIG SAUER, INC.
By its attorneys,

Dated: May 24, 2022        /s/Mark V. Franco

Mark V. Franco, NH Bar #16708
Drummond Woodsum
84 Marginal Way, Suite 600
Portland, ME 04101
(207) 772-1941
mfranco@dwmlaw.com

Dated: May 24, 2022        /s/ B. Keith Gibson

B. Keith Gibson, *pro hac vice* NY Bar #4176244
Littleton Park Joyce Ughetta & Kelly
LLPThe Centre at Purchase
4 Manhattanville Road, Suite 202
Purchase, NY 10577
(914) 417-3400
keith.gibson@littletonpark.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing **STIPULATION OF DISMISSAL WITH PREJUDICE** has been electronically served through ECF this 24th day of May, 2022, to all counsel of record.

<u>/s/ Cassandra Long</u>
Cassandra Long

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| BRITTANY I. HILTON, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:21-CV-00441-MJT |
| | § | JUDGE MICHAEL J. TRUNCALE |
| SIG SAUER, INC., | § | |
| *Defendant*. | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Defendant Sig Sauer, Inc.'s Rule 702 Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Timothy Hicks [Dkt. 26], Rule 702 Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Peter Villani [Dkt. 27], and Motion for Summary Judgment [Dkt. 28]. For the reasons set forth below, the Court grants Sig Sauer's motions.

## I.    BACKGROUND

Plaintiff Brittany Hilton, a Bridge City police officer, claims that she was injured when her department-issued Sig Sauer P320 pistol discharged a round into her upper thigh without its trigger being pulled. Ms. Hilton was carrying the loaded pistol in her purse, along with other loose items, when it discharged. Specifically, the firearm discharged in Ms. Hilton's purse as she walked around her desk in her office, just after she put a bottle of body spray into the purse and looped the purse over her arm. Ms. Hilton subsequently brought this suit against Sig Sauer, the manufacturer of the P320 pistol. Ms. Hilton's live claims are for strict product liability, negligence, and breach of implied warranty of merchantability.[1]

---

[1] In her Original Complaint, Plaintiff alleged additional causes of action for breach of express warranty and violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2308(a). [Dkt. 1 at 36–37]. She stipulated to the dismissal of these claims, with prejudice, however. *See* [Dkts. 8, 9].

## II.   *DAUBERT* MOTIONS

Sig Sauer seeks to exclude the testimony and opinions of Plaintiff's experts, Timothy Hicks and Peter Villani, on the grounds that they are unqualified and that their opinions are unreliable. Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. It provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Whether an individual is qualified to testify as an expert is a question of law. *Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002) (citing Fed. R. Evid. 104(a)). "District courts must be assured that the proffered [expert] witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting Fed. R. Evid. 702). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.* Experts need not be highly qualified to satisfy Rule 702 though.  *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.* But the "witness's qualifying training or experience, and resultant specialized knowledge" must be "sufficiently related to the issues and evidence before the trier of fact." *United States v. Wen Chyu Liu*, 716 F.3d 159, 167 (5th Cir. 2013)

(quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.04(1)(b) (Joseph M. McLaughlin ed., 2d. 1997)).

In *Daubert*, the Supreme Court outlined four non-exclusive factors for courts to use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993). When evaluating a *Daubert* challenge, a court's focus "must be solely on [the expert's] principles and methodology, not on the conclusions that they generate." *Id.* at 595.

While *Daubert* provides a "flexible inquiry" rather than a "definitive checklist," *id.* at 593, 595, it requires that "an expert bears the burden of furnishing some objective, independent validation of his methodology." *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (internal quotation marks omitted). "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007); *see also Brown*, 705 F.3d at 536 ("The expert's assurances that he has utilized generally accepted principles is insufficient.").

## A. Timothy Hicks

Timothy Hicks is a mechanical engineer who spent most of his career in the automotive industry. [Dkt. 26-5]. While Hicks has never manufactured a firearm or a component of a firearm, he testified that his automotive experience required similar processes and approaches. [Dkt. 26-6 at 23:10–17]. He is not a gunsmith, nor has he ever taken any gunsmith courses or been employed by a company that manufactures firearms. *Id.* at 23:22–23:4. He also has never published anything

3

on the manufacture or design of a firearm. *Id.* at 24:5–10. Hicks has never seen a firearm assembled from an initial production standpoint, or manufactured. *Id.* at 25:8–13. And before his involvement with similar P320 cases in 2022, he had never looked at drawings or internal components of a pistol similar to the P320. *Id.* at 24:11–19.

Hicks' opinion is that if two conditions occurred, then Plaintiff's gun could have discharged without a trigger pull: (1) the striker had to have become disconnected from the sear; and (2) the safety lock had to have failed. [Dkt. 26-6 at 26:6–20]. This theory requires that "there has to be some type of motion or inertia or vibration to the to the firearm to make it discharge." *Id.* at 28:14–29:2. But he could not answer how much inertia or vibration would be required, *id.* at 29:3–10; whether the vibration or inertia caused disengagement immediately or incrementally over time, *id.* at 29:16–20; or whether firing the gun would reset it, thus requiring additional force to move the parts out of place again. *Id.* at 30:3–12.

Hicks ultimately concluded, "[b]ased on [his] investigation and the work conducted to date . . . [that] the physical evidence . . . supports Detective Hilton's description of the circumstances of this incident" and that her P320 "was defective and unsafe for use." [Dkt. 26-4 at 20]. Specifically, that "normal and expected movement and vibration while holstered caused an un-commanded discharge with a combination of some or all of the defective conditions" described in his report, including:

1) Surface quality (no secondary processing) and misalignment of interfacing sear step and striker foot. With both of these parts being out of specification, the striker became disconnected from the sear without the trigger being pulled.

2) Surface quality, rounded surfaces, and misalignment of the face of the safety lock tab and the vertical stop face on the striker body, such that both of these areas failed to prohibit the striker from moving forward during the subject event.

4

3) Axial variation and gaps between the striker pin and striker housing with slide movement causes misalignment of the safety lock tab to the striker pin body, and the striker foot lateral position to the sear step face. This occurs after each round is fired and can affect the orientation of the two components each time.

4) Ability of the slide (and therefore the striker assembly) to move vertically and laterally relative to the sear reducing the interfacing surface contact area even further, which will cause the striker foot to become disengaged from the sear face. This relative movement occurs while properly holstered from normal body movement and usage of the firearm.

5) The striker foot is unable to engage completely on the surface of the sear step due to the changes in the upgraded design, manufacturing processes and lack of secondary machining, and fit-up and variation issues between the parts discussed in this report.

6) The removal of the safety lever return spring by Sig Sauer allows the lever to rotate out of position when the pistol is carried in a muzzle down orientation, which can also contribute to the safety lock to be out of position. When this issue is combined with the axial variation described in item 3 above and the part quality issues, it allows the striker to move forward completely when it becomes disengaged from the sear. The safety lock only has to be out of position or out of tolerance by the thickness of the stamping which is 0.9 mm.

[26-4 at 20]. He testifies that each of these alleged defects *could have* contributed to Plaintiff's P320 firing without trigger pull but he cannot say which ones specifically caused the firearm to discharge. *Id.* at 31:1–21. When questioned about his conclusions, he repeatedly conceded that he did not have any testing or analysis to show that the alleged defects would cause the effects he reported. [Dkt. 26-6 at 11:4–11; 11:21–12:2; 13:16–24; 17:12–18:4; 27:14–18; 28:6–12; 29:3–10; 31:24–32:9].

**B. Peter Villani**

Peter Villani is a former police officer currently employed as an operations officer for the United States Department of Veteran Affairs Police. [Dkt. 27-6 at 2]. He has participated in shooting competitions, worked as a range manager and firearms salesman, and taught tactical awareness and proper use of issued sidearms. *Id.* at 3–4. He has also been certified as an armorer for multiple firearms (including the Sig Sauer P320), and as a firearms instructor, pistol safety

instructor, and range safety officer. *Id.* Villani is not an engineer, nor has he ever been involved with the design or manufacture of firearms or firearm components. [Dkt. 27-7 at 10:22–11:17]. Prior to his involvement in similar P320 cases, Villani had never reviewed design schematics for any firearm. *Id.* at 11:18–21. Beyond "test firing" pistols, Villani has never done any type of firearms testing to any recognized or written standard. *Id.* at 13:14–7. He testified in a similar P320 case that he has not even read any recognized firearm testing standards. [Dkt. 27-8 at 6:14–7:2]. He also has never published any article or other publication, or given any presentation, related to firearm design or manufacture. [Dkt. 27-7 at 13:18–24]. Villani also testified that he did not rely on any publications or studies to reach his opinions. [Dkt. 27-7 at 5:2–9].

While some of Villani's work has involved dissembling and repairing guns that were not working properly, it was limited to cleaning the firearms and simple repairs like replacing broken springs. *Id.* at 16:20–19:16. He is not a gunsmith, nor has he ever taken any gunsmithing courses. *Id.* at 14:2–6. When questioned about his conclusions, he repeatedly conceded that he did not have any testing or analysis to show that the alleged defects would cause the effects he reported. *Id.* at 25:21–24; 26:10–12; 27:3–7; 30:23–31:3. Many of Villani's opinions relate to "excess material" in the gun; however, he testified that he has not measured or quantified the amount of excess material on any of those four components, nor does he have the equipment to. *Id.* at 30:4–13. Instead, he believes that he suggested to Hicks that if Hicks could measure the excess material, he should try to. *Id.* at 30:14–17. Villani's report provides: "Depending upon the condition of the individual [P320] components' status (sear/striker engagement, excess molding material, misalignment of safety lock tab, wear, etc.), any combination of these reported defect could lead to an uncommanded discharge minus a trigger pull." [Dkt. 27-5 at 12]. But he testified that other than the excess material and the "ramp" he does not know which of the factors that he identified

were present when Plaintiff's gun discharged. [Dkt. 27-7 at 32:13–21]. He also testified that if

something in her purse caused the trigger to be pulled, then the "defects would be of no

consequence." *Id.* at 33:5–14. Villani did not undertake any analysis of what was in her purse that

may have been able to pull the trigger, however. *Id.* at 33:17–20. Indeed, other than a surgical

mask, Villani does not know what items were in her purse when the gun discharged. *Id.* at 8:6–9.

Villani contends in his report that when he "began [his] examination and photography of

the firearm's internal parts" he noticed several "manufacturing defects." [Dkt. 27-5]. He then

recounts these supposed defects and their effects:

1) "The safety lock tabs positive contact surface is deformed and does not match Sig Sauer[']s drawings . . . which depicts the tab to be rectangular with squared off edges. The safety lock tab presented, showed an oval type shape with raised edges which appeared to be excess material from the stamping process that was not removed prior to the parts installation into the striker assembly. This raised perimeter prevents the positive contact surface from making proper contact with the striker stop (wall) of the striker should the striker fail from an uncommanded discharge." *Id.* at 5.

2) "There is also a raised higher edge along the bottom horizontal portion of the tab which is slightly higher in appearance than the rest of the raised edging. This portion of the tab rides along the horizontal plane of the striker body as the striker travels forward during an uncommanded discharge. Normally, the safety lock tab would be raised over the striker's horizontal plane as the safety lever located in the fire control unit (FCU), would raise it during an intentional trigger press. . . . Unlike Sig Sauers official drawings, this part, again, does not match what was installed in the firearm." *Id.*

3) "[T]he striker foot [has] excess molding material around the entire perimeter of the striker foot's positive contact surface which prevents 'positive' contact with the sear face. When actually engaged with the sear[']s 'positive contact surface', the only portion of the striker foot that makes physical contact with the sear is the lower raised portion of the excess molding material which reduces the overall contact between the two parts. Since both the sear and striker foot show excess molding material along the perimeter of both parts of their 'positive contact' areas, it is unlikely that there was ever positive contact as designed between the two parts which can contribute to an uncommanded discharge." *Id.* at 6.

7

4) "Also, the top portion of the sear face . . . also shows a deformity as the top horizontal edge of the sear is not straight and also shows excess molding material along its horizontal edge. The sear also shows signs of physical offset of the striker foot to the left of the sear due to the striker not being vertically centered to the sear as there is a discoloration caused by discharge blowby during recoil. This offset has been observed in previous P-320's that I have examined. Also not having the striker foot vertically centered to the sear causes the sear springs to be unevenly compressed causing the sear to be at an angle to the striker foot allowing it to walk off easier." *Id.* at 7.

5) "[A] small piece of slivered brass . . . was caught in the inner bottom corner of the stop. This piece of brass could interfere with the operation of the safety lock tab as it is in between the safety lock tab and striker stop." *Id.* at 8. "[T]he brass obstruction could move, preventing the safety lock tab from properly engaging the striker stop and contributing to an uncommanded discharge if the striker foot had slipped off of the sear face." *Id.* at 9.

6) "[A] 'ramping' transition from an angled portion of the horizontal striker body on the right side to a straight portion of the horizontal striker body which can also cause the safety lock tab to 'jump' up and over the striker stop during an uncommanded discharge. This angled ramp along with the foreign obstruction (brass) can contribute to the safety lock tab failure." *Id.* at 10.

## C.  Neither expert's testimony is reliable.

While the Court has doubts about both experts' relevant qualifications, it need not decide whether they are qualified. Even if the experts are qualified, their testimonies are not reliable, and therefore are not admissible. Indeed, this is the same decision reached by most of the courts that have considered their testimonies in similar cases.[2] *See Mayes v. Sig Sauer, Inc.*, No. 1:19-CV-00146-GNS-HBB, 2023 WL 2730264, at *7 (W.D. Ky. Mar. 30, 2023) (addressing and excluding Hicks and Villani); *Frankenberry v. Sig Sauer, Inc.*, 4:19-CV-02990-JD, [Dkt. 79 at 10] (D.S.C. Feb. 4, 2022) (addressing and excluding Villani); *Jinn v. Sig Sauer, Inc.*, No., 1:20-CV-01122-

---

[2] Only one court has ruled otherwise. *See Guay v. Sig Sauer, Inc.*, 610 F. Supp. 3d 423 (D.N.H. 2022). The *Guay* court admitted Hicks' testimony entirely, *id.* at 433, but concluded that Villani was only qualified to testify to some of his opinions. *Id.* at 429–32. Other than opining that testing is not necessary, the *Guay* court did not address the *Daubert* reliability factors, however. A jury in *Guay* ultimately returned a verdict in favor of Sig Sauer. *Guay v. Sig Sauer, Inc.*, No. 1:20-cv-00736-LM, [Dkt. 109], (D.N.H. Sept. 9, 2022).

PGG-RWL, *Report and Recommendation of Magistrate Judge* [Dkt. 75 at 17, 33] (S.D.N.Y. Apr. 12, 2023) (addressing and recommending excluding Hicks and Villani).[3] Because Plaintiff makes essentially the same reliability arguments for both experts in response to Sig Sauer's motions, the Court analyzes the experts together.

Not a single *Daubert* reliability factor favors admitting Hicks' or Villani's testimony. As previously discussed, neither expert has completed *any* testing to prove that the alleged defects could cause the pistol to fire without a trigger pull. As to Villani, Plaintiff attempts to discredit this deficiency by disingenuously claiming that "Villani testified that the failure has been replicated in real life many times." [Dkt. 38 at 28]. Her claim references Villani's testimony regarding *one* separate incident where a P320 allegedly discharged without a trigger pull. After watching the video, Villani supposedly testified that he "[had] no question that [the individual depicted] did not pull the trigger. His finger was off of the trigger, and the gun was in his holster." *Id.* at 29.[4]  As to Hicks, Plaintiff similarly argues that "[c]ommon sense" prohibits requiring an expert "to risk his or her life to replicate an event that has already been replicated in real life many times over the last six years." [Dkt. 38 at 21]. Plaintiff then recounts several allegations of unintended discharges in lieu of Hicks completing his own testing. [Dkt. 38 at 21–24]. Plaintiff's argument seems to be that a functioning gun does not discharge without a trigger pull, and because numerous P320s have allegedly discharged without a trigger pull, her experts must be right that her gun is defective. This argument neglects that the Court's focus is the experts' methodologies, not their conclusions. *See Daubert*, 509 U.S. 595. "To be sure, it is not required that the experts conduct a litany of tests on

---

[3] As of the date of this Order, the United States District Judge presiding over *Jinn v. Sig Sauer, Inc.* in the Southern District of New York has not entered an order adopting or rejecting the abovementioned Report and Recommendation of Magistrate Judge.

[4] The Court could not locate this testimony in the exhibit that Plaintiff cited. *See* [Dkt. 38-17].

[Plaintiff's] specific pistol, but rather, they must demonstrate that their theories have some empirical evidence to support the assertion that the alleged defects have been found to cause uncommanded discharges." *Mayes*, 2023 WL 2730264, at *8.

Second, the experts' theories have not been subjected to peer review or publication. Both experts testified that they have not published any work involving firearm manufacture or design, nor did they rely on any publications to reach their respective opinions. Plaintiff argues that "[t]here is no peer reviewed literature on the P320's defect as it is a relatively new design." [Dkt. 38 at 29]. As with the testing, a publication need not be on the P320 specifically to demonstrate that the experts' theories are supported by some empirical evidence. *See Mayes*, 2023 WL 2730264, at *8. The experts do not even point to any literature to demonstrate that their opinions are based on new applications of existing theories. To the Court's knowledge, Hicks' and Villani's opinions are based on wholly novel theories that they expect the Court to simply take their word for.

Third, neither expert identifies a known error rate for their respective methodology. And finally—as already alluded to in analyzing the previous factors—they have not demonstrated that there is a general acceptance of their respective theories in the engineering community. Plaintiff contends that their conclusions that the pistol can fire without a trigger pull "is not a novel or unreliable opinion given that Sig Sauer's own August 4, 2017 press release on the P320 stated that vibration could make the original gun's safety mechanism fail." [Dkt. 38 at 4] (citing [Dkt. 38-5 at 1]). The press release she references provides:

> All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

[Dkt. 38-5 at 1]. Plaintiff again neglects, however, that when evaluating a *Daubert* challenge, a court's focus "must be solely on [the expert's] principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. This generic disclaimer does not provide an objective, independent validation of the experts' methodologies. *See Brown*, 705 F.3d at 536.

Even though none of the *Daubert* factors favors admitting the experts' testimonies, Plaintiff instructs the Court: "So long as an expert's scientific testimony rests on 'good grounds based on what is known' it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." [Dkt. 38 at 29] (quoting *Daubert*, 509 U.S. at 590) (internal citations omitted). But while Plaintiff asserts that their testimony "rests on good grounds based on what is known," the only basis she provides for that assertion is their subjective opinions. Additionally, the Court held a hearing on Sig Sauer's *Daubert* motions, but Plaintiff did not have Villani or Hicks attend. [Dkt. 48]. Therefore, Plaintiff forfeited the opportunity to have her experts potentially remediate these deficiencies. The Court must exclude expert testimony that is not reliable. *See* Fed. R. Evid. 702. Because the Court is not aware of any objective, independent validation of the methodologies used by Timothy Hicks or Peter Villani, it must grant Sig Sauer's motions to exclude their testimonies and opinions. [Dkts. 26, 27]

## III.    MOTION FOR SUMMARY JUDGMENT

In its Motion Summary Judgment, Sig Sauer contends that if the Court excludes Hicks' and Villani's testimonies, it should also dismiss Plaintiff's case because she cannot proceed on any of her claims without expert testimony. [Dkt. 28 at 2]. The Court agrees.

11

## A. Legal Standard

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper when the pleadings and evidence demonstrate that no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (internal citations omitted); Fed. R. Civ. P. 56(c). An issue is material if its resolution could affect the outcome of the action. *DIRECTV*, 420 F.3d at 536. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* All reasonable inferences must be drawn in favor of the nonmoving party. *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002). There is no genuine issue of material fact if, when the evidence is viewed in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (citations omitted).

Where the dispositive issue is one which the nonmoving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the nonmovant's claim, or (2) demonstrating that there is no evidence in the record to establish an essential element of the nonmovant's claim. *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (internal citations omitted).

If, under the first option, the nonmoving party cannot point to evidence sufficient to dispute the movant's contention that there are no disputed facts, the moving party is entitled to summary judgment as a matter of law. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1980); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). Under the second option, the nonmoving party may defeat the motion by pointing to "supporting evidence already in the

12

record that was overlooked or ignored by the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332–33 (1986) (Brennan, J., dissenting). "Conclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment." *Duffy v. Leading Edge Prods.*, 44 F.3d 308, 312 (5th Cir. 1995).

If the nonmoving party can meet its burden under either of these scenarios, the burden shifts back to the movant to demonstrate the nonmovant's inadequacies. *Id.* If the movant meets this burden, "the burden of production shifts [back] to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)." *Celotex*, 477 U.S. at 333 n.3. "Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial." *Parekh v. Argonautica Shipping Invests. B.V.*, No. CV 16-13731, 2018 WL 295498, at *3 (E.D. La. Jan. 4, 2018) (quoting *Celotex*, 477 U.S. at 333 n.3).

## B. Discussion

"In Texas, a plaintiff can predicate a products liability action on one or more of at least three theories of recovery: (1) strict liability under [Restatement (Second) of Torts] § 402A, (2) breach of warranty under the U.C.C., and (3) negligence." *Syrie v. Knoll Intern.*, 748 F.2d 304, 306 (5th Cir. 1984); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 82.001(2) (defining "products liability action" as "any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach

13

of express or implied warranty, or any other theory or combination of theories"). Here, Plaintiff

seeks to recover under all three theories.

To prevail on a strict products liability action, a plaintiff must establish that: "(1) a product

is defective; (2) the defect rendered the product unreasonably dangerous; (3) the product reached

the consumer without substantial change in its condition from the time of original sale; and (4) the

defective product was the producing cause of the injury to the user." *Syrie*, 748 F.2d at 306. "A

product may be proven to be defective if it is unreasonably dangerous in construction, or it is

unreasonably dangerous as designed, or it is unreasonably dangerous because adequate warnings

or instructions are not provided." *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 376 (Tex. 1984).

For a products liability claim premised on negligence, a plaintiff must demonstrate: "(1)

that the manufacturer owed a duty to the plaintiff; (2) that the manufacturer breached that duty; (3)

that the plaintiff was injured; and (4) that the manufacturer's breach of the duty was the proximate

cause of the plaintiff's injury or damages." *McLennan v. Am. Eurocopter Corp., Inc.*, 245 F.3d

403, 431 (5th Cir. 2001). A strict liability claim "focuses upon the product itself, and requires a

showing that the manufacturer placed a product into the stream of commerce that was unreasonably

dangerous for a foreseeable use," while a negligence claim "focuses upon the conduct of the

manufacturer in placing that product into the stream of commerce, and requires a determination of

whether that conduct complies with the applicable standard of care." *Id.*

"[A]lthough a negligence claim requires a different showing from a strict liability claim, a

manufacturer logically cannot be held liable for failing to exercise ordinary care when producing

a product that is not defective." *Garrett v. Hamilton Standard Controls, Inc.*, 850 F.2d 253, 257

(5th Cir. 1988). This is because: "(1) if a product is not unreasonably dangerous because of the

way it was manufactured, it was not negligent to manufacture it that way and (2) even if the

manufacturer was somehow negligent in the design or production of the product, that negligence cannot have caused the plaintiff's injury because the negligence did not render the product 'unreasonably dangerous.'" *Id.* Accordingly, if Plaintiff's strict liability claim fails because she cannot establish that the firearm was defective, then her negligence claims necessarily fail too.[5]

Similarly, if a plaintiff's strict liability claim must be dismissed, so too must their implied warranty of merchantability claim, when the two claims are premised on the same alleged defect. *Smith v. Chrysler Grp., L.L.C.*, 909 F.3d 744, 752 (5th Cir. 2018) (citing *Hyundai Motor Co. v. Rodriquez ex rel. Rodriguez*, 995 S.W.2d 661, 665 (Tex. 1999)). "[A] seller of goods impliedly warrants that they 'are fit for the ordinary purposes for which such goods are used.'" *Gen. Motors Corp. v. Brewer*, 966 S.W.2d 56, 57 (Tex. 1998) (quoting Tex. Bus. & Com. Code Ann. § 2.314(b)(3)). "For goods to breach this warranty, they must be defective—that is, they must be 'unfit for the ordinary purposes for which they are used because of a lack of something necessary for adequacy.'" *Id.* (quoting *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 443–444 (Tex. 1989)). Indeed, this a different definition of "defective" than is used for a strict products liability claim, which focuses on whether a product is "unusually dangerous." *See Lucas*, 696 S.W.2d at 376. Thus, a product may breach the implied warranty of merchantability without giving rise to a strict liability claim if it is unfit for its ordinary purpose but is not unusually dangerous. But where, as here, the breach of the implied warranty claim is premised on the same defect as the strict liability claim, the failure to establish a defect for purposes of the strict liability claim also kills the implied warranty claim.

---

[5] Plaintiff alleges that Sig Sauer was negligent in designing and manufacturing the firearm, as well as in "failing to unambiguously warn purchasers and end users of the gun . . . of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture." [Dkt. 1 at 32]. While some negligent failure to warn claims may not be encompassed by a strict products liability claim, *see Garrett*, 850 F.2d at 257 & n.8, that is not the case here. Plaintiff's negligent failure to warn claim is premised on the firearm discharging without a trigger pull because of a defect. Therefore, if she fails to prove that defect, her failure to warn claim fails.

The Court therefore first addresses whether Plaintiff can prevail on her strict liability claim. If she cannot establish that a defect caused the gun to discharge without a trigger pull, the Court need not engage in a negligence or breach of implied warranty of merchantability analysis.

"Expert testimony is required when an issue involves matters beyond jurors' common understanding." *Mack Trucks, Inc. v, Tamez*, 206 S.W.3d 572, 583 (Tex. 2006). "Proof other than expert testimony will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition." *Id.* In defective products cases, the Supreme Court of Texas has "consistently required competent expert testimony and objective proof that a defect caused the condition complained." *Id.* (citing *Nissan Motors Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 137 (Tex. 2004) (holding that "[a] lay juror's general experience and common knowledge do not extend to whether design defects such as those alleged in this case caused releases of diesel fuel during a rollover accident"); *see also Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 42–43 (Tex. 2007) ("If juries were generally free to infer a product defect and injury causation from an accident or product failure alone, without any proof of the specific deviation from design that caused the accident, expert testimony would hardly seem essential. Yet we have repeatedly said otherwise.").

Determining whether a defect in Plaintiff's P320 enabled it to discharge without a trigger pull, thereby causing her injuries, requires technical knowledge beyond jurors' general experience and common understanding. *See Mack Trucks*, 206 S.W.3d at 583. Therefore, expert testimony on causation is required to show that Plaintiff is entitled to recover under any of the products liability theories.

16

Plaintiff's response to Sig Sauer's Motion for Summary Judgment directs the Court's attention to other similar incidents involving P320s that allegedly discharged without trigger pulls. These other incidents cannot establish that a defect caused her gun to discharge, however. Analogous cases involving cars that allegedly accelerated without the driver pressing the gas pedal demonstrate why. *See, e.g.*, *Nissan Motors Co. v. Armstrong*, 145 S.W.3d 131 (Tex. 2004). "In all of these cases, it was not enough that a vehicle accelerated when claimants swore they had done nothing. Instead, [the Supreme Court of Texas] [has] consistently required competent expert testimony and objective proof that a defect caused the acceleration." *Id.* (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 715, 717, 719 (Tex. 1998); *Gen. Motors Corp. v. Hopkins*, 548 S.W.2d 344, 346–47 (Tex. 1977), *overruled on other grounds by Turner v. Gen. Motors Corp.*, 584 S.W.2d 844 (Tex. 1979) *and Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex. 1984); *Henderson v. Ford Motor Co.*, 519 S.W.2d 87, 88–89, 93–94 (Tex. 1974), *overruled on other grounds by Duncan*, 665 S.W.2d 414).

In *Nissan Motors*, the Supreme Court of Texas reversed a jury verdict that found that a defect caused the plaintiff's car to unintentionally accelerate. 145 S.W.3d at 134. To prove that her car had a defect, the plaintiff's case at trial centered on the quantity of other alleged incidents of unintended accelerations. *Id.* at 144–48. The trial court erred by allowing such evidence because "[p]roof of unintended acceleration is *not* proof of a defect." *Id.* at 148. And "proof of *many* instances of unintended acceleration cannot prove a defect either; a lot of no evidence is still no evidence." *Id.* "[P]roduct defects must be proved; they cannot simply be inferred from a large number of complaints. If the rule were otherwise, product claims would become a self-fulfilling prophecy—the more that are made, the more likely all must be true." *Id.* at 142. While the court acknowledged that other similar incidents may be admissible for certain purposes, it concluded:

17

> [W]e have never held that mere claims of previous accidents can prove a product is defective, and we decline to do so here. A number of complaints may require a prudent manufacturer to investigate, and may presage liability if those complaints are substantiated and the manufacturer does nothing. But a large number of complaints cannot alone raise a fact question that a defect exists.

*Id.* at 140.

Likewise, here, proof of an unintended discharge is not proof of a defect. Nor is proof of many unintended discharges. Under Texas law, no reasonable jury could conclude that a defect caused Plaintiff's gun to discharge without a trigger pull solely from (1) lay testimony that her gun discharged without a trigger pull and (2) the existence of other similar alleged incidents. Qualified and reliable expert testimony on causation is necessary. With Hicks and Villani excluded from testifying, Plaintiff has failed to raise a fact question that a defect exists.[6] Because Plaintiff's claims are all predicated on this same defect, Sig Sauer is entitled to summary judgment on all of Plaintiff's claims. *See Garrett*, 850 F.2d at 257; *Smith*, 909 F.3d at 752.

## IV.   CONCLUSION

It is therefore **ORDERED** that Defendant Sig Sauer, Inc.'s Rule 702 Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Timothy Hicks [Dkt. 26], Rule 702 Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Peter Villani [Dkt. 27], and Motion for Summary Judgment [Dkt. 28] are **GRANTED**.

---

[6] Plaintiff points out in her response to Sig Sauer's Motion for Summary Judgment that she designated a third expert, Jonathyn Priest, and that Sig Sauer did not move to exclude his testimony. [Dkt. 35 at 1 n.1]. Priest's expert report does not address or identify any defects that caused or could have caused Plaintiff's gun to discharge without a trigger pull, however. *See generally* [Dkt. 35-1]. Therefore, his report does not cure this deficiency in Plaintiff's proffered evidence.

It is further **ORDERED** that Plaintiff Brittany Hilton's claims are **DISMISSED WITH PREJUDICE**. The Court will enter a Final Judgment in accordance with this Order.

**SIGNED this 8th day of June, 2023.**


_Michael J. Truncale_
Michael J. Truncale
United States District Judge

# EXHIBIT 9

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

HOWARD ROBERT NORTHROP and
BRENDA SCHIRO,

        Plaintiffs,

v.

SIG SAUER, INC. and
FLORIDA BULLET, INC.,

        Defendants.

_____/

CASE NO.: 2021-CA-006111
DIVISION: F

## ORDER GRANTING DEFENDANT SIG SAUER, INC'S MOTION O EXCLUDE AND/OR LIMIT THE TESTIMONY OF PLAINTIFF'S EXPERT, JAMES TERTIN AND
## ORDER GRANTING DEFENDANT SIG SAUER, INC'S MOTION O EXCLUDE AND/OR LIMIT THE TESTIMONY OF PLAINTIFF'S EXPERT, WILLIAM VIGILANTE, JR. AND
## ORDER GRANTING DEFENDANT SIG SAUER, INC.'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** came before the Court on November 1, 2023 on  Defendant Sig Sauer Inc.'s ("Sig Sauer") Motion to Exclude and/or Limit the Testimony of Plaintiffs' Expert, James Tertin, Motion to Exclude and/or Limit the Testimony of Plaintiffs' Expert, William Vigilante, and Motion for Summary Judgment. Each motion is fully briefed and at issue.  The Court, having  heard arguments of counsel, reviewed the court file, considered the written submissions of the parties,[1] and being otherwise duly advised in the premises finds as follows:

_____

[1] Both parties submitted Notices of Filing Supplemental Authority and Second Notices of Filing Supplemental Authority, which the Court has considered.

### *INTRODUCTION*

On February 27, 2020, Plaintiff Howard Robert Northrop, a Reserve-Duty Officer with the Tampa Police Department ("TPD"), was injured in his leg when his Sig Sauer P320 pistol unintentionally discharged. Plaintiffs assert claims for strict product liability, negligence, and loss of consortium against Sig Sauer, the manufacturer of the pistol. All of Plaintiffs' claims are based on the theory that the subject P320 service pistol was defectively designed and unreasonably dangerous when used in a reasonably foreseeable manner because it discharged without a trigger pull, and that such defects proximately caused Mr. Northrop's injuries. Alternatively, Plaintiffs now claim that if the trigger was unintentionally actuated, the pistol was defectively designed and unreasonably dangerous when used in a reasonably foreseeable manner because the pistol lacks a manual thumb safety and a tabbed trigger safety.

In support of these claims, Plaintiffs offer expert testimony from James Tertin, a gunsmith, and William Vigilante, a human factors engineer. The P320 pistol involved in this case did not come with an external manual safety, such as a trigger safety or a thumb safety. Contrary to the allegations in the Complaint and Mr. Northrop's testimony, both experts opine that the trigger on Mr. Northrop's pistol must have been pulled to cause the discharge (*see* Tertin Dep. at 9:9-12 [Filing # 167851680, Doc. No. 135 Exhibit B]; Vigilante Dep. at 35:24-36:10 [Filing # 167851680, Doc. No. 135 Exhibit C]).[2] Tertin and Vigilante

---

[2] Plaintiffs, in their briefing and oral argument on the present Motions, also concede that the trigger was pulled for the pistol to discharge, and appear to have abandoned the theory that the P320 can and did discharge without trigger actuation. Plaintiffs' current theory of liability is that

both opine that the failure to incorporate a manual external safety into the P320 caused Mr. Northrop's injuries. Sig Sauer seeks to exclude these causation opinions under section 90.702, Florida Statutes. Sig Sauer also moves for summary judgment, arguing that Plaintiffs' claims necessarily fail without admissible evidence of causation.

### *FACTUAL SUMMARY*

On February 27, 2020, Mr. Northrup was patrolling the grounds at Jefferson High School in Tampa, Florida. Mr. Northrup testified that his P320 pistol discharged when he placed the palm of his hand on the top of his pistol, which was fully seated in his department issued Safariland Level III ALS/SLS retention holster. *See* Northrop Dep. at 56:2-9 [Filing # 167851680, Doc. No. 137 Exhibit B]. He further testified that the pistol was fully holstered on his right hip when the discharge occurred, even though the discharged round struck him in his left leg. *See* Northrop Dep. 87:19-90:18 [Filing # 167851680, Doc. No. 137 Exhibit B]; Seckley Interview of Northrop at lines 241-267 [Filing # 167851680, Doc. No. 137 Exhibit C]. More specifically, at his deposition, Mr. Northrup testified as follows:

> A.   I was standing behind the bleachers at the baseball field. I happened to look behind me onto the football field, which is directly behind it. I saw five or six people, somewhere in that vicinity, on the track about halfway out into the field. There's not supposed to be anybody on the track or the football field unless there's a specific event going on. I decided that I was going to go either remove them or find out who they were.

---

the P320 is "unreasonably susceptible to *unintended* actuation of the trigger." *See, e.g.,* Pls.' Resp. to MSJ at 2 [Filing # 171643953, Doc. No. 141].

> And as I started walking toward the gate, I began removing my keys, because the gate is supposed to be locked. When I got to the gate, the gate was already unlocked. I therefore assumed that whoever it was out there most likely was there legitimately. And I turned around and started walking back to my original position behind the visitor bleachers. As I was walking, I attempted to put my keys back where I had removed them from the hook. And I couldn't get past my jacket. My jacket was in the way. And I fiddled with my jacket a little bit. Couldn't do anything. I put my hand up onto the gun. And the very moment I put my hand onto the gun thinking my jacket-- it's a jacket that wraps around the holster on both sides, one for the radio and one for the gun. And when I put my hand on the gun, it discharged. (Plaintiff Deposition, 56:10 - 57:12)
>
> …
>
> Q.   Okay. What happened to the P320 pistol after it discharged? Was it still in the holster?
>
> A.   Yes, ma'am. (Plaintiff Deposition, 60:13-15)

Other evidence in the record, demonstrates that the pistol must have been at least partially unholstered at the time of the discharge. The spent casing from the discharge was fully ejected from Mr. Northrup's pistol (ending up on the ground) and a new, live round was cycled into the chamber. TPD's firearms instructor, Kenneth Morman, testified that it is "100 percent impossible" and "not within the realm of possibility to even consider" that the spent casing would have been ejected and a new round cycled into the chamber if the pistol was fully holstered when the discharge occurred." *See* Morman Dep. 33:23-34:6 Filing # 167851680, Doc. No. 135, Exhibit G]. According to Mr. Morman, that is because the ejection port of a fully holstered pistol is completely covered, rendering the ejection of the spent casing a physical impossibility. *See id.* at 29:11-18. An examination of the evidence by Mr. Morman also indicated that the damage to

Plaintiff's holster could only have been caused by a pistol that was at least partially withdrawn from the holster. *See* Morman Dep. at 24:18-25:24 [Filing # 167851680, Doc. No. 135, Exhibit G]. Sig Sauer's expert, Derek Watkins, also conducted testing from which he concluded that it would be a physical impossibility for the pistol to cycle, as it did, when in the Safariland ALS/SLS Level III retention holster that Mr. Northrop was using at the time of the discharge. *See* Watkins Rpt. at 16-19 [Filing # 167851680, Doc. No. 135, Exhibit F]. Additionally, Plaintiff's medical records from shortly after the incident provide the following account of the incident: "[t]he patient unholstered his pistol which then went off resulting in an entrance wound through his medial ankle and exiting his lateral ankle, going through his boot." 2/28/2020 St. Joseph's Hosp. Rec. [Filing # 167851680, Doc. No. 135, Exhibit F].

Mr. Northrup's P320 pistol was issued to him by TPD. When TPD selected the P320 model pistol as its duty weapon in 2017, none of the pistols being considered were equipped with manual thumb safeties. This is because TPD does not "use [manual thumb] safeties as department policy." Morman Dep. 9:3-11:7 [Filing # 167851680, Doc. No. 135, Exhibit G].

Plaintiffs' experts opine that the P320 is defectively designed because it has a short single-action trigger pull without an external safety, making it too easy for the trigger to be accidentally actuated. *See* Plaintiffs' Expert Witness Disclosure at 1, 2 [Filing # 167851680, Doc. No. 135, Exhibit I]. Neither expert opines that the P320 can fire without a trigger pull. *See* Tertin Dep. at 9:9-12 2 [Filing # 167851680, Doc. No. 135, Exhibit B]; Vigilante Dep. at 35:24-36:10 2 [Filing # 167851680, Doc. No. 135, Exhibit C]. An external manual safety,

according to these experts, can include either a tabbed trigger or a manual thumb safety. Vigilante Opinion List ¶¶ 9-1 [Filing # 167851680, Doc. No. 136, Exhibit G]; Tertin Dep. at 22:22-23:2 [Filing # 167851680, Doc. No. 135, Exhibit B]. A tabbed trigger is "a small tab within the trigger that must be depressed for the trigger to be able to fully depress and fire the weapon." Mr. Tertin, Plaintiffs' firearms expert, opines that a tabbed trigger effectively prevents accidental discharges because it requires a user's finger to be placed squarely on the center of the trigger. Tertin Dep. at 67:19-21[Filing # 167851680, Doc. No. 135, Exhibit B]. A manual thumb safety is "a switch on the side of the pistol that can be flipped on or off with the user's thumb" and which prevents the trigger from being actuated when it is engaged. Plaintiffs' experts both opine that the accident would most likely not have occurred if the gun were equipped with either a manual thumb safety or a tabbed trigger. Tertin Dep. at 15:1-6; 67:8-13 [Filing # 167851680, Doc. No. 135, Exhibit B]; Vigilante Opinion List ¶¶ 13-14 13 [Filing # 167851680, Doc. No. 136, Exhibit G].

### *DISCUSSION*

### A. Motions to Exclude Expert Testimony

#### 1. Legal Standard

The admissibility of expert testimony is governed by section 90.702, Florida Statutes. Florida uses the standard for admitting expert testimony that is set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Essentially, Florida prohibits the use of pure opinion testimony. *State Farm Mutual Automobile Insurance Company v. All X-Ray Diagnostic Services, Corp.*,

338 So. 3d 376, 384 (Fla. 3d DCA 2022). Section 90.702, Florida Statutes, reads as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
> (2) The testimony is the product of reliable principles and methods; and
> (3) The witness has applied the principles and methods reliably to the facts of the case.

Accordingly, trial courts must act as gatekeepers, and ensure that any and all expert testimony admitted is relevant, and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *see also McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253 (11th Cir. 2005) (the court's gatekeeper roles ensures that "speculative, unreliable expert testimony does not reach the jury."); *Sanchez v. Cinque*, 238 So. 3d 817, 823 (Fla. 4th DCA 2018) ("The court's gatekeeping function requires more than simply taking the expert's word.")(internal citations omitted). The purpose of a *Daubert* Motion, or those alike, is to employ the trial court in its gatekeeping capacity to prevent introduction of improper evidence at trial. *Chadwick v. Corbin*, 476 So. 2d 1366 (Fla. 1st DCA 1985).

Therefore, trial courts may properly admit expert testimony only when the proffering party establishes by a preponderance of the evidence that (1) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; (2) the expert is qualified to testify competently regarding the matters he intends to address; and

(3) the testimony will assist the trier of fact through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *see also Perez v. Bell S. Telecomm., Inc., 138 So. 3d 492, 497 (Fla. 3d DCA 2014)* (interpreting § 90.702, Fla. Stat. in accordance with *Daubert*); *Baan v. Columbia Cnty.*, 180 So. 3d 1127, 1131-32 (Fla. 1st DCA 2015) ("The proponent of expert testimony must, when properly challenged, establish the basis for its admissibility by a preponderance of the evidence.").

### 2. Analysis

Defendant challenges the reliability of the causation opinions offered by Tertin and Vigilante. Neither experts' qualifications are at issue for purposes of these motions. Qualified expert testimony is reliable, and therefore admissible, only when it is based on valid underlying data, which has a proper factual basis. *Daubert*, 509 U.S. at 589; *Carnival Corp. v. Stowers*, 834 So.2d 386 (Fla. 3d DCA 2003). Thus, "the opinions and inferences of the expert are inadmissible unless the party offering the testimony establishes the underlying facts or data." §90.705, Fla. Stat., 2022. In other words, an expert simply cannot assume the facts which form the basis of his opinion. *Brito v. County of Palm Beach*, 753 So. 2d 109 (Fla. 4th DCA 1998); *Kelly v. Kinsey*, 362 So.2d 402, 404 (Fla. 1st DCA 1978) ("opinion of an expert witness cannot be used to form the basis for a conclusion in the absence of evidence."). According to the Florida Supreme Court:

> It is elementary that the conclusion or opinion or an expert witness based on facts or inferences not supported by the evidence in a cause has no evidential value. It is equally well settled that the basis

for a conclusion cannot be deduced or inferred from the conclusion itself. The opinion of the expert cannot constitute proof of the existence of the facts necessary to the support of the opinion.

*Arkin Const. Co. v. Simpkins*, 99 So.2d 557, 561 (Fla. 1957).

Defendant seeks to exclude Tertin and Vigilante from opining that Mr. Northrop's accident most likely would not have occurred if the gun was equipped with a thumb safety or a tabbed trigger safety on the grounds that these opinions are speculative and lacking in reliable foundation. *See* Tertin Motion at 3 [Filing # 167851680, Doc. No. 137]; Vigilante Motion at 2 [Filing # 167851680, Doc. No. 136]. The Court finds that neither Tertin nor Vigilante has a reliable factual basis for these particular opinions. Tertin and Vigilante both acknowledge that (1) a tabbed trigger will not prevent an unintentional discharge if an object squarely contacts the face of the trigger, (2) a thumb safety (which, as discussed below, cannot be considered an alternative design here because it was not a permitted feature on duty weapons by TPD) will not prevent an unintentional discharge if it is not engaged, (3) and the gun will not discharge without the trigger being fully actuated. Tertin Dep. at 64:2-8; 15:19-22; 9:9-12 [Filing # 167851680, Doc. No. 137, Exhibit B]; Vigilante Dep. at 42:14-43:1, 35:24-36:10 [Filing # 167851680, Doc. No. 136, Exhibit F]. Nevertheless, neither expert knows what part of the trigger was contacted, and TPD would not have purchased a pistol with a thumb safety. Consequently, the experts' conclusion that a tabbed trigger would have prevented the accident is entirely speculative and not grounded in facts. Their conclusion that a manual thumb safety would have prevented the accident ignores the impossibility of that option as an alternative design.

### i. Manual thumb safety

Plaintiff's P320 pistol was a duty weapon issued to him by TPD. At the time the department selected the P320 model, it had in place a policy that did not allow external manual safeties on duty weapons. Morman Dep. 9:3-11:7 [Filing # 167851680, Doc. No. 136, Exhibit A] Ex. A. In view of these undisputed facts in the record, a manual thumb safety is not a viable alternative design theory in this case. Thus, the lack of that feature on the P320 could not have been a proximate cause of Plaintiff's incident. Further, even without these facts, the experts admit that a manual thumb safety will not prevent a pistol from discharging unless it is engaged (*see* Tertin Dep. at 15:19-22 [Filing # 167851680, Doc. No. 137, Exhibit B]). There is no evidence in the record that would permit the inference that a thumb safety would have been engaged. Therefore, both Tertin's and Vigilante's opinions that a manual thumb safety more likely than not would have prevented Plaintiff's accidental discharge are not sufficiently reliable as applied to the facts of this case.

### ii. Tabbed trigger safety

#### 1. Tertin

Tertin did not take any steps to identify how the subject discharge occurred. Tertin Dep. at 17:14-18:24 [Filing # 167851680, Doc. No. 137, Exhibit B]. He did not review Mr. Northrop's testimony, the hospital report (which indicated Mr. Northrop reported the pistol discharged when he pulled it out of his holster), the TPD investigation (which indicated Mr. Northrop's account of the accident—that the pistol was fully holstered when it discharged—was impossible), or any other evidence in this matter. *Id.* He did not review any peer-

reviewed or scientific articles or studies, analyze real world data, perform any calculations, or conduct any testing to confirm whether a tabbed trigger would have prevented the discharge alleged by Plaintiffs. *Id.* at 20:18-25; 21:6-10; 24:24-25:4.

Moreover, Tertin does not offer any opinion as to what actuated the trigger in this case—whether it was Mr. Northrop's finger or an object. Tertin Dep. at 62:14-24 (stating "I have no idea what caused [Northrop's pistol] to discharge."). Tertin also does not know where the trigger was pulled or the force applied to the trigger to discharge the gun. *Id.* at 14:11-24. However, Tertin acknowledged that had either Mr. Northrop's finger or an object squarely contacted the trigger and pulled it back, the pistol would have discharged regardless of whether it was equipped with a tabbed trigger. *See id.* at 64:2-8.

While Tertin asserts that a tabbed trigger would have made it significantly more unlikely for Mr. Northrop's accident to occurred, he did not research any real-world data on accidental discharges occurring with pistols equipped with these external safety features to support his opinion. *See id.* at 24:15-25:4. In fact, Tertin was unaware of real-world data reporting increases in the frequency of accidental discharges with law enforcement officers when moving to pistols quipped with passive trigger safeties.[3] *See id.* at 44:14-18. Tertin has no information about the occurrence rate of accidental discharges with pistols equipped with manual thumb or passive trigger safeties. *See id.* at 24:15-25:4.

---

[3] A tabbed trigger is a "passive" safety because it is disengaged through the normal firing process of pulling the trigger. A thumb safety, on the other hand, is a "manual" safety because it must be engaged or disengaged through a separate action from firing the pistol.

Tertin did not attempt to replicate the incident with P320 exemplar pistols or other manufacturers' pistols to determine whether an external safety would have prevented Mr. Northrop's incident.[4]  *Id.* at 47:3-8; 70:12-16.

Tertin admits that he knows "very little" about the Northrop incident and confirmed that he did not rely on any of the facts surrounding the specific incident to render his opinions. *Id.* at 5:18-20; 18:22-24.  Thus, the specific circumstances surrounding this incident were not important to Tertin in reaching any of his opinions. Rather, he is basing his causation opinion on his conclusion that, in general, it is unsafe to sell a gun like the P320 without a manual safety. Even assuming for the sake of the argument that the P320's failure to include a tabbed trigger safety were considered a design defect, it does not follow that the defect was the cause of Mr. Northrop's particular accident. Mr. Tertin does not identify any factual basis for his conclusion that a tabbed trigger safety would have most likely prevented this incident.  As a result, his causation opinion is not sufficiently reliable as applied to the facts of this case.

## 2. Vigilante

Vigilante's causation opinions are similarly flawed. Vigilante agrees that a tabbed trigger will not prevent a discharge caused by a finger or object contacting the face of the trigger where the tab is located. *See* Vigilante Dep. at 42:14-43:1 [Filing # 167851680, Doc. No. 136, Exhibit F]. Instead, he opines that a tabbed trigger will prevent a discharge caused by a finger or object making inadvertent

---

[4] While Tertin points to other incidents of unintended discharges involving P320 pistols as "replication" (*see* Tertin Dep. at 70:12-19), and Plaintiffs have emphasized the existence of other incidents in their arguments, these other incidents, which Plaintiffs have not established are admissible evidence, are not sufficient to establish causation in this case.

contact with only the side of the trigger (as opposed to the face of the trigger where the tab is located). Vigilante does not, however, have any opinion on what caused the trigger on Mr. Northrop's pistol to be pulled. *See id.* at 33:12-16. He does not know what part of the trigger was contacted, which resulted in the firearm discharging. *Id.* at 35:14-19. Yet, despite not knowing what pulled the trigger or what part of the trigger was contacted, Vigilante still opines that a tabbed trigger would have prevented the discharge.

Vigilante never inspected or performed physical testing on Mr. Northrup's pistol or holster. *Id.* at 30:5-12. He did not conduct any testing to determine whether it was physically possible for the spent casing to be ejected from Mr. Northrop's pistol if it was fully holstered as Mr. Northrop claims. *Id.* at 21:24-22:12; 23:18-24:2; 36:11-22. Vigilante never put a P320 pistol into an exemplar Safariland holster, like the one Mr. Northrup was using, to determine whether the trigger is fully covered when the pistol is holstered. *Id.* at 21:24-22:12. Vigilante does not have an opinion on whether the pistol was holstered or unholstered at the time of the discharge. *Id.* at 35:20-23.

Because neither Tertin nor Vigilante know what contacted the trigger, where or how the trigger was contacted, or even whether tabbed triggers reduce the rate of unintentional discharges,[5] their conclusion that a tabbed trigger

---

[5] Plaintiffs point to an "ICE memorandum" claiming it "provides a real-world case study of the dangers of the P320 relative to a competitor firearm with a tabbed trigger safety." Plaintiffs' also point to testimony of Sig Sauer's director of law enforcement sales, Matt Farkas, who acknowledges that in "recent history" the P320 has had more reports of unintended discharges than other Sig Sauer guns. From these two things, Plaintiffs argue that tabbed triggers are "demonstrably effective" at preventing unintended discharges. Pls.' Resp. to MSJ at 6-7, 50 [Filing # 171643953, Doc. No. 141]. Putting aside the import of these facts, which the parties dispute, there is no evidence that either Tertin or Vigilante reviewed or relied on Mr. Farkas's testimony. In addition, even assuming this evidence tends to demonstrate the general effectiveness of tabbed

would likely have prevented the accident is pure speculation. Plaintiffs argue that the gun could unintentionally discharge from a "brush," "graze,"[6] or "side pull" that would not have depressed a tabbed trigger. However, Plaintiffs' experts do not know if that is what happened here. The specific facts of this case seem to be of no importance to either expert in forming either of their opinions. Therefore, their respective opinions that a tabbed trigger most likely would have prevented the accident are speculative and inadmissible. *Doctors Co. v. State Dept. of Ins.*, 940 So. 2d 466, 470 (Fla. 1st DCA 2006) ("an expert's opinion testimony is inadmissible if it is grounded on speculation, conjecture, or incorrect assumptions."); *M.A. Hajianpour, M.D., P.A. v. Khosrow Maleki*, P.A., 932 So. 2d 459 (Fla. 4th DCA 2006) ("When the expert's opinion is based on speculation and conjecture, not supported by the facts, or not arrived at by recognized methodology, the testimony will be stricken.").

## B. Motion for Summary Judgment

### 1. Standard

Under Fla. R. Civ. P. 1.510, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The test for determining

---

triggers in preventing unintended discharges, it does not provide a sufficient basis upon which the experts could conclude that a tabbed trigger would have prevented Mr. Northrop's unintended discharge. Plaintiffs' experts admit that they do not know, nor have they sought to determine, the actual rates of unintended discharges of other model pistols that do include tabbed triggers as compared to the P320 and have not presented any such statistical evidence. At best, this evidence is anecdotal.

[6] While Plaintiffs use the term "graze," among others, to describe the type of contact, which they argue could have caused Mr. Northrop's P320 to discharge but would not have depressed a tabbed trigger, it is misleading in its implication that only minimal force was required to pull the P320 trigger. The evidence supports an average trigger pull force of 8.675 pounds is necessary for the Sig Sauer P320. *See* Watkins Rpt. at 10 [Filing # 167851680, Doc. No. 135, Exhibit H].

whether a genuine dispute as to a material fact exists is whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "All reasonable doubts about the facts should be resolved in favor of the non-movant." *Clemons v. Doughterty Cnty., Ga.*, 684 F.2d 1365, 1369 (11th Cir. 1982). The trial court "may not weigh the evidence or find facts" and "is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party." *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003). Nor may a trial court make credibility choices between competing views of the evidence. *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 934 (11th Cir. 1987).

"A movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019). "The burden on the moving party may be discharged by 'showing'—that is, point[ing] out to the court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Bedford v. Doe*, 880 F.3d 993, 996-97 (8th Cir. 2018) (stating that "[i]f the nonmoving party must prove *X* to prevail [at trial], the moving party at summary judgment can either produce evidence that *X* is not so or point out that the nonmoving party lacks the evidence to prove *X*."). After the movant has met its burden, the burden of production shifts and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The court in

*Matsushita Electric Industrial Co., Ltd.* further reasoned that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 599.

"The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements of its case on which it will bear the burden of proof at trial." *Mousa v. Lauda Air Luftfahrt, A.G.*, 258 F.Supp.2d 1329, 1333-34 (S.D. Fla. 2003) (citing *Celotex* and *Matsushita*). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment" *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## 2. Analysis

In this case, causation is the issue on summary judgment. Defendant argues that summary judgment in its favor is required because without reliable expert testimony, Plaintiffs lack admissible evidence of causation. Causation is an essential element on each of the Plaintiffs' claims, which Plaintiffs do not dispute. However, Plaintiffs contend that the evidence is sufficient to create a genuine, material factual dispute as to causation.

In a products liability case, the plaintiff bears the burden of proving: 1) a defect in the subject product; and 2) that the defect caused the plaintiff's alleged harm. *See West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 87 (Fla. 1976). A

plaintiff must produce admissible expert evidence to establish the existence of a defect and causation where the jury is asked to assess scientific issues outside the scope of a layperson's knowledge. *See Wong v. Crown Equip. Corp.*, 676 So. 2d 981 (Fla. 3d DCA 1996); *see also Pierre v. Intuitive Surgical, Inc.*, 476 F. Supp. 3d 1260, 1269 ("Plaintiff must also provide expert testimony to prove a design defect, and failure to provide such testimony is fatal to Plaintiff's claim."(*citing Cooper v. Old Williamsburg Candle Corp.*, 653 F. Supp. 2d 1220, 1225 (M.D. Fla. 2009)); *Alvarez v. General Wire Spring Company*, 2009 WL 248264, *4 (M.D. Fla. 2009 ("Design defects must be proven by expert testimony."); *Timmons v. The Purdue Pharma Co.*, Case No. 8:04-CV-1479-T-26MAP, 2006 WL 263602, at *3 (M.D. Fla. Feb. 2, 2006)(A defective product must be proven by expert testimony."); *Blinn v. Smith & Nephew Richards, Inc.*, 55 F. Supp. 2d 1353, 1362 (M.D. Fla. 1999); *Savage v. Danek Med., Inc.*, 31 F. Supp. 2d 980 (M.D. Fla. 1999).

The plaintiff asserting a product liability cause of action, whether sounding in strict liability, negligence, or breach of warranty, must prove a causal connection between the injuries sustained and the alleged product defect. *See Wong v. Crown Equip. Corp.*, 676 So. 2d 981, 982 (Fla. 3d DCA 1996); *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984) ("A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant" (*quoting* W. Prosser, Law of Torts § 41 (4th ed. 1971))). A plaintiff in a complex design case cannot establish causation when the court excludes his expert from offering

causation opinions or testimony at trial. *See, e.g., Cerna v. S. Florida Bioavailability Clinic, Inc., 815 So. 2d 652, 656 (Fla. 3d DCA 2002)*; *Herrera v. United Auto. Ins. Co.*, 00-1540 CA25, 2002 WL 32072837, at *2 (Fla. Cir. Ct. Dec. 31, 2002). It is not enough for Plaintiffs to create a metaphysical possibility that the alleged defect was a cause of the injury. *See R.J. Reynolds Tobacco Co. v. Nelson*, 353 So. 3d 87 (Fla. 1st DCA 2022). Rather, Plaintiffs must show that there was a defect and that the defect was the cause of the injury. *Id.* ("evidence must have been admitted that could prove that, absent the defendant's negligence or alleged defect design, the plaintiff more likely than not would not have been injured and suffered damages").

As explained above, it is not enough to merely contend that a defect existed, show that an accident occurred, and assume the two are necessarily related. There must also be some admissible evidence from which a reasonable jury could conclude that this incident was more probably than not caused by a defective product. Plaintiffs argue they can make this showing in two alternative ways. First, they argue that the causation opinions of their experts create a genuine factual dispute as to causation. This argument is foreclosed by the Court's determination that the experts' causation opinions are inadmissible.

Second, Plaintiffs argue that the claims can be proven through circumstantial evidence even without expert testimony. More specifically, Plaintiffs contend that "the issue of causation is so simple that expert testimony on the issue is not essential for Plaintiffs' claim to survive." Pls.' Resp. to MSJ at 51 [Filing # 171643953, Doc. No. 141]. As discussed above, the undisputed facts in the record are that TPD did not use duty pistols equipped with manual thumb

safeties as a matter of department policy. Because TPD would not have purchased or issued to Mr. Northrop a pistol equipped with a manual thumb safety, the addition of that feature on the P320 could not possibly have prevented his accident. Therefore, the lack of a manual thumb safety on the P320, whether or not it renders the pistol defective, was not a cause of Mr. Northrop's accident.

As for the tabbed trigger, the question of causation is not within the scope of a layperson's knowledge. To determine whether the actuation of Mr. Northrop's trigger occurred in a manner that would have also depressed a tabbed trigger involves scientific and technical understanding of the design and function of tabbed and non-tabbed triggers. It also involves analysis of the available physical evidence showing how the accident occurred.

Further, even if expert testimony were not required on this issue, Plaintiffs' admissible evidence is insufficient to create a genuine factual dispute as to causation. Mr. Northrop testified that his holstered pistol discharged when his hand touched the top of it. His testimony does not indicate what caused the trigger to move or where force was applied. In fact, in direct contradiction to his experts' opinions, Mr. Northrop claims that nothing touched the trigger causing his pistol to discharge. Other evidence in the record shows that the pistol was at least partially unholstered when it discharged, thus leaving the trigger exposed and allowing for the possibility that it was contacted squarely on its face causing it to discharge. This evidence includes an account of the incident contained in Plaintiff's medical records from immediately following the accident, the fact that the spent casing ejected and a new round cycled into the chamber, TPD's own review of the incident, and testing conducted by Defendant's expert.

Causation can be inferred from circumstantial evidence, but the causal connection must be based upon more than conjecture and surmise. Therefore, absent an evidentiary basis for a finding that an alleged defect more likely than not caused a plaintiff's injuries, the question of a defendant's liability is too conjectural and uncertain to warrant submission to a jury. Plaintiffs must present at least some evidence from which a jury could reasonably conclude that it was more likely than not that a tabbed trigger would have prevented Mr. Northrop's accidental discharge and therefore, that the accident was proximately caused by its absence. The record evidence does not support an inference that the trigger was somehow brushed or grazed with sufficient force to discharge the pistol. This is not sufficient to survive summary judgment. Although Plaintiffs have presented a theory of possible causation, there is not sufficient evidence from which a jury could rationally conclude that the gun's alleged defect—the absence of a tabbed trigger safety—caused the injuries in this case. *See R.J. Reynolds Tobacco Co.*, 47 Fla. L. Weekly D2436; *Cerna v. S. Florida Bioavailability Clinic, Inc.*, 815 So. 2d 652, 656 (Fla. 3d DCA 2002); *Herrera v. United Auto. Ins. Co.*, 00-1540 CA25, 2002 WL 32072837, at *2 (Fla. Cir. Ct. Dec. 31, 2002).

### i. *Herman, Davis,* and *Lang* Opinions

The Court is aware of and has reviewed three recent opinions from United States District Courts deciding similar motions concerning the same experts and opinions at issue in this case: *John Tyler Herman v. Sig Sauer, Inc.*, No. CIV 21-1028-R (W.D. Okla. Sept. 8, 2023)(granted Sig Sauer's motions to exclude Tertin and Vigilante and its motion for summary judgment); *Timothy Davis v. Sig Sauer, Inc.*, No. 3:22-cv-00010-GFVT (E.D. Ky. Jan. 4,

2024)(granting Sig Sauer's motions to exclude Tertin and Vigilante and its motion for summary judgment); and *Robert Lang v. Sig Sauer, Inc.*, No. CIV 1:21-CV-04196 (N.D. Ga. Sept. 28, 2023)(granting Sig Sauer's motions only as to the experts' opinions regarding the manual thumb safety and otherwise denying the motions). While none of these decisions are binding on this Court, the Court finds that the facts and legal reasoning in *Herman* and *Davis* are applicable here. The *Lang* case however, is readily distinguishable.

In *Herman* and *Davis*, as in this case, Plaintiffs' experts did not consider or rely on the facts surrounding the specific discharge incident. Instead, these experts based their causation opinions entirely on the opinion that generally tabbed triggers are effective at preventing unintended discharges. *Herman* Opinion at 7-8; *Davis* Opinion at 4-6.

In *Lang*, by contrast, the Court found that the experts' causation opinions regarding the tabbed trigger were sufficiently "based on the specifics of the incident as described by Plaintiff in his testimony and other corroborating evidence." *Lang* Opinion at 31. The same conclusion cannot be reached here. In the instant case, any "connection" Tertin and Vigilante purport to make between the lack of a tabbed trigger and the discharge of Mr. Northrup's pistol lacks in evidentiary support entirely. Simply put, the individualized facts of this case were of no significance in the formulation of the experts' opinions.

Further, *Lang* has an important factual distinction from this case. Among the "corroborating evidence" that the *Lang* Court found supported the plaintiff's testimony that the pistol was holstered when it discharged was the fact that the spent casing did *not* eject from the pistol. Here, by contrast, the spent casing

did eject and a new live round was cycled. These facts, among other evidence in the record, indicate that Mr. Northrup's pistol was at least partially unholstered when it discharged. In this case, as in *Herman* and *Davis*, the facts in the record simply do not support an inference that it is more probable than not that Mr. Northrop's trigger was brushed or side pulled in such a way that a tabbed trigger would have prevented the accident.[7]

Plaintiffs also argue that the *Herman* decision is distinguishable because it relies on Oklahoma law, which differs from Florida law in that "Florida law imposes no across-the-board requirement of expert testimony in products liability cases." Pls.' Response to Notice of Supp. Authority [Filing # 183740321, Doc. No. 186] at 8. The Court does not find this argument persuasive. Under both Oklahoma and Florida law, expert testimony is necessary in cases that involve complex issues of design and function, not "across the board." *See Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 679 (10th Cir. 2018); *Wong v. Crown Equip. Corp.*, 676 So. 2d 981 (Fla. 3d DCA 1996). Moreover, even if Florida law were more permissive than Oklahoma law on this issue, Plaintiffs' argument is moot because the *Herman* Court did *not* find that expert testimony was necessarily required to establish the element of causation. Rather, the *Herman* Court found that, even in the absence of expert testimony, the admissible evidence was insufficient to create a genuine factual dispute as to causation.

---

[7] During oral argument, Plaintiffs raised for the first time new arguments to bolster their theory that inadvertent contact was more likely than not made with only the side of Mr. Northrop's trigger (for example, Plaintiffs' counsel suggested that contact to only one of nine spots where the P320 trigger could potentially be contacted would result in a tabbed trigger being depressed). Because these arguments are not based on facts in the record and were not considered or relied upon by Plaintiffs' experts, they will not be considered here.

*Herman* Opinion at 13. As discussed above, the facts in this case support the same conclusion.

Based on the above, the Court finds summary judgment in favor of Defendant is proper on the issue of causation.

### *CONCLUSION*

Accordingly, it is hereby **ORDERED and ADJUDGED** that:

1. Defendant's Motion to Exclude and/or Limit the Testimony of Plaintiffs' Expert, James Tertin, is **GRANTED**.

2. Defendant's Motion to Exclude and/or Limit the Testimony of Plaintiffs' Expert, William Vigilante is **GRANTED**.

3. Defendant's Motion for Summary Judgment is **GRANTED**.

4. A separate judgment will be entered.

**Done and ordered** and effective as of the date and time imprinted below with the Judge's signature.

Electronically Conformed 3/12/2024
Jennifer Gabbard
_____

JENNIFER GABBARD
CIRCUIT JUDGE

Copies electronically served via
JAWS on all Attorneys and Parties
registered/associated to this case.

# EXHIBIT 10

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

MICHAEL COLWELL and JULIA COLWELL,

                         Plaintiffs,                  1:21-cv-1200 (BKS/ML)

v.

SIG SAUER, INC.,

                         Defendant.

---

**Appearances:**

*For Plaintiffs:*
Paul B. Sherr
PBS Legal, LLC
8 John Street
Nassau, NY 12123

Ryan D. Hurd
Daniel Ceisler
Robert Zimmerman
Saltz Mongeluzzi & Bendesky
1650 Market Street 52nd Floor
Philadelphia, PA 19103

*For Defendant:*
Robert L. Joyce
Brian K. Gibson
Littleton, Park Joyce Ughetta & Kelly, LLP
4 Manhattanville Road, Suite 202
Purchase, NY 10577

Jonathan T. Woy
Littleton Park Joyce Ughetta & Kelly, LLP
201 King of Prussia Road - Suite 220
Radnor, PA 19087

Kristen E. Dennison
Littleton Park Joyce Ughetta & Kelly, LLP
2460 N Courtenay Pkwy, Suite 24
Merritt Island, FL 32953

**Hon. Brenda K. Sannes, Chief United States District Judge:**

### DECISION AND ORDER

Before the Court are Defendant's motions *in limine* to exclude certain expert testimony and Defendant's motion for summary judgment. (Dkt. No. 46; Dkt. No. 47; Dkt. No. 48). The parties have briefed the issues, and the Court has elected to decide the matter without oral argument.

## I.      INTRODUCTION

Plaintiff Michael Colwell brings this diversity action against Defendant Sig Sauer, the manufacturer of a Sig Sauer P320 handgun which Plaintiff alleges discharged unintentionally, into Plaintiff's thigh. (Dkt. No. 1). Michael Colwell asserts claims for strict products liability, negligence, breach of implied warranty of merchantability, breach of express warranty, and negligent and intentional infliction of emotional distress. His wife, Julia Colwell, asserts a claim for loss of consortium. (*Id.*).

In support of these claims, Plaintiffs have elicited expert testimony from James Tertin, a gunsmith, and William Vigilante, a human factors engineer. The version of the P320 involved in this case does not come with an external safety device, such as a manual thumb safety or tabbed trigger safety. Mr. Tertin and Mr. Vigilante both opine that the failure to incorporate a safety into the P320 caused Plaintiff's injuries. Defendant seeks to exclude these causation opinions under Rule 702 of the Federal Rules of Evidence. (Dkt. Nos. 46, 47). Defendant also moves for summary judgment, arguing that Plaintiffs' claims necessarily fail without admissible expert evidence of causation. (Dkt. No. 48).

## II.     FACTUAL BACKGROUND

Plaintiff Michael Colwell alleges that a Sig Sauer P320, which he was issued in connection with his duties as a police officer in Troy, New York, discharged during a police

training exercise even though Plaintiff never touched the trigger. (Dkt. No. 1). Plaintiff testified

that he put the gun in his holster during the exercise and was starting to move across his body to

get his taser, or was "just about to get there," when the gun discharged. (Dkt. No. 46-5, at 8).

Defendant has submitted reports that provide a different version of the accident. The

police report states that Plaintiff was taking part in firearms training and "[w]hile manipulating

his firearm during said training, the pistol discharged causing the projectile to strike [Plaintiff] in

the right thigh." (Dkt. No. 46-7, at 2). The report from the emergency medical team at the scene

states that "while at training [Plaintiff] attempted to holster his sidearm when it misfired and shot

his right leg." (Dkt. No. 46-6, at 2).[1]

The gun in question, a Sig Sauer P320, did not have any form of external safeties, such as

a thumb safety or a tabbed trigger, and Plaintiffs allege that the lack of such devices is a design

defect that led to Colwell's injuries. Defendants' motions challenge the expert testimony of

William Vigilante and James Tertin. The experts have opined that the lack of external safeties

rendered the P320 defective because it is a single-action pistol with a short trigger pull, which

makes it more likely to be actuated. Both experts have opined that the defective design was a

cause of the unintentional discharge in this case. Defendant argues that the proffered causation

testimony is inadmissible because it is without foundation and is purely speculative. (Dkt. No.

46-1; Dkt. No. 47-1). Defendant also seeks summary judgment, arguing that the causation

opinions are unreliable and inadmissible. (Dkt. No. 48-1). Plaintiffs oppose the motions, arguing

that the experts' opinions are based on reliable evidence and admissible. (Dkt. No 49; Dkt. No.

50; Dkt. No. 51-2).

---

[1] Plaintiffs failed to respond to Defendant's statement of undisputed material facts, as required by NDNY Local Rule
56.1(b), and Plaintiffs' briefing does not address the discrepancies between the reports of the incident and Michael
Colwell's testimony.

## III.    DEFENDANT'S MOTIONS IN LIMINE

### A.    Standard

Federal Rule of Evidence 702 "governs the admissibility of expert testimony." *Showers v.*
*Pfizer, Inc.*, 819 F.3d 642, 658 (2d Cir. 2016). That Rule permits "[a] witness who is qualified as
an expert by knowledge, skill, experience, training or education" to "testify in the form of an
opinion" under certain conditions. Fed. R. Evid. 702. To be qualified to testify, the "expert's
scientific, technical, or other specialized knowledge" must "help the trier of fact to understand
the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In addition, "the testimony"
must be "based on sufficient facts or data" and be "the product of reliable principles and
methods." Fed. R. Evid. 702(b)-(c). Finally, the expert must have reliably applied "the principles
and methods to the facts of the case." Fed. R. Evid. 702(d). "The proponent of the expert
testimony has the burden to establish these admissibility requirements." *Showers*, 819 F.3d at
658.

A district court has "broad discretion" in evaluating expert testimony. *McCullock v. H.B.*
*Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir. 1995). In carrying out its role as gatekeeper, a court must
take a "flexible" approach that focuses on "the scientific validity—and thus the evidentiary
relevance and reliability—of the principles that underlie a proposed submission." *Daubert v.*
*Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-95 (1993). The court is to concentrate only on
"principles and methodology," and "not on the conclusions that they generate." *Id.* at 595. Of
course, "the types of factors that are appropriate to consider" in evaluating expert testimony "will
'depend[ ] upon the particular circumstances of the particular case at issue[.]'" *Showers*, 819
F.3d at 658 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). The trial court's
role is as "gatekeeper," making sure "that the 'expert's testimony both rests on a reliable
foundation and is relevant to the task at hand.'" *Id.* (quoting *United States v. Williams*, 506 F.3d

151, 160 (2d Cir. 2007). Nevertheless, "[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions[.]" *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005).

Once a court determines that an expert is qualified to testify, "Rule 702 imposes on the trial judge an obligation to determine whether the expert's specialized knowledge will assist the trier of fact, i.e., will be not only relevant, but reliable." *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015). The court must determine "whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." *Campbell v. Metropolitan Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting *Daubert*, 509 U.S. at 597). The court should ask whether (1) "the testimony is grounded on sufficient facts or data; (2) . . . the testimony 'is the product of reliable principles and methods'; and (3) . . . 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, [federal law] mandate[s] the exclusion of that unreliable opinion testimony." *Id.* at 266.

"An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). The court is not required to admit conclusory opinions which are "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" to admit the expert opinion. *Id.* Still, the court should keep in mind "the liberal admissibility standards of the federal rules" and acknowledge "that our adversary system

provides the necessary tools for challenging reliable, albeit debatable, expert testimony."
*Amorgianos*, 303 F.3d at 267.

With this framework in mind, the Court addresses Defendant's arguments for exclusion of the causation opinions of Plaintiffs' two experts.

### B.    Discussion

Defendants do not challenge Mr. Tertin's qualifications to testify as a firearms expert or Mr. Vigilante's qualifications to testify as a human factors expert. The Court finds that Mr. Tertin, who is a professional gunsmith and is currently the director of research and development for a firearms manufacturer, (Dkt. No. 51-5, at 3), is qualified to testify as a firearms expert.[2]

### 1.    General Background Regarding the P320

Mr. Tertin provided the following analysis of the P320, following his inspection and analysis of the P320 used by Michael Colwell. The P320 functions as a single-action pistol, with a striker that is "fully cocked and ready to be fired before any trigger movement." (*Id.* at 5). The trigger is easier to pull and has a shorter trigger travel distance than competitor pistols, such as the Glock. (*Id.* at 18). "[T]he trigger travel distance of a single-action gun makes it very easy for the trigger to be inadvertently actuated by a part of a user's body or a foreign object." (*Id.* at 9). While the P320 has internal safeties designed to prevent inadvertent discharges, "they are disengaged with exceptionally little manual effort" such that "a disengagement can be caused by vibration, jostling, or contact with the P320." (*Id.* at 9–10).

Although the P320 has internal safeties, it has no external safeties. External safeties "help prevent unintended discharges by manually blocking the trigger from being pulled until the user decides they are ready to fire." (*Id.* at 13). Competitors sell striker-fired handguns with external

---

[2] In light of the absence of briefing regarding Mr. Vigilante's qualifications, and the Court's ruling excluding his causation opinion, the Court does not address Mr. Vigilante's qualifications to testify to the opinions he provided.

safeties, such as (1) thumb safeties and (2) tabbed trigger safeties. (*Id.* at 14–15). "A thumb safety is a switch on the side of the pistol that can be flipped on or off [in 'safe mode' or 'fire mode'] with the user's thumb." (*Id.* at 14). A tabbed trigger safety "is a small tab within the trigger that must be depressed for the trigger to be able to fully depress and fire the weapon." (*Id.* at 15).

Plaintiffs assert that the failure to include a manual thumb safety and/or a tabbed trigger into the design of the P320 rendered the firearm defective and unreasonably dangerous. (Dkt. No. 51-2, at 19). Mr. Tertin opined that the P320 is "unreasonably dangerous and defectively designed because the combination of its extremely short single-action trigger-pull and lack of external safeties makes it far too easy for the trigger to be accidentally actuated." (Dkt. No. 51-5, at 19). Mr. Vigilante offers similar opinions. The Court will evaluate each expert's causation opinion individually.

### 2. William Vigilante, Jr.

Plaintiffs seek to present Mr. Vigilante's testimony "that the P320's lack of safety features . . . was a proximate cause of Plaintiff's unintended discharge." (Dkt. No. 50, at 6). Mr. Vigilante would testify that "[h]ad Sig Sauer integrated a tab trigger safety[3] into the design of the Sig P320, the subject unintentional discharge would most likely not have occurred and Michael Colwell would not have been injured." (*Id.* at 13). In forming this opinion, Mr. Vigilante did not conduct any formal testing, and instead asserts his reliance on Plaintiff's testimony, personal knowledge and evidence of similar incidents. (*Id.* at 6; Dkt. No. 51-10, at 12).

---

[3] Defendant argues that Mr. Vigilante does not opine that the lack of an external manual thumb safety caused Plaintiff's accident, (Dkt. No. 46-1 at 3 n.1), and Plaintiffs do not dispute this.

Mr. Vigilante's knowledge of this particular incident is severely limited. He did not personally inspect the holster or the pistol. (Dkt. No. 51-10, at 4, 7). He read Plaintiff's testimony but did not speak with Plaintiff or anyone with direct knowledge about the incident. (*Id.* at 5). Furthermore, Plaintiff testified that the gun was holstered whereas the police report indicated that Plaintiff was in the process of reholstering his firearm. (*Id.* at 5–6). When questioned about this discrepancy, Mr. Vigilante indicated his lack of knowledge as to "why the two stories are different." (*Id.* at 6). Mr. Vigilante testified that it would not affect his opinion if the incident happened when the pistol was in the holster or if it happened when Plaintiff was in the process of reholstering. (*Id.*). Similarly, when asked about his opinion as to what caused the trigger to move in this case, Mr. Vigilante stated that he had no opinion on the matter and was not asked to address that question. (*Id.*). He was likewise unaware of the part of the trigger contacted and admitted it was "possible" that something could have gotten into the trigger as the gun was being holstered, causing the gun to discharge. (*Id.* at 6–7). When asked whether a tab trigger would have prevented the pistol from discharging, Mr. Vigilante answered, "[t]hat's its intent and purpose." (*Id.* at 12).

Having carefully reviewed the record in this case, the Court finds that Mr. Vigilante's causation opinion does not pass muster under Fed. R. Evid. 702 because it is not "based on sufficient facts or data"; it is not "the product of reliable principles and methods" and it does not "reflect[ ] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The limitations in Mr. Vigilante's knowledge of the incident evince a substantial analytical gap. This is consistent with other similar cases where Mr. Vigilante has been offered as an expert witness on causation. Mr. Vigilante has authored reports in several other cases against Defendant involving P320s. (Dkt. No. 50, at 5). These reports appear to be fairly

repetitive, espousing Mr. Vigilante's view on causation without reference to the specific facts of each underlying instance. For example, in a comparable Oklahoma case, the court noted:

> [T]he specific circumstances surrounding this incident are not important to Mr. Vigilante. Rather, he is basing his causation opinion on his conclusion that, in general, it is unsafe to sell a gun like the P320 without a manual safety. Assuming for the sake of the argument that the P320's failure to include a manual safety is a design defect, it does not necessarily follow that the defect was the cause of Plaintiff's particular accident. Mr. Vigilante does not identify any factual basis for his conclusion that a manual safety would have most likely prevented this incident. As a result, his causation opinion is not sufficiently reliable as applied to the facts of this case.

*Herman v. Sig Sauer*, No. CIV 21-1038-R, 2023 WL 5827054, at *3 (W.D. Okla. Sept. 8, 2023). Other courts have reached similar conclusions. A district court in Kentucky court found that Mr. Vigilante lacked "a reliable factual basis for [his] opinion[ ] regarding causation," because his "opinions are scarcely, if at all, based on any of the facts related to [plaintiff's] case." *Davis v. Sig Sauer*, No. 3:22-cv-00010-GFVT, 2024 WL 54595, at *2–3 (E.D. Ky. Jan. 4, 2024). As such, "[h]is conclusions lack[ed] any indicia of reliability that might help a jury to determine what ultimately caused [plaintiff's] trigger to be pulled," meaning that "his causation opinion [wa]s not sufficiently reliable as applied to the facts of this particular case." *Id.* at *3. Similarly, a district court in Pennsylvania noted that "Vigilante's conclusion or any proffered support are neither testable nor tethered to the circumstances in which [plaintiff's] pistol fired, as Vigilante recognized in his deposition that he lacked key information and analysis concerning how the gun discharged in this case." *Slatowski v. Sig Sauer, Inc.*, No. 21-729-RBS, 2024 WL 1078198, at *8 (E.D. Pa. Mar. 12, 2024); *cf. Jinn v. Sig Sauer, Inc.*, No. 20-CV-1122, 2023 WL 2919558, at *11 (S.D.N.Y. Apr. 12, 2023) ("Without any testing, and without any other data or analysis to support his theories that the conditions observed rendered [plaintiff's] pistol defective and caused

his accident, [the expert's] opinion does not pass the threshold for admissibility."), *report and recommendation adopted*, 2023 WL 5972507 (S.D.N.Y. Dept. 13, 2023). Here too, Mr. Vigilante's testimony is wholly disconnected from the facts of this particular case due to his own lack of knowledge about how the gun discharged.

Plaintiffs have cited cases in which Mr. Vigilante's proffered testimony had established a connection between the alleged design defect and the facts of the particular case. In one case, there was video footage of the incident, leading to an undisputed theory of how the pistol discharged. *Catatao v. Sig Sauer, Inc.*, No. 1:22-cv-10620-PBS, at 2–3 (D. Mass. July 9, 2024), ECF No. 96. There, an officer had a keychain with multiple keys on her gear bag, which was hanging on her right shoulder and her P320 was holstered on her right hip. *Id.* at 2. In that case, Sig Sauer's undisputed theory was that one of the keys entered the holster and actuated the pistol's trigger. *Id.* at 2–3. This theory was supported by the discovery of brass-colored scratches found on her P320 after the incident and damage to the holster. *Id.* at 3. Using that information, Mr. Vigilante "conducted experiments to test whether a tabbed trigger could have prevented [plaintiff's] P320 from discharging." *Catatao v. Sig Sauer, Inc.*, No: 1:22-cv-10620-PBS, at 6 (D. Mass. July 9, 2024), ECF No. 95. In these experiments, Mr. Vigilante placed a model P320 and a Glock with a tabbed trigger into the type of holster the injured officer was using, mirrored the circumstances of the incident, and attempted to actuate the pistol's trigger. *Id.* at 4. Because Mr. Vigilante's causation opinion in that case was "reasonably related to his experiments, research, and expertise," the Court allowed his causation testimony. *Id.* at 6–7. Like *Catatao*, another court found Mr. Vigilante's opinion to be admissible, noting that it was "based on the specifics of the Incident as described by Plaintiff in his testimony and other corroborating evidence." *Lang v. Sig Sauer, Inc.*, 1:21-cv-04196-ELR, at 31 (N.D. Ga. Sept. 28, 2023).

Here, however, there was no video footage, no explanation as to why Colwell's pistol discharged, and no experimentation. Mr. Vigilante's opinion in this case is not based on specifics of Plaintiff's incident, unlike his opinions in *Catatao* and *Lang*. Because his opinion is "connected to existing data only by the *ipse dixit* of the expert," it will be excluded. *Gen. Elec. Co.*, 522 U.S. at 146. Accordingly, the Court will grant Defendant's motion in limine with respect to Mr. Vigilante.

### 3. James Tertin

Plaintiffs seek to elicit Mr. Tertin's testimony that "[t]he P320 is unreasonably dangerous and defectively designed because the combination of its extremely short single-action trigger-pull and lack of external safeties makes it far too easy for the trigger to be accidentally actuated." (Dkt. No. 49, at 17). Mr. Tertin further opined that "[t]he defective design of the P320 was a proximate cause of Plaintiff's accident, in the event that his finger or a foreign object touched the trigger." (*Id.* at 18).

In forming his opinions, Mr. Tertin relied upon his inspection of the P320 pistol used by Plaintiff, his inspection of an exemplar P320, his review of several competitor pistols, and videos of other similar incidents. (Dkt. No. 51-5, at 2-3). These bases for his opinion are the same bases he has relied upon in all other similar matters. (Dkt. No. 51-7, at 5). His report issued for this case is "substantially the same" as one he issued in *Davis v. Sig Sauer*. (*Id.* at 2–3).

During his deposition Mr. Tertin testified that he did not review any file materials in this matter and understood the incident to have occurred as Plaintiff described it. (*Id.* at 3). Mr. Tertin did not inspect the Plaintiff's holster and did not have an opinion as to whether Plaintiff's hands were fully off the pistol at the time it discharged or what conclusions the police reached regarding the incident. (*Id.* at 4). Mr. Tertin does not know what caused Plaintiff's pistol to discharge: he testified in his deposition that the trigger must be actuated for the P320 to

11

discharge. (*Id.* at 3). At the same time, in his report, Mr. Tertin opined that "a foreign object or pressure against the holster can leave the gun unacceptably vulnerable to a discharge without an intentional trigger pull; without the finger being on or near the trigger, or even without full actuation of the trigger." (Dkt. No. 51-5, at 13).

Mr. Tertin acknowledged that he had no information about whether Plaintiff would have engaged a manual thumb safety in this instance if one had been available. (Dkt. No. 51-7, at 5). To that end, there is nothing in the record to demonstrate that a manual safety would have been engaged if the P320 had one. The record does not indicate that Mr. Colwell would have preferred a manual safety or used a manual safety. In fact, Mr. Colwell personally owns a pistol without a manual safety. (Dkt. No. 51-4, at 14).[4] "Without any evidence permitting an inference that a thumb safety would have been used, a finding that the lack of a thumb safety caused the accident is pure speculation." *Herman*, 2023 WL 5827054, at *6.

Mr. Tertin's analysis hinges on "practical function" that because a pistol with a tabbed trigger has "one more step for safety," Plaintiff's pistol would have been less likely to fire if it had a tabbed trigger. (Dkt. No. 51-7, at 6, 8). Nevertheless, Mr. Tertin acknowledges that guns with tabbed triggers can discharge unintentionally too. (*Id.* at 7). Mr. Tertin does not explain how a tabbed trigger would have prevented the accident if a foreign object, such as an article of clothing, had been caught in the trigger. Furthermore, Mr. Tertin states that he would not change his opinion about this matter, even if it were proven that pistols with tabbed triggers discharged unintentionally three times as often as the P320. (*Id.*).

---

[4] The Court notes that Defendant's expert states that "the Troy Police Department could have purchased SIG P320 pistols equipped with manual safeties but chose the SKU of SIG P320 that did not contain a manual safety." (Dkt. No. 54-4, at 3).

Mr. Tertin has issued substantially similar reports in other cases where courts have found his causation opinions to be "similarly flawed" to those of Mr. Vigilante. *See, e.g.*, *Herman*, 2023 WL 5827054, at \*4. One district court noted:

> [Mr. Tertin] leaps to concluding that the lack of a manual safety caused Plaintiff's accident, even though he admits that he has no idea what happened in this incident, performed no analysis as to what may have pulled the trigger, and did not evaluate the rate of unintentional discharges for guns with tabbed triggers. If Mr. Tertin does not know where the trigger was pulled, whether a thumb safety would have been engaged, or even whether tabbed triggers reduce the rate of unintentional discharges, his conclusion that a manual safety would likely have prevented the accident is simply speculation.

*Id.* (citations omitted)*; see also Davis*, 2024 WL 54595, at \*2 (finding that the lack of empirical evidence coupled with Mr. Tertin's failure to investigate the factual circumstances rendered his causation opinion "speculative, without any basis in fact"); *Slatowski*, 2024 WL 1078198, at \*7 (finding that Mr. Tertin failed to "provide[ ] a methodology, reasoning or support to explain why or how a tabbed trigger would have prevented the unintentional discharge in this case."). The Court agrees that Mr. Tertin's causation opinion does not pass muster under Fed. R. Evid. 702 because it is not "based on sufficient facts or data"; it is not "the product of reliable principles and methods" and it does not "reflect[ ] a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Accordingly, the Court will grant Defendant's motion in limine with respect to Mr. Tertin.

## IV.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.   Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In so doing, the nonmoving party may not rest upon "mere allegations or denials" asserted in his pleadings. *Anderson*, 477 U.S. at 256. Likewise, the nonmoving party may not rest upon "conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Furthermore, "[w]hen ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

**B.    Analysis**

In a products liability case, such as this one, "a manufacturer or retailer who sells a product in a defective condition is liable for injury which results from the use of the product, regardless of privity, foreseeability, or the exercise of due care." *Wheeler v. Sears Roebuck & Co.*, 37 A.D.3d 710, 710 (2d Dept. 2007). "The plaintiff need only prove that the product was

defective as a result of either a manufacturing flaw, improper design, or a failure to provide adequate warnings regarding the use of the product, and that the defect was a substantial factor in bringing about the injury." *Id.* at 710–11 (citations omitted); *see Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC*, 419 F. Supp. 3d 490, 507 (E.D.N.Y. 2019). Thus, causation is an essential element of Plaintiffs' strict products liability claim. A plaintiff's negligence and strict liability claims based upon an alleged defect are "functionally equivalent" and should "be analyzed concurrently." *Oden v. Boston Scientific Corp.*, 330 F. Supp. 3d 877, 887 (E.D.N.Y. 2018).

Defendant argues that Plaintiffs cannot establish the essential element of causation without the excluded expert testimony. (Dkt. No. 48-1). Plaintiffs respond that (1) the issue of causation is so simple it is within the knowledge of an ordinary juror and (2) causation can be established with circumstantial evidence without expert testimony. (Dkt. No. 51-2).

If the nexus between the alleged design defect and the injury would not be obvious to a lay juror, "expert evidence is often required to establish the causal connection between the accident and some item of physical or mental injury." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (quoting *Moody v. Maine Cent. R.R. Co.*, 823 F.2d 693, 695 (1st Cir. 1987). "[E]xpert testimony is unnecessary in cases where jurors 'are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training.'" *Id.* (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)).

Plaintiffs argue that the issue of causation here is well within the understanding of an ordinary juror. (Dkt. No. 51-2, at 17–19). Plaintiffs cite to *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 110-11 (1983) in support of that argument. In *Voss*, the plaintiff was injured while using a circular saw. *Id.* at 104. As he made a cut across one of the boards, the saw hit a knot, projecting the saw upward approximately eighteen inches into the air which caused severe

injuries to plaintiff's hand. *Id.* There was no dispute that the saw's guard was operating properly and had closed as far as it could before the blade came into contact with the plaintiff's hand. *Id.* at 104–05. Plaintiff alleged that the saw blade guard allowed an excessive amount of the blade to be exposed. *Id.* at 105. On those facts, the court concluded that the jury could consider the characteristics of the defective product and plaintiff's description of how the accident happened. *Id.* at 110–11. A jury could conclude that a longer saw blade would have mitigated the plaintiff's injuries.

Here, on the other hand, there is no clear description of what caused the P320 to discharge and how the accident happened. And the mechanics of a P320 firearm are not within the common knowledge of a lay person. As another district court noted, "[t]he inner workings and mechanics of the P320 are not matters of general knowledge, but instead involve a complex and technical understanding of firearms, engineering, and physics to fully determine whether a defect exists." *Davis*, 2024 WL 5495, at *5 (quoting *Mayes v. Sig Sauer, Inc.*, No. 1:19-cv-00146, 2023 WL 2730264, at *9 (W.D. Ky. Mar. 30, 2023). In this case a lay person is not capable of reaching an opinion on causation without the help of an expert. *See, e.g.*, *Jinn*, 2023 WL 2919558, at *17 ("[F]irearms are not the type of product for which alternative designs are 'obvious and understandable' [to a layperson]."); *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 387 F. Supp. 3d 323, 342 (S.D.N.Y. 2019), *aff'd*, 982 F.3d 113 (2d Cir. 2020) (noting that expert testimony is generally required in "cases involving complex causation issues," such as cases involving pharmaceuticals or medical devices); *Nemes v. Dick's Sporting Goods, Inc.*, 521 F.Supp.3d 328, 339 (S.D.N.Y. 2021) (collecting cases where a lay person would not readily understand the defective product's design, including trucks, pipe-

cutting machines, saws, and seat belts and finding the same with respect to crossbows). Thus, unlike in *Voss*, Plaintiffs need expert testimony establishing causation.

Plaintiffs cite to *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 46 (2d Cir. 2002) for the proposition that the "existence of [a] causative defect is provable by circumstantial evidence." (quoting *Hunter v. Ford Motor Co.*, 37 A.D.2d 335, 337 (3rd Dept. 1971)). (Dkt. No. 51-2, at 17–18). Plaintiffs appear to argue that, like *Jarvis and Hunter*, "[t]he precise defect need not be named and proved" if "the cumulation of circumstances and inferences . . . support the conclusion that there was a defect which caused the accident." (Dkt. No. 51-2, at 18) (quoting *Hunter*, 37 A.D.2d at 337). However, Plaintiffs can only rely on circumstantial evidence if they "exclude all other causes for the product's failure that are not attributable to defendants." *Speller v. Sears, Roebuck & Co.*, 100 N.Y.2d 38, 41 (2003). Even construing the evidence in the light most favorable to the Plaintiffs with all inferences in Plaintiffs' favor, Plaintiffs are unable here to exclude all other causes. Crediting Plaintiff's testimony that the pistol discharged when it was holstered, over the reports that he was manipulating the gun, or attempting to holster the gun, it is still possible that the trigger was actuated by a factor not attributable to defendant. Both of Plaintiff's proffered experts admitted that the trigger could have been actuated, for example, by an accidental touch or by contact with a piece of clothing. (Dkt. No. 51-5, at 10; Dkt. No. 51-10, at 7). Plaintiffs have not eliminated these possibilities, which are non-attributable to Defendant and could have caused the gun to potentially discharge even if the pistol had a tabbed trigger. And, as set forth above, there is nothing in this record to indicate that a manual safety would have been engaged.

No jury could rationally conclude from the evidence adduced by Plaintiffs that the gun's alleged defects *caused* the injuries in this case. *See Coning v. Bayer Pharma AG (In re Mirena*

*IUS Levonorgestrel-Related Prods. Liab. Litig.)*, 982 F.3d 113, 124 (2d Cir. 2020) ("[N]o reasonable juror could find that it was more likely than not that general causation had been established based on plaintiffs' admissible evidence."). Plaintiffs cannot establish through expert testimony or circumstantial evidence the essential element of causation with respect to their strict products liability and negligence causes of action. Although the Court is sympathetic to the significant injuries Plaintiff has suffered, the Court finds summary judgment in favor of Defendant is proper on the issue of causation with respect to the strict products liability and negligence claims, Counts I and II.

### C.     Remaining Claims

The parties primarily focused on strict products liability and negligence, Counts I and II of the complaint, in their briefing. Notably, however, Plaintiffs also brought claims of (i) breach of implied warranty of merchantability, (ii) breach of express warranty, (iii) negligent infliction of emotional distress, (iv) intentional infliction of emotional distress, and (v) loss of consortium. (Dkt. No. 1, Counts III –VII). These claims may be subject to dismissal for the same reason.[5] However, the parties have not briefed these claims and the Court will not resolve issues that have not been briefed. *See Brief v. Albert Einstein College of Medicine*, 423 Fed. Appx. 88, 93 (2d Cir. 2011) (refusing to decide issues that had not been fully briefed and argued). Accordingly, the parties are ordered to confer within the next 30 days and file a status report concerning how they would like to proceed with respect to the remaining claims.

## V.     CONCLUSION

For these reasons, it is hereby

---

[5] The first four claims also include causation as an essential element. *See Oden*, 330 F. Supp. 3d at 895–96; *Avola v. Louisiana-Pacific Corp.*, 991 F.Supp.2d 381, 391 (E.D.N.Y. 2013); *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021); *Quinn v. United States*, 946 F.Supp. 2d 267, 278 (N.D.N.Y. 2013). If each of these claims is dismissed, a loss of consortium claim cannot exist alone. *Maidman v. Stagg*, 82 A.D.2d 299, 302 (2d Dept. 1981).

**ORDERED** that the Defendant's motions in limine (Dkt. No. 46; Dkt. No. 47) are **GRANTED**; and it is further

**ORDERED** that the Defendant's motion for summary judgment (Dkt. No. 48) is **GRANTED** with respect to Counts I and II of the Complaint; and it is further

**ORDERED** that the parties confer within the next 30 days and file a status report concerning how they would like to proceed with the remaining claims.

**IT IS SO ORDERED.**

Dated: September 17, 2024
      Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge