# EXHIBIT 11

Case: 1:17-cv-06260 Document #: 1343-3 Filed: 10/07/25 Page 2 of 78 PageID #:28435

IN THE CIRCUIT COURT OF THE
13th JUDICIAL CIRCUIT IN AND FOR
HILLSBOROUGH                COUNTY,
FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO:   21-CA-009783

James B. Hulett, individually and as
Personal Representative of the Estate of
James B. Hulett, II,

     Plaintiff,

v.

SIG Sauer, Inc.

     Defendant.

_____/

## **PLAINTIFF'S NOTICE OF VOLUNTARY DISMISSAL**

Plaintiff, JAMES B. HULETT, individually and as Personal Representative
of the Estate of James B. Hulett II, by and through undersigned counsel, and
pursuant to Rule 1.420(a), Florida Rules of Civil Procedure, voluntarily dismisses
Defendant SIG SAUER, INC., with each party to bear their respective attorneys'
fees and costs.

*[This space intentionally left blank]*

CASE NO. 21-CA-009783

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing was electronically filed with the Clerk of Miami-Dade County and served by using the Florida Courts E-Filing Portal on October 2, 2024, to:   SEE ATTACHED SERVICE LIST.

**FREIDIN BROWN P.A.**
One Biscayne Tower, Suite 3100
2 South Biscayne Boulevard
Miami, FL 33131
Phone (305) 371-3666

By:   */s/ Jonathan E. Freidin*
**PHILIP FREIDIN**
Florida Bar No.: 118519
**JONATHAN E. FREIDIN**
Florida Bar No.: 98955
**SARAH GLASSER**
Florida Bar No.: 1035935
pf@freidinbrown.com
jf@freidinbrown.com
sg@freidinbrown.com
eg@freidinbrown.com
pleadings@fblawyers.net

CASE NO. 21-CA-009783

**<u>SERVICE LIST</u>**

Kimberly Boldt, Esquire
RATZAN WEISSMAN & BOLDT
160 W. Camino Real, Ste. 262
Boca Raton, Florida 33432
eservice.legal@rwblawyers.com
Kimberly@rwblawyers.com
Reina@rwblawyers.com
*Co-Counsel for Plaintiff*

Anthony J. Petrillo, Esq.
Florida Bar No. 874469
Matthew P. Moschell, Esq.
Florida Bar No. 1018921
**LUKS, SANTANIELLO, PETRILLO
COHEN & PETERFRIEND**
100 N. Tampa St., Suite 2120
Tampa, FL 33602
Telephone: (813) 226-0081
Facsimile: (813) 226-0082
LuksTpa-Pleadings@LS-Law.com
AJP@insurancedefense.net
MMoschell@insurancedefense.net
*Counsel for Sig Sauer, Inc.*

Kristen E. Dennison, Esq.
Florida Bar No. 0088476
**LITTLETON PARK JOYCE
UGHETTA & KELLY LLP**
201 King of Prussia Rd., Suite 220
Radnor, PA 19087
Telephone: (484) 254-6220
Facsimile: (484) 254-6221
kristen.dennison@littletonpark.com
*Co-Counsel for Sig Sauer, Inc.*

# EXHIBIT 12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  | ) | CIVIL ACTION |
|---|---|---|
| WALTER COLLETTE, JR., | ) | NO. 1:21-CV-11392-FDS |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| SIG SAUER, INC., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## ~~[PROPOSED]~~
## ORDER DISMISSING ALL CLAIMS WITH PREJUDICE

Plaintiff's Motion to Dismiss All Claims with Prejudice having come before the Court, there being no opposition thereto, IT IS HEREBY ORDERED:

1.   Plaintiff's Motion to Dismiss All Claims with Prejudice is ALLOWED.

2.   This Action, and all claims therein, are hereby DISMISSED WITH PREJUDICE.

3.   Pursuant to Plaintiff's Motion to Dismiss All Claims with Prejudice, it further is ORDERED that each party shall bear its own costs, including all court costs and attorney's fees.

4.   The Clerk is directed to enter a separate Judgment of dismissal with prejudice in accordance with the above and close the case

SO ORDERED this _15th_ day of _August_, 2023.

_____
F. Dennis Saylor IV
Chief United States District Judge

# EXHIBIT 13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

| | | |
|---|---|---|
| JACK ANTHONY WILLIAMS, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **JUDGMENT IN A CIVIL CASE** |
| vs. | ) | **CASE NO. 4:22-CV-48-D** |
| | ) | |
| SIG SAUER INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**Decision by Court.**

**IT IS ORDERED, ADJUDGED, AND DECREED** that the court GRANTS defendant's motions to exclude plaintiffs expert witnesses [D.E. 124, 128], GRANTS defendant's motion for summary judgment [D.E. 130], and DISMISSES WITH PREJUDICE plaintiffs claims against defendant. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk SHALL close the case.

This Judgment filed and entered on September 8, 2025, and copies to:
Counsel of record for the parties         (via CM/ECF electronic notification)

September 8, 2025                    Peter A. Moore, Jr.
                                    Clerk of Court

                                    By: /s/ Amber Harrison
                                        Deputy Clerk

# EXHIBIT 14

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

ELVIS RAMON GREEN-BERRIOS,

    **Plaintiff,**

        v.

SIG SAUER INC.,

    **Defendant.**

**CIVIL NO. 22-1002(JAG)**

## JUDGMENT

      Pursuant to Plaintiff's Motion for Voluntary Dismissal, Docket No. 162, and this Court's Order, Docket No. 168, Judgment is hereby entered DISMISSING WITH PREJUDICE Plaintiff's case without the imposition of attorney's fees or costs. This Judgment is final and unappealable. The case is now closed for statistical purposes.

IT IS SO ORDERED.

In San Juan, Puerto Rico this Tuesday, March 11, 2025.

<u>s/ Jay A. Garcia-Gregory</u>
JAY A. GARCIA-GREGORY
U.S. DISTRICT JUDGE

# EXHIBIT 15

**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Harvey Winingham, | No. CV-22-01037-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Sig Sauer Incorporated, | |
| Defendant. | |

At issue is Defendant Sig Sauer, Incorporated's Motion for Summary Judgment (Doc. 71-1, MSJ) accompanied by a Statement of Facts (Doc. 71-2, DSOF), to which Plaintiff Harvey Winingham filed a Response (Doc. 78, Resp.) accompanied by a Statement of Facts (Doc. 77, PSOF), and Defendant filed a Reply (Doc. 81, Reply). The Court has reviewed the parties' briefs and finds this matter appropriate for decision without oral argument. *See* LRCiv 7.2(f). For the reasons set forth below, the Court will grant Defendant's Motion for Summary Judgment.

## I.   BACKGROUND

Plaintiff owns a P320 handgun, which is designed, manufactured, marketed, and sold by Defendant. As part of its marketing efforts, Defendant advertised that the P320 "won't fire unless you want it to," and it will not discharge "unless the trigger is pulled." (PSOF ¶ 4.) When Plaintiff purchased his P320, however, he had not seen any of Defendant's advertising for the gun. (DSOF, Ex. A, Winingham Dep. at 51:5–11.) Shortly after acquiring the pistol, Plaintiff learned that Defendant was offering P320 owners a

voluntary "upgrade" that was intended to decrease the risk of the gun misfiring when dropped. (PSOF ¶ 7.) Plaintiff sent the gun in for an upgrade and received it back, and he specifically recalls reading again Defendant's statement that the gun "won't fire unless you want it to." (PSOF ¶ 9.)

Plaintiff alleges that on May 31, 2020, he was holding his P320 on his belly when it discharged without him touching the trigger. (Winingham Dep. at 77–92.) The bullet entered through Plaintiff's left hand and resulted in "the loss of a finger, significant injury to the entire hand, and severe pain and suffering." (Doc. 27, Am. Compl. ¶ 19.) Plaintiff filed an Amended Complaint against Defendant alleging (1) negligence, (2) strict liability, (3) breach of implied warranty of merchantability, (4) breach of warranty of fitness for a particular purpose, (5) breach of express warranty, (6) consumer fraud, and (7) common law fraud. (Am. Compl.)

Defendant moved to exclude the opinions of Plaintiff's expert and moved for summary judgment on each claim. On April 17, 2024, the Court granted Defendant's Motion to Preclude the Evidence and Opinions of Plaintiff's Expert, David Bosch. (Doc. 83.) The Court now rules on the Motion for Summary Judgment.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 232. When the moving party does not bear the ultimate burden of proof, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party carries this initial burden, the nonmoving party must produce evidence to support its claim or defense. *Id.* at 1103. Summary judgment is appropriate against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the court must regard as true the nonmoving party's evidence, as long as it is supported by affidavits or other evidentiary material. *Anderson*, 477 U.S. at 255. However, the nonmoving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Id.* at 256–57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." (citation omitted)). And, for a genuine issue of material fact to arise, the nonmoving party may need to present more than "a self-serving declaration that states only conclusions." *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015).

III. **ANALYSIS**

A. **Plaintiff's Product Liability Claims**

Plaintiff brings two product liability claims: one under a negligence theory and one under a strict liability theory. He alleges that Defendant negligently designed and

manufactured the P320 and failed to warn that the gun was defective. (Am. Compl. ¶¶ 26–34.) His strict liability claim is less specific; rather than identifying whether he alleges defective design, manufacturing, or failure to warn, Plaintiff's Complaint simply repeats the general statement that the gun was "in a defective condition and unreasonably dangerous." (Am. Compl. ¶¶ 36–38.)

Under Arizona law, both of Plaintiff's product liability claims "must rely on the allegation that [the] product is defective." *See Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1194 (9th Cir. 2007). Defendant argues that it is entitled to summary judgment on each claim because Plaintiff fails to identify any defect in the P320. (MSJ at 11.) As Defendant points out, Plaintiff's claims rest entirely on his assertion that the gun discharged without him contacting the trigger.[1] Plaintiff offers no scientific or mechanical evidence that a defect exists.

Nevertheless, Plaintiff responds that he may prove his products liability claims by relying on the doctrine of *res ipsa loquitur*—"the gun is defective and unreasonably dangerous because guns do not discharge by themselves absent someone's negligence." (Resp. at 6.) Under Arizona law, a plaintiff may rely on *res ipsa loquitur* only if he can show that (1) the accident is of a kind that ordinarily does not occur in the absence of negligence, (2) the accident was caused by an agency or instrumentality within the exclusive control of the defendant, and (3) the plaintiff is not in a position to show the particular circumstances that caused the offending agency or instrumentality to operate his injury. *Cox v. May Dep't Store Co.*, 903 P.2d 1119, 1122–24 (Ariz. Ct. App. 1995).

Defendant contends that Plaintiff's reliance on *res ipsa loquitur* is misplaced because he cannot satisfy the first element. The "first element merely requires a weighing of the probabilities of the cause of the accident," and to defeat a motion for summary

---

[1] Plaintiff's Response also alludes to an alternative factual theory in which Plaintiff touched the trigger so lightly that he did not perceive the contact. (Resp. at 2–3, 6.) This version of the facts purports to both prove that the trigger was defectively sensitive and explain why Plaintiff testified that he did not touch the trigger. However, this theory is unpled, and these facts find no support in the record. The only evidence of whether Plaintiff touched the trigger is Plaintiff's testimony, and Plaintiff insists that he did not. (Winingham Dep. at 87:7–8, 89:13–15, 90:19–91:6.) On this record, any argument to the contrary is purely speculative and cannot support the claims' survival of summary judgment.

judgment, "the evidence presented must be sufficient to allow the jury to infer that negligence was more likely than not the cause of the accident." *Cox*, 903 P.2d at 1122. "This issue, '[i]n borderline cases, is properly left to the jury.'" *Id.* (quoting *Ruiz v. Otis Elevator*, 703 P.2d 1247, 1250 (Ariz. Ct. App. 1985)).

Defendant argues that the injury is not "of a kind that ordinarily does not occur in the absence of negligence" because, as Defendant couches the issue, the injury is a "self-inflicted gunshot wound," which is "precisely the kind of injury that *does* occur" absent such a defendant's negligence. (Reply at 3.) But Plaintiff testified that he did nothing more than lay the gun across his belly without contacting the trigger, and if a factfinder were to believe that testimony, it would appear much more probable that Defendant's negligence caused the injury. Thus, to weigh the probabilities of the cause of the accident, the Court would have to evaluate Plaintiff's credibility based only on a cold record—a task that is both difficult and generally disfavored in the law. In this case, however, the Court need not resolve that issue, because even if Plaintiff could satisfy this element, he has not satisfied the second or third.

Although the parties focus their briefing exclusively on the first element, the Court finds that the latter two elements preclude Plaintiff from relying on *res ipsa loquitur*. The second element, which requires Plaintiff to show that the defendant was in exclusive control of the instrumentality that caused the injury, "is not to be applied rigidly but 'is merely an aid in determining whether it is more probable than not that the accident was the result of defendants' negligence.'" *Sanchez v. Tucson Orthopaedic Inst., P.C.*, 202 P.3d 502, 504 (Ariz. Ct. App. 2008) (quoting *Byars v. Ariz. Pub. Serv. Co.*, 539 P.2d 534, 540 (Ariz. Ct. App. 1975)). And the third element requires Plaintiff to establish that he is "unable to show the particular circumstances that caused the offending instrumentality to operate [his] injury." *Cox*, 903 P.2d at 1124.

Plaintiff fails to satisfy both elements for essentially the same reason: Plaintiff was in sole possession of the gun at the time of the injury. Because the gun discharged while it was in Plaintiff's hand, it would be difficult for Plaintiff to argue that Defendant was "in

exclusive control" of the firearm. Perhaps there is an argument to be made—although Plaintiff does not make it—that here, "exclusive control" should mean control over the production rather than the operation of the gun. *See Cox*, 903 P.2d at 1123 (noting that the department store and elevator company defendants were "in exclusive control over the design, installation, and maintenance" of an allegedly defective escalator, explaining that "control" under *res ipsa loquitur* refers to "responsibility for the instrumentality," not "permissive use of the instrumentality"). But under the facts of this case, such an interpretation would run the risk of undermining the purpose of the second element, which is to "aid in determining whether it is more probable than not that the accident was the result of defendants' negligence.'" *Sanchez*, 202 P.3d at 504 (quoting *Byars*, 539 P.2d at 540). The situation is summed up nicely by Plaintiff's own framing of the facts: "Based on the record here, there are two possibilities. One is that [Plaintiff] . . . came into contact with the trigger with sufficient force to actually pull the trigger. In that case, he was arguably negligent." (Resp. at 6.) Because Plaintiff had control of the instrumentality that caused his injury, he has not satisfied the second element.

He likewise has not satisfied the third. This final element requires Plaintiff to establish that he is in no position to show the particular circumstances that caused the gun to misfire. *See Cox*, 903 P.2d at 1124. In analyzing this element, the Arizona courts have cautioned that "[i]nvocation of *res ipsa loquitur* is no substitute for reasonable investigation and discovery. The doctrine may benefit a plaintiff unable directly to prove negligence; it does not relieve a plaintiff too uninquisitive to undertake available proof." *McDonald v. Smitty's Super Valu, Inc.*, 757 P.2d 120, 125 (Ariz. Ct. App. 1988). As the owner and possessor of the gun, Plaintiff was in a position to show the circumstances causing the accident. This is exemplified by the fact that Plaintiff had an expert who performed "basic manipulation of the pistol." (Doc. 70, Ex. B, Ex. D. at 11:2–15.) That the expert's testimony has since been excluded is of no moment because the inquiry is only whether Plaintiff was *in the position* to show the circumstances that caused the misfire, not whether he actually did. Plaintiff's ability to obtain an expert who physically examined the

gun tends to show that Plaintiff was in a position to explain why the gun discharged, and he does not argue that he or any expert was incapable of inspecting the firearm or of otherwise acquiring explanatory information through investigation and discovery. Plaintiff thus fails to satisfy the third element.

Because Plaintiff cannot satisfy each of the three elements, the Court will not allow Plaintiff to rely on the doctrine of *res ipsa loquitur* here. And without his *res ipsa loquitur* theory, Plaintiff is left with no evidence to prove that the P320 was defective.[2] Accordingly, neither of Plaintiff's product liability claims can survive summary judgment. *See Cook v. Hawkins*, No. 1 CA-CV 18-03999, 2109 WL 2442263, at *2–3 (Ariz. Ct. App. June 11, 2019) (disposing of both a negligence and a strict product liability claim when each relied on a *res ipsa loquitur* inference). Moreover, under Arizona law, "the theory of liability under implied warranty has been merged into the doctrine of strict liability" such that Plaintiff's implied warranty claims "must stand or fall" with his strict liability claim. *See Scheller v. Wilson Certified Foods, Inc.*, 559 P.2d 1074, 1076 (Ariz. Ct. App. 1976). Therefore, Plaintiff's claims for breach of implied warranty of merchantability and breach of warranty of fitness for a particular purpose also fail.

### B.    Plaintiff's Fraud and Express Warranty Claims

Plaintiff also brings claims for common law fraud, consumer fraud, and breach of express warranty, each based on alleged misrepresentations in Defendant's marketing materials that the P320 "won't fire unless you want it to" and will not discharge "unless the trigger is pulled." (Am. Compl. at 13–15.) Defendant argues that it is entitled to summary judgment on all three claims because Plaintiff fails to present evidence of Defendant's misrepresentations or his reliance thereon. (MSJ at 13.)

---

[2] Plaintiff briefly argues there is other evidence that the P320 is defective, pointing to several reports of unintended discharges. (Resp. at 7.) But at best, these reports show only that the P320 might fire without an *intentional* trigger pull. (PSOF ¶¶ 22–25.) They do not show that the P320 is capable of firing without any trigger actuation at all, which is Plaintiff's only alleged theory here. *See supra* note 1 (rejecting the theory that Plaintiff unintentionally actuated the trigger). These reports, therefore, do not support Plaintiff's claims.

### 1.    Common Law Fraud

The requirements for proof of common law fraud in Arizona are "very strict" and require a showing of nine elements: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) intent that it should be acted upon, (6) the hearer's ignorance of its falsity, (7) the hearer's reliance of its truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury. *Fridenmaker v. Valley Nat'l Bank of Ariz.*, 534 P.2d 1064, 1067–68 (Ariz. Ct. App. 1975). The "failure to prove any one of the essential elements is fatal to the cause of action." *Id.* at 1068.

Defendant lays out all nine elements and argues that Plaintiff cannot show a misrepresentation or reliance. (MSJ at 12–13.) Rather than addressing any of these elements, Plaintiff simply responds that "the elements of common law fraud are plainly present" and moves on to support his consumer fraud claim. (Resp. at 9.) Failure to respond to a motion may be deemed consent to the Court's granting that motion. LRCiv 7.2(i). Accordingly, the Court finds that Plaintiff has waived the argument and Defendant is entitled to summary judgment on Plaintiff's common law fraud claim. *See F.D.I.C. v. Garner*, 126 F.3d 1138, 1145 (9th Cir. 1997) (holding a party that presents no argument in support of its claim waives the argument); *see also Pelfresne v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. We will not do his research for him." (internal citations omitted)).

### 2.    Consumer Fraud

Plaintiff also brings a claim for violation of the Arizona Consumer Fraud Act. "The Arizona Consumer Fraud Act is a broad act intended to eliminate unlawful practices in merchant-consumer transactions." *Holeman v. Neils*, 803 F. Supp. 237, 242 (D. Ariz. 1992) (citing *State ex rel. Corbin v. Hovatter*, 698 P.2d 225, 226 (Ariz. Ct. App. 1985)). To succeed on a claim of consumer fraud, a plaintiff must show "1) a false promise or

misrepresentation made in connection with the sale or advertisement of 'merchandise,' and 2) consequent and proximate injury resulting from the misrepresentation." *Watts v. Medicis Pharm. Corp.*, 365 P.3d 944, 953 (Ariz. 2016); *see also* A.R.S. § 44-1522(A). "[I]njury occurs when the consumer relies on the misrepresentation even though the reliance is not reasonable." *Holeman*, 803 F. Supp. at 242. But while reasonableness is not required, reliance must be possible. *See Kuehn v. Stanley*, 91 P.3d 346, 351 (Ariz. Ct. App. 2004) (holding that reliance was not possible when the plaintiffs received a false report only after entering into a contract). Furthermore, the misrepresentation "on which liability is predicated must be logically related to the transaction in which it occurs and rationally significant to the parties in view of the nature and circumstances of the transaction." *Haisch v. Allstate Ins. Co.*, 5 P.3d 940, 944–45 (Ariz. Ct. App. 2000).

It follows, then, that Plaintiff must show he relied on Defendant's statements in connection with some transaction, and there are only two transactions at play here. First, Plaintiff purchased the P320, and later, Plaintiff elected to upgrade the P320. The initial purchase cannot be the transaction upon which Plaintiff stakes his claim because he admitted that he did not visit Defendant's website or see any advertising for the P320 prior to purchasing the gun.[3] (Winingham Dep. at 51:5–11.) It is thus impossible that Plaintiff relied on the alleged misrepresentations in connection with the purchase. Therefore, to support his consumer fraud claim, Plaintiff must show a misrepresentation that is "logically related to the [upgrade] transaction." *See Haisch*, 5 P.3d at 944–45. To that end, Plaintiff argues that he relied on Defendant's misrepresentation that the gun "will not fire unless you want it to" in two specific ways: (1) the statement is "why [he] sent [the gun] in" for

---

[3] Although Plaintiff did not view any of Defendant's advertising prior to purchasing the P320, he did conduct some internet research and "was influenced by the Army's decision to adopt the gun and the wide-spread consumer confidence (as seen in reviews), which were undoubtedly influenced by [Defendant]'s misrepresentations." (Resp. at 10–11.) Citing only an unpublished District of New Jersey case for support, Plaintiff argues that Defendant had the "capacity to mislead" consumers generally, and thus "one can reasonably infer that the misrepresentations . . . contributed to creating a general, widespread impression that the P320 was safe." (Resp. at 10–11.) The Court finds this theory unsupported in the law and too attenuated to constitute a violation of Arizona's Consumer Fraud Act.

the upgrade (Winingham Dep. at 60:10–12), and (2) the statement caused him to mistakenly believe his P320 was safe to carry after the upgrade. (PSOF ¶ 11.)

Plaintiff's first argument is unavailing because, even if Plaintiff relied on the statement in choosing to upgrade the pistol, he has not alleged any harm arising out of the upgrade itself. In other words, Plaintiff did not allege that the statement misled him into upgrading the gun. Rather, in line with his second argument, Plaintiff asserts that the statement misled him to incorrectly believe the gun was safe after the upgrade.

The sequence of events, however, renders Plaintiff's argument problematic. As Plaintiff notes, Defendant made this statement "[p]rior to [him] acquiring the P320." (PSOF ¶ 4.) And Plaintiff further acknowledges that he read the statement both "before the upgrade" and "once again, . . . after the upgrade." (Winingham Dep. at 59:25–60:10.) Therefore, while Plaintiff may have believed the gun would not misfire after the upgrade, he cannot have formed that belief by relying on Defendant's statement in a manner that was "logically related to the [upgrade] transaction." Accordingly, there is no evidence from which a reasonable jury could find that Plaintiff relied on the statements in connection with the transactions of purchasing or upgrading the P320, and Plaintiff cannot maintain his claim for consumer fraud.

### 3. Breach of Express Warranty

Plaintiff's final claim is for breach of express warranty. To prevail on such a claim, a plaintiff must show an "affirmation of fact or promise made by the seller to the buyer which relates to goods and becomes part of the basis of the bargain." *Dillon v. Zeneca Corp.*, 42 P.3d 598, 602 (Ariz. Ct. App. 2002). As analyzed above, Plaintiff cannot show reliance and thus cannot show that Defendant's statements became "part of the basis of the bargain" when he purchased or upgraded the P320. Defendant is therefore entitled to summary judgment on Plaintiff's breach of express warranty claim.

## IV. CONCLUSION

On this record, there is no genuine dispute of material fact as to any of Plaintiff's claims, and Defendant is entitled to judgment as a matter of law.

1       **IT IS THEREFORE ORDERED** granting Defendant's Motion for Summary

2   Judgment (Doc. 71).

3       **IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment in

4   favor of Defendant and to close this case.

5       Dated this 7th day of August, 2024.

6

7                    Honorable John J. Tuchi
                 United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LEONCE WHITE,

    Plaintiff,

      v.

SIG SAUER, INC.,

    Defendant.

CIVIL ACTION FILE
NO. 1:22-CV-1985-TWT

## OPINION & ORDER

This is a products liability action. It is before the Court on the Defendant Sig Sauer, Inc.'s Motion for Summary Judgment [Doc. 21]. The Plaintiff Leonce White has not filed a response to the Motion. For the reasons set forth below, the Defendant's Motion for Summary Judgment [Doc. 21] is GRANTED.

## I. Background[1]

Plaintiff Leonce White was issued a Sig Sauer P320 pistol as his service weapon in conjunction with his employment at the City of Riverdale Police Department. (Def.'s Statement of Undisputed Material Facts ¶ 1). According to the Plaintiff, he sustained a gunshot wound to his thigh when the "P320 discharged as he was in the process of holstering his weapon" during training

---

[1] The operative facts on the Motion for Summary Judgment are taken from the Defendant's Statement of Undisputed Material Facts. The Court will deem the parties' factual assertions, where supported by evidentiary citations, admitted unless the respondent makes a proper objection under Local Rule 56.1(B). As the Plaintiff here has not filed a response to the Motion, the Court will deem the Defendant's Statement of Undisputed Material Facts admitted.

at a firing range. (*Id.* ¶ 2 (quotation marks omitted)); (Compl. ¶ 10). As a result of this injury, the Plaintiff filed suit against the Defendant, asserting state law claims for negligence, breach of the implied warranty of merchantability, breach of the warranty of fitness for a particular purpose, negligent infliction of emotional distress, and intentional infliction of emotional distress. (Compl. ¶¶ 51-91).

The basis of the Plaintiff's claims is that the P320 fired without a trigger pull. (*Id.* ¶ 13). However, the Plaintiff has not located an expert who can support his allegation and did not serve an expert report by the June 1, 2023 deadline for him to do so. (Def.'s Statement of Undisputed Material Facts ¶¶ 12-13). Similarly, the Plaintiff has not located an expert who could opine that his P320 was defective. (*Id.* ¶¶ 14-15). To date, the Plaintiff has not adduced any admissible evidence that his P320 was capable of discharging without the trigger being pulled, or that the discharge at issue in this matter was not caused by the trigger being pulled. (*Id.* ¶¶ 16-17). Nor has the Plaintiff produced any admissible evidence that his P320 had a design or manufacturing defect, a defect due to failure to warn, was not of merchantable quality, or was not fit for its intended purpose. (*Id.* ¶¶ 18-22).

## II. Legal Standards

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter

of law. Fed. R. Civ. P. 56(a), (c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

Despite the Defendant's lack of opposition, the Court "cannot base the entry of summary judgment on the mere fact that the motion [i]s unopposed, but, rather, must consider the merits of the motion." *United States v. One Piece of Real Property Located at 5800 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). In considering the merits, the Court "need not sua sponte review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary materials." *Id.*

### III. Discussion

In its Motion for Summary Judgment, the Defendant argues that the Plaintiff's failure to serve an expert report that supports his allegations dooms his claims. (Def.'s Mot. for Summ. J., at 4-5). The Defendant contends that expert evidence is required in a case such as this where the jury would be tasked with assessing technical issues outside the scope of a layperson's

3

knowledge, such as the internal components and functioning of the P320 pistol. (*Id.* at 6-7). The Court agrees.

In products liability cases, "expert testimony is necessary to show a manufacturing defect when an evaluation of the alleged defect lies outside the common experience of a jury—that is, when a juror would not otherwise understand how the product was intended to perform." *O'Shea v. Zimmer Biomet Holdings, Inc.*, 342 F. Supp. 3d 1354, 1359 (N.D. Ga. 2018) (quotation marks omitted) (citing *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1320 (11th Cir. 2011). Moreover, "[a]s a general rule, expert testimony is required to identify design defects and to establish proximate causation in products liability cases." *Goodrich ex. rel Goodrich v. Fisher-Price, Inc.*, 2018 WL 11343390, at *3 (N.D. Ga. Nov. 14, 2018).

All of the Plaintiff's claims hinge on there being a defect in the P320 pistol that caused it to discharge without the Plaintiff having pulled the trigger. But the Plaintiff has not even attempted to present any evidence, let alone expert evidence, that supports his allegation that the P320 was defective in some way. The Court agrees that the innerworkings of a firearm are outside the scope of knowledge of a layperson, and therefore, such expert evidence was required for the Plaintiff's claims to survive summary judgment. *See O'Shea*, 342 F.3d at 1359; *Goodrich ex. rel Goodrich*, 2018 WL 11343390, at *3. On the other hand, the Defendant has provided the Court with several factually similar cases that were ultimately dismissed because of the failure of an expert

4

to opine that a defect in the P320 could have caused it to discharge without the trigger having been pulled. (*See* Def.'s Mot. for Summ. J., Exs. 7-10). The Defendant has therefore carried its burden of demonstrating the absence of a genuine dispute of material fact as to the issue of a defect in the P320. *Celotex Corp.*, 477 U.S. at 323-24. And as the Plaintiff has not responded to the Motion for Summary Judgment, he has failed to carry his burden of presenting affirmative evidence supporting the existence of a genuine dispute of material fact as to the defect issue. *Anderson*, 477 U.S. at 257. Therefore, summary judgment in the Defendant's favor is warranted.

## IV. Conclusion

For the foregoing reasons, the Defendant Sig Sauer, Inc.'s Motion for Summary Judgment [Doc. 21] is GRANTED. The Clerk is DIRECTED to enter judgment in favor of the Defendant, and to close the case.

SO ORDERED, this <u>  25th  </u> day of January, 2024.

THOMAS W. THRASH, JR.
United States District Judge

5

# EXHIBIT 17

# ORDER

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ANGELO VALENTINO and
LILLIAN VALENTINO, per quod,

        Plaintiffs,

v.

SIG SAUER INC.,

        Defendant.

Civil Action No.: 23-cv-01309 (BRM) (JRA)

**STIPULATION OF VOLUNTARY
DISMISSAL WITH PREJUDICE**

IT IS HEREBY STIPULATED AND AGREED by and between Plaintiffs Angelo and

Lillian Valentino and Defendant Sig Sauer, Inc. that all of Plaintiffs' claims in this action shall be,

and are hereby, VOLUNTARILY DISMISSED WITH PREJUDICE. Each party shall bear its own

costs.

Damon A. Vespi, Esq.
Vespi Law Firm
361 Union Blvd.
Totowa, NJ
Tel: 973-633-1000
info@vespilegal.com
*Attorney for Plaintiffs*

Jonathan T. Woy, Esq.
Littleton Joyce Ughetta & Kelly LLP
100 Matsonford Rd., 4-520
Radnor, PA
Tel: 484-254-6225
Jonathan.woy@littletonjoyce.com
*Attorney for Sig Sauer, Inc.*

Dated: July 22, 2024

**SO ORDERED:**

*s/Jamel K. Semper*

**Hon. Jamel K. Semper, U.S.D.J.**
**Dated: July 24, 2024**

1

# EXHIBIT 18

Case: 1:17-cv-06260 Document #: 1343-3 Filed: 10/07/25 Page 32 of 78 PageID #:28465

### IN THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT
### IN AND FOR TAYLOR COUNTY, FLORIDA

Coy J. Mathis and Amber Mathis,

     Plaintiffs,

v.                                                                    Circuit Civil Division

SIG Sauer, Inc. and Kevin's Guns and Sporting            Case No. 23-055CA
Goods, LLC,

     Defendants.

_____/

## **PLAINTIFFS' NOTICE OF VOLUNTARY DISMISSAL WITH PREJUDICE**

Plaintiffs, COY J. MATHIS and AMBER MATHIS, voluntarily dismiss with prejudice

all claims made against Defendants SIG SAUER, INC. and KEVIN'S GUNS AND SPORTING

GOODS, LLC, with each party to bear its own fees and costs.

[CERTIFICATE OF SERVICE ON THE FOLLOWING PAGE]

Electronically Filed Taylor Case # 23000055CAAXMX 04/02/2024 09:42:17 AM

CASE NO. 23-055CA

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was electronically served on

all counsel listed on the attached service list this 2nd day of April 2024.

*Respectfully submitted,*

FREIDIN BROWN, P.A.
One Biscayne Tower Building
2 South Biscayne Blvd., Suite 3100
Miami, Florida 33131
Tel:    305.371.3666

By:    /s/ *Jonathan E. Freidin*
PHILIP FREIDIN
Florida Bar No. 118519
JONATHAN E. FREIDIN
Florida Bar No. 098955
pf@freidinbrown.com
jf@freidinbrown.com
df@freidinbrown.com

## SERVICE LIST

Jeffrey Jarvis Sneed, Esquire
FBN #593450
Law Office of J. Christopher Norris
PO Box 7217
London, KY 40742
Telephone: 904-346-5422
Primary E-mail (eservice only):  JacksonvilleLegalMail@LibertyMutual.com Secondary E-mail:
Jeffrey.Sneed@libertymutual.com
Lynn.davis@LibertyMutual.com
*Attorney for Defendant, Kevin's Guns and Sporting Goods, LLC*

FREIDIN BROWN, P.A.
One Biscayne Tower, Suite 3100, 2 South Biscayne Boulevard, Miami, FL 33131, Phone: 305.371.3666 Fax: 305.371.6725 www.YourFloridaTrialTeam.com

2

CASE NO. 23-055CA

Kristen E. Dennison, Esquire
FBN#0088476
Ericka A. Esposito, Esquire
Littlejohn Park Joyce Ughetta & Kelly LLP
201 King of Prussia Road, Suite 220
Radnor, PA 19087
Telephone: 484-254-6220
Facsimile: 484-254-6221
Kristen.Dennison@littletonpark.com
Ericka.Esposito@littletonpark.com
patricia.lopane@littletonpark.com
***Attorneys for Defendant SIG Sauer, Inc.***

Kimberly L. Boldt, Esq.
Florida Bar No. 957399
Brooke M. Mesner, Esq.
Florida Bar No. 1032022
**RATZAN WEISSMAN & BOLDT**
160 W. Camino Real, #262
Boca Raton, Florida 33432
Telephone: (561) 316-6531
eservice.legal@rwblawyers.com
***Co-Counsel for Plaintiffs***

FREIDIN BROWN, P.A.

One Biscayne Tower, Suite 3100, 2 South Biscayne Boulevard, Miami, FL 33131, Phone: 305.371.3666 Fax: 305.371.6725 www.YourFloridaTrialTeam.com

3

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

BRITTANY I. HILTON,                  §
                                     §
         *Plaintiff*,                §
                                     §
v.                                   §
                                     §    CIVIL ACTION NO.  1:21-CV-00441-MJT
                                     §    JUDGE MICHAEL J. TRUNCALE
SIG SAUER, INC.,                     §
                                     §
         *Defendant*.                §
                                     §

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Defendant Sig Sauer, Inc.'s Rule 702 Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Timothy Hicks [Dkt. 26], Rule 702 Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Peter Villani [Dkt. 27], and Motion for Summary Judgment [Dkt. 28]. For the reasons set forth below, the Court grants Sig Sauer's motions.

## I.    BACKGROUND

Plaintiff Brittany Hilton, a Bridge City police officer, claims that she was injured when her department-issued Sig Sauer P320 pistol discharged a round into her upper thigh without its trigger being pulled. Ms. Hilton was carrying the loaded pistol in her purse, along with other loose items, when it discharged. Specifically, the firearm discharged in Ms. Hilton's purse as she walked around her desk in her office, just after she put a bottle of body spray into the purse and looped the purse over her arm. Ms. Hilton subsequently brought this suit against Sig Sauer, the manufacturer of the P320 pistol. Ms. Hilton's live claims are for strict product liability, negligence, and breach of implied warranty of merchantability.[1]

---

[1] In her Original Complaint, Plaintiff alleged additional causes of action for breach of express warranty and violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2308(a). [Dkt. 1 at 36–37]. She stipulated to the dismissal of these claims, with prejudice, however. *See* [Dkts. 8, 9].

## II.    *DAUBERT* MOTIONS

Sig Sauer seeks to exclude the testimony and opinions of Plaintiff's experts, Timothy Hicks and Peter Villani, on the grounds that they are unqualified and that their opinions are unreliable. Rule 702 of the Federal Rules of Evidence governs the admissibility of expert witness testimony. It provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Whether an individual is qualified to testify as an expert is a question of law. *Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002) (citing Fed. R. Evid. 104(a)). "District courts must be assured that the proffered [expert] witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting Fed. R. Evid. 702). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Id.* Experts need not be highly qualified to satisfy Rule 702 though.  *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Id.* But the "witness's qualifying training or experience, and resultant specialized knowledge" must be "sufficiently related to the issues and evidence before the trier of fact." *United States v. Wen Chyu Liu*, 716 F.3d 159, 167 (5th Cir. 2013)

2

(quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.04(1)(b) (Joseph M. McLaughlin ed., 2d. 1997)).

In *Daubert*, the Supreme Court outlined four non-exclusive factors for courts to use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993). When evaluating a *Daubert* challenge, a court's focus "must be solely on [the expert's] principles and methodology, not on the conclusions that they generate." *Id.* at 595.

While *Daubert* provides a "flexible inquiry" rather than a "definitive checklist," *id.* at 593, 595, it requires that "an expert bears the burden of furnishing some objective, independent validation of his methodology." *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (internal quotation marks omitted). "Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007); *see also Brown*, 705 F.3d at 536 ("The expert's assurances that he has utilized generally accepted principles is insufficient.").

## A. Timothy Hicks

Timothy Hicks is a mechanical engineer who spent most of his career in the automotive industry. [Dkt. 26-5]. While Hicks has never manufactured a firearm or a component of a firearm, he testified that his automotive experience required similar processes and approaches. [Dkt. 26-6 at 23:10–17]. He is not a gunsmith, nor has he ever taken any gunsmith courses or been employed by a company that manufactures firearms. *Id.* at 23:22–23:4. He also has never published anything

on the manufacture or design of a firearm. *Id.* at 24:5–10. Hicks has never seen a firearm assembled from an initial production standpoint, or manufactured. *Id.* at 25:8–13. And before his involvement with similar P320 cases in 2022, he had never looked at drawings or internal components of a pistol similar to the P320. *Id.* at 24:11–19.

Hicks' opinion is that if two conditions occurred, then Plaintiff's gun could have discharged without a trigger pull: (1) the striker had to have become disconnected from the sear; and (2) the safety lock had to have failed. [Dkt. 26-6 at 26:6–20]. This theory requires that "there has to be some type of motion or inertia or vibration to the to the firearm to make it discharge." *Id.* at 28:14–29:2. But he could not answer how much inertia or vibration would be required, *id.* at 29:3–10; whether the vibration or inertia caused disengagement immediately or incrementally over time, *id.* at 29:16–20; or whether firing the gun would reset it, thus requiring additional force to move the parts out of place again. *Id.* at 30:3–12.

Hicks ultimately concluded, "[b]ased on [his] investigation and the work conducted to date . . . [that] the physical evidence . . . supports Detective Hilton's description of the circumstances of this incident" and that her P320 "was defective and unsafe for use." [Dkt. 26-4 at 20]. Specifically, that "normal and expected movement and vibration while holstered caused an un-commanded discharge with a combination of some or all of the defective conditions" described in his report, including:

1) Surface quality (no secondary processing) and misalignment of interfacing sear step and striker foot. With both of these parts being out of specification, the striker became disconnected from the sear without the trigger being pulled.

2) Surface quality, rounded surfaces, and misalignment of the face of the safety lock tab and the vertical stop face on the striker body, such that both of these areas failed to prohibit the striker from moving forward during the subject event.

4

3) Axial variation and gaps between the striker pin and striker housing with slide movement causes misalignment of the safety lock tab to the striker pin body, and the striker foot lateral position to the sear step face. This occurs after each round is fired and can affect the orientation of the two components each time.

4) Ability of the slide (and therefore the striker assembly) to move vertically and laterally relative to the sear reducing the interfacing surface contact area even further, which will cause the striker foot to become disengaged from the sear face. This relative movement occurs while properly holstered from normal body movement and usage of the firearm.

5) The striker foot is unable to engage completely on the surface of the sear step due to the changes in the upgraded design, manufacturing processes and lack of secondary machining, and fit-up and variation issues between the parts discussed in this report.

6) The removal of the safety lever return spring by Sig Sauer allows the lever to rotate out of position when the pistol is carried in a muzzle down orientation, which can also contribute to the safety lock to be out of position. When this issue is combined with the axial variation described in item 3 above and the part quality issues, it allows the striker to move forward completely when it becomes disengaged from the sear. The safety lock only has to be out of position or out of tolerance by the thickness of the stamping which is 0.9 mm.

[26-4 at 20]. He testifies that each of these alleged defects *could have* contributed to Plaintiff's P320 firing without trigger pull but he cannot say which ones specifically caused the firearm to discharge. *Id.* at 31:1–21. When questioned about his conclusions, he repeatedly conceded that he did not have any testing or analysis to show that the alleged defects would cause the effects he reported. [Dkt. 26-6 at 11:4–11; 11:21–12:2; 13:16–24; 17:12–18:4; 27:14–18; 28:6–12; 29:3–10; 31:24–32:9].

**B. Peter Villani**

Peter Villani is a former police officer currently employed as an operations officer for the United States Department of Veteran Affairs Police. [Dkt. 27-6 at 2]. He has participated in shooting competitions, worked as a range manager and firearms salesman, and taught tactical awareness and proper use of issued sidearms. *Id.* at 3–4. He has also been certified as an armorer for multiple firearms (including the Sig Sauer P320), and as a firearms instructor, pistol safety

instructor, and range safety officer. *Id.* Villani is not an engineer, nor has he ever been involved with the design or manufacture of firearms or firearm components. [Dkt. 27-7 at 10:22–11:17]. Prior to his involvement in similar P320 cases, Villani had never reviewed design schematics for any firearm. *Id.* at 11:18–21. Beyond "test firing" pistols, Villani has never done any type of firearms testing to any recognized or written standard. *Id.* at 13:14–7. He testified in a similar P320 case that he has not even read any recognized firearm testing standards. [Dkt. 27-8 at 6:14–7:2]. He also has never published any article or other publication, or given any presentation, related to firearm design or manufacture. [Dkt. 27-7 at 13:18–24]. Villani also testified that he did not rely on any publications or studies to reach his opinions. [Dkt. 27-7 at 5:2–9].

While some of Villani's work has involved dissembling and repairing guns that were not working properly, it was limited to cleaning the firearms and simple repairs like replacing broken springs. *Id.* at 16:20–19:16. He is not a gunsmith, nor has he ever taken any gunsmithing courses. *Id.* at 14:2–6. When questioned about his conclusions, he repeatedly conceded that he did not have any testing or analysis to show that the alleged defects would cause the effects he reported. *Id.* at 25:21–24; 26:10–12; 27:3–7; 30:23–31:3. Many of Villani's opinions relate to "excess material" in the gun; however, he testified that he has not measured or quantified the amount of excess material on any of those four components, nor does he have the equipment to. *Id.* at 30:4–13. Instead, he believes that he suggested to Hicks that if Hicks could measure the excess material, he should try to. *Id.* at 30:14–17. Villani's report provides: "Depending upon the condition of the individual [P320] components' status (sear/striker engagement, excess molding material, misalignment of safety lock tab, wear, etc.), any combination of these reported defect could lead to an uncommanded discharge minus a trigger pull." [Dkt. 27-5 at 12]. But he testified that other than the excess material and the "ramp" he does not know which of the factors that he identified

6

were present when Plaintiff's gun discharged. [Dkt. 27-7 at 32:13–21]. He also testified that if
something in her purse caused the trigger to be pulled, then the "defects would be of no
consequence." *Id.* at 33:5–14. Villani did not undertake any analysis of what was in her purse that
may have been able to pull the trigger, however. *Id.* at 33:17–20. Indeed, other than a surgical
mask, Villani does not know what items were in her purse when the gun discharged. *Id.* at 8:6–9.

Villani contends in his report that when he "began [his] examination and photography of
the firearm's internal parts" he noticed several "manufacturing defects." [Dkt. 27-5]. He then
recounts these supposed defects and their effects:

1) "The safety lock tabs positive contact surface is deformed and does not match
Sig Sauer[']s drawings . . . which depicts the tab to be rectangular with squared
off edges. The safety lock tab presented, showed an oval type shape with raised
edges which appeared to be excess material from the stamping process that was
not removed prior to the parts installation into the striker assembly. This raised
perimeter prevents the positive contact surface from making proper contact with
the striker stop (wall) of the striker should the striker fail from an uncommanded
discharge." *Id.* at 5.

2) "There is also a raised higher edge along the bottom horizontal portion of the
tab which is slightly higher in appearance than the rest of the raised edging.
This portion of the tab rides along the horizontal plane of the striker body as the
striker travels forward during an uncommanded discharge. Normally, the safety
lock tab would be raised over the striker's horizontal plane as the safety lever
located in the fire control unit (FCU), would raise it during an intentional trigger
press. . . . Unlike Sig Sauers official drawings, this part, again, does not match
what was installed in the firearm." *Id.*

3) "[T]he striker foot [has] excess molding material around the entire perimeter of
the striker foot's positive contact surface which prevents 'positive' contact with
the sear face. When actually engaged with the sear[']s 'positive contact
surface', the only portion of the striker foot that makes physical contact with
the sear is the lower raised portion of the excess molding material which reduces
the overall contact between the two parts. Since both the sear and striker foot
show excess molding material along the perimeter of both parts of their
'positive contact' areas, it is unlikely that there was ever positive contact as
designed between the two parts which can contribute to an uncommanded
discharge." *Id.* at 6.

7

4) "Also, the top portion of the sear face . . . also shows a deformity as the top horizontal edge of the sear is not straight and also shows excess molding material along its horizontal edge. The sear also shows signs of physical offset of the striker foot to the left of the sear due to the striker not being vertically centered to the sear as there is a discoloration caused by discharge blowby during recoil. This offset has been observed in previous P-320's that I have examined. Also not having the striker foot vertically centered to the sear causes the sear springs to be unevenly compressed causing the sear to be at an angle to the striker foot allowing it to walk off easier." *Id.* at 7.

5) "[A] small piece of slivered brass . . . was caught in the inner bottom corner of the stop. This piece of brass could interfere with the operation of the safety lock tab as it is in between the safety lock tab and striker stop." *Id.* at 8. "[T]he brass obstruction could move, preventing the safety lock tab from properly engaging the striker stop and contributing to an uncommanded discharge if the striker foot had slipped off of the sear face." *Id.* at 9.

6) "[A] 'ramping' transition from an angled portion of the horizontal striker body on the right side to a straight portion of the horizontal striker body which can also cause the safety lock tab to 'jump' up and over the striker stop during an uncommanded discharge. This angled ramp along with the foreign obstruction (brass) can contribute to the safety lock tab failure." *Id.* at 10.

## C.  Neither expert's testimony is reliable.

While the Court has doubts about both experts' relevant qualifications, it need not decide whether they are qualified. Even if the experts are qualified, their testimonies are not reliable, and therefore are not admissible. Indeed, this is the same decision reached by most of the courts that have considered their testimonies in similar cases.[2] *See Mayes v. Sig Sauer, Inc.*, No. 1:19-CV-00146-GNS-HBB, 2023 WL 2730264, at *7 (W.D. Ky. Mar. 30, 2023) (addressing and excluding Hicks and Villani); *Frankenberry v. Sig Sauer, Inc.*, 4:19-CV-02990-JD, [Dkt. 79 at 10] (D.S.C. Feb. 4, 2022) (addressing and excluding Villani); *Jinn v. Sig Sauer, Inc.*, No., 1:20-CV-01122-

---

[2] Only one court has ruled otherwise. *See Guay v. Sig Sauer, Inc.*, 610 F. Supp. 3d 423 (D.N.H. 2022). The *Guay* court admitted Hicks' testimony entirely, *id.* at 433, but concluded that Villani was only qualified to testify to some of his opinions. *Id.* at 429–32. Other than opining that testing is not necessary, the *Guay* court did not address the *Daubert* reliability factors, however. A jury in *Guay* ultimately returned a verdict in favor of Sig Sauer. *Guay v. Sig Sauer, Inc.*, No. 1:20-cv-00736-LM, [Dkt. 109], (D.N.H. Sept. 9, 2022).

PGG-RWL, *Report and Recommendation of Magistrate Judge* [Dkt. 75 at 17, 33] (S.D.N.Y. Apr. 12, 2023) (addressing and recommending excluding Hicks and Villani).[3] Because Plaintiff makes essentially the same reliability arguments for both experts in response to Sig Sauer's motions, the Court analyzes the experts together.

Not a single *Daubert* reliability factor favors admitting Hicks' or Villani's testimony. As previously discussed, neither expert has completed *any* testing to prove that the alleged defects could cause the pistol to fire without a trigger pull. As to Villani, Plaintiff attempts to discredit this deficiency by disingenuously claiming that "Villani testified that the failure has been replicated in real life many times." [Dkt. 38 at 28]. Her claim references Villani's testimony regarding *one* separate incident where a P320 allegedly discharged without a trigger pull. After watching the video, Villani supposedly testified that he "[had] no question that [the individual depicted] did not pull the trigger. His finger was off of the trigger, and the gun was in his holster." *Id.* at 29.[4] As to Hicks, Plaintiff similarly argues that "[c]ommon sense" prohibits requiring an expert "to risk his or her life to replicate an event that has already been replicated in real life many times over the last six years." [Dkt. 38 at 21]. Plaintiff then recounts several allegations of unintended discharges in lieu of Hicks completing his own testing. [Dkt. 38 at 21–24]. Plaintiff's argument seems to be that a functioning gun does not discharge without a trigger pull, and because numerous P320s have allegedly discharged without a trigger pull, her experts must be right that her gun is defective. This argument neglects that the Court's focus is the experts' methodologies, not their conclusions. *See Daubert*, 509 U.S. 595. "To be sure, it is not required that the experts conduct a litany of tests on

---

[3] As of the date of this Order, the United States District Judge presiding over *Jinn v. Sig Sauer, Inc.* in the Southern District of New York has not entered an order adopting or rejecting the abovementioned Report and Recommendation of Magistrate Judge.

[4] The Court could not locate this testimony in the exhibit that Plaintiff cited. *See* [Dkt. 38-17].

[Plaintiff's] specific pistol, but rather, they must demonstrate that their theories have some empirical evidence to support the assertion that the alleged defects have been found to cause uncommanded discharges." *Mayes*, 2023 WL 2730264, at *8.

Second, the experts' theories have not been subjected to peer review or publication. Both experts testified that they have not published any work involving firearm manufacture or design, nor did they rely on any publications to reach their respective opinions. Plaintiff argues that "[t]here is no peer reviewed literature on the P320's defect as it is a relatively new design." [Dkt. 38 at 29]. As with the testing, a publication need not be on the P320 specifically to demonstrate that the experts' theories are supported by some empirical evidence. *See Mayes*, 2023 WL 2730264, at *8. The experts do not even point to any literature to demonstrate that their opinions are based on new applications of existing theories. To the Court's knowledge, Hicks' and Villani's opinions are based on wholly novel theories that they expect the Court to simply take their word for.

Third, neither expert identifies a known error rate for their respective methodology. And finally—as already alluded to in analyzing the previous factors—they have not demonstrated that there is a general acceptance of their respective theories in the engineering community. Plaintiff contends that their conclusions that the pistol can fire without a trigger pull "is not a novel or unreliable opinion given that Sig Sauer's own August 4, 2017 press release on the P320 stated that vibration could make the original gun's safety mechanism fail." [Dkt. 38 at 4] (citing [Dkt. 38-5 at 1]). The press release she references provides:

> All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

[Dkt. 38-5 at 1]. Plaintiff again neglects, however, that when evaluating a *Daubert* challenge, a court's focus "must be solely on [the expert's] principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. This generic disclaimer does not provide an objective, independent validation of the experts' methodologies. *See Brown*, 705 F.3d at 536.

Even though none of the *Daubert* factors favors admitting the experts' testimonies, Plaintiff instructs the Court: "So long as an expert's scientific testimony rests on 'good grounds based on what is known' it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." [Dkt. 38 at 29] (quoting *Daubert*, 509 U.S. at 590) (internal citations omitted). But while Plaintiff asserts that their testimony "rests on good grounds based on what is known," the only basis she provides for that assertion is their subjective opinions. Additionally, the Court held a hearing on Sig Sauer's *Daubert* motions, but Plaintiff did not have Villani or Hicks attend. [Dkt. 48]. Therefore, Plaintiff forfeited the opportunity to have her experts potentially remediate these deficiencies. The Court must exclude expert testimony that is not reliable. *See* Fed. R. Evid. 702. Because the Court is not aware of any objective, independent validation of the methodologies used by Timothy Hicks or Peter Villani, it must grant Sig Sauer's motions to exclude their testimonies and opinions. [Dkts. 26, 27].

## III. MOTION FOR SUMMARY JUDGMENT

In its Motion Summary Judgment, Sig Sauer contends that if the Court excludes Hicks' and Villani's testimonies, it should also dismiss Plaintiff's case because she cannot proceed on any of her claims without expert testimony. [Dkt. 28 at 2]. The Court agrees.

11

## A. Legal Standard

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper when the pleadings and evidence demonstrate that no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (internal citations omitted); Fed. R. Civ. P. 56(c). An issue is material if its resolution could affect the outcome of the action. *DIRECTV*, 420 F.3d at 536. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* All reasonable inferences must be drawn in favor of the nonmoving party. *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002). There is no genuine issue of material fact if, when the evidence is viewed in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (citations omitted).

Where the dispositive issue is one which the nonmoving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the nonmovant's claim, or (2) demonstrating that there is no evidence in the record to establish an essential element of the nonmovant's claim. *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (internal citations omitted).

If, under the first option, the nonmoving party cannot point to evidence sufficient to dispute the movant's contention that there are no disputed facts, the moving party is entitled to summary judgment as a matter of law. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1980); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). Under the second option, the nonmoving party may defeat the motion by pointing to "supporting evidence already in the

record that was overlooked or ignored by the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332–33 (1986) (Brennan, J., dissenting). "Conclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment." *Duffy v. Leading Edge Prods.*, 44 F.3d 308, 312 (5th Cir. 1995).

If the nonmoving party can meet its burden under either of these scenarios, the burden shifts back to the movant to demonstrate the nonmovant's inadequacies. *Id.* If the movant meets this burden, "the burden of production shifts [back] to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)." *Celotex*, 477 U.S. at 333 n.3. "Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial." *Parekh v. Argonautica Shipping Invests. B.V.*, No. CV 16-13731, 2018 WL 295498, at *3 (E.D. La. Jan. 4, 2018) (quoting *Celotex*, 477 U.S. at 333 n.3).

## B. Discussion

"In Texas, a plaintiff can predicate a products liability action on one or more of at least three theories of recovery: (1) strict liability under [Restatement (Second) of Torts] § 402A, (2) breach of warranty under the U.C.C., and (3) negligence." *Syrie v. Knoll Intern.*, 748 F.2d 304, 306 (5th Cir. 1984); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 82.001(2) (defining "products liability action" as "any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach

13

of express or implied warranty, or any other theory or combination of theories"). Here, Plaintiff seeks to recover under all three theories.

To prevail on a strict products liability action, a plaintiff must establish that: "(1) a product is defective; (2) the defect rendered the product unreasonably dangerous; (3) the product reached the consumer without substantial change in its condition from the time of original sale; and (4) the defective product was the producing cause of the injury to the user." *Syrie*, 748 F.2d at 306. "A product may be proven to be defective if it is unreasonably dangerous in construction, or it is unreasonably dangerous as designed, or it is unreasonably dangerous because adequate warnings or instructions are not provided." *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 376 (Tex. 1984).

For a products liability claim premised on negligence, a plaintiff must demonstrate: "(1) that the manufacturer owed a duty to the plaintiff; (2) that the manufacturer breached that duty; (3) that the plaintiff was injured; and (4) that the manufacturer's breach of the duty was the proximate cause of the plaintiff's injury or damages." *McLennan v. Am. Eurocopter Corp., Inc.*, 245 F.3d 403, 431 (5th Cir. 2001). A strict liability claim "focuses upon the product itself, and requires a showing that the manufacturer placed a product into the stream of commerce that was unreasonably dangerous for a foreseeable use," while a negligence claim "focuses upon the conduct of the manufacturer in placing that product into the stream of commerce, and requires a determination of whether that conduct complies with the applicable standard of care." *Id.*

"[A]lthough a negligence claim requires a different showing from a strict liability claim, a manufacturer logically cannot be held liable for failing to exercise ordinary care when producing a product that is not defective." *Garrett v. Hamilton Standard Controls, Inc.*, 850 F.2d 253, 257 (5th Cir. 1988). This is because: "(1) if a product is not unreasonably dangerous because of the way it was manufactured, it was not negligent to manufacture it that way and (2) even if the

14

manufacturer was somehow negligent in the design or production of the product, that negligence cannot have caused the plaintiff's injury because the negligence did not render the product 'unreasonably dangerous.'" *Id.* Accordingly, if Plaintiff's strict liability claim fails because she cannot establish that the firearm was defective, then her negligence claims necessarily fail too.[5]

Similarly, if a plaintiff's strict liability claim must be dismissed, so too must their implied warranty of merchantability claim, when the two claims are premised on the same alleged defect. *Smith v. Chrysler Grp., L.L.C.*, 909 F.3d 744, 752 (5th Cir. 2018) (citing *Hyundai Motor Co. v. Rodriquez ex rel. Rodriquez*, 995 S.W.2d 661, 665 (Tex. 1999)). "[A] seller of goods impliedly warrants that they 'are fit for the ordinary purposes for which such goods are used.'" *Gen. Motors Corp. v. Brewer*, 966 S.W.2d 56, 57 (Tex. 1998) (quoting Tex. Bus. & Com. Code Ann. § 2.314(b)(3)). "For goods to breach this warranty, they must be defective—that is, they must be 'unfit for the ordinary purposes for which they are used because of a lack of something necessary for adequacy.'" *Id.* (quoting *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 443–444 (Tex. 1989)). Indeed, this a different definition of "defective" than is used for a strict products liability claim, which focuses on whether a product is "unusually dangerous." *See Lucas*, 696 S.W.2d at 376. Thus, a product may breach the implied warranty of merchantability without giving rise to a strict liability claim if it is unfit for its ordinary purpose but is not unusually dangerous. But where, as here, the breach of the implied warranty claim is premised on the same defect as the strict liability claim, the failure to establish a defect for purposes of the strict liability claim also kills the implied warranty claim.

---

[5] Plaintiff alleges that Sig Sauer was negligent in designing and manufacturing the firearm, as well as in "failing to unambiguously warn purchasers and end users of the gun . . . of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture." [Dkt. 1 at 32]. While some negligent failure to warn claims may not be encompassed by a strict products liability claim, *see Garrett*, 850 F.2d at 257 & n.8, that is not the case here. Plaintiff's negligent failure to warn claim is premised on the firearm discharging without a trigger pull because of a defect. Therefore, if she fails to prove that defect, the failure to warn claim fails.

The Court therefore first addresses whether Plaintiff can prevail on her strict liability claim. If she cannot establish that a defect caused the gun to discharge without a trigger pull, the Court need not engage in a negligence or breach of implied warranty of merchantability analysis.

"Expert testimony is required when an issue involves matters beyond jurors' common understanding." *Mack Trucks, Inc. v, Tamez*, 206 S.W.3d 572, 583 (Tex. 2006). "Proof other than expert testimony will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition." *Id.* In defective products cases, the Supreme Court of Texas has "consistently required competent expert testimony and objective proof that a defect caused the condition complained." *Id.* (citing *Nissan Motors Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 137 (Tex. 2004) (holding that "[a] lay juror's general experience and common knowledge do not extend to whether design defects such as those alleged in this case caused releases of diesel fuel during a rollover accident"); *see also Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 42–43 (Tex. 2007) ("If juries were generally free to infer a product defect and injury causation from an accident or product failure alone, without any proof of the specific deviation from design that caused the accident, expert testimony would hardly seem essential. Yet we have repeatedly said otherwise.").

Determining whether a defect in Plaintiff's P320 enabled it to discharge without a trigger pull, thereby causing her injuries, requires technical knowledge beyond jurors' general experience and common understanding. *See Mack Trucks*, 206 S.W.3d at 583. Therefore, expert testimony on causation is required to show that Plaintiff is entitled to recover under any of the products liability theories.

Plaintiff's response to Sig Sauer's Motion for Summary Judgment directs the Court's attention to other similar incidents involving P320s that allegedly discharged without trigger pulls. These other incidents cannot establish that a defect caused her gun to discharge, however. Analogous cases involving cars that allegedly accelerated without the driver pressing the gas pedal demonstrate why. *See, e.g.*, *Nissan Motors Co. v. Armstrong*, 145 S.W.3d 131 (Tex. 2004). "In all of these cases, it was not enough that a vehicle accelerated when claimants swore they had done nothing. Instead, [the Supreme Court of Texas] [has] consistently required competent expert testimony and objective proof that a defect caused the acceleration." *Id.* (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 715, 717, 719 (Tex. 1998); *Gen. Motors Corp. v. Hopkins*, 548 S.W.2d 344, 346–47 (Tex. 1977), *overruled on other grounds by Turner v. Gen. Motors Corp.*, 584 S.W.2d 844 (Tex. 1979) *and Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex. 1984); *Henderson v. Ford Motor Co.*, 519 S.W.2d 87, 88–89, 93–94 (Tex. 1974), *overruled on other grounds by Duncan*, 665 S.W.2d 414).

In *Nissan Motors*, the Supreme Court of Texas reversed a jury verdict that found that a defect caused the plaintiff's car to unintentionally accelerate. 145 S.W.3d at 134. To prove that her car had a defect, the plaintiff's case at trial centered on the quantity of other alleged incidents of unintended accelerations. *Id.* at 144–48. The trial court erred by allowing such evidence because "[p]roof of unintended acceleration is *not* proof of a defect." *Id.* at 148. And "proof of *many* instances of unintended acceleration cannot prove a defect either; a lot of no evidence is still no evidence." *Id.* "[P]roduct defects must be proved; they cannot simply be inferred from a large number of complaints. If the rule were otherwise, product claims would become a self-fulfilling prophecy—the more that are made, the more likely all must be true." *Id.* at 142. While the court acknowledged that other similar incidents may be admissible for certain purposes, it concluded:

17

> [W]e have never held that mere claims of previous accidents can prove a product is defective, and we decline to do so here. A number of complaints may require a prudent manufacturer to investigate, and may presage liability if those complaints are substantiated and the manufacturer does nothing. But a large number of complaints cannot alone raise a fact question that a defect exists.

*Id.* at 140.

Likewise, here, proof of an unintended discharge is not proof of a defect. Nor is proof of many unintended discharges. Under Texas law, no reasonable jury could conclude that a defect caused Plaintiff's gun to discharge without a trigger pull solely from (1) lay testimony that her gun discharged without a trigger pull and (2) the existence of other similar alleged incidents. Qualified and reliable expert testimony on causation is necessary. With Hicks and Villani excluded from testifying, Plaintiff has failed to raise a fact question that a defect exists.[6] Because Plaintiff's claims are all predicated on this same defect, Sig Sauer is entitled to summary judgment on all of Plaintiff's claims. *See Garrett*, 850 F.2d at 257; *Smith*, 909 F.3d at 752.

## IV.     CONCLUSION

It is therefore **ORDERED** that Defendant Sig Sauer, Inc.'s Rule 702 Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Timothy Hicks [Dkt. 26], Rule 702 Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Peter Villani [Dkt. 27], and Motion for Summary Judgment [Dkt. 28] are **GRANTED**.

---

[6] Plaintiff points out in her response to Sig Sauer's Motion for Summary Judgment that she designated a third expert, Jonathyn Priest, and that Sig Sauer did not move to exclude his testimony. [Dkt. 35 at 1 n.1]. Priest's expert report does not address or identify any defects that caused or could have caused Plaintiff's gun to discharge without a trigger pull, however. *See generally* [Dkt. 35-1]. Therefore, his report does not cure this deficiency in Plaintiff's proffered evidence.

It is further **ORDERED** that Plaintiff Brittany Hilton's claims are **DISMISSED WITH PREJUDICE**. The Court will enter a Final Judgment in accordance with this Order.

**SIGNED this 8th day of June, 2023.**

Michael J. Truncale
United States District Judge

19

# EXHIBIT 20

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:19-CV-00146-GNS-HBB

STEPHEN MAYES                                                          PLAINTIFF

v.

SIG SAUER, INC.                                                       DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Timothy M. Hicks (DN 70); Defendant's Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Peter Villani (DN 71); and Defendant's Motion for Summary Judgment (DN 72). The motions are ripe for adjudication. For the reasons outlined below, the motions are **GRANTED**.

## I.       STATEMENT OF FACTS

On October 30, 2018, Stephen Mayes ("Mayes") was shooting his new Sig Sauer P320 X Carry 9MM pistol, which was designed and manufactured by Defendant Sig Sauer, Inc. ("Sig Sauer"). (Compl. ¶¶ 7-8, 11, DN 1; Mayes Dep. 92:2-4, Mar. 31, 2021, DN 72-2). Mayes had the gun in a holster on his hip and was preparing to draw the gun when it discharged, shooting Mayes in the thigh. (Compl. ¶ 8-9; Mayes Dep. 97:8-12). Mayes alleges the pistol discharged without a

trigger pull, which Sig Sauer refutes.  (Compl. ¶ 8; Answer ¶ 9, DN 11; *see* Mayes Dep. 100:4-101:1).

Mayes initiated this action against Sig Sauer, alleging product liability claims sounding in strict liability, negligence, and breach of express and implied warranties, as well as claims under the Kentucky Consumer Protection Act.  (Compl. ¶¶ 43-48).  Sig Sauer moves to exclude two of Mayes' experts and for summary judgment, which Mayes opposes.  (Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert, DN 70 [hereinafter Def.'s Mot. Exclude Hicks]; Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert, DN 71 [hereinafter Def.'s Mot. Exclude Villani]; Def.'s Mot. Summ. J., DN 72; Pl.'s Resp. Def.'s Mots. Summ. J. & Exclude Pl.'s Experts, DN 83 [hereinafter Pl.'s Mem.]).

## II.     JURISDICTION

The Court has subject-matter jurisdiction of this dispute based upon diversity of citizenship.  *See* 28. U.S.C. § 1332(a)(1).

## III.     DISCUSSION

### A.     Defendant's Motions to Exclude Evidence and Expert Opinions

Sig Sauer contends that Timothy Hicks ("Hicks") and Peter Villani ("Villani") should be precluded from testifying as expert witnesses on the grounds that they are unqualified and their testimony is unreliable.  (Def.'s Mot. Exclude Hicks; Def.'s Mot. Exclude Villani).  Fed. R. Evid. 702 governs expert witness testimony and provides that an expert's opinion is admissible if:

(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b)     the testimony is based on sufficient facts or data;
(c)     the testimony is the product of reliable principles and methods; and
(d)     the expert has reliably applied the principles and methods to the facts of the case.

The trial court must act as a gatekeeper and ensure that expert testimony is both relevant and reliable, as required by Fed. R. Evid. 104 and 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th. Cir. 2002). "It is the proponent of the testimony that must establish its admissibility by a preponderance of proof," and "[a]ny doubts regarding the admissibility . . . should be resolved in favor of admissibility." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10); *Commins v. Genie Indus., Inc.*, No. 3:16-CV-00608-GNS-RSE, 2020 U.S. Dist. LEXIS 43123, at *8 (W.D. Ky. Mar. 12, 2020) (alteration in original) (quoting *In re E.I. Du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 337 F. Supp. 3d 728, 739 (S.D. Ohio 2015)). "[R]ejection of expert testimony is the exception, rather than the rule," as "[t]he Court's gatekeeping role does not supplant the traditional adversarial system and the jury's role in weighing evidence." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (citation omitted); *Certain Underwriters at Lloyd's v. Morrow*, No. 1:16-CV-00180-GNS-HBB, 2019 U.S. Dist. LEXIS 130113, at *21 (W.D. Ky. Aug. 5, 2019) (citing *Rogers v. Detroit Edison Co.*, 328 F. Supp. 2d 687, 691 (E.D. Mich. 2004); *Stotts v. Heckler & Koch, Inc.*, 299 F. Supp. 2d 814, 819 (W.D. Tenn. 2004)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

### 1.    *Qualifications*

The Court's role is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997) (citation omitted). "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are

not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (internal citation omitted) (citations omitted). "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* (internal citation omitted). Still, the "liberal interpretation of this requirement 'does not mean that a witness is an expert simply because he claims to be.'" *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citation omitted).

### a.   Timothy M. Hicks

Sig Sauer argues Hicks is not qualified to offer opinions about the alleged manufacturing or design defects in the pistol because (1) his engineering experience is primarily in automobiles; (2) "he had never fired, examined, or otherwise familiarized himself with the P320 model pistol," prior to this case and; (3) his only experience with firearms aside from personal experience is his certification to test the mechanical functioning of firearms for sale in California and Massachusetts. (Def.'s Mot. Exclude Hicks 10-11).

Hicks is a Principal Engineer who has nearly forty years of experience and is licensed in multiple states. (Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert Ex. G, at 1-3, DN 70-7 [hereinafter Hicks CV]). He holds a master's degree in engineering sciences and a bachelor's degree in mechanical engineering, as well as experience in mechanical design and system evaluations, having led advanced engineering teams. (Hicks CV 2; Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert Ex. F, at 1, DN 70-6 [hereinafter Hicks Report]). In his current role, Hicks conducts numerous investigations and certification tests on firearms and firearm safety devices. (Hicks Report 1). In addition to his work, Hicks is a member of the National Society of Professional Engineers, the American Society of Mechanical Engineers, and the Society of Automotive Engineers, of which he currently serves as the Chair of the Chicago section. (Hicks

Report 1).  Hicks also holds two patents regarding rear suspension in automobiles and has given

two presentations about testing techniques for structural integrity and failure analysis to members

of a variety of industries. (Hicks CV 4; Hicks Dep. 225:15-226:1, Mar. 9, 2022, DN 70-8).

Sig Sauer contends that because the bulk of Hicks' mechanical engineering experience is

related to automobiles, he is not sufficiently qualified to offer opinions on the manufacturing or

design of firearms.  (Def.'s Mot. Exclude Hicks 3).  The Sixth Circuit has previously held that an

expert's "skill, education, and training in mechanical engineering render[ed] him competent to

offer opinions on a variety of mechanical topics" despite the fact that he did not have any

specialized knowledge specific to firearms.  *Palatka v. Savage Arms, Inc.*, 535 F. App'x 448, 455

(6th Cir. 2013); *see Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 294 (6th Cir.

2007) (holding that although an expert's proffered experience was not specific to a particular

industry, his background and experience made him "well-positioned to 'assist the trier of fact' to

make sense of" the evidence); *cf. Guay v. Sig Sauer, Inc.*, No. 20-cv-736-LM, 2022 U.S. Dist.

LEXIS 121360, at *20 (D.N.H. July 11, 2022) ("[T]here is no indication that mechanics of guns

are so specialized that a person requires a lifetime of experience specifically with guns or a

particular gun to be able to opine about its design or manufacturing flaws.").  In his current role,

Hicks "[p]erforms engineering investigations and failure analysis from a mechanical engineering

perspective," which involves "design analysis, product liability, intellectual property,

manufacturing, accident investigation and reconstruction, fire cause and origin, and component

testing." (Hicks CV 1).  In these analyses, he has experience with vehicles, but also non-vehicles

such as "medical, athletic, and wheelchair accessibility equipment," "consumer products," and

"other mechanical systems." (Hicks CV 1).  Hicks' wide breadth of engineering experience and

capabilities demonstrate that, like the expert in *Palatka*, he is "competent to offer opinions on a

variety of mechanical topics," including the mechanics of the pistol at issue.  *Palatka*, 535 F. App'x at 455; *see Faughn v. Upright, Inc.*, No. 5:03-CV-00237-TBR, 2007 U.S. Dist. LEXIS 19341, at *12 (W.D. Ky. Mar. 15, 2007) ("[C]ourts have held that an expert witness need not have experience working in the specific industry he testifies about."  (citing *Surles*, 474 F.3d at 294; *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir. 1997); *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991))); *Commins*, 2020 U.S. Dist. LEXIS 43123, at *12 (determining that "an engineer who intends to testify about . . . engineering aspects of a particular machine[]" was qualified (citation omitted)).  Any lack of direct firearm experience is more suitably addressed at cross-examination.  *See Daubert*, 509 U.S. at 596.

Sig Sauer also contends Hicks' lack of familiarity with firearms in a professional setting renders him unqualified to offer opinions regarding any design or manufacturing defects of Mayes' pistol.  Sig Sauer asserts Hicks has never been involved with or witnessed the design and manufacture of a firearm, never published articles related to such topics, and never inspected or tested a P320 or a comparable firearm before this case.  (Def.'s Mot. Exclude Hicks 3).  Hicks' lack of involvement in the manufacture and design of a firearm is immaterial to his ability to assess Mayes' firearm for defects, considering his general design and manufacturing experience.  *See Palatka*, 535 F. App'x at 454-55 (determining an expert was qualified even though "he [was] not a firearms expert and ha[d] not consulted in the design or manufacture of a firearm."); (Hicks Dep. 226:6-15, 226:21-227:4, DN 70-8).  It is also immaterial that Hicks has not published articles about the design and manufacture of firearms.  *See Faughn*, 2007 U.S. Dist. LEXIS 19341, at *9-10 (determining that an expert was qualified to testify despite the fact that he had not "authored reports, texts, or articles" about the subject matter to which he was meant to testify).  Furthermore, the fact that Hicks has not inspected a P320 or a comparable firearm before this case does not

render him unqualified to testify as an expert.  Hicks has significant mechanical engineering experience as well as familiarity with the component parts of firearms and is certified to identify malfunctions.  (Hicks CV 1-4; Hicks Report 1; Hicks Dep. 57:18-58:14, DN 70-8).  These qualifications are sufficient to overcome the purported shortcomings, as "[t]he law does not require that [an expert] be the most qualified expert conceivable, only that he will 'assist the trier of fact in understanding and disposing of issues relevant to the case.'"  *Faughn*, 2007 U.S. Dist. LEXIS 19341, at *10 (quoting *Pride*, 218 F.3d at 578).

Finally, Sig Sauer argues that Hicks' certifications to test firearms in California and Massachusetts are insufficient to demonstrate that he is qualified to testify as an expert.  (Def.'s Mot. Exclude Hicks 11).  California's certification process required Hicks to apply, subject his facilities to an inspection, demonstrate for the certifying body that he could conduct firearm tests, and then produce a report compliant with its procedures.  (Hicks Dep. 56:23-57:2, DN 70-8).  With this certification, Hicks evaluates firearms and determines whether a specific model can be certified for sale in California, which he accomplishes by identifying that a firearm model meets certain loaded-round indicator requirements, firing six hundred rounds through each sample with incremental inspections, recording evident malfunctions, "field stripping" the model to look at the component parts, checking if all fasteners are tight, and conducting a drop test.  (Hicks Dep. 57:20-58:12, DN 70-8).  This experience alongside Hicks' engineering career and education is sufficient to render him qualified in identifying any alleged defects in Mayes' pistol.  *See Faughn*, 2007 U.S. Dist. LEXIS 19341, at *10.

Sig Sauer cites to *Whybark v. Synthes, Inc.*, No. 5:15-CV-00084-GNS-LLK, 2017 U.S. Dist. LEXIS 67988 (W.D. Ky. May 4, 2017), to support its contention that Hicks is not qualified.  (Def.'s Mot. Exclude Hicks 11-12).  The facts in *Whybark*, however, are distinguishable from the

7

present action.  In *Whybark*, the plaintiff sought to present a physician who would testify that a broken bone screw potentially had a defect, but the physician had no manufacturing or engineering experience.  *Whybark*, 2017 U.S. Dist. LEXIS 67988, at *9, *12.  Ultimately, the physician was excluded because his "opinion as to a defect in manufacture of the bone screw relate[d] to a field entirely different from his medical background."  *Id.* at *12.  Hicks is not being proffered to offer his opinion regarding a field outside of his own; he is an engineer seeking to testify about engineering defects.  Additionally, he has general design and manufacturing experience, unlike the doctor in *Whybark*.  (Hicks Dep. 226:6-15, 226:21-227:4, DN 70-8).

Therefore, Sig Sauer's arguments regarding Hicks' qualifications are unavailing at this stage, as "[g]aps in [his] qualification or knowledge generally go to the weight of the . . . testimony, not its admissibility."  *Faughn*, 2007 U.S. Dist. LEXIS 19341, at *12 (first alteration in original) (citation omitted); *see Daubert*, 509 U.S. at 596 (citation omitted).[1]

### b.  Peter Villani

Sig Sauer similarly maintains that Villani is not qualified to opine about alleged manufacturing or design defects in the pistol because he is not an engineer, has never taken any engineering coursework, and does not have any experience in firearm design and manufacturing. (Def.'s Mot. Exclude Villani 2).

Villani is a former police officer currently employed as an operations officer for the United States Department of Veteran Affairs Police.  (Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert

---

[1] Sig Sauer alleges that Mayes conceded Hicks is not qualified to offer opinions regarding design defects, as Mayes stated that Hicks "limits his report to how this specific product, the Sig P320, has failed due to manufacturing defects."  (Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert 3, DN 86 (quoting Pl.'s Mem. 23)).  Interpreting this statement as a concession of Hicks' qualifications is attenuated at best, as it is merely an effort to explain the scope of Hicks' report. (*Cf.* Hicks Report 3, 5-7 (noting both design and manufacturing defects); Hicks Dep. 226:6-15, DN 70-8 (discussing Hicks' general design experience)).

Ex. I, DN 71-9 [hereinafter Villani CV]).  He has worked as a manager at a gun range where he taught gun safety courses and performed cleaning and maintenance on customers' firearms, including replacement of broken components.  (Villani CV; Villani *Guay*[2] Dep. 46:18-23, 47:17-20, Mar. 1, 2022, DN 71-10).   These responsibilities required him to fully disassemble the pistols and remove the components.  (Villani *Guay* Dep. 50:17-25).  Villani performs similar tasks in his current role with the Veteran Affairs Police.  (*See* Villani *Guay* Dep. 54:24-55:7).  He is also a certified armorer and has obtained a certification from Sig Sauer for the P320.  (Villani *Guay* Dep. 55:17-23; Pl.'s Resp. Def.'s Mots. Summ. J. & Exclude Pl.'s Experts Ex. 9, DN 83-9).

Villani's lack of design and manufacturing experience renders him unqualified to offer opinions regarding alleged design and manufacturing defects.  Villani's qualifications amount to experience in handling, assembling, and disassembling firearms, which are insufficient qualifications for him to testify about the alleged defects.  In fulfilling his responsibilities as an armorer, customers would bring Villani guns with "[b]roken firing pins, broken extractors, failures to feed, damaged magazines . . . [and] really filthy guns that wouldn't operate because they were so filthy the gun wouldn't even cycle properly," so his responsibilities were largely replacing broken parts and performing routine cleaning and maintenance.  (Villani *Guay* Dep. 47:9-16; *see* Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert Ex. F, DN 87-6).  Although this role provided Villani with the ability to identify broken parts, damage to a gun, or some other abnormality, his experience does not go so far as to qualify him to testify about the cause of such damage or abnormality.  Although he can adequately identify a problem, there is nothing in Villani's

---

[2] Plaintiff's experts were hired to offer opinions in cases in addition to the current action.  To avoid duplicative deposition questions, some generally applicable information was collected in depositions for the other cases and submitted to the record in this case.

experience that enables him to identify whether the cause of a problem is in fact a design or manufacturing defect versus damage from ordinary use or misuse by the owner of the gun.

Moreover, Villani has no relevant experience with manufacturing or designing commercial products. (Villani *Frankenberry* Dep. 120:1-7, 120:22-24, June 18, 2021, DN 87-5. *But see* Villani *Guay* Dep. 57:19-58:2 (noting that Villani has designed and manufactured a holster made out of two pieces of leather for his personal use)). This is a significant distinction because he lacks the "scientific, technical, or other specialized knowledge" to be able to opine about manufacturing and design defects given that he has no familiarity or experience to support those opinions. *See* Fed. R. Evid. 702. This is in contrast to Hicks, who has design and manufacturing experience as an engineer. Villani is more akin to the expert in *Whybark* than he is to Hicks, because if permitted to testify, he would be providing expert opinions in a field entirely different than his own. *See Whybark*, 2017 U.S. Dist. LEXIS 67988, at *12.

Mayes' contends that "Villani need not possess a degree in mechanical engineering . . . to have extensive 'specialized knowledge' in firearms . . . ." (Pl.'s Mem. 4). Indeed, he does not need to have a degree; however, he must have experience with designing and manufacturing processes to be able to opine about defects resulting from those processes. The issue with Villani's qualifications is that he possesses no experience whatsoever with designing or manufacturing products. For that reason, he is unqualified to offer expert testimony as to the existence of alleged design or manufacturing defects in Mayes' pistol.

Given that both experts opinions rely on substantially similar theories and methods, the reliability of their testimony will be jointly considered, notwithstanding Villani's lack of qualifications.

2.      *Reliability*

When determining the reliability of an expert's testimony, a key is "whether the reasoning or methodology underlying the testimony is sufficiently valid . . . ." *Daubert*, 509 U.S. at 592-93. The Supreme Court has advised, however, that the inquiry is flexible and that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95. Thus, there is no definitive checklist for determining whether an expert's testimony is reliable, but *Daubert* outlines a non-exhaustive list of factors for courts to consider: (1) whether the theory or method in question "can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"; (3) whether it has a "known or potential rate of error"; and (4) whether the theory or technique enjoys "general acceptance" in the "relevant scientific community . . . ." *Id.* at 593-94 (citation omitted).

Where a party challenges the testimony of a proffered expert for insufficient "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (alteration in original) (quoting *Daubert*, 509 U.S. at 592). *Daubert* involves balancing the desire to liberally admit relevant evidence against the necessity of excluding misrepresentative "junk science." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176-77 (6th Cir. 2009). Ultimately, "the trial judge . . . ha[s] considerable leeway in deciding . . . whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152; *Conwood Co.*, 290 F.3d at 792; *see Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671-72 (6th Cir. 2010) ("Rule 702, we recognize, does not require anything approaching absolute certainty. And where one person sees speculation, we acknowledge, another may see knowledge, which is

why the district court enjoys broad discretion over where to draw the line." (internal citation omitted) (citation omitted)).

"The subject of an expert's testimony must be 'scientific . . . knowledge.'" *Daubert*, 509 U.S. at 589-90. The gatekeeping obligations in *Daubert* only applied to "scientific knowledge," but were later extended to include "testimony based on 'technical' and 'other specialized' knowledge." *Id.* at 592; *Kumho Tire Co.*, 526 U.S. at 141, 152. "[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. "[I]t would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably there are no certainties in science." *Id.* As the Supreme Court has noted:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and opinion offered.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted).

The Sixth Circuit has noted "[r]ed flags that caution against certifying an expert," such as "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (citation omitted); *cf. Clark v. Takata Corp.*, 192, F.3d 750, 757 (7th Cir. 1999) ("We have held that a district court is required to rule out 'subjective belief or unsupported speculation' by considering 'whether the testimony has been subjected to the scientific method." (citation omitted)); *Scientific Method, Black's Law Dictionary* (11th ed. 2019) ("The process of generating hypotheses and testing them through experimentation, publication, and replication."). Ultimately, it is Mayes' burden to establish that his proffered experts' "theories are reliable and adequately supported by sound technical data, methodology and testing." *Berry v. Crown Equip. Corp.*, 108 F. Supp. 2d 743, 754 (E.D. Mich. 2000) (citation omitted).

Mayes submits Hicks' and Villani's opinions to support his claims that there are multiple defects in Mayes' pistol. Hicks and Villani were present for the inspection of Mayes' P320 and several other firearms on March 18, 2021. (Hicks Report 1; Pl.'s Resp. Def.'s Mots. Summ. J. & Exclude Pl.'s Experts Ex. 8, at 5, DN 83-8 [hereinafter Villani Suppl. Report]). Hicks' report describes the process used to inspect and examine the guns and notes tests performed by a Sig Sauer expert under laboratory conditions. (Hicks Report 2). Hicks and Villani based their opinions on their review of CT scan images of the gun, close up images of the surfaces of the striker foot and sear face inside the gun's fire control unit, a simulation of the gun's mechanics developed by an independent third party, viewing the function test performed by Sig Sauer's expert and the single cycle that Hicks performed, several other P320s allegedly containing the same defects, and the facts of the incident provided by Mayes' counsel in the form of the Complaint filed in this action. (Hicks Dep. 27:7-8, DN 70-8; Hicks Dep. 14:12-17, Mar. 9, 2022, DN 88-2; Hicks *Guay* Dep. 32:10-15, DN 70-10, Villani Suppl. Report 5-6).

According to Hicks' theory, two internal safeties within the pistol have to be overcome for the P320 to discharge without a trigger pull: (1) the striker foot-to-sear interface and (2) the safety lock. (Hicks Dep. 129:2-9, DN 70-8). Hicks opines that low friction between the striker foot and the sear can result in the disengagement of the two parts. (Hicks Dep. 117:2-8, DN 70-8). If those two parts lose connection due to the striker foot rotating enough either to the left or right to cause the striker foot to disconnect from the sear, the firearm could discharge. (Hicks Dep. 192:9-13). Hicks also claims that disengagement can occur where the striker foot moves up and the sear moves down due to the inertia from the weapon being carried. (Hicks *Jinn* Dep. 117:1-5, Mar. 10, 2022, DN 70-9). Hicks also theorizes that a defect in the safety lock, coupled with a defect in the striker foot, can lead to an uncommanded discharge if the safety lock fails to restrain the striker foot from

propelling forward to strike the loaded cartridge. (Hicks Dep. 175:16-18, 176:5-9, DN 70-8). Villani utilizes a similar theory, based primarily on the existence of "rollover," which is "excess molding material left over from the manufacturing process that hasn't been removed before installation of that part into the product." (Villani *Guay* Dep. 90:8-11). He contends that "rollover" can reduce the contact area between components and thus cause them to disengage, resulting in an uncommanded discharge. (Def.'s Mot. Exclude Evidence & Ops. Pl.'s Expert Ex. H, at 12, DN 71-8 [hereinafter Villani Report]; *see* Villani Dep. 12:21-25, DN 71-11).

Based on his review, Hicks identified five allegedly defective conditions in Mayes' P320. First, there was no secondary processing of the surface of the interface between the sear and striker foot, resulting in diminished quality of the interface. (Hicks Report 10). He alleges that these components, which are produced using a Metal Injection Molding ("MIM") process, are usually secondarily processed to eliminate any variation on critical surfaces, such as the interface here. (Hicks Report 3; *see* Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert, Ex. C, at 38, DN 87-3 [hereinafter Watkins Report]). Mayes' firearm allegedly had inconsistencies on the surface area of the interface and a raised area around the periphery of the interface surface ("rollover") which minimized the contact area and increased the likelihood that the components would disengage, leading to a discharge. (Hicks Report 4). Second, Hicks identified an "[a]xial variation of the striker pin after each slide movement causing misalignment of [the] safety lock tab to striker pin, and the striker foot lateral position to the sear step face." (Hicks Report 10). These misalignments similarly resulted in a less secure interface between the components, making an uncommanded discharge more likely. (Hicks Report 7). Hicks also discussed a third defective condition, specifically the "[a]bility of the slide (and therefore the strike assembly) to move vertically relative to the sear reducing the interfacing surface contact area even further." (Hicks Report 10). He

14

opined that a minimal amount of overlap between the components means that the striker could move forward and discharge a round with only minor trigger movement. (Hicks Report 5). The fourth defect Hicks identified was that "[t]he sear is unable to fully rotate forward to allow flat engagement of the striker foot." (Hicks Report 10). The final defect discussed is that the pistol does not have a safety lever return spring, which "allows the lever to rotate out of position when the pistol is carried in a muzzle down orientation." (Hicks Report 10). Villani identified similar defects, as well as others, all contributing to contact surface area deficiency that resulted in an uncommanded discharge. (Villani Report 10, 12-13; Villani Suppl. Report 1-3).

Sig Sauer's main contention is that Hicks' and Villani's opinions should be excluded as unreliable because they have done no testing to support their theories. (Def.'s Mot. Exclude Hicks 2, 6-8, 14). Sig Sauer notes that Hicks' determinations are based on only visual inspections of the subject pistol and exemplar pistols. (Def.'s Mot. Exclude Hicks 4). Thus, Sig Sauer maintains these experts cannot prove the defects identified can cause a discharge without a trigger pull because they conducted no physical testing to replicate a P320 discharge. (Def.'s Mot. Exclude Hicks 8; *see* Hicks Dep. 117:2-13, 234:5-10, DN 70-8).

Indeed, Hicks admitted that no testing has been conducted to confirm that the sear and striker can lose connection due to the striker foot rotation; he has no calculations regarding the extent to which contact surface area is needed to prevent a loss of engagement or how much inertia would be required to move the sear down. (Hicks Dep. 117:14-17, 192:14-19, DN 70-8; Hicks *Jinn* Dep. 117:18-21, DN 70-9). Villani similarly conceded that he had conducted no testing to support his theories. (Villani *Guay* Dep. 83:24-25, Mar. 1, 2022, DN 87-1; *see* Villani *Guay* Dep. 101:1-4, 102:6-10, 109:13-19; Villani Dep. 14:16-19). In response, Hicks contends that the striker foot had to have "walked off" the sear, as there is no other means besides pulling the trigger for

the firearm to discharge.  (Hicks Dep. 129:19-22, DN 70-8).  Further, he supports his theories by citing his review of videos of other P320 discharges, although he was not aware of any such discharge occurring without trigger movement.  (Hicks Dep. 169:4-9, DN 70-8; *see* Hicks *Jinn* Dep. 103:7-20, Mar. 10, 2022, DN 86-4 (noting that Hicks conducted no independent analysis regarding the cause of the recorded discharges); *see also* Knox Decl. ¶¶ 6, 8, DN 86-6; Burmester Decl. ¶ 2, DN 86-7).

"[H]ands-on testing is not an absolute prerequisite to the admission of expert testimony, but the theory here easily lends itself to testing and substantiation by this method, such that conclusions based only on personal opinion and experience do not suffice."  *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) (citation omitted); *accord Johnson ex rel. Gilfeather v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 431 (6th Cir. 2007) (quoting *Dhillon*, 269 F.3d at 870).  Furthermore, opinions amounting to no more than a hypothesis are not reliable, despite how convincing they may appear.  *Ada-Es, Inc. v. Big Rivers Elec. Corp.*, No. 4:18-CV-00016-JHM, 2020 U.S. Dist. LEXIS 219073, at *9 (W.D. Ky. Nov. 23, 2020).  Opinions that are based solely on the occurrence of an accident or on "conjecture and speculation" are unreliable and should be excluded.  *Berry*, 108 F. Supp. 2d at 755 (citation omitted).

Both Hicks' and Villani's opinions are insufficiently reliable to warrant admission in this case, as they are not based on tested or otherwise corroborated theories.  Neither of the experts have conducted physical testing on Mayes' pistol specifically, nor any other pistol to support their theory regarding the amount of rollover needed to cause an uncommanded discharge.  (Hicks Dep. 117:2-13, 192:14-19, DN 70-8; Villani *Guay* Dep. 101:1-4, 102:6-10, 109:13-19; *see* Villani *Frankenberry* Dep. 127:18-21 (admitting that he did not adhere to a specific methodology)).  They also do not offer any calculations to support their theories.  (Hicks Dep. 117:14-17, DN 70-8;

Hicks *Jinn* Dep. 117:18-21, DN 70-9).  Plainly, both experts opine that a raised surface on the interface between components of the gun *could* result in an uncommanded discharge in theory. But neither Hicks nor Villani offers any evidence suggesting that such an uncommanded discharge occurs generally or that it did in this case.  Mayes has offered the bare hypotheses of both Hicks and Villani, which fall short of admissibility.

To be sure, it is not required that the experts conduct a litany of tests on Mayes' specific pistol, but rather, they must demonstrate that their theories have some empirical evidence to support the assertion that the alleged defects have been found to cause uncommanded discharges. *See Reynolds v. Freightliner LLC*, No. 05-70-GFVT, 2006 U.S. Dist. LEXIS 97244, at *28 (E.D. Ky. June 21, 2006) ("Absent some formulaic process involving engineering or other mathematical principles, the [c]ourt is unable to determine how [an expert] could have surmised or even began to calculate the forces involved [and] reach his conclusions.").  Hicks' and Villani's theories have no such support; they have identified no publications recognizing their theory, they have not subjected their opinions to peer review, and they have not demonstrated that their theories are generally accepted in the relevant communities. *See Daubert*, 509 U.S. at 593-94.  As presented, Hicks and Villani offer no more than "conjecture and speculation."  *See Berry*, 108 F. Supp. 2d at 755.  Ultimately, there is an "analytical gap" between the theories proffered and the assertion that the alleged defects cause uncommanded discharges.  *Gen. Elec. Co.*, 522 U.S. at 146 (citation omitted).  Therefore, both experts must be excluded as their opinions are unreliable.

Mayes does not dispute that neither Hicks nor Villani have tested their theories.  Instead, he argues that the *Daubert* factors are not stringent, and any testing would be too dangerous for the experts to conduct.  (Pl.'s Mem. 13, 23).  Indeed, *Daubert* is a flexible test, but that contention cannot overcome the necessity that expert opinions be more than a "subjective belief or

unsupported speculation," which is all that these opinions amount to.  *Daubert*, 509 U.S. at 590; *see id.* at 594-95.  Furthermore, Mayes has not met his burden to demonstrate that possible testing is so dangerous that his experts could not have attempted to undertake any empirical assessment of their theories.  *See generally Berry*, 108 F. Supp. 2d at 754 (stating that it is the Plaintiff's burden to demonstrate that an expert's opinion is reliable).  Indeed, Hicks stated that drop testing[3] could create inertial forces causing "the sear to lose its grip on the striker foot[,]" although not a direct comparison.  (Hicks *Guay* Dep. 37:4-18; *see* Hicks *Jinn* Dep. 106:15-18, DN 83-6).  Additionally, vibration testing can be utilized to test these theories, considering Sig Sauer has conducted such tests.  (Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert 10, DN 87 ("Sig has produced testing conducted by Dayton T. Brown, Inc. . . . demonstrating that the P320 will not fire due to vibration or jostling without trigger actuation." (emphasis omitted) (footnote omitted))); *see* Def.'s Reply Mot. Exclude Evid. & Ops. Pl.'s Expert Ex. H, DN 87-8).

Based upon the foregoing, Hicks and Villani cannot testify as expert witnesses in this matter.  As such, Sig Sauer's motions to exclude are granted.

### B.      Defendant's Motion for Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Thereafter, the burden shifts to the nonmoving party to present specific facts indicating a genuine issue of a disputed material fact essential to the

---

[3] Drop testing is a testing method Hicks uses when certifying firearms, which consists of a "pneumatic clamp-grip system set up where the firearm is inserted . . . and once it's ready, [he] activate[s] the switch to drop the weapon into a . . . 6-by-6 piece of concrete that is at least three inches or three and a half inches thick."  (Hicks Dep. 58:19-23, DN 70-8).

case, beyond "some metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The nonmoving party must present facts demonstrating a material factual dispute that must be presented to "a jury or judge to resolve the parties' differing versions of the truth at trial[;]" the evidence, however, is "not required to be resolved conclusively in favor of the party asserting its existence . . . ." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).  When considering the evidence, the Court must view it in the light most favorable to the nonmoving party.  *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).  If the record, taken as a whole, could not lead the trier of fact to find for the nonmoving party, the motion should be granted.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

"The [Kentucky Product Liability Act] applies to all damage claims arising from the use of products, regardless of the legal theory advanced." *Monsanto Co. v. Reed*, 950 S.W.2d 811, 814 (Ky. 1997); *see* KRS 411.300(1); *see also Thacker v. Ethicon, Inc.*, 47 F.4th 451, 459 (6th Cir. 2022).  A plaintiff may advance a product liability action under theories of strict liability, negligence, and breach of warranty.  *Prather v. Abbott Lab'ys*, 960 F. Supp. 2d 700, 705 (W.D. Ky. 2013) (citing *Williams v. Fulmer*, 695 S.W.2d 411, 413 (Ky. 1985)).  The Kentucky Product Liability Act recognizes claims based on defective design and manufacture and failure to warn. *Id.* (citing *Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 251 (Ky. 1995)); *cf. Red Hed Oil, Inc. v. H.T. Hackney Co.*, 292 F. Supp. 3d 764, 772 (E.D. Ky. 2017) (noting that each theory constitutes separate and distinct claims (citing *CertainTeed Corp. v. Dexter*, 330 S.W.3d 64, 79 (Ky. 2010))). In such actions, the plaintiff must show that the product had a defect and that the defect caused the alleged damages.  *Prather*, 960 F. Supp. 2d at 706 (citing *McCoy v. Gen. Motors Corp.*, 47 F. Supp. 2d 838, 839 (E.D. Ky. 1998); *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1995)).

1.    *Existence of Defects*

Sig Sauer's motion for summary judgment must be granted because there is no genuine

issue of material fact regarding the existence of a design or manufacturing defect in the P320.

Under Kentucky law, expert witnesses are "generally necessary" to prove the presence of a defect

in a products liability action.  *Honaker v. Innova, Inc.*, No. 1:04-CV-132(M), 2007 U.S. Dist.

LEXIS 30225, at *4 (W.D. Ky. Apr. 23, 2007) (quoting William S. Haynes, *Kentucky*

*Jurisprudence: Torts* §§ 21-28 (1987)).  As the Sixth Circuit has explained,

> Expert testimony may be required in cases in which the question is of a complex
> and technical nature such that a lay juror could not, without the aid of the expert,
> infer that a defective condition of the product caused the product's failure and
> caused the injury to the plaintiff.

*Stevens v. Keller Ladders*, 1 F. App'x 452, 458 (6th Cir. 2001) (citation omitted).  By contrast,

"matters of general knowledge" do not require expert testimony.  *Honaker*, 2007 U.S. Dist. LEXIS

30225, at *5; *accord Commonwealth, Dep't of Highways v. Robbins*, 421 S.W.2d 820, 824 (Ky.

1967) ("[A] proper understanding of that which requires scientific or specialized knowledge and

which cannot be determined intelligently from testimony on the basis of ordinary knowledge

gained in the ordinary affairs of life, expert testimony is needed." (citation omitted)).  Accordingly,

expert testimony is necessary unless a defect is of the type that the jury can comprehend "as well

as a specially trained expert could . . . ."  *Burgett v. Troy-Bilt LLC*, 970 F. Supp. 2d 676, 681 (E.D.

Ky. 2013) (citation omitted), *aff'd*, 579 F. App'x 372 (6th Cir. 2014).  "[C]ourts permit[] inferences

of defects premised on . . . circumstantial evidence *only* when the plaintiffs [are] able to eliminate

all other reasonable explanations for the accident, thereby leaving manufacturing defect as the only

reasonabl[e] possibil[ity] . . . ."  *Siegel v. Ky. Farm Bureau Mut. Ins. Co.*, No. 3:08CV-00429-S,

2010 U.S. Dist. LEXIS 74876, at *11-12 (W.D. Ky. July 26, 2010) (citations omitted), *aff'd sub nom. Siegel v. Dynamic Cooking Sys., Inc.*, 501 F. App'x 397 (6th Cir. 2012) (emphasis added).

The inner workings and mechanics of the P320 are not "matters of general knowledge," but instead involve a complex and technical understanding of firearms, engineering, and physics to fully determine whether a defect exists. *See Honaker*, 2007 U.S. Dist. LEXIS 30225, at *5; *Stevens*, 1 F. App'x at 458. Furthermore, any circumstantial evidence offered by Mayes cannot eliminate all other reasonable explanations for the accident because there remains a dispute as to whether Mayes pulled the trigger, given there were no witnesses to the accident. (Mayes Dep. 92:2-5. *Compare* Mayes Dep. 100:21-101:4 (stating that Mayes did not pull the trigger), *with* Watkins Report 3 (asserting that "[n]o physical or empirical evidence . . . suggests the subject pistol was capable of discharging absent a trigger pull in a manner consistent with Mr. Mayes' testimony.")).

Fed. R. Civ. P. 56 requires entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element for which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322. Given that Hicks and Villani are Mayes' only witnesses to testify about the P320's alleged defects and they have been excluded as experts, Mayes is left with no expert witnesses to testify regarding the alleged defect with Mayes' P320. Sig Sauer correctly asserts that Mayes did not meet his burden of demonstrating causation between the alleged defect and Mayes' injury. (Def.'s Mot. Summ. J. 6-8). As "expert witnesses are generally necessary, indeed essential, in products liability cases . . . to prove such matters as a product defect *and* proximate causation[.]" *Fimbres v. Garlock Equip. Co.*, No. 3:11-CV-226-

CRS-JDM, 2014 U.S. Dist. LEXIS 79384, at *10-11 (W.D. Ky. June 11, 2014) (alteration in original) (emphasis added) (citation omitted).

Thus, with no evidence to establish a defect or causation with respect to the P320, Mayes cannot establish an essential element of his product liability claims for negligence or defective design and manufacture.  Accordingly, Sig Sauer's motion must be granted.

### 2.      *Breach of Express and Implied Warranties*

Sig Sauer also moves for summary judgment on Mayes' product liability claims based on breach of express and implied warranties.  (Def.'s Mot. Summ. J. 9-10).  Mayes has not attempted to argue a breach of express or implied warranty in his response to Sig Sauer's motion for summary judgment, nor has Mayes otherwise furthered these claims, which are therefore dismissed. *Alexander v. Carter*, 733 F. App'x 256, 261 (6th Cir. 2018) ("When a plaintiff 'fails to address [a claim] in response to a motion for summary judgment,' the claim is deemed waived.  Where claims are so waived, district courts in this Circuit grant summary judgment as a matter of course." (alteration in original) (internal citation omitted)).[4]

### IV.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows: Defendant's Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Timothy M. Hicks (DN 70) is **GRANTED**; Defendant's Motion to Exclude Evidence and Opinions of Plaintiff's Expert, Peter Villani (DN 71) is **GRANTED**; and Defendant's Motion for Summary Judgment (DN 72) is

---

[4] In addition to the claims addressed, two causes of action asserted in the Complaint were not argued in Sig Sauer's motion for summary judgment.  Mayes has also asserted claims based on a failure to warn as well as violation of the Kentucky Consumer Protection Act.  (Compl. ¶¶ 47-48). As neither of these causes of actions were substantively addressed in the motions considered here, those claims remain.

**GRANTED**.  Plaintiff's failure to warn and Kentucky Consumer Protection Act claims are still

pending.

Greg N. Stivers, Chief Judge

United States District Court

March 29, 2023

cc:     counsel of record