# EXHIBIT 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JIMMY S.C. JINN,

              Plaintiff,

        - against -

SIG SAUER. INC.,

            Defendant.

**MEMORANDUM**
**OPINION & ORDER**

20 Civ. 1122 (PGG) (RWL)

PAUL G. GARDEPHE, U.S.D.J.:

        In this action, Plaintiff Jimmy S.C. Jinn alleges that Defendant Sig Sauer, Inc.
designed and manufactured a firearm that unexpectedly discharged a round into Jinn's leg.  The
Complaint asserts claims for strict liability, negligence, and breach of the implied warranty of
merchantability, as well as intentional and negligent infliction of emotional distress.  (Cmplt.
(Dkt. No. 1) ¶¶ 6-8, 91-128)

        Sig Sauer has moved for summary judgment and to preclude Plaintiff's two expert
witnesses.  (Dkt. Nos. 56, 58, 60)  Jinn has moved for leave to file a video exhibit in further
opposition to Sig Sauer's motions.  (Dkt. No. 70)  On April 12, 2023, Judge Lehrburger issued a
Report & Recommendation ("R&R") recommending that Sig Sauer's motions to exclude
Plaintiff's experts and for summary judgment be granted, and that Jinn's motion to introduce the
video exhibit be denied.  (See R&R (Dkt. No. 75))  On April 26, 2023, Jinn filed objections to
Judge Lehrburger's R&R, and on May 10, 2023, Sig Sauer filed a response to Jinn's objections.
(See Pltf. Obj. (Dkt. No. 76); Def. Resp. (Dkt. No. 77))

        For the reasons stated below, Jinn's objections will be overruled, and Judge
Lehrburger's R&R will be adopted in its entirety.

# BACKGROUND[1]

## I.   FACTS[2]

At the time that Jinn was injured, he was employed by the United States

Department of Homeland Security ("DHS") as a special agent.  (R&R (Dkt. No. 75) at 2 (citing

Def. Sum. J. Br., Ex. 1 ("Def. R. 56.1 Stmt.") (Dkt. No. 61-1) ¶ 1); Def. Sum. J. Br., Ex. 4 (Dkt.

No. 61-4) at 4)[3]  In 2019, DHS issued a Sig Sauer model P320 pistol to Jinn.  As part of his

---

[1]  The page numbers of documents referenced in this opinion correspond to the page numbers
designated by this District's Electronic Case Files ("ECF") system.

[2]  Because the parties have not objected to Judge Lehrburger's factual statement, this Court
adopts it in full.  See Silverman v. 3D Total Solutions, Inc., No. 18 Civ. 10231 (AT), 2020 WL
1285049, at *1 n.1 (S.D.N.Y. Mar. 18, 2020) ("Because the parties have not objected to the
R&R's characterization of the background facts . . . , the Court adopts the R&R's 'Background'
section and takes the facts characterized therein as true."); Hafford v. Aetna Life Ins. Co., No. 16
Civ. 4425 (VEC) (SN), 2017 WL 4083580, at *1 (S.D.N.Y. Sept. 13, 2017) ("The parties do not
object to the Magistrate Judge's . . . recitation of the facts of this case, and the Court adopts them
in full.").

[3]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it
has done so because the opposing party has either not disputed those facts or has not done so
with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140
(2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving
party's Rule 56.1 statement, that fact will be deemed admitted."); Local Civ. R. 56.1(d) ("Each
statement by the movant or opponent . . . , including each statement controverting any statement
of material fact, must be followed by citation to evidence which would be admissible.").  Where
the non-moving party disputes the moving party's characterization of cited evidence, and has
presented an evidentiary basis for doing so, the Court relies on the non-moving party's
characterization of the evidence.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)
("In ruling on a motion for summary judgment, the district court must resolve all ambiguities,
and credit all factual inferences that could rationally be drawn, in favor of the party opposing
summary judgment.").

Because "a Rule 56.1 statement 'is not itself a vehicle for making factual assertions that are
otherwise unsupported in the record', . . . 'where the record does not support the assertions in a
Local 56.1 statement, those assertions [have been] disregarded and the record reviewed
independently.'"  Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, 138 F.
Supp. 3d 352, 394 (S.D.N.Y. 2015), aff'd sub nom. Congregation Rabbinical Coll. of Tartikov,
Inc. v. Vill. of Pomona, NY, 945 F.3d 83 (2d Cir. 2019) (quoting Holtz v. Rockefeller & Co.,
Inc., 258 F.3d 62, 74 (2d Cir. 2001)).

employment, Jinn "was required to qualify [to use this firearm] on a quarterly basis." (R&R
(Dkt. No. 75) at 2 (citing Def. R. 56.1 Stmt. (Dkt. No. 61-1) ¶¶ 2-3))

On July 24, 2019, Jinn participated in a "speed drill exercise" with his co-workers
at the Rodman's Neck Range in the Bronx. (Id. (citing Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68)
¶ 5; Pltf. Resp. R. 56.1 Stmt., Ex. 1 ("Jinn Dep.") (Dkt. No. 68-1) at 1)) Sig Sauer "describes the
speed drill exercise as a 'quick-draw speed shooting competition,' a characterization that Jinn
opposes to the extent it 'implies that the plaintiff . . . was handling [his] weapon in an
irresponsible fashion.'" (Id. at 2 n.2 (omission and alteration in original) (quoting Def. R. 56.1
Stmt. (Dkt. No. 61-1) ¶ 5; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶ 5)) "In the speed drill, two
participants stood on the firing line and, upon the instructor blowing a whistle, attempted to be
the first to draw their pistol, fire, and hit a target." (Id. at 2 (citing Jinn Dep. (Dkt. No. 68-1) at
1)) "The first participant to hit the target remained on the firing line" to compete against the next
participant. (Id. (citing Jinn Dep. (Dkt. No. 68-1) at 1)) Jinn won the first two rounds of the
speed drill, but on his third round, "when pushing down on his pistol to remove it from a tight,
new holster, the pistol fired one round into his leg." (Id. (citing Jinn Dep. (Dkt. No. 68-1) at 3;
Def. R. 56.1 Stmt. (Dkt. No. 61-1) ¶ 9))

"The parties dispute how far out of the holster the gun was when it fired, as well
as whether Jinn, or a foreign object inside the holster, actually pulled the trigger." (Id. at 3
(citing Def. R. 56.1 Stmt. (Dkt. No. 61-1) ¶¶ 13, 21, 28; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68)
¶¶ 13, 21, 28, at 5)) "Jinn alleges that his P320, and others like it, are designed and
manufactured with defects, including a faulty striker-sear connection, that allow the gun to fire
un-commanded and, in fact, caused the un-commanded discharge of his pistol." (Id. (citing Pltf.
Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶¶ 13, 17)) Jinn further alleges that "over 80 similar incidents

3

of P320 pistols firing without a trigger pull have occurred." (Id. (citing Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶ 17, at 5-7))  In opposing Defendant's summary judgment motion, Jinn submitted reports and deposition testimony from alleged experts Peter Villani and Timothy Hicks, both of whom "identify purported defects [in the P320 pistol] and conclude that defects in the design and/or manufacture of the P320 caused Jinn's pistol to fire without him pulling the trigger." (Id.)

## II.    PROCEDURAL HISTORY

The Complaint was filed on February 10, 2020. (Cmplt. (Dkt. No. 1))  On February 13, 2020, this Court referred this case to Magistrate Judge Lehrburger for general pretrial supervision. (Dkt. No. 5)  Discovery closed on March 1, 2022. (See (Dkt. No. 33))

On August 22, 2022, Sig Sauer moved to preclude Plaintiff's two expert witnesses and for summary judgment. (Def. Mots. (Dkt. Nos. 56, 58, 60))  On September 30, 2022, Jinn moved for leave to file a video exhibit in further opposition to Sig Sauer's motions. (Sept. 30, 2022 Pltf. Ltr. (Dkt. No. 70))  On January 25, 2023, this Court referred Sig Sauer's motions to Judge Lehrburger for an R&R. (Dkt. No. 72)

On April 12, 2023, Judge Lehrburger issued a forty-nine-page R&R recommending that Sig Sauer's motions to exclude and motion for summary judgment be granted, and that Jinn's motion to introduce the video exhibit be denied. (See R&R (Dkt. No. 75))

In recommending that Sig Sauer's motions to exclude Plaintiff's two experts be granted, Judge Lehrburger concludes that (1) "Villani is not qualified and that, regardless, his opinions are unreliable"; and (2) "regardless of whether Hicks is qualified, his opinions are . . . unreliable and should be excluded." (R&R (Dkt. No. 75) at 8, 27)

4

In recommending that Sig Sauer's motion for summary judgment be granted, Judge Lehrburger finds that, "[w]ithout expert testimony, Jinn lacks evidence establishing that the P320 is not reasonably safe, that an alleged defect caused his accident, and that an alternative safer design was feasible. As a result, Jinn cannot establish any of his alleged causes of action." Judge Lehrburger further finds that, "even if the opinions of Jinn's experts were admissible, Sig [Sauer] would still be entitled to summary judgment because there is insufficient evidence to support critical elements of Jinn's claims." (Id. at 35)

Finally, Judge Lehrburger recommends that Plaintiff's motion for leave to submit a video exhibit be denied. (Id. at 46-48)

## III.   JINN'S OBJECTIONS

On April 26, 2023, Jinn filed objections to Judge Lehrburger's R&R, and on May 10, 2023, Sig Sauer filed a response to Jinn's objections. (See Pltf. Obj. (Dkt. No. 76); Def. Resp. (Dkt. No. 77))

In his objections, Jinn complains that Judge Lehrburger (1) "omits any consideration of Sig [Sauer]'s August 4, 2017 press release stating that vibration, among other inertial forces, can make the P320's internal safety system fail resulting in a discharge without a trigger pull"; (2) "erroneously imposes a[n] 'identity' standard" in "discounting numerous videos and eyewitness statements of defective discharges involving the exact same gun . . . because they did not occur under the exact same circumstances"; (3) "faults Villani for not examining the Jinn holster," despite the fact that, according to Jinn, "there was no holster to inspect" because "DHS destroyed it shortly before the lawsuit"; and (4) notes that Plaintiff's experts have performed no laboratory testing of the P320, because "[l]aboratory testing of the P320 under realistic carrying conditions, with an adequate sample of P320s, is cost prohibitive and impractical under Daubert

[v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)),] in the face of real-life replication all over the country." (Pltf. Obj. (Dkt. No. 76) at 3, 6, 12 (emphasis omitted))

## DISCUSSION

### I.  LEGAL STANDARDS

#### A.  Review of a Magistrate Judge's Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). "'The district judge evaluating a magistrate judge's recommendation may adopt those portions of the recommendation, without further review, where no specific objection is made, as long as they are not clearly erroneous.'" Gilmore v. Comm'r of Soc. Sec., No. 09 Civ. 6241 (RMB) (FM), 2011 WL 611826, at *1 (S.D.N.Y. Feb. 18, 2011) (quoting Chimarev v. TD Waterhouse Inv. Servs., Inc., 280 F. Supp. 2d 208, 212 (S.D.N.Y. 2003)). A decision is "clearly erroneous" when, "upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been committed." United States v. Snow, 462 F.3d 55, 72 (2d Cir. 2006) (quotation marks and citation omitted).

Where a timely objection has been made to a magistrate judge's recommendation, the district judge "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, "[o]bjections that are 'merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review.'" Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) (second alteration in original) (quoting Vega v. Artuz, 97 Civ. 3775 (LTS)

6

(JCF), 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)). "To the extent . . . that the party . .

. simply reiterates the original arguments, [courts] will review the Report strictly for clear error."

IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., 07 Civ. 6865 (LTS) (GWG), 2008 WL

4810043, at *1 (S.D.N.Y. Nov. 3, 2008) (citing Pearson-Fraser v. Bell Atl., No. 01 Civ. 2343

(WK), 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003); Camardo v. Gen. Motors Hourly-Rate

Emps. Pension Plan, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)); see also Ortiz v. Barkley, 558 F.

Supp. 2d 444, 451 (S.D.N.Y. 2008) ("Reviewing courts should review a report and

recommendation for clear error where objections are merely perfunctory responses, . . .

rehashing . . . the same arguments set forth in the original petition." (quotation marks and

citations omitted)).

**B.    Admissibility of Expert Testimony**

Pursuant to Federal Rule of Evidence 702, opinion testimony from an expert

witness who is qualified "by knowledge, skill, experience, training, or education" may be

admitted where

> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue; (b) the
> testimony is based on sufficient facts or data; (c) the testimony is the product of
> reliable principles and methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under Rule 702, a trial court must "'ensur[e] that an expert's testimony . . . rests

on a reliable foundation and is relevant to the task at hand.'" United States v. Williams, 506 F.3d

151, 160 (2d Cir. 2007) (quoting Daubert, 509 U.S. at 597).

> Daubert enumerated a list of factors that, while not constituting a "definitive
> checklist or test," a district court might consider in evaluating whether a proffered
> expert opinion has the required indicia of scientific reliability:  whether a theory
> or technique had been and could be tested, whether it had been subjected to peer

7

review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation.

Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005) (quoting Daubert, 509 U.S. at 593-94).

The Supreme Court has stated that

reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."

Id. (alteration in original) (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)). "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002).

In considering the reliability of proffered expert testimony, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Id. at 267. "[I]n accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing Amorgianos, 303 F.3d at 267). Absent such flaws, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

C.   **Summary Judgment Standard**

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).  "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, L.L.C., No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, a court must "'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, "'[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex,

9

Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). "'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" Eviner v. Eng, No. 13 Civ. 6940 (ERK), 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)). A moving party can demonstrate the absence of a genuine issue of material fact "'in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quoting Farid v. Smith, 850 F.2d 917, 924 (2d Cir. 1988)).

"'The principles governing admissibility of evidence do not change on a motion for summary judgment' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

## II.    ANALYSIS

### A.    Sig Sauer's Motion to Exclude Plaintiff's Experts

#### 1.    The R&R's Recommendation

##### a.    Peter Villani

Since 2001, "Villani has worked as an Operations Officer, Senior Firearms Instructor/Armorer, and Primary Evidence Custodian for the United States Department of Veterans Affairs Police"; "has participated in a number of firearms training courses and has worked as a Range Manager and salesman for a gun range in the past"; and "is a certified armorer for several guns, including the Sig Sauer P320." (R&R (Dkt. No. 75) at 8-9 (citing Def. Br., Ex. 7 (Dkt. No. 57-7)))

10

In his report, "Villani analyzed five P320 pistols, not including the pistol that shot Jinn." His "examination of the fifth pistol was limited to viewing photographs, as it was in evidence in another case," and his "examination of the fourth pistol was also circumscribed because it was entered into evidence in a different case." (Id. at 9 & n.6 (citing Def. Br., Ex. 5 ("Villani Report") (Dkt. No. 57-5) at 2, 10)) He first visually examined the four pistols he was able to physically access and "assigned a percentage condition based on external signs of wear," and then "'field stripped' each [firearm], made measurements of the dimensions of several components, and observed a variety of purported manufacturing and design defects."[4] He then "fired 100 rounds through the first and second pistols, disassembled them again, and observed deposits of gunpowder." (Id. at 9 (footnote omitted) (citing Villani Report (Dkt. No. 57-5) at 2, 6, 9, 10, 12)) Villani opines that "there were inconsistencies in the height of slide caps" and that "there generally 'seemed to be no consistency of dimension between the same parts between all four [P320s],' which he termed a manufacturing defect and speculated could be caused by subcontractors using different formulas in their mold injected metal ('MIM') processes." (Id. (alteration in original) (quoting Villani Report (Dkt. No. 57-5) at 13))

In the four P320 pistols that Villani physically examined, he observed that the "the MIM components were not 'finished to a tighter tolerance' and exhibited rounded areas of excess material, termed 'rollover' by Villani, which 'prevented full intended contact of the sear and striker overlaps.'" (Id. at 9-10 (quoting Villani Report (Dkt. No. 57-5) at 13)) Villani opines that "the reduced contact between components, 'with the addition of minimal movement

---

[4] Judge Lehrburger notes that "[t]o 'field strip' a weapon is to 'dismantle or disassemble (a firearm or other piece of equipment), esp[ecially] as one would in the field rather than in a workshop.'" (R&R (Dkt. No. 75) at 9 n.7 (second alteration in original) (quoting Field-strip, OED Online, Oxford University Press, https://www.oed.com/view/Entry/287186? Redirected From=%22field+strip%22& (accessed September 12, 2023)))

of the trigger/safety level/safety lock which would cause the safety to be disengaged, could lead to an unintended discharge.'" Villani "identifie[s] as a manufacturing defect" Sig Sauer's "discontinu[ation] [of] the use of a safety lever return spring in its current P320 production." (Id. at 10 (quoting Villani Report (Dkt. No. 57-5) at 13)) He concludes that

> because of "the various sizes of internal parts and [the] . . . wide range of motion between these parts, . . . [the P320's] 'exposure to acute conditions (e.g.[,] shock, vibration,[ ]heavy or repeated drops) may have a negative effect on [its] safety mechanisms and cause them to not work as designed.'"

(Id. (fourth alteration in original) (quoting Villani Report (Dkt. No. 57-5) at 15))

After Jinn's pistol was recovered from DHS, Villani and Defendant's expert Derek Watkins examined Jinn's pistol on October 28, 2021. Villani was present for Watkins's examination and Watkins was present for Villani's examination. Villani then prepared a supplemental report.[5] (Id.; see also Villani Supp. Report (Dkt. No. 57-6) at 2-4) During Watkins's examination of Jinn's pistol – which Villani observed – Villani noted that Jinn's pistol "did not have a safety lever return spring, instead relying on gravity to return the safety lever to the 'lowered' position after the pistol is fired." He opines that Sig Sauer's "flaw in intentionally omitting this component . . . is that when a pistol is held in a vertical position, the safety lever can move outwards, make contact with the safety lock, and push the safety lock upwards, rend[er]ing it unable to stop the striker from traveling forward." (Id. at 11-12 (citing Villani Supp. Report (Dkt. No. 57-6) at 3-4)) "Villani did not perform any tests or calculations to determine whether and how his theory of safety lever and lock movement would actually occur[, however]." (Id. at 12 (citing Def. Br., Ex. 9 ("Villani Dep.") (Dkt. No. 57-9) at 9-10))

---

[5] The parties have not introduced any report prepared by Watkins after he and Villani examined Jinn's P320 pistol on October 28, 2021. The only report from Watkins that is in the record is dated August 2, 2021, and was prepared without Watkins having had the opportunity to physically examine Jinn's firearm. (See Def. Br., Ex. 9 (Dkt. No. 59-9) at 2-3)

With respect to Jinn's P320 pistol, Villani notes,

> as he had with the four other P320 pistols he examined, "rollover" (excess material) on the striker foot and a rounded edge on [the] striker stop wall, which he again opines can cause reduced contact between the contact surfaces of the striker foot and sear, allowing the striker to "walk off" the sear, and also allow the safety lock tab to "jump[] over" the striker stop wall.

(Id. (second alteration in original) (quoting Villani Supp. Report (Dkt. No. 57-6) at 5-6))  Villani opines that "these two failures 'can . . . contribute' to an un-commanded discharge."  (Id. (omission in original) (quoting Villani Supp. Report (Dkt. No. 57-6) at 5-6))  Villani also "observed an off-center 'drag mark' on the sear, indicating that the striker is not centered on the sear, which can further reduce the contact and cause misalignment between the striker foot and sear."  The failure of the striker to center on the sear "could also lead the safety lock tab to fail, in combination with the contact surface issues."  (Id. (citing Villani Supp. Report (Dkt. No. 57-6) at 7-9))

Villani concludes – "'to a reasonable degree of certainty [–] that a combination of the [discussed] defects did create a "perfect storm" scenario which led to a triggerless discharge upon inertial force and vibration on the subject gun as in many other cases involving the [P320].'"  (Id. (second and third alterations in original) (quoting Villani Supp. Report (Dkt. No. 57-6) at 14))  "'[D]epending upon the condition of the individual [P320] components' status, (sear/striker engagement, excess molding material, misalignment of safety lock tab, wear, etc.), any combination of these reported designs or manufacturing defects could lead to an uncommanded discharge.'"  (Id. at 12-13 (second alteration in original) (quoting Villani Supp. Report (Dkt. No. 57-6) at 15))

With respect to Villani's qualifications, Judge Lehrburger notes that Villani's "opinions in this case go much further than 'discuss[ing] the pistols that he disassembled and

13

how he found what he perceived to be worn or damaged parts.'" (Id. at 15 (alteration in original)

(quoting Guay v. Sig Sauer, Inc., 610 F. Supp. 3d 423, 430 (D.N.H. 2022)))

> Nothing in Villani's qualifications or the content of his report[, however,]
> suggests [that] he has any expertise "that enables him to identify whether the
> cause of a problem is in fact a design or manufacturing defect versus damage
> from ordinary use or misuse by the owner of the gun," or to determine what effect
> any observed defects would have on the function of the gun.

(Id. (citation omitted) (quoting Mayes v. Sig Sauer, Inc., No. 19 Civ. 00146 (GNS) (HBB), 2023

WL 2730264, at *4 (W.D. Ky. Mar. 30, 2023), amended, 2023 WL 3854266 (W.D. Ky. June 6,

2023))) Judge Lehrburger therefore concludes that "Villani's qualifications are insufficient to

sustain his offering opinions both on whether the P320 is defectively designed or manufactured

and on whether any purported defect or combination of defects caused Jinn's accident." (Id. at

17)

Judge Lehrburger further concludes that "[e]ven if Villani were qualified to opine

on firearm design and manufacture, his opinions would still need to be sufficiently reliable in

order to be admissible," and Judge Lehrburger goes on to find that Villani's opinions are not

reliable. (Id. at 17-27)

Noting that "Jinn seeks to have Villani qualified based on his experience, rather

than based on any scientific testing," Judge Lehrburger points out that

> even where an expert is qualified based on specialized experience, the expert must
> still "have based that opinion on sufficient facts or data, and must explain how
> that experience leads to the conclusion reached, why that experience is a
> sufficient basis for the opinion, and how that experience is reliably applied to the
> facts, because the trial court's gatekeeping function requires more than simply
> taking the expert's word for it."

(Id. at 18 (quoting Emig v. Electrolux Home Prods. Inc., No. 06 Civ. 4791 (KMK), 2008 WL

4200988, at *8 (S.D.N.Y. Sept. 11, 2008))) And Judge Lehrburger goes on to find that "Villani

has not explained how his experience with firearms qualifies him to opine on design,

manufacture, and causation.  Nor has he based his opinions on sufficient facts or data, or reliably applied any experience to the facts."  (Id.)

Judge Lehrburger explains that "Villani examined [Jinn's] pistol, found rollover, and concluded that it was a defect that caused Jinn's injury without any data to support the conclusion."  Villani's opinion is thus "based on his ipse dixit alone and should be excluded." (Id. at 19)

In so concluding, Judge Lehrburger notes that Villani's lack of experience and knowledge "could have perhaps been cured by testing of his theories, but Villani conducted no such testing."  (Id. at 20)  In rejecting Jinn's argument that "any testing would have put his experts' lives at risk" (id. at 21 (citing Pltf. Opp. (Dkt. No. 67) at 19)), Judge Lehrburger notes that

> [t]hat proposition is somewhat belied by the testing performed by Sig [Sauer]'s expert, who used a cartridge loaded with putty to test whether the lateral movement of the slide assembly identified by Villani could cause the gun's internal safety mechanisms to fail, as well as vibration testing performed by Sig Sauer purporting to demonstrate that the P320 is incapable of firing without a trigger pull.

(Id. (citation omitted) (citing Villani Supp. Report (Dkt. No. 57-6) at 2-3; Def. Reply (Dkt. No. 62) at 6; id., Ex. 13 (Dkt. No. 62-13)))

Judge Lehrburger also rejects Jinn's argument that "testing is not necessary because videos of other allegedly similar incidents of triggerless discharges of P320s corroborate [Jinn's] theories."  (Id. at 22 (citing Pltf. Opp. (Dkt. No. 67) at 27-28))  Judge Lehrburger explains that "[t]he leap from the unauthenticated videos, allegedly depicting triggerless discharges of other P320s in different situations, to Villani's conclusions that Jinn's P320 was defective and that those defects caused his accident in particular, is too far for [Judge Lehrburger] to find Villani's opinions reliable."  (Id. at 23)

Judge Lehrburger also rejects Villani's argument that "testing his hypothesis would be virtually impossible" (id. (citing Villani Supp. Report (Dkt. No. 57-6) at 2)), because that argument "only demonstrates that his opinions have no reliable foundation." (Id. at 23-24) Although "testing is not an absolute [requirement for admissibility]," Judge Lehrburger notes that "[w]ithout any testing, and without any other data or analysis to support his theories that the conditions observed rendered Jinn's pistol defective and caused his accident, Villani's opinion does not pass the threshold for admissibility." (Id. at 24)

In finding Villani's opinions unreliable, Judge Lehrburger notes that, "[i]n addition to the lack of analysis supporting his rollover theory, Villani also does not tie his causation opinions sufficiently to the facts of this case." (Id. at 25) While "Villani's opinions are based on his observation of Jinn's pistol and counsel's explanation of how the accident occurred, he did not speak to Jinn or anyone else who witnessed the accident, nor did he review any materials related to the incident, [such as] DHS's report following the accident." (Id. (citing Villani Dep. (Dkt. No. 57-9) at 5-7)) "Villani also did not examine Jinn's holster, beyond viewing two largely illegible photographs." (Id. (citing Villani Dep. (Dkt. No. 57-9) at 10)) According to Judge Lehrburger, "Villani's failure to engage with and consider the circumstances of Jinn's accident further renders his opinions unreliable." (Id.)

"Also problematic is Villani's failure to identify and analyze a feasible alternative design." (Id.) Judge Lehrburger notes that – although "the Court might infer that an alternative design would be one that omits all identified defects" – "Villani performed no testing or calculations and offers no more than his own assurances to support the implication that remedying the identified defects . . . would actually reduce the likelihood of a triggerless discharge." (Id. at 25-26) Although "Jinn offers an alternative design in his briefing – the

16

addition of an external safety[ – ] . . . neither of Jinn's experts . . . analyze either the feasibility or efficacy of this purported alternative." (Id. at 26 (citing Pltf. Sum. J. Opp. (Dkt. No. 69) at 9-10; Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶ 16))

In sum, Judge Lehrburger finds that "Villani fails to 'bridge the logical gap between [the] facts' of his observations and 'his conclusion' that the observed conditions of Jinn's P320 constitute product defects which caused Jinn's injury." (Id. at 27 (alteration in original) (quoting Bocoum v. Daimler Trucks N. Am. LLC, No. 17 Civ. 7636 (JPC) (BCM), 2022 WL 902465, at *12 (S.D.N.Y. Mar. 28, 2022))) "'This is precisely the type of opinion evidence that is connected to existing data only by the ipse dixit of the expert, which courts have held inadmissible under Rule 702 and Daubert.'" (Id. (quoting Bocoum, 2022 WL 902465, at *12))

**b.    Timothy Hicks**

Hicks "is a Professional Engineer licensed in five states and is a member of several professional associations"; "has a background in mechanical design and system evaluations, including accident reconstruction, and has 'spent close to 20 years . . . in the automotive industry, responsible for the design, manufacturing, testing, and validation of vehicle systems'"; "earned a Bachelor of Science in Mechanical Engineering from Michigan Technological University and a Master of Science in Engineering Sciences from Rensselaer Polytechnic Institute." He also "holds Certificates of Eligibility from the California Department of Justice Bureau of Firearms and Massachusetts Firearms Records Bureau for performing firearm certification testing." (Id. at 28 (quoting Pltf. Resp. R. 56.1 Stmt., Ex. 2 ("Hicks Report") (Dkt. No. 68-2) at 1; citing Def. Br., Ex. 5 (Dkt. No. 59-5) at 2-3))

"In forming his opinions, Hicks relied on the testing performed by Sig [Sauer]'s

expert [Derek Watkins, when he and Villani examined Jinn's pistol on October 28, 2021],

[Watkins's August 2, 2021 report,] [computerized tomography] scans, and Villani's observations

and photographs."[6] He "did not attend or participate in the testing and examination of Jinn's

---

[6] According to Watkins's August 2, 2021 report, he is the president and chief engineer of Nth-Level LLC. (Def. Br., Ex. 9 (Dkt. No. 59-9) at 9) The record contains no other information concerning his qualifications. In his report, Watkins states that Sig Sauer examined Jinn's pistol on January 29, 2020, and that this examination was video-recorded. The opinions expressed in Watkins's report are based on his knowledge of the design of the Sig Sauer P320 pistol and his review of the video-recorded examination of Jinn's pistol. As of August 2, 2021, Watkins had not physically examined Jinn's pistol. (Id. at 3-4) According to Watkins, "[t]he pistol was a 'Post Upgrade' version and shown to be in a clean condition, with no overt damage or alterations observed. The pistol was first tested per the [following] function tests": "Magazine Catch," "Slide Catch," "Magazine Release," "Slide Release," "Trigger Function," "Disconnector Function," "Firing Pin/Striker Function," "Striker Safety Lock Function," and "Trigger Pull Actuation Force Testing." Jinn's pistol "passed all the function tests." (Id. at 2-3)

In his August 2, 2021 report, Watkins further states that

> NRA (National Rifle Association) hanging weights were employed to test the trigger actuation force of the pistol. The pistol was shown to discharge at approximately five pounds. The pistol was then field stripped, and its sub systems examined. The pistol appeared to be very clean internally, with no significant field debris observed. The trigger, trigger bar, disconnector, sear, and striker safety lever were all shown to be functioning properly. When the fire control unit was removed from the pistol and visually examined during the inspection, it was observed to be relatively clean, free of overt damage and alteration, and functioning properly. The fire control unit's components were observed to be in factory condition and the only way the pistol could be made to fire was to cock the pistol and then fully pull the trigger. No physical or empirical evidence was observed that would suggest the subject pistol was capable of discharging absent a trigger pull in a manner consistent with Mr. Jinn's complaint.

(Id. at 3)

According to Watkins, "[a]ll physical testing of the subject pistol failed to produce a discharge absent a trigger pull," and "[t]here is no physical evidence to support an allegation that the pistol fired at the time of the incident – or any other time – in any manner other than when the pistol's chamber was loaded, the striker pin was cocked, and the trigger was actuated." (Id.) Watkins concludes that "[t]he design of the S[ig] Sauer P320, combined with the video examination of the subject pistol indicates Mr. Jinn caused the trigger of the subject pistol to be pulled when he was removing the pistol from the holster." (Id. at 4)

P320[, however]; nor did he contribute to the examination or testing process." He also "did not
speak with Jinn and read only two pages of his deposition." (Id. (citing Hicks Report (Dkt. No.
68-2) at 2, 9; Def. Br., Ex. 7 (Dkt. No. 59-7) 5, 9-11); see also Pltf. Opp., Ex. 7 (Dkt. No. 67-7)
at 19)

    According to Judge Lehrburger, "Hicks identifies essentially the same defects as
Villani, without explicitly differentiating between design and manufacturing defects, and opines
that '[t]hese defects explain Special Agent Jinn's report of un-commanded (no trigger pull)
discharge of the firearm.'" (Id. at 28-29 (alteration in original) (quoting Hicks Report (Dkt. No.
68-2) at 3-7)) Hicks concludes,

> with "a reasonable degree of scientific and engineering certainty . . . based on
> engineering education, experience, and training, as well as the work conducted to
> date and the information available at this time" that "the physical evidence
> supports [Jinn's] description of the circumstances of his accident" and that
> "[n]ormal and expected movement and vibration while holstered can cause an
> accidental discharge given the defective conditions described."

(Id. at 29 (alterations and omission in original) (quoting Hicks Report (Dkt. No. 68-2) at 11))

    Judge Lehrburger was "dubious about Hicks's qualifications to opine about the
issues in this case," but finds that "[r]egardless of whether Hicks is qualified, his opinions, like
Villani's, are not sufficiently reliable to be admitted under Fed. R. Evid. 702 and Daubert." (Id.
at 32)

    As to reliability, Judge Lehrburger finds that "Hicks's methodology suffers from
. . . defects [similar to those seen in] Villani's," and "[f]or all the same reasons discussed
regarding Villani's opinions . . . , this lack of analysis, testing, calculations, or modeling renders
Hicks's testimony unreliable, regardless of his qualifications." (Id. at 33-34) Judge Lehrburger
also rejects Hicks's claim that "'his investigation methods are in accordance with the generally
accepted standards and practices of his field, including utilizing the scientific method.'" (Id. at

34 (quoting Hicks Report (Dkt. No. 68-2) at 1)) Judge Lehrburger notes that "'[t]here is no general acceptance in the engineering community for a methodology that omits testing of a hypothesis'" (id. (quoting Colon ex rel. Molina v. BIC USA, Inc., 199 F. Supp. 2d 53, 78 (S.D.N.Y. 2001))), and that "[w]hile Hicks 'insists in his report that he applied the scientific method in reaching his conclusions, it is . . . clear that this was not the case,' contrary to his engineering training." (Id. (omission in original) (quoting Zsa Zsa Jewels, Inc. v. BMW of N. Am., LLC, 419 F. Supp. 3d 490, 515 (E.D.N.Y. 2019))) Judge Lehrburger concludes that "like Villani's opinions, Hicks's opinions do not have sufficient reliability to pass through the admissibility gateway." (Id. at 35)

## 2. Jinn's Objections to the R&R

Jinn complains that Judge Lehrburger's R&R "omits any consideration of Sig [Sauer]'s August 4, 2017 press release stating that vibration, among other inertial forces, can make the P320's internal safety system fail resulting in a discharge without a trigger pull," and that this omission constitutes "plain error."[7] (Pltf. Obj. (Dkt. No. 76) at 3-4 (emphasis omitted))

---

[7] The August 4, 2017 press release, entitled "SIG SAUER[] Reaffirms safety of P320[] Pistol," reads as follows:

In response to social media rumors questioning the safety of the P320 pistol, a variant of which was selected by the U.S. government as the U.S. Army's Modular Handgun System (MHS), SIG SAUER, Inc. has full confidence in the reliability, durability and safety of its striker-fired handgun platform. There have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date.

The P320 meets and exceeds all U.S. standards for safety, including the American National Standards Institute (ANSI) and Sporting Arms and Ammunition Manufacturers' Institute, Inc. (SAANII), as well as rigorous testing protocols for global military and law enforcement agencies.

All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g.[,] shock, vibration, heavy or repeated drops) may have a

According to Jinn, Sig Sauer's press release "constitutes an admission by Sig [Sauer] on the central issue in the case, i.e., that the P320 as originally designed can fire without a trigger pull." (Id. at 4 (footnote omitted))

Jinn next complains that Judge Lehrburger "erroneously imposes a[n] 'identity' standard, . . . discounting numerous videos and eyewitness statements of defective discharges involving the exact same gun . . . because they did not occur under the exact same circumstances." (Id. at 6 (emphasis omitted))  Jinn contends that the R&R's finding that "[n]one of the incidents in the videos occur in similar situations to Jinn's accident" (R&R (Dkt. No. 75) at 22) is "inaccurate, and contrary to the governing New York case law," because "[a]ll the videos [proffered by Jinn] involve the exact same product – the P320 – and the circumstances, while never identical, are highly similar and involve the same alleged defect."  (Pltf. Obj. (Dkt. No. 76) at 6)

Jinn also complains that the R&R "faults Villani for not examining the Jinn holster" when "there was no holster to inspect," because "DHS destroyed it shortly before the lawsuit."  (Id. at 12 (emphasis omitted))

Jinn further contends that "[l]aboratory testing of the P320 under realistic carrying conditions, with an adequate sample of P320s, is cost prohibitive and impractical under Daubert

_____

negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

As a result, individual attempts to perform drop tests outside of professionally controlled environments should not be attempted.

"SIG SAUER is committed to producing only the finest products," said Ron Cohen, President and CEO of SIG SAUER.  "Safety and reliability have been and always will be paramount to the SIG SAUER brand."

(Pltf. Sum. J. Opp., Ex. 2 (Dkt. No. 69-2) at 1)

in the face of real-life replication all over the country." (Id. (emphasis omitted))  While the R&R acknowledges that "testing, i.e., replication of trigger-less discharge in a lab setting, is 'not required' under Daubert, the R[&]R essentially proceeds to require it absolutely."  According to Jinn, "it is substantially on this basis that the R[&]R excludes Villani['s] and Hicks['s]" proffered opinions.  (Id. (citation omitted) (citing R&R (Dkt. No. 75) at 24))  Jinn further argues that "Daubert and its progeny expressly recognize that testing in some cases may be impractical or impossible," and Jinn contends "that this is one of those cases[,] given the costs of realistic testing that could approach seven figures, assuming it could even be done realistically with robots."  (Id. at 14 (footnote omitted))  Jinn also argues "that laboratory replication is not necessary given the substantial evidence of real-world replication" and – referring to the press release – asserts that "Sig [Sauer] itself has acknowledged in writing that the product can fail in the fashion Jinn asserts."  (Id.)

Jinn's objections will be reviewed de novo.  See 28 U.S.C. § 636(b)(1)(C).

### 3.    Analysis

As an initial matter, Jinn errs in arguing that the R&R "omits any consideration" of Sig Sauer's August 4, 2017 press release.  (Pltf. Obj. (Dkt. No. 76) at 3 (emphasis omitted))  Indeed, Judge Lehrburger – in discussing Villani's report – quotes the Sig Sauer press release language on which Jinn relies.  (See R&R (Dkt. No. 75) at 10 (quoting Villani Report (Dkt. No. 57-5) at 15) ("[Villani] ultimately concluded that because of 'the various sizes of internal parts and having a wide range of motion between these parts, [he] concur[s] with Sig Sauer's own assessment . . . that "like any mechanical device,[ ]exposure to acute conditions (e.g.[,] shock, vibration,[ ]heavy or repeated drops) may have a negative effect on these safety mechanisms and

22

cause them to not work as designed."'" (omission and fourth and sixth alterations in original)
(emphasis added)))  In sum, Judge Lehrburger clearly considered the Sig Sauer press release.

      The press release is of little assistance to Jinn, however.  While Jinn contends that
the press release "stat[es] that vibration, among other inertial forces, can make the P320's
internal safety system fail resulting in a discharge without a trigger pull" (Pltf. Obj. (Dkt. No. 76)
at 3 (emphasis omitted)), the press release makes clear that an unintended discharge occurs only
in "acute conditions (e.g.[,] shock, vibration, heavy or repeated drops)."  After emphasizing "the
reliability, durability and safety of its striker-fired handgun platform," Sig Sauer notes that
"[t]here have been zero (0) reported drop-related P320 incidents in the U.S. commercial market,
with hundreds of thousands of guns delivered to date," and "[t]he P320 meets and exceeds all
U.S. standards for safety, . . . [and reflects] rigorous testing protocols for global military and law
enforcement agencies."  (Pltf. Sum. J. Opp., Ex. 2 (Dkt. No. 69-2) at 1)

      The press release goes on to state that

> [a]ll SIG SAUER pistols incorporate effective mechanical safeties to ensure they
> only fire when the trigger is pressed.  However, like any mechanical device,
> exposure to acute conditions (e.g.[,] shock, vibration, heavy or repeated drops)
> may have a negative effect on these safety mechanisms and cause them to not
> work as designed.  This language is common to owner's manuals of major
> handgun manufacturers.
>
> As a result, individual attempts to perform drop tests outside of professionally
> controlled environments should not be attempted.

(Id.)

      Jinn contends that his P320 unexpectedly discharged while he was removing it
from its holster.  (See Pltf. Opp. (Dkt. No. 67) at 11 ("[A] rational jury could find based on the
evidence . . . that Jinn's P320, like so many others, fired without a trigger pull when he was
pushing it down in his new holster before drawing it."); Pltf. Sum. J. Opp. (Dkt. No. 69) at 6-8)
The circumstances of the discharge did not involve the sort of "acute conditions" cited by Sig

Sauer, whether extraordinary shock, vibration, or heavy or repeated drops. In sum, while the press release – as an evidentiary matter – constitutes an admission by Sig Sauer (see Fed. R. Evid. 801(d)(2)), it does not demonstrate that Jinn's P320 pistol spontaneously discharged under the circumstances he describes, or that P320 pistols in general spontaneously discharge under such circumstances, as Jinn contends. (See Pltf. Obj. (Dkt. No. 76) at 4 (footnote omitted) ("This statement constitutes an admission by Sig [Sauer] on the central issue in the case, i.e., that the P320 as originally designed can fire without a trigger pull.")) Finally, Sig Sauer's press release does not cure the defects in Villani's and Hicks's qualifications and methodology, which is the basis for Judge Lehrburger's recommendation that their testimony be excluded and that Sig Sauer's motion for summary judgment be granted. Accordingly, this objection will be overruled.

Jinn also complains that the R&R "erroneously imposes a[n] 'identity' standard on the issue of other similar incidents, discounting numerous videos and eyewitness statements of defective discharges involving the exact same gun . . . because they did not occur under the exact same circumstances." (Pltf. Obj. (Dkt. No. 76) at 6 (emphasis omitted))

At summary judgment, Jinn proffered five videos that he contends capture "un-commanded discharges of the P320."[8] (Pltf. Opp. (Dkt. No. 67) at 20) In reality, the videos cited by Jinn are not enlightening, because in nearly all the videos offered by Jinn, the discharge of the P320 is not shown.

---

[8] In his opposition, Jinn claims that "[a]t least six" videos depict "un-commanded discharges of the P320" pistol (Pltf. Opp. (Dkt. No. 67) at 20), but Jinn provided only five videos. (See Pltf. Resp. R. 56.1 Stmt. (Dkt. No. 68) ¶ 2, at 5; id., Exhs. 5, 7-9, 11 (Dkt. Nos. 68-5, 68-7, 68-8, 68-9, 68-11)) While Jinn references a sixth video – reflecting a March 28, 2022 incident in Houston, Texas, which Jinn states depicts a "[p]olice officer's P320 discharg[ing] as he is getting into his car" (Pltf. Opp. (Dkt. No. 67) at 22) – Jinn has not provided this video.

For example, Jinn offers February 4, 2016 body camera footage from a Roscommon, Michigan police officer. The footage depicts the officer getting out of his vehicle, followed by the sound of a gun discharging and the officer stating that his gun "[went] off." The gun itself is not visible in the video at the time of the alleged accidental discharge, however. (See Pltf. Resp. R. 56.1 Stmt., Ex. 5 (Dkt. No. 68-5))

Similarly, an August 26, 2019 video taken at a Southeastern Pennsylvania Transportation Authority ("SEPTA") train station in Philadelphia shows what appears to be footage from a police officer's body camera. The video begins with the officer reporting "an accidental discharge" of a gun, but the video does not show the discharge itself. (See Pltf. Resp. R. 56.1 Stmt., Ex. 7 (Dkt. No. 68-7))

A January 2, 2021 video from Milwaukee is security camera footage. It includes no sound. After four individuals get out of a car, they all look in the direction of one individual, who then looks towards the side of his body and then looks around the car. No gun is clearly visible, and the circumstances of what happened are not clear from the video. (See Pltf. Resp. R. 56.1 Stmt., Ex. 8 (Dkt. No. 68-8))

A December 5, 2021 video from Rose Casino in Louisiana is security camera footage. The video shows a woman moving her handbag towards what appears to be a slot machine in a casino, followed by the sound of a gun discharging. The video does not show the gun itself. (See Pltf. Resp. R. 56.1 Stmt., Ex. 11 (Dkt. No. 68-11))

Finally, an August 3, 2021 video from Saint Clare Prison in Detroit is security camera footage that includes no sound. The video shows an officer inserting a gun into his holster, making a startled movement and looking towards his holster. The video appears to show

the gun discharging in its holster.  The circumstances of the firing are not clear.  (See Pltf. Resp.

R. 56.1 Stmt., Ex. 9 (Dkt. No. 68-9))

    In sum, the videos have little probative value, because they do not clearly depict

the circumstances of any alleged accidental discharge of a P320.

    Jinn contends, however, that Judge Lehrburger erred in finding that "'[n]one of

the incidents in the videos occur in similar situations to Jinn's accident.'"  (Id. at 6 (alteration in

original) (quoting R&R (Dkt. No. 75) at 22))  But it is important to acknowledge that Judge

Lehrburger makes this finding in the context of discussing the reliability of Villani's opinions,

and in evaluating Jinn's argument that these videos render any testing unnecessary.  (See R&R

(Dkt. No. 75) at 22; Pltf. Opp. (Dkt. No. 67) at 27-28)  Like Judge Lehrburger, this Court

considers whether Jinn's videos depict events sufficiently similar to the alleged facts here such

that they render testing of Villani's conclusions unnecessary in determining whether his opinions

are sufficiently reliable.

    Jinn first argues that Judge Lehrburger "invades the province of the jury by

asserting that it is 'impossible to determine whether the trigger was pulled'" in the February 4,

2016 Roscommon, Michigan video and in the August 26, 2019 SEPTA video, "because the 'gun

is not visible when it fires.'"  (Pltf. Obj. (Dkt. No. 76) at 7 (quoting R&R (Dkt. No. 75) at 22))

But a judge considering the admissibility of proposed expert testimony is required to closely

examine the materials on which an expert relies.  Indeed, the Second Circuit has instructed that

"the district court should undertake a rigorous examination of the facts on which the expert

relies, the method by which the expert draws an opinion from those facts, and how the expert

applies the facts and methods to the case at hand."  Amorgianos, 303 F.3d at 267.  Accordingly,

Judge Lehrburger did not err in noting that these videos do not show whether any trigger was pulled.

In his supplemental report, Villani "conclude[s] to a reasonable degree of certainty that a combination of . . . defects did create a 'perfect storm' scenario which led to a triggerless discharge upon inertial force and vibration on the subject gun as in many other cases involving the P[]320." (Villani Supp. Report (Dkt. No. 57-6) at 15)  And Jinn argues that – although Villani "did not conduct any experiments shaking a loaded P320" – "the [spring-charged foot and sear face connection] failure has been replicated in real life many times," as shown in the videos he has proffered.  (Pltf. Opp. (Dkt. No. 67) at 27-28)  The videos Jinn has proffered, however, do not render testing of Villani's conclusions unnecessary, because the videos do not provide a factual basis for Villani's proffered opinions.  The videos do not show how the gun in each incident came to have discharged.  Indeed, as discussed above, most of the videos proffered by Jinn do not even show the discharge of a firearm.  In sum, Jinn's videos do not depict circumstances similar to those here.

In his objections, Jinn complains, in particular, about Judge Lehrburger's findings concerning the February 4, 2016 Roscommon, Michigan video, and the August 26, 2019 SEPTA video.  But as is explained above, in the Roscommon, Michigan video, the pistol that discharges is not visible (see Pltf. Resp. R. 56.1 Stmt., Ex. 5 (Dkt. No. 68-5)), and in the SEPTA video, the footage begins after the gun discharged.  (See Pltf. Resp. R. 56.1 Stmt., Ex. 7 (Dkt. No. 68-7))  These videos are "simply inadequate to support the conclusions reached" by Villani, see Amorgianos, 303 F.3d at 266, which are (1) that a P320 discharged defectively, albeit under entirely different circumstances than those alleged here; and (2) the same defects caused each alleged defective discharge.  (See Villani Supp. Report (Dkt. No. 57-6) at 15)  But Jinn's videos

do not clearly show defective discharges, and he offers nothing to suggest that the same defects caused the discharges in each video and the discharge in this case.[9]  In sum, Jinn's videos are not proper substitutes for testing, and without other indicia of reliability, Villani's proffered expert opinions are not admissible.

Jinn next argues that the R&R "errs in stating that [the August 3, 2021 Saint Clare Prison video] shows an officer 'standing with a hand outside of the holster.'"  Jinn contends that "[t]hat is merely one still frame of the video."  (Pltf. Obj. (Dkt. No. 76) at 9 (quoting R&R (Dkt. No. 75) at 22 n.20))  According to Jinn, the Saint Clare video shows an officer "inserting [a gun] into his holster."  (Id. at 10)  As an initial matter, Jinn's contention that the officer in the video is shown "inserting [a gun] into his holster" is not inconsistent with the R&R's statement that, at another point in the Saint Clare video, the officer was "standing with a hand outside of the holster."  (R&R (Dkt. No. 75) at 22 n.20)  In any event, the circumstances of the alleged discharge at the Saint Clare Prison are not similar to the facts alleged here, where Jinn claims that his P320 discharged while he "was pushing [the gun] down, in the process of pulling it out" of his holster.  (See Jinn Dep. (Dkt. No. 68-1) at 2-3)  As such, the Saint Clare video is not a proper substitute for the testing necessary to verify the reliability of Villani's opinions.  In sum, most of the Jinn videos do not show a discharge, and "[n]one of the videos depict a P320 firing

---

[9]  Moreover, Jinn does not object to Judge Lehrburger's finding that the videos are entirely unauthenticated.  As Judge Lehrburger states, "Jinn has offered no testimony from anyone with personal knowledge of the videos or the incidents depicted to authenticate the videos."  (R&R (Dkt. No. 75) at 23)  And while Jinn cites to deposition testimony from an officer shown in one of the videos, and an affidavit from the officer's partner – both introduced in another case (see Pltf. Obj. (Dkt. No. 76) at 8; id., Exhs. 2, 3 (Dkt. Nos. 76-2, 76-3)) – neither the testimony nor the affidavit establish that the video at issue depicts what Jinn claims it depicts.  See Fed. R. Evid. 901(a).

while the user attempted to draw it from the holster." (R&R (Dkt. No. 75) at 22 n.20)

Accordingly, Jinn's objection will be overruled.

As for Jinn's complaint that the R&R "faults Villani for not examining the Jinn

holster," when "DHS destroyed the holster" (Pltf. Obj. (Dkt. No. 76) at 12 (emphasis omitted)),

Judge Lehrburger does not "fault" or "critici[ze]" Villani for not examining the holster, as Jinn

contends. (Id.) He merely notes this fact in discussing the basis for Villani's opinions. And it is

obviously relevant that Villani's proffered expert opinions are not informed by or premised on

any examination of Jinn's holster. In sum, Judge Lehrburger's findings that "Villani . . . does not

tie his causation opinions sufficiently to the facts of this case," and that "Villani's failure to

engage with and consider the circumstances of Jinn's accident further renders his opinions

unreliable" (see R&R (Dkt. No. 75) at 25) are well supported by the record.

In this regard, Judge Lehrburger notes that

> Villani's opinions are based on his observation of Jinn's pistol and counsel's
> explanation of how the accident occurred; he did not speak to Jinn or anyone who
> witnessed the accident, nor did he review any materials related to the incident,
> including DHS's report following the accident. . . . .Villani concludes that a
> combination of observed defects "did create a 'perfect storm' scenario which led
> to a triggerless discharge" but conceded that "[y]ou just can't tell" what
> combination of possible misalignments identified in his report were in fact present
> to cause Jinn's accident.

(Id. (alteration in original) (citations omitted) (citing Villani Dep. (Dkt. No. 57-9) at 5-7, 11;

Villani Supp. Report (Dkt. No. 57-6) at 14)) Accordingly, Jinn's objection will be overruled.

Jinn also complains that while Judge Lehrburger acknowledges that "testing, i.e.,

replication of trigger-less discharge in a lab setting, is 'not required' under Daubert, [he]

essentially proceeds to require it absolutely." According to Jinn, "it is substantially on this basis

that the R[&]R excludes Villani[']s and Hicks['s]" proffered opinions. (Pltf. Obj. (Dkt. No. 76)

at 12 (citation omitted) (citing R&R (Dkt. No. 75) at 24))

29

Testing is not an absolute prerequisite for admitting an expert opinion. <u>See</u> <u>Nimely</u>, 414 F.3d at 396 (quoting <u>Daubert</u>, 509 U.S. at 593-94) ("<u>Daubert</u> enumerated a list of factors that, while not constituting a 'definitive checklist or test,' a district court might consider in evaluating whether a proffered expert opinion has the required indicia of scientific reliability," which includes, <u>inter alia</u>, "whether a theory or technique had been and could be tested."). However, for a proffered expert opinion to be admissible, it must otherwise be reliable. And "'[n]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the <u>ipse dixit</u> of the expert.'" <u>Id.</u> (quoting <u>Joiner</u>, 522 U.S. at 146); <u>see also</u> <u>Karnauskas v. Columbia Sussex Corp.</u>, No. 09 Civ. 7104 (GBD), 2012 WL 234377, at *8 (S.D.N.Y. Jan. 24, 2012) (quoting <u>Colon ex rel. Molina</u>, 199 F. Supp. 2d at 76) ("In design defect cases, testing, although not an absolute [prerequisite] for expert testimony to be admissible, 'is usually critical to show that an expert adhere[d] to the same standards of intellectual rigor that are demanded in their professional work.'" (second alteration in original)).

Jinn argues, however, that "the costs of realistic testing [here] could approach seven figures, assuming it could even be done realistically with robots." And according to Jinn, "laboratory replication is not necessary given the substantial evidence of real-world replication." (Pltf. Obj. (Dkt. No. 76) at 14) "Although not all expert testimony is able to be scientifically verified or examined, this lack of verification, coupled with the insufficient basis and speculation on which [Jinn's proffered expert] opinion[s] [are] based, further demonstrates that [their] opinion[s] [are] unreliable." <u>See</u> <u>Ryan v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.</u>, No. 3:03-CV-0644 (CFD), 2010 WL 2232670, at *8 (D. Conn. June 2, 2010).

Other than through ipse dixit, Jinn's proffered experts do not connect the alleged "real-world replication" data to their conclusions that Jinn's P320 pistol was defective, and that this defect led to an accidental discharge of Jinn's pistol. (See Villani Supp. Report (Dkt. No. 57-6) at 15; Hicks Report (Dkt. No. 68-2) at 12) The only alleged "real-world replication" data here are the same videos discussed earlier (see Pltf. Obj. (Dkt. No. 76) at 14; Pltf. Opp. (Dkt. No. 67) at 19-23), and as explained above, the videos do not show P320 handguns accidentally discharging, much less discharging under the circumstances here, where Jinn says the incident occurred when he "was pushing [the gun] down, in the process of pulling it out" of his holster. (Jinn Dep. (Dkt. No. 68-1) at 2-3) Jinn's experts have not shown that any defect in any gun shown or referenced in the videos was also present in Jinn's pistol, or that this defect caused each discharge. Accordingly, "'there is simply too great an analytical gap between the data'" – Jinn's videos – "'and the opinion[s] proffered'" – that Jinn's pistol discharged as a result of certain alleged defects.[10] See Nimely, 414 F.3d at 396 (quoting Joiner, 522 U.S. at 146). Accordingly, Jinn's objection will be overruled.[11]

For the reasons stated above, Jinn's objections regarding Judge Lehrburger's findings concerning Jinn's expert witnesses will be overruled.

---

[10] Judge Lehrburger also finds that Villani's "qualifications . . . [are] insufficient to sustain his offering opinions both on whether the P320 is defectively designed or manufactured and on whether any purported defect or combination of defects caused Jinn's accident." Accordingly, even if Villani's proffered opinions were reliable – which they are not – his opinions would be excluded on the independent basis of insufficient qualifications. (R&R (Dkt. No. 75) at 8, 17) Indeed, the R&R finds both proffered expert opinions unreliable for reasons independent from the lack of testing (see id. at 18-20, 33-35), and Jinn has not objected to these conclusions.
[11] Jinn asks this Court to appoint an expert "to conduct laboratory testing of an adequate sample of P320s under realistic carrying conditions." (See Pltf. Obj. (Dkt. No. 76) at 15) Jinn has not cited law supporting his request, which is denied.

**B.      Sig Sauer's Motion for Summary Judgment**

        Judge Lehrburger goes on to find that Sig Sauer is entitled to summary judgment

on all of Jinn's claims:

> Without expert testimony, Jinn lacks evidence establishing that the P320 is not
> reasonably safe, that an alleged defect caused his accident, and that an alternative
> safer design was feasible.  As a result, Jinn cannot establish any of his alleged
> causes of action, and summary judgment should be entered in Sig [Sauer]'s favor
> on all claims.  But even if the opinions of Jinn's experts were admissible, Sig
> [Sauer] would still be entitled to summary judgment because there is insufficient
> evidence to support critical elements of Jinn's claims.

(R&R (Dkt. No. 75) at 35)

**1.      Products Liability and Negligence Claims**

        Judge Lehrburger concludes that "Jinn cannot prevail on a design defect theory."

(Id. at 38)  He reasons that "[n]either expert, nor Jinn's counsel, discusses or presents evidence

of the feasibility of an alternative design as required under New York law."  Rather, "Jinn merely

contends that he does not need expert testimony to establish the existence of a safer alternative

design because the existence of a safer design, namely a pistol with an external safety, is

'obvious and understandable' to a layperson."  (Id. (quoting Pltf. Sum. J. Opp. (Dkt. No. 69) at

10))  Judge Lehrburger finds this argument "unpersuasive," because "firearms are not the type of

product for which alternative designs are 'obvious and understandable.'"  (Id.)  Judge Lehrburger

further finds that "the fact that **Jinn's employer specifically requires a pistol without an**

**external safety** suggests that the alternative design championed by Jinn would not be feasible

due to lack of utility."  (Id. (emphasis in original) (citing Def. Sum. J. Reply, Ex. 2 (Dkt. 64-2) at

9))  "Even considering [Jinn's] expert reports," Judge Lehrburger finds that "Jinn has offered

nothing analyzing the utility and cost tradeoffs of his favored alternative design," and concludes that "[t]hat omission is fatal to his [products liability and negligence] claims." (Id. at 40)

Judge Lehrburger further concludes that "Jinn offers no evidence to establish a manufacturing defect claim under either" negligence or strict liability. (Id. at 41) "Even if Villani's and Hicks'[s] opinions were admissible, neither compared Jinn's P320 to any others alleged not to be defective." (Id.) "Indeed, Jinn's entire theory is one of design defect; despite using the words 'manufacturing defect,' Jinn suggests that the alleged defects in his P320 are part of a widespread problem with P320 pistols in general." (Id. at 41-42 (citing Pltf. Sum. J. Opp. (Dkt. No. 69) at 4-5; Cmplt. (Dkt. No. 1) at 2-3)) Judge Lehrburger finds that "[w]here, as here, '[a] claim [is] devoid of allegations that a particular unit differed when compared to others in the same product line[, a manufacturing defect claim] will be dismissed.'" (Id. at 42) (second and third alterations in original) (quoting Guariglia v. Procter & Gamble Co., No. 2:15-cv-04307 (ADS) (SIL), 2018 WL 1335356, at *5 (E.D.N.Y. Mar. 14, 2018))). Judge Lehrburger further finds that "[t]he exclusion of the experts' testimony identifying defects and asserting causation also supports granting summary judgment for Sig [Sauer]" because, without any such testimony, there is no evidence that any design defect caused Jinn's accident. (Id. at 43)

### 2. Breach of Warranty of Merchantability Claim

Judge Lehrburger notes that "Jinn does not differentiate between the factual bases for any of his claims in his opposition to summary judgment," and thus concludes that "for the same reasons that Sig [Sauer] is entitled to summary judgment on Jinn's . . . products liability claims, Sig [Sauer] is entitled to summary judgment in its favor on Jinn's claim for breach of [the] implied warranty of merchantability." (Id. at 44; see also id. (quoting Nemes v. Dick's Sporting Goods, Inc., 521 F. Supp. 3d 328, 346 (S.D.N.Y. 2021)) ("'Where a plaintiff fails to submit anything in opposition to summary judgment establishing separate factual bases for their

33

breach of implied warranty of merchantability claims and the strict products liability claim based
on defective design,[] the implied warranty claim fails alongside the design defect claim.'"))

### 3. Negligent and Intentional Infliction of Emotional Distress Claims

Judge Lehrburger finds that Jinn's negligent and intentional infliction of
emotional distress claims "'seek[] damages for the same circumstances and injuries, physical and
emotional, that his tort claims seek.'"  (Id. at 45-46 (alteration in original) (quoting Boateng v.
Bayerische Motoren Werke Aktiengesellschaft, No. 17 Civ. 00209 (KAM) (SIL), 2022 WL
4357555, at *29 (E.D.N.Y. Sept. 20, 2022)))  Because "[a] claim for emotional distress
'generally is not allowed if it is essentially duplicative of tort or contract causes of action'" (id. at
45 (quoting Djangmah v. Falcione, No. 08 Civ. 4027 (PAC) (FM), 2013 WL 208914, at *9
(S.D.N.Y. Jan. 18, 2013), report and recommendation adopted, 2013 WL 1195261 (S.D.N.Y.
Mar. 25, 2013))), Judge Lehrburger finds that Sig Sauer is entitled to summary judgment on
Jinn's negligent and intentional infliction of emotional distress claims.  Judge Lehrburger further
finds that even where a defendant has "'potentially . . . designed, manufactured, or failed to warn
of defects in a product, [such conduct] does not rise to the "outrageous" conduct or indecent
behavior that a claim of [negligent or intentional infliction of emotional distress] requires.'"  (Id.
at 46 (quoting Boateng, 2022 WL 4357555 at *29))

*       *       *       *

Apart from Jinn's general objection that Judge Lehrburger's R&R "omits any
consideration" of Sig Sauer's August 4, 2017 press release (Pltf. Obj. (Dkt. No. 76) at 3
(emphasis omitted)), there are no objections to the R&R's recommendation that Sig Sauer's
motion for summary judgment be granted.  To the extent that any of Jinn's objections apply to
the portion of the R&R that discusses Sig Sauer's motion for summary judgment, they will be

overruled for the reasons set forth above. The Court therefore reviews the remainder of the R&R for clear error. See Gilmore, 2011 WL 611826, at *1.

This Court agrees with Judge Lehrburger that Jinn has not set forth evidence of a feasible alternative design for the P320 pistol, and has not proffered evidence of any manufacturing defect in Jinn's P320 pistol. This Court likewise agrees that Jinn has not offered evidence sufficient to make out claims for breach of warranty of merchantability, or negligent or intentional infliction of emotional distress. Accordingly, there is no clear error in Judge Lehrburger's recommendation that these claims be dismissed. Accordingly, this Court will adopt the R&R's recommendation that Sig Sauer's motion for summary judgment be granted.

### C. Jinn's Motion to File a Video Exhibit

Judge Lehrburger concludes that, "because [he] recommends granting summary judgment for Sig [Sauer] based on Jinn's lack of critical evidence, Plaintiff's later-filed motion to introduce an additional video exhibit should be denied as moot." (R&R (Dkt. No. 75) at 46) Judge Lehrburger further states, however, that "[w]hether admitted or not, the [later-filed] video would have no effect on the Court's ultimate conclusion that Sig [Sauer] is entitled to summary judgment" because, among other reasons, "Jinn does not disclose any additional details of the circumstances surrounding th[e] alleged triggerless discharge" allegedly shown in the video. (Id.) Judge Lehrburger also concludes that "Plaintiff's failure to authenticate the video under the Federal Rules of Evidence is reason enough to deny his motion." (Id. at 48) Although experts may rely on inadmissible evidence, "neither of Jinn's experts considered the additional video in forming their opinions. Nor could they have, as the incident depicted occurred well after their

reports were submitted in this case, and Jinn has not tendered any supplemental reports from either Villani or Hicks." (Id. (citing Fed. R. Evid. 703))

No party has objected to the R&R's recommendation that Jinn's motion for leave to file the video exhibit be denied. The Court therefore reviews that recommendation for clear error. See Gilmore, 2011 WL 611826, at *1.

This Court agrees that the video exhibit that Jinn seeks to offer in further opposition to Sig Sauer's motions has not been authenticated, and that – even if the video had been authenticated – it does not support Jinn's argument that the opinions of his proffered experts are reliable, particularly given that neither of Jinn's experts viewed the video.

To the extent that Jinn argues that this video exhibit supports his opposition to Sig Sauer's motion for summary judgment, Jinn has not shown how this video constitutes evidence of his claims. Jinn represents that the video depicts "a P320 discharging inside an officer's holster in Honesdale, Pennsylvania on February 7, 2022," and contends that "it is another substantially similar incident of a triggerless discharge of a P320 from which a rational jury should be allowed to weigh and could reasonably infer from it and others that Jinn's P320 was similarly defective." (Sept. 30, 2022 Pltf. Ltr. (Dkt. No. 70) at 1) As discussed above, Jinn has not shown that there was a defect in the design or manufacture of Jinn's P320 pistol, and has not shown a breach of the warranty of merchantability or any negligent or intentional infliction of emotional distress. Jinn likewise has not shown that this video – allegedly depicting the triggerless discharge of a different P320 firearm – alters that conclusion.

Accordingly, there is no clear error in Judge Lehrburger's recommendation, and Jinn's motion for leave to file the video exhibit will be denied.

## CONCLUSION

For the reasons stated above, Judge Lehrburger's R&R is adopted in its entirety. Defendant's motions to preclude Plaintiff's experts and for summary judgment are granted, and Plaintiff's motion for leave to file a video exhibit is denied.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 56, 58, 60, 70), and to close this case.

Dated:  New York, New York
        September 13, 2023

                    SO ORDERED.

                    _____
                    Paul G. Gardephe
                    United States District Judge

# EXHIBIT 22

| | |
|---|---|
| **GEORGE ABRAHAMS,**<br>Plaintiff,<br><br>v.<br>**SIG SAUER, INC.**<br>Defendants. | COURT OF COMMON PLEAS OF<br>PHILADELPHIA COUNTY<br><br>JUNE TERM, 2022<br>NO. 220601213 |

## ORDER

**AND NOW**, this 3rd day of June, 2025, upon consideration of Defendant's post-trial

motions, Plaintiff's responses thereto, and oral arguments, it is hereby **ORDERED** and

**DECREED**, that punitive damages are **STRICKEN**.  All other requests for relief are **DENIED**.


BY THE COURT;


D. GARCIA, J.


ORDER-Abrahams Vs Sig Sauer, Inc. Etal [FJB]

22060121300377

| CTRL NOs. : | 24120264 |
|---|---|
| | 24120263 |
| | 25030051 |

# EXHIBIT 23

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| TIMOTHY DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 3:22-cv-00010-GFVT |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| SIG SAUER, INC., | ) | **AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Sig Sauer's Motion to Exclude Evidence and Opinions of Plaintiff's Expert James Tertin [R. 39], Sig Sauer's Motion to Exclude Evidence and Opinions by Plaintiff's Expert William Vigilante [R. 40], and Sig Sauer's Motion for Summary Judgment [R. 41.] Each motion is fully briefed, and the matter is ripe for review. For the reasons outlined below, Sig Sauer's motions are **GRANTED**.

**I**

In January 2021, while exiting his vehicle, Plaintiff Timothy Davis's Sig Sauer P320 X-Carry pistol discharged unexpectedly. [R. 23-1 at 17.] Consequently, Mr. Davis's leg was struck with a 9mm hollow-point bullet, which severely injured his leg. The details of the circumstances surrounding the incident are unclear. In his deposition testimony, Mr. Davis claims that he was sitting in his vehicle when he opened up his console, inserted the P320 into his holster, and then went to put his leg out of his vehicle when the pistol discharged. *Id.* According to Mr. Davis, his P320 was fully holstered and "locked in" to the holster on his left hip. *Id.* A police report written by the sheriff's deputy who responded to the incident scene and

an EMT report tell a different story.  According to them, Mr. Davis explained that he was attempting to holster his P320 when the pistol discharged.  [R. 39-3 at 4; R. 39-4 at 3.]  Either way, Mr. Davis alleges that his P320 discharges without a trigger pull, which Sig Sauer disputes.

Mr. Davis brought this product liability action asserting strict products liability and negligence on Sig Sauer's part.  [R. 18.]  In support of his claims, Mr. Davis offers expert testimony from James Tertin, a gunsmith, and William Vigilante, a human factors engineer.  Mr. Davis's P320 pistol does not come with any external safeties, such as a tabbed trigger or a thumb safety.  According to Messrs. Tertin and Vigilante, this lack of external safeties renders Mr. Davis's version of the P320 defective because it is a single-action pistol with a short trigger pull. [R. 23-2] [R. 40-5.]  Without an external manual safety, the firearm becomes unreasonably dangerous because the trigger is more likely to be actuated, which in turn means that the P320 is more likely to accidentally discharge.

Messrs. Tertin and Vigilante both opine that Sig Sauer's failure to incorporate a manual safety into the P320 caused the pistol to be defective.  Moreover, they opine that the alleged defect was the proximate cause of Mr. Davis's injury.  Sig Sauer moves to exclude the opinions of Messrs. Tertin and Vigilante, which Mr. Davis opposes.  Sig Sauer also moves for summary judgment, arguing that, with the exclusion of Mr. Davis's experts, there is no genuine dispute of material fact and that Mr. Davis fails to prove causation.

## II

### A

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony.  It permits an expert to testify about scientific knowledge if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a

fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702;  *see also United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021).  The Sixth Circuit, applying *Daubert*, outlines four inquires that guide the reliability analysis:  "Is the technique testable?  Has it been subjected to peer review?  What is the error rate and are there standards for lowering it?  Is the technique generally accepted in the relevant scientific community?"  *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993)).  Put more simply, "[t]o be admissible, any relevant scientific or technical evidence must be the product of reliable principles and methods and must have been reliably applied in the case."  *Id*. (internal quotations omitted).

"Daubert['s] factors do not constitute a 'definitive checklist or test,' but may be tailored to the facts of a particular case."  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).  Thus, the test of reliability is "flexible."  *Id*.  The district court must act as a "gatekeeper" to ensure that only reliable and relevant expert testimony and evidence go to the jury.  *Id.*;  *see also Daubert*, 509 U.S. at 597.  "The objective of that requirement . . . [i]s to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho*, 526 U.S. at 152.  The proponent of the expert testimony must establish its admissibility by a preponderance of the evidence.  *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

Here, Sig Sauer challenges in multiple ways the proffered testimony of Messrs. Tertin and Vigilante.  First, Sig Sauer argues that the causation opinions offered by Messrs. Tertin and

3

Vigilante should be excluded because each opinion is speculative and rests on unreliable foundations. Sig Sauer also challenges Mr. Vigilante's qualifications to provide an opinion on firearm design.[1] Ultimately, Sig Sauer seeks to exclude Messrs. Tertin and Vigilante from opining that Mr. Davis's accident most likely would not have occurred had the P320 been equipped with a thumb safety or tabbed trigger safety. After extensive review of the record, the Court agrees that neither Mr. Tertin nor Mr. Vigilante has a reliable factual basis for their opinions regarding causation.

First, Mr. Tertin opines that any single-action firearm without a manual thumb safety is defective. [R. 39-1 at 6.] He also opines that it is "common-sense" that tabbed-triggers reduce the instances of unintentional discharges. *Id.* Based on these opinions, Mr. Tertin concludes that a tabbed trigger "probably would have prevented the accident," and that the defective design was the proximate cause of Mr. Davis's accident. *Id.* at 23; [R. 23-2 at 20.] Mr. Tertin admits, however, that he has no information as to what caused Mr. Davis's trigger to depress. [R. 39-1 at 23.] Mr. Tertin further admitted that he doesn't even know whether Mr. Davis was seated or standing when the pistol discharged, and that he didn't do any further analysis into the circumstances surrounding Mr. Davis's accident. *Id.* at 22-23. According to Mr. Tertin, no further analysis is needed because he does not intend to offer any opinions as to how Mr. Davis's accident occurred. *Id.* at 23. Mr. Tertin performed no analysis as to what may have pulled the trigger and, to reiterate, admits that he has no information as to what actually depressed the trigger. *Id.* And with regard to a manual thumb safety, Mr. Tertin cannot say with any definitive certainty whether Mr. Davis would have had the thumb safety engaged even if the P320 came equipped with the feature.

---

[1] Because the Court ultimately concludes that Mr. Vigilante's testimony must be excluded based on its reliability, the Court foregoes any lengthy analysis of determining Mr. Vigilante's bona fides.

All of the above leads the Court to find that Mr. Tertin's conclusion that the lack of a manual safety was the proximate cause of Mr. Davis's accident is pure speculation. Although it may be "common sense" that some types of manual safeties reduce the number of unintentional discharges, Mr. Tertin provides no empirical evidence to prove as much. And with no attempt to even determine what may have depressed Mr. Davis's trigger, the Court agrees with Sig Sauer that Mr. Tertin's conclusions are purely "ipse dixit." Accordingly, because Mr. Tertin's opinion is speculative, without any basis in fact, it is inadmissible to prove causation.

Mr. Vigilante's opinion suffers a similar fate. According to Mr. Vigilante, the absence of an external manual safety rendered the P320 defective and unreasonably dangerous, and was the cause of the unintentional discharge. And according to Mr. Vigilante, there are three ways a trigger can move: through inertia, through contact with a foreign object, or through contact with a body part. [R. 40-4 at 7.] Yet Mr. Vigilante does not have any opinion on how Mr. Davis's trigger became engaged. He does not know what depressed the trigger, nor what part of the trigger was contacted causing it to move. *Id*. at 8. Mr. Vigilante admits that he has not inspected Mr. Davis's pistol nor Mr. Davis's holster, and bases his understanding of how the accident occurred solely on Mr. Davis's deposition and a sheriff's report. *Id*. at 4. Mr. Vigilante did not speak with Mr. Davis about how the accident occurred. *Id*. at 4-5. Mr. Vigilante did not review the deposition testimony of any of the first responders. *Id*. at 5. And he has not performed any testing or analysis of the physical evidence to confirm whether Mr. Davis's version of the accident is even plausible. *Id*. at 8-9. Mr. Vigilante's opinions are scarcely, if at all, based on any of the facts related to Mr. Davis's case.

Thus, it appears that the specific circumstances surrounding this particular accident are not important to Mr. Vigilante. He bases his causation opinion upon a general conclusion that it

is unsafe for Sig Sauer to sell the P320 without a manual safety. Even these generalized conclusions are founded on shaky ground—when Mr. Vigilante was asked in another similar matter whether he had done any studies regarding the P320's rate of unintentional discharges compared to other "striker fire pistols," Mr. Vigilante admits that he did not. [R. 40-6 at 3-4.] Mr. Vigilante's opinion on the P320's rate of unintentional discharge relies on Youtube videos and a memorandum by the United States Immigration and Customs Enforcement Agency. *Id*. This partially "anecdotal" data is hardly the type of empirical evidence that Rule 702 demands to admit expert testimony. Even if the Court accepts the assumption that the absence of a manual safety on the P320 is a design defect, it does not necessarily follow that the defect was the cause of Mr. Davis's accident. Mr. Vigilante does not provide any factual basis for his conclusion that a manual safety would have made this particular accident less likely to have occurred. Due to the lack of investigation into the specific circumstances of Mr. Davis's accident, Mr. Vigilante's opinions regarding the cause of that accident are too speculative. His conclusions lack any indicia of reliability that might help a jury to determine what ultimately caused Mr. Davis's trigger to be pulled. Accordingly, because his causation opinion is not sufficiently reliable as applied to the facts of this particular case, Mr. Vigilante's expert testimony must be precluded.

The Court will briefly address another argument that Mr. Davis asserts in support of admitting the expert testimony of Messrs. Tertin and Vigilante. In his response to Sig Sauer's motion for summary judgment, Mr. Davis compares and contrasts two recent Orders entered by other district courts that considered almost identical motions filed by Sig Sauer. [*See* R. 51.] In each of these cases, plaintiffs have offered the testimony of Messrs. Tertin and Vigilante, and Sig Sauer has moved to exclude their testimony and for summary judgment. One court, in the Northern District of Georgia, partially denied Sig Sauer's motions. [*See* R. 51-14.] Another

court, in the Western District of Oklahoma, granted Sig Sauer's motions. *See Herman v. Sig Sauer*, No. CIV 21-1038-R, 2023 U.S. Dist. LEXIS 159146 (W.D. Okla. Sep. 8, 2023). Mr. Davis argues that this Court should distinguish *Herman* because the facts in the present case are so distinct. [R. 51 at 24.] He suggests that this Court should distinguish *Herman* as the district court in the Northern District of Georgia did when it recognized that the opinions of Messrs. Tertin and Vigilante were based on the specifics of the incident at issue. *Id.*

The Court has reviewed both Orders and their supporting records. Ultimately, the Court concludes that *Herman* is not distinguishable, at least when it comes to the reasoning that supports the exclusion of expert testimony by Messrs. Tertin and Vigilante. While it may be that the Northern District of Georgia recognized that the opinions of Messrs. Tertin and Vigilante were based on the specifics of the incident at issue in that particular case, the Court finds no similar evidence of such here. Rather, like the *Herman* court, what this Court finds is broad conclusions regarding an alleged defect in Sig Sauer's P320 that are then applied generally to the facts of the case. Mr. Tertin and Mr. Vigilante both admit that the specific circumstances surrounding Mr. Davis's incident aren't tremendously important to their opinions. [*See* R. 39-1 at 14, 23 and R. 40-4 at 4-9.] Thus, as explained above, neither expert can be relied upon to render an accurate and helpful opinion as to what may have caused the injury in Mr. Davis's particular case. Both experts, therefore, must be precluded from testifying.

**B**

Summary judgment is appropriate when the pleadings, discovery materials, and other documents in the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). "A genuine dispute exists on a material fact, and thus

summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corp. of the Pres. Of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating there is a genuine issue in dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).

The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting Anderson, 477 U.S. at 251-52). In doing so, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001). Summary judgment is inappropriate where there is a genuine conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013).

Kentucky law governs this diversity action. The Kentucky Product Liability Act "defines a 'product liability action' as 'any action brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation . . . warning, instructing, marketing, advertising, packaging, or labeling of any product.'" *Smith v. Wyeth, Inc.*, 657 F.3d 420, 423 (6th Cir. 2011) (quoting Ky. Rev. Stat. Ann. § 411.300(1)

8

(2010)).  The Act "applies to all damages claims arising from the use of products, regardless of the legal theory advanced."  *Monsanto Co. v. Reed*, 950 S.W.2d 811, 814, 44 5 Ky. L. Summary 22 (Ky. 1997).  Plaintiffs may advance a product liability action under the theory of strict liability, negligence, and breach of warranty.  *Prather v. Abbott Labs.*, 960 F. Supp. 2d 700, 705 (W.D. Ky. 2013) (citing *Williams v. Fulmer*, 695 S.W.2d 411, 412 (Ky. 1985)).  Kentucky law recognizes three theories of product liability:  (1) defective design, (2) defective manufacture, and (3) failure to warn.  *Id*. (citing *Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 251 (Ky. 1995).  To succeed, a plaintiff must prove the existence of a defect and that the defect was the legal cause of the alleged damages.  *Id*. at 706 (citing *McCoy v. Gen. Motors Corp.*, 47 F. Supp. 2d 838, 839 (E.D. Ky. 1998)); *see also Smith*, 657 F.3d at 423.

Here, Mr. Davis's product claim is premised on strict products liability and negligence.  [R. 18.]  Unfortunately for Mr. Davis, he cannot show that there is a genuine issue of material fact regarding the existence of a defect in the P320.  Mr. Davis argues that the causation opinions proffered by his experts create a genuine factual dispute as to whether a defect exists in the P320 and whether the alleged defect caused Mr. Davis's injury.  That argument is disposed of by the Court's determination that the opinions of Messrs. Tertin and Vigilante are inadmissible.  No worries, says Mr. Davis.  He argues that his claims can survive without expert opinions on the issue of causation because the issue is well within the understanding of an ordinary juror.  [R. 51 at 21-23.]  Thus, Mr. Davis maintains, his claims can be proven through circumstantial evidence.

As explained by a sister court applying Kentucky law, "[e]xpert testimony is almost always needed to meet the plaintiff's burden in a products liability case."  *Honaker v. Innova, Inc.*, No. 1:04-CV-132(M), 2007 U.S. Dist. LEXIS 30225, at *4 (W.D. Ky. Apr. 23, 2007).  An expert may be required where the question is of a complex and technical nature such that a lay

juror could not, without the aid of the expert, infer that a defect caused the plaintiff's injury. *Stevens v. Keller Ladders*, 1 Fed. App'x 452, 458 (6th Cir. 2001). Contrastly, expert testimony is not required where "the nature of the defect and resultant injuries are so obvious as to fall within the general knowledge of the ordinary person." *Honaker*, 2007 U.S. LEXIS 30225, at *5 (citing William S. Hanes, *Kentucky Jurisprudence: Torts* § 21-28 (1987)). In short, matters of general knowledge do not require expert testimony, while more technical matters do.

We agree with a sister court considering a similar action against Sig Sauer that "[t]he inner workings and mechanics of the P320 are not matters of general knowledge, but instead involve a complex and technical understanding of firearms, engineering, and physics to fully determine whether a defect exists." *See Mayes v. Sig Sauer, Inc.*, No. 1:19-CV-00146, 2023 U.S. Dist. LEXIS 54976, at *30 (W.D. Ky. March 30, 2023). Thus, expert testimony is required to prove that the P320 is defective and that the alleged defect caused Mr. Davis's injury. Messrs. Tertin and Vigilante are Mr. Davis's only witnesses proffered to testify regarding the alleged defect of the P320. With their exclusion, Mr. Davis is left with no expert witness to testify as to the alleged defect and causation. Because Mr. Davis cannot demonstrate that a defect exists and that the alleged defect caused his injury, his claims lack an essential element and fail under Kentucky law. Accordingly, Sig Sauer's motion for summary judgment must be granted.

### III

Mr. Davis's accident is extremely unfortunate. For the reasons explained above, however, the testimony of his proffered experts must be excluded and Sig Sauer's motion's must prevail. Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

1. Defendant Sig Sauer's Motion to Exclude Evidence and Opinions of Plaintiff's Expert

James Tertin **[R. 39]** is **GRANTED**;

2. Sig Sauer's Motion to Exclude Evidence and Opinions by Plaintiff's Expert William Vigilante **[R. 40]** is **GRANTED**;

3. Sig Sauer's Motion for Summary Judgment **[R. 41]** is **GRANTED**; and

4. Judgment in favor of Sig Sauer **SHALL** be entered promptly.

This the 4th day of January 2024.

Gregory F. Van Tatenhove
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| TIMOTHY DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:22-cv-00010-GFVT |
| | ) | |
| v. | ) | |
| | ) | |
| SIG SAUER, INC., | ) | **JUDGMENT** |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

This matter is before the Court on Defendant Sig Sauer's Motion to Amend Judgment [R. 82.]  On January 4, 2024, this Court granted Sig Sauer's Motion for Summary Judgment [R. 80] and contemporaneously entered judgment in favor of Sig Sauer.  [R. 81.]  In its judgment, this Court dismissed Plaintiff Timothy Davis's complaint without prejudice.  *Id.*  Sig Sauer moves, pursuant to Federal Rule of Civil Procedure 60(a), for this Court to amend its judgment and indicate that Mr. Davis's complaint should have been dismissed with prejudice.  [R. 82.]

Pursuant to Federal Rule of Civil Procedure 60(a), this Court may correct a clerical mistake or a mistake arising from oversight in a judgment.  Fed. R. Civ. P. 60(a).  Summary judgment is, as Sig Sauer points out, a final adjudication on the merits.  *See Heike v. Cent. Mich. Univ. Bd. of Trs.*, 573 Fed. Appx. 476, 482 (6th Cir. 2014).  Accordingly, and the Court being otherwise sufficiently advised, it is **ORDERED** as follows:

1. Defendant Sig Sauer's Motion to Alter Judgment **[R. 82]** is **GRANTED**;

2. The Court's previous judgment **[R. 81.] SHALL** be amended; and

3. Timothy Davis's amended complaint [**R. 18**] is **DISMISSED** with prejudice.

This the 6th day of February, 2024.

Gregory F. Van Tatenhove
United States District Judge

# EXHIBIT 24

# Derek L. Watkins

219 Enterprise Drive                                               Cell: (270) 307-9996
Elizabethtown, KY 42701                                      dereklw@nth-level.com

## PROFESSIONAL EXPERIENCE

**Next Level Designs, LLC.  (1/22 – Present)**
Elizabethtown, KY
President & Chief Engineer
- Manage Next Level Designs, LLC
- Product Engineering and Design

**Atlas Development Group, LLC.  (1/18 – 12/19)**
Elizabethtown, KY
Part Owner & Engineering Manager
- Product Engineering and Design

**N$^{th}$-Level, LLC.  (7/14 – Present)**
Elizabethtown, KY
President & Chief Engineer
- Manage N$^{th}$-Level, LLC
- Engineering Consultant
- Expert Witness

**Remington Arms Company, LLC.**
**Research & Development Technical Center (8/09 – 7/14)**
Elizabethtown, KY
Director of Product Technology Integration
- Managed the On-Gun Accessories technology division.
- Managed Remington's intellectual properties department, patents and trademarks.
- Provided firearms expert witness testimony in Remington's product liability cases.
- Provided corporate representative testimony in Remington's product liability cases.
- Managed and conducted product liability investigations & testing.

**General Electric**
**GE Consumer & Industrial (7/98 – 7/09)**
Louisville, KY
Sr. Design Engineer, Advanced Development in Dishwasher Products (12/08 – 7/09)
- Redesigning the GE dishwasher product line from the top down for a multigenerational implementation of new technologies, delivering market leading performance while beating DOE and Energy Start standards.

Sr. Design Engineer, Innovations Group (3/03 – 12/08)

- Developed a high efficiency gas burner, delivering 80% more of the available heat to the cooking pan.  (2008)

- Served on the Monogram Dish Drawer program and was responsible for the hydraulic pattern, auto filtration and prototype controls hardware/software. (2007-2008)

- Designed a new magnetic based rinse aid dispenser for GE's low-end Dishwashers in a time period of four months from conception to production.  In 2007 GE was producing 900,000 of these units a year.

- Served on the Single-Double Wall Oven team.  I was responsible for the design of the controls harness mechanism located in the door; the cavity venting; the recessed convection system; and the structure design.  The oven can be seen at http://www.geappliances.com/products/introductions/single_double_wall_ovens. (2007)

- Served on the Whole Home Water II team and was responsible for hydraulics control and structure. (2006)

- Designed a water recirculation wash system for VA (vertical axis) clothes washers, reducing water use by 30% while increasing cleaning scores, reducing wear, and maintaining rinse ability.  (2005)

- Designed a new variable speed direct drive system for the VA clothes washer line. Currently over 50% of all GE VA clothes washers employ this drive system, which allows for reduced water and energy usage while maintaining superior wash performance. (2004)

- Served on the Detergent Bulk Dispense team for our dishwasher, which is available on our higher end products, model ZBD8920PSS (2003)

Six Sigma Black Belt/Design Manager (3/02 – 3/03)

- Served as Design Manager for a team of 32 individuals with 7 direct reports. Implemented the 2002 stainless steel clothes washer program in nine months.

Senior Systems Engineer, Laundry Products (8/00 – 3/02)

- Developed a stainless steel basket and hub system for the high-speed 2002 washer.

- Designed GE's first accelerometer based out-of-balance detection and control system for VA washers.

- Developed the synthetic back splashes and control housings for the 2002 washer program.

Lead Engineer, Laundry Products (7/98 – 8/00)

- Developed the DADS (Dynamic Analysis and Design Simulation) model of the GE washer and used it to drive several product cost takeout and systems engineering projects.

**Remington Arms Company, Inc.**
**Research & Development Technical Center (6/95 – 7/98)**
Elizabethtown, KY

- Lead Engineer for the M710 (version 1), initial product layout and development. Continued to consumer availability of the M710 (version 2 by Michael Keeney) in 2001.

- Designed fire controls based on four and six bar linkages for sporting firearms and military applications.

- Conducted FEA, kinematic, and dynamic analysis of systems undergoing frictional contact, impact, and both rotational and linear motion using ANSYS, ADAMS, and Working Model software packages.

## DEMONSTRATED STRENGTHS

- Six Sigma: Black Belt certified (GE)
- Dynamic Simulation packages: DADS & COSMOS
- CAD packages: SolidWorks & ProE,
- FEA Analysis packages: ANSYS & COSMOS
- CFD Analysis: CF Design & COSMOS
- Data Acquisition: LabView Hardware & Coding

- Mathematical packages: Mathematica and Maple.
- Graphics packages: Adobe Photoshop & SolidWorks
- Office packages: Microsoft Project, Word, Excel, and Power Point

## EDUCATION

University of Missouri – Rolla:  M.S. in Mechanical Engineering - May, 1995 (Thesis Defended in 1998)
University of Missouri – Rolla: B.S. in Mechanical Engineering - May, 1992

## CERTIFICATIONS

Advanced Computer Tomography Certified (2015, North Star Imaging, Inc.)
Digital Radiology & Basic CT Certified (2015, North Star Imaging, Inc.)
Six Sigma – Black Belt Certified (2005, General Electric)
Six Sigma – Green Belt Certified (1999, General Electric)

## PUBLICATIONS

"A Closed Form Method for Backtracking from a Modified Burmester Curve to a set of Precision Positions," The 1996 ASME Design Engineering Technical Conferences and Computers in Engineering Conference, 1996, CD 1.

"Use of the Prime Number Principle to improve the efficiency of the automated determination of Independent Kinematic Loops," Third National Applied Mechanisms & Robotics Conference, 1993, pp. 93-053-01 - 93-053-05.

"Computed Tomography, The Modern Engineer Multi-Tool," Web blog post. The iNSIde View, North Star Imaging Blog, 16 Sept. 2015, http://4nsi.com/blog/2015/09/16/computed-tomography-the-modern-engineer's-multi-tool/.

## PATENTS GRANTED

1. 9,845,978 - RESIDENTIAL HEAT PUMP WATER HEATER
2. 9,820,629 - FILTER ASSEMBLY FOR A DISHWASHER APPLIANCE
3. 9,399,996 – CAM PLATE AND AN APPLIANCE INCLUDING THE CAM PLATE
4. 9,080,776 – FAN APPARANCEY ARRANGEMENT FOR AN APPLIANCE
5. 8,422,870 - RESIDENTIAL HEAT PUMP WATER HEATER
6. 8,381,714 - BURNER FOR COOKING APPLIANCES
7. 8,342,165 - APPLIANCE WITH A VENTURI BASED VENTING SYSTEM
8. 8,328,953 – APPLIANCE DEVICE WITH MOTORS RESPONSIVE TO SINGLE-PHASE ALTERNATING CURRENT INPUT
9. 8,253,074 - WIRING ASSEMBLY FOR AN APPLIANCE VENTING SYSTEM
10. 8,245,414 - DRYING DRAWER AND METHOD OF DRYING
11. 8,226,180 - DOOR COUPLING SYSTEM
12. 8,141,549 - APPLIANCE WITH A VACUUM-BASED REVERSE AIRFLOW COOLING SYSTEM USING ONE FAN
13. 8,136,367 - HINGE ASSEMBLY FOR A REFRIGERATOR
14. 8,087,184 - CLOTHES DRYER WITH EXTENDABLE RACK
15. 8,006,687 - APPLIANCE WITH A VACUUM-BASED REVERSE AIRFLOW COOLING SYSTEM
16. 7,765,837 - CLOTHES WASHER ACCELERATING SYSTEMS AND METHODS
17. 7,757,323 - BELT DRIVE WASHER
18. 7,731,805 - DISHWASHER RACK LIFT SYSTEM
19. 7,690,061 - METHOD AD APPARATUS FOR CONTROLLING A LAUNDERING PROCESS
20. 7,621,158 - WASHING MACHINE AND COUPLING APPARATUS
21. 7,536,880 - MAGNETIC LID SWITCH
22. 7,254,969 - RIBBED WASHING MACHINE BASKET
23. 7,246,395 - WASHER/DRYER GRAPHICAL USER INTERFACE
24. 6,634,194 - WASHING MACHINE OVERFLOW SYSTEM
25. 5,872,323 - GAS OPERATED FIREARM PISTON/PISTON SEAL ASSEMBLY
26. 11,199,373 - FIRE CONTROL / TRIGGER MECHANISM
27. 11,326,848.- FIRE CONTROL / TRIGGER MECHANISM
28. 12,163,747 - FIRE CONTROL / TRIGGER MECHANISM

# EXHIBIT 25

**N<sup>th</sup>-Level, LLC**
219 Enterprise Drive
Elizabethtown, KY 42701
270.307.9996
dereklw@nth-level.com



---

**Stephen Mayes v. SIG Sauer, Inc.,**
**Expert Report – Incident and Firearm Analysis**
Prepared by: Derek Watkins
Date: 09/16/2021

---



Figure 1.1: Subject SIG Sauer P320 XCarry, 9mm (SN: 58C333291)

## 1. Introduction & Incident Background

This report is for the matter of Mayes v. SIG Sauer, Inc. According to the allegations of the Complaint, on October 30, 2018, on his farm in Kentucky, Mr. Stephen Mayes was injured by a gunshot wound to his right leg. Mr. Mayes was allegedly engaging in recreational shooting with his SIG Sauer P320 XCarry pistol (SN 58C333291, chambered in 9mm) and a holster attached to his belt prior to the shooting. The complaint claims the subject P320 "discharged with no prompting while fully-seated in its holster", while Mr. Mayes's "hands remained off the pistol". Reportedly no persons witnessed the discharge of the pistol. The discharged round caused injury to Mr. Mayes's upper right leg.

---

Mr. Mayes's claim of pistol discharging with his hands "off the pistol" is disputed by his reported statements to law enforcement and medical personnel after the incident:

- Simpson County Sheriff Dept report 1800057078 – "Mayes advised that he had been shooting at a private range on his personal farm when he accidentally shot himself in the leg. Mayes advised that he had been doing speed drills and he believed that he had put his finger on the trigger when he drew the weapon, which caused the gun to go off";
- Franklin Simpson County Ambulance report 18103152 – "Patient stated accidental discharge of a 9mm handgun in the Midthigh at a remote location";
- Skyline Medical Center, Emergency Patient Record, Encounter G00091116975 – "Per AE: 'PT was practicing speed drills and when he was reholstering his gun e accidentally shot himself in the right thigh.'"; and
- Trauma Resuscitation Flow Sheet Tristar Skyline Medical Center, Encounter G00091116975 – Per Pt: "I was trying to reholster my gun + I shot myself".

Per Mr. Mayes's testimony and the produced documentation, any claims that the pistol discharged uncommanded were not made until after Mr. Mayes and/or his wife had performed internet research on the P320 model pistol.

SIG Sauer had initiated an upgrade program for early model P320 pistols to enhance the drop safety of the pistol. The subject P320 pistol is a post upgrade pistol, meaning it already contained all the upgraded components, bringing its performance into alignment with the US Military version of the pistol. Mr. Mayes confirmed that he did not drop his P320 pistol in the incident.

## 2. Summary of Findings

The subject pistol was jointly examined by the consultants for the plaintiff (Peter Villani and Timothy Hicks) and myself (expert for SIG Sauer) on March 17, 2021 at North Star Imaging (NSI) in Marlborough, MA. SIG Sauer engineer Sean Toner also examined the subject pistol. The mechanical components and operation of the pistol were examined via CT scan, 2D radiography, digital photography, force measurements and physical testing. The pistol was memorialized non-destructively via CT scan and 2D radiography before being physically inspected and tested. Throughout the inspection no evidence of

manufacturing or design defects were observed, and the pistol passed all the function tests. See Figure 2.1.

| CT & 2D Radiograph | Pass | Fail |
|---|---|---|
| Sear to Striker Pin Engagement | ✓ | |
| Striker Safety Lock to Safety Lever Clearance | ✓ | |
| Striker Safety Lock to Striker Pin Engagement | ✓ | |
| Trigger Bar Spring Integrity | ✓ | |
| Sear Spring Springs Integrity | ✓ | |
| Component Movement After Trigger Pull | ✓ | |
| **Function Testing** | Pass | Fail |
| Magazine Catch | ✓ | |
| Slide Catch | ✓ | |
| Magazine Release | ✓ | |
| Slide Release | ✓ | |
| Trigger Function | ✓ | |
| Disconnector Function | ✓ | |
| Firing Pin/Striker Function | ✓ | |
| Striker Block Function | ✓ | |
| Trigger Pull Actuation Force Testing | ✓ | |

Figure 2.1: Summary of the Function Tests Performed on the Subject SIG Sauer P320 Pistol.

The examination of the subject SIG Sauer P320 revealed the pistol was fully functional and in an unaltered condition. Despite being fully function tested a minimum of ten times during the inspection, the pistol was never made to discharge absent a trigger pull. It should be noted that Mr. Villani, consultant for the plaintiff, was never observed to perform any formal function tests on the subject P320. Mr. Hicks was observed to perform minimal function tests. At no time did Mr. Villani or Mr. Hicks demonstrate any of their claimed design or manufacturing defects during the examination of the pistol. When the fire control unit was removed from the pistol and visually examined during the inspection, it was observed that the fire control unit was in a lightly oiled and clean condition. The fire control unit's components were observed to be in factory condition and the only way the pistol could be made to fire was to cock the pistol and then pull the trigger. No physical or empirical evidence was observed that would suggest the subject pistol was capable of discharging absent a trigger pull in a manner consistent with Mr. Mayes's testimony.

The subject holster was presented for examination at the exam on August 18, 2021. The subject holster appeared to be constructed of kydex, a compliant thermal form polymer material that has become common in holster manufacturing in recent years. High resolution photos were taken of the holster's interior and exterior surfaces. Film deposits consistent with gunshot residue were observed on the interior surfaces of the holster. The residue dispersion pattern was not localized at the muzzle opening in the holster. The residue was observed to be run partially up the inner walls of the holster. The residue pattern is consistent with a holster in which a pistol had been discharge while the pistol was partially inserted in the holster. The physical evidence of the holster and its condition contradicts Mr. Mayes's claim that the pistol discharged while it was fully seated in the holster.

The plaintiff's "expert" reports from Mr. Villani and Mr. Hicks make multiple incorrect statements that pre-existing design and manufacturing defects were present in the subject P320 pistol when Mr. Mayes shot himself. However, neither Mr. Villani nor Mr. Hicks have provided any proof of defective behavior in the subject pistol or subject incident. The event or chain of events that caused the incident discharge has also not been established – or even attempted to be established – by Mr. Villani or Mr. Hicks. Mr. Villani and Mr. Hicks have dismissed the conclusion that Mr. Mayes shot himself through improper handling of the subject pistol without any empirical data, analytical data or adherence to the scientific method.

All physical testing of the subject pistol failed to produce a discharge absent a trigger pull. The pistol could be made to fire only when it was cocked and the trigger was pulled. There is no physical evidence to support an allegation that the pistol fired at the time of the incident – or any other time – in any manner other than when the pistol's chamber was loaded, the striker pin was cocked, and the trigger was actuated. It is my demonstrable opinion that the physical condition of the subject P320, memorialized in the CT scan, 2D radiographs, physical testing, photographs, and microscope analysis; coupled with the residue patterns observed in the subject holster, dictates the root cause of the incident shooting was that Mr. Mayes inadvertently pulled the trigger of the subject pistol while the pistol was partially inserted in the holster.

Per Mr. Mayes's testimony and complaint, the claim that the pistol spontaneously discharged in his holster is in direct violation of the first law of Newtonian Physics: "An object will remain at rest or in a uniform state of motion unless that state is changed by an external force." Neither the physical condition of the pistol, nor the laws of physics support Mr. Mayes's claim of an uncommanded discharge.

### 3.) Brief Overview of the SIG Sauer P320



Figure 3.1:   Select Components of the SIG Sauer P320

The SIG Sauer P320 is a semi-automatic striker fired pistol manufactured by SIG Sauer, Inc. The P320 was first introduced to the US market in 2014 and is an evolution of the SIG Sauer P250 platform.   The uniqueness of the P320 is it employs a short displacement trigger system housed in a modular fire control unit (FCU).   See Figure 3.1.  The use of a modular FCU allows a single fire control system to be used in generic grip modules, enabling the

user to configure the pistol to their needs.  Currently, SIG Sauer manufactures over 16 different models of the P320, including a customer configurable line.  The modularity of the P320 is one of the features that allowed a variant of the P320 to win the US Army's solicitation for a new sidearm in 2017, making a custom version of the P320 the standard issued sidearm of the US Army in the form of the M17 (full size) and M18 (compact).



Figure 3.2:  Component Displacement Due to a Trigger Pull

The short displacement trigger system of the P320 is one of the features that distinguishes it from many other striker fired pistols on the market.  Up to the 1980s, hammer fired pistols dominated the handgun market, with the most prolific model being the Colt 1911

and its clones. The hammer fired 1911 employs a short displacement trigger and was the US Army's standard issue sidearm from 1911 to 1985. Due to the fundamental differences between hammer fired and striker fired pistols, it has only been in the past couple of decades that striker fired pistols with short displacement triggers have become readily available in the civilian firearms market.

The P320 also employs a passive safety system, meaning the safety is engaged at all times when the pistol is cocked and the trigger is not being pulled. See Figure 3.2. When the trigger of the P320 is pulled, the trigger bar is pulled towards the muzzle end of the pistol. As the trigger bar is displaced, it first contacts the safety lever, causing the safety lever to rotate counterclockwise, displacing the striker safety lock and unlocking the striker pin. When the striker safety lock is in the down position, as shown in Figure 3.2, the striker pin is blocked from traveling forward and detonating the cartridge loaded in the chamber of the barrel (Figure 3.1). Once the striker safety lock has been displaced, the trigger bar contacts and rotates the sear counterclockwise, causing the sear to rotate downward and lose its engagement with the striker pin. When the striker pin is no longer restrained by the sear and the striker safety lock is in the unlocked position, the striker pin – which is under spring tension – is propelled forward and impacts the primed cartridge causing the pistol to discharge. Each time the pistol discharges and the pistol fully cycles, the striker safety lock will re-engage, blocking/locking the striker pin until the trigger is once again pulled. The sear also resets, catching the striker and re-energizing it under spring tension and making it ready to fire another round. If the sear does not rise back up and catch the striker foot, the P320 pistol is not cocked and is unable to fire.

The short displacement trigger, the modular fire control unit and the user configurable grip modules, combined with the P320's excellent reliability and performance, have made the P320 the platform of choice among multiple branches of the military and law enforcement agencies, and the pistol of choice for many consumers. In the seven-plus years the SIG Sauer P320 has been in production, it has risen to be a market leader.

4.    Inspection and Testing of the Subject Pistol

On March 17, 2021 the subject P320 pistol was examined at the North Star Imaging (NSI) facility in Marlborough, MA.  The condition of the pistol was assessed non-destructively with photography, 2D digital radiography (x-ray imaging), computed tomography (CT), function-testing and physical measurements.  North Star Imaging's CT equipment is similar to the CT equipment used in hospitals, only many times more powerful.  North Star is one of the leaders in using digital radiography and CT for industrial quality assurance and fault analysis.  The CT scans serve to memorialize the condition of the fire control unit's components and their relationship to one another prior to any functioning testing or disassembly of the pistol.  The resolution of the CT scan was 58.35 microns or 0.0023 inches, meaning all measurements made via the CT would be accurate to within 0.002 inches.  After the CT and x-ray analyses were completed, the pistol was evaluated with respect to its condition and functionality.

I am not aware of what testing, disassembly or other examination of the subject pistol was performed between the time of the incident and my inspection in March 2021.  At the inspection, the pistol was found to be in a clean condition and fully functional.  The pistol passed all function tests and discharged only with a contemporaneous actuation of the trigger.  Mr. Villani and Mr. Hicks, consultants for the plaintiff, were present for the entirety of the exam.  At no point during the exam did Mr. Villani or Mr. Hicks demonstrate any defects in the pistol.  Throughout the exam, Mr. Villani was not observed to perform any formal function tests of the pistol, even when asked if he would like to do so.  Mr. Hicks was more active in the examination process and did perform some abbreviated functioning of the pistol.  Mr. Hick's handling of the subject pistol showed the pistol was functioning properly.

When the function testing and measurements of the pistol were completed, the pistol was disassembled and examined at the component level.  No overt signs of component alteration or damage were observed.  After the pistol was reassembled, the function tests were repeated to confirm the functionality of the pistol had not been affected by the exam. The pistol passed all of the post-examination function tests.

## 4.1.  External Inspection of the Pistol

The pistol was initially verified to be unloaded and clear of ammunition.  Initial external photographs of the pistol were taken before the pistol was placed in the CT machine.  The pistol was observed to be in good condition and relatively clean. No overt signs of damage or alteration were observed.

## 4.2.  CT and 2D Radiography Review

The pistol was placed in the CT scanner without being function tested beyond verifying it was fully unloaded.  The purpose of the CT scan was to nondestructively memorialize the pistol's components and examine the fire control unit for signs of adjustment, abuse, and broken or improperly manufactured parts.  Examination of the CT scan can also determine if any foreign material was interfering with the pistol's function.  The pistol was scanned in the fully cocked condition, enabling the interaction of the pistol's internal components to be examined as they would have been configured immediately prior to the incident discharge.  The CT scan confirmed the pistol was a post upgrade vintage and did not contain aftermarket parts.



Figure 4.2.1:  CT Scan Image of the Subject P320's Striker Pin to Sear Engagement



Figure 4.2.2:  CT Image of the Sear's Rotation Engagement Stop

Figure 4.2.1 shows a CT image slice through the center of the pistol's fire control unit.  The engagement between the sear and the striker pin was measured to be approximately 0.0397 inches and was within factory specification.  Mr. Hicks improperly reports the engagement as 0.031 inches in his report. It appears Mr. Hicks did not measure the full length of engagement between the components (see Hicks Report, at p. 6, Figure 6). The CT also verified nothing was impeding the motion of the sear at its rotational stop.  Mr. Villani and Mr. Hicks opined in their reports that the design and/or manufacture of the P320 was defective because the striker pin's engagement surface was not completely covered by the sear's engagement surface.  This is a false premise of defect.  Many pistols, by many manufacturers, including the SIG Sauer P320, have striker engagements that are designed to function properly with less than 100% striker engagement surface coverage.  The function of the striker pin's engagement surface is not only to provide overlapping contact with the sear, but also to provide enough material to support the contact stress.  Therefore, it has been my experience that striker pin engagements in pistols measuring at or above 0.020 inches are reliable.  SIG Sauer specifies a minimum engagement of 0.021

inches (0.526 mm) for the P320. The measured 0.034 inches is well above the SIG standard. The CT scan confirms the striker pin to sear engagement of the subject pistol was not causally related to the incident shooting.

Additionally, the subject pistol contains a post upgrade sear, which is designed to maximize the engagement between the striker pin and the sear to 100%. When the striker engages the sear, the sear rotates in a clockwise manner, increasing the engagement between the striker and the sear until the bottom of the striker contacts the rotation stop surface of the sear. Because the sear's rotation is stopped by the striker, the sear adaptively rotates to sear and negates any tolerance stack that may exist between the sear assembly and the striker assembly. See Figure 4.2.2. Mr. Hicks asserts in his report (page 5) that the sear is "unable to rotate upwards any further since it comes into contact with a pin". Mr. Hicks is describing how the pre upgrade sear functioned and not the subject sear. Figure 4.2.2. clearly shows no contact between the sear and the safety lever pivot pin. Any assertion or implication made by Mr. Hicks that the engagement between the subject striker and the sear is less than 100% is false. The sear physically cannot cover/engage more of the striker.

Furthermore, the CT image Mr. Hicks presents in his report is a slice parallel to the side of the striker and gives a false representation of the contact/engagement between the striker and the sear. Slicing the CT through the striker, not just parallel to its side, gives a true representation of the full engagement between the subject striker and sear. See Figure 4.2.3.



Figure 4.2.3: Comparison of Mr. Hicks Representation of Engagement Contact vs. Actual Engagement Contact

The CT also showed the striker safety lock was well seated in the striker pin's mating channel and was properly aligned to block the striker pin from completing a full stroke if somehow the striker pin was released before the striker safety lock was rotated up and out of position by the safety lever. See Figure 4.2.4. The CT scan confirms the striker safety lock was not causally related to the incident shooting.



Figure 4.2.4: CT Image of the Striker safety lock Sitting in the Striker Pin's Channel

Mr. Villani states in his supplemental report that the striker safety lock channel in the striker pin contains an angled surface that would cause the safety lock to rise out of position during use and defeat the blocking feature of the striker safety lock. This is a false assertion by Mr. Villani. The striker pin contains no such angled surface. See Figure 4.2.4.



Figure 4.2.5: CT Image of the Trigger Bar Spring to Magazine Gap

Mr. Villani and Mr. Hicks mention contact between the trigger bar spring and the pistol's magazine as a defect. The CT clearly shows the trigger bar spring of the subject P320 does not contact the magazine. See Figure 4.2.5.

The sear springs in the subject pistol were also examined via the CT scan. See Figure 4.2.6. The scan showed the springs were properly aligned in their respective guide channels. Mr. Villani is critical of the sear springs, stating the sear spring coils drag along the sear housing, which could prevent the sear from rising to make full contact with the striker. Mr. Villani fails to realize the spring guide channels in the sear housing are designed to contact the sear springs and that is how they accomplish their function of guiding the springs. The design intent is for the springs to contact the sear housing along the guide channels. Spring guide channels are common in machine design and are used across a diversified field of products, from automobiles to home appliances. Mr. Villani's claim of a defect is without a physical foundation and demonstrates a clear misunderstanding of the fundamentals of machine design. The CT scan confirmed the sear springs were not causally related to the incident shooting.



Figure 4.2.6: CT Image of the Sear Springs in their Respective Channels in the Sear Housing

Mr. Villani and Mr. Hicks are critical of the striker pin's retention and positioning in the subject pistol, asserting excessive gaps on the sides of the striker pin that will allow the striker pin to rotate "excessively" from side to side. Figure 4.2.7A is an image from Mr. Hick's report in which he improperly depicts the side gaps of the sear (yellow circle). Mr. hicks shows the foot of the striker pin surrounded by the slide rear cap. The slide rear cap does not nor is it designed to restrain the rotation of the striker pin. The striker pin's rotation is restrained by the striker housing. Figure 4.2.7B shows the rotation of the striker pin is well restrained and by the striker housing. Figure 4.2.7.C shows the striker housing is well restrained within the pistol's slide.






Figure 4.2.7: Mr. Hicks Improper Representation of the Striker Pin's Rotational Gaps vs the Actual Rotational Gap

The potential rotational displacement of the subject striker pin is not excessive.  By depicting the striker rear cap as the as intended rotational limiter for the striker pin, Mr. Hicks is demonstrating a profound ignorance of the subject pistol's components and their design.  Mr. Hicks also states the CT shows gaps between the slide and the rails of the fire control unit, and these gaps will allow the striker to move vertically relative to the sear.  See the blue circles in Figure 4.2.7A.  Interestingly, Mr. Hicks's CT image shows the slide is biased upward and is pressing against the rails (the gap on the top of the rails), the slide cannot go any higher relative to the fire control unit.  Further examination of the CT also shows the striker and striker housing are also biased upward against the slide.  The vertical biasing of the pistol's slide components is not by chance.  When the striker engages the sear, a clockwise moment is induced in the striker (shooter's right side).  This moment causes the striker to attempt to rise, pushing the striker up into the striker housing, the striker housing into the slide and the slide up against the rails of the fire control unit.  This biasing upward of the striker combined with the rotation of the sear means that every time the pistol is cycled the engagement between the sear and the striker is maximized and all of the upward gaps between the sear, striker, striker housing and slide are removed.  This means the engagement between the striker and sear is maximized and it is a physical impossibility for the striker to ride up and over the sear without the sear being physically roated down.  Mr. Hicks does not plainly state, but rather implies that relative motion between the slide and the fire control unit of the subject pistol could produce a uncommanded discharge.  Any such assertion is false, cyclical vertical displacement between the subject fire control unit and the slide will not induce an uncommanded discharge.

Mr. Hicks was also critical of the lack of a safety lever return spring in the subject pistol, stating, "this spring can also be considered part of the safety features, and its discontinued use by SIG SAUER also contributes to uncommanded discharges as the safety lever does not work as fully designed".  Mr. Hicks statement demonstrates a clear ignorance of the functionality of the safety lever in the post upgrade pistols.  Figure 4.2.8 shows how the safety lever functions in the post upgrade pistols.  The post upgrade safety levers (green) are equipped with a "v" notch that the trigger bar (yellow) engages.  As the trigger is pulled

an the trigger bar is displaced forward and engages the forward edge of the "v" notch, causing the rotation of the safety lever up and into contact with the striker lock (orange). As the trigger is released, the trigger bar is displaced backward and the safety lever is rotated downward by contact between the rear edge of the safety lever's "v" notch and the trigger bar. Furthermore, the striker lock is biased downward by the striker lock spring (red) and the striker lock spring is strong enough to reset the striker lock and the safety lever (if ever needed). The safety lever spring was removed from the post upgrade fire control units because safety lever design change rendered the safety lever spring obsolete.





Figure 4.2.8: CT Image of the Safety Lever and Striker Lock System

Non-spring loaded safety levers are not unique to the P320. One of the most popular semi-automatic pistols ever mass produced, the series 80 1911 pistol, has employed springless safety levers for approximately 40 years. Almost every major firearms pistol manufacturer produced a variant of the 1911 pistol.

After the CT scan was completed, the pistol was placed in multiple conditions to evaluate the motion of the internal components via 2D radiography. Figure 4.2.9 shows the subject pistol in the discharged condition, with the trigger held in the pulled position. The image shows the safety lever has been rotated up by the pulling of the trigger, causing the striker safety lock to rotate and allow the striker pin to fully translate forward to the fired position. The image also shows the striker pin is now forward of the sear, indicating the pistol has fired. The 2D radiography images confirm the fire control components were functioning properly and were not causally related to an uncommanded discharge of the subject pistol.



Figure 4.2.9:  2D Radiograph of the Subject P320 in the Trigger Pull Condition

Analysis of the CT scan and 2D radiographs showed no propensity for the subject P320 to discharge absent a trigger pull. None of the imaged components were observed to be overtly altered or damaged. The motions and interactions between the components were

found to be within factory specifications. No physical evidence was observed that would support any of Mr. Villani's or Mr. Hicks's assertions of defect.

### 4.3.    Physical Testing of the Pistol

After the CT scan and 2D digital radiography images were completed, the pistol was function tested. The purpose of function testing is to verify the components of the pistol are interacting properly and determine if any claimed defects can be substantiated. Figure 4.3.1 documents each function test that was performed. The function tests were performed a minimum of five times before any disassembly of the pistol was performed and five more times after the pistol was reassembled. The pistol passed all the function testing prior to disassembly and after the reassembly. Curiously, Mr. Villani declined to function test the pistol when invited to do so. Mr. Villani also fails to mention if he ever performed any function tests on the pistol in either of his reports. Mr. Hicks was observed to perform limited function tests of the pistol. He does not indicate in his report that he found any issue with the pistol while performing this limited function testing.

| Function Testing | Pass | Fail |
|---|---|---|
| Magazine Catch | ✓ | |
| Slide Catch | ✓ | |
| Magazine Release | ✓ | |
| Slide Release | ✓ | |
| Trigger Function | ✓ | |
| Disconnector Function | ✓ | |
| Firing Pin/Striker Pin Function | ✓ | |
| Striker Block Function[1] | ✓ | |

Figure 4.3.1:  Summary of the Function Tests Performed on the P320 Pistol.

Hanging weights were employed to measure the force required to pull the pistol's trigger and discharge the firearm. Five trigger pull forces were measured with an average trigger

---

[1] The striker block function testing requires the slide to be removed from the pistol. The striker block function testing was conducted after the pistol was disassembled.

pull force of 5.325 pounds.  See Figure 4.3.2.  The measured trigger pulls are well above the Sporting Arms and Ammunition Manufacturer's Institute's (SAAMI) recommended 3lb minimum.

| Trigger Pull Measurements (pounds) | |
| --- | --- |
| No Discharge | Discharge |
| 5.25 | 5.50 |
| 5.00 | 5.25 |
| 5.25 | 5.50 |
| 5.00 | 5.25 |
| 5.50 | 5.75 |

Figure 4.3.2: Trigger Pull Force Measurements

During the function testing and throughout the examination, the pistol could only be made to discharge when the pistol was cocked, and the trigger was fully pulled.  The pistol never discharged absent a trigger pull or behaved in any way that would substantiate any of Mr. Villani or Mr. Hicks' assertions of defect.

4.4.   Disassembly and Inspection

When the function testing and trigger pull measurements had been completed, the fire control unit was removed from the pistol and visually inspected.  The components were relatively clean, with a light film of oil present.  See Figure 4.4.1.  No overt signs of damage or alteration were observed.



Figure 4.4.1:  Subject Fire Control Unit

The subject sear was manually depressed multiple times to verify it was moving freely and the sear springs were returning the sear with force. The sear was proven to be functioning properly. The sear had a light film of what appeared to be grease on its engagement surface. No signs of damage or alteration were observed. See Figure 4.4.2.



Figure 4.4.2: Subject Sear's Engagement Surface

Mr. Villani and Mr. Hicks have asserted in their reports that the burnished top edge of the sear is evidence that the sear is improperly formed. Mr. Villani uses the term "rollover" – which is not a term used in product design or manufacturing – to characterize this "defect". The observed burnishing is a product of the tooling and the motion of the sear against the engagement surface of the striker pin as the trigger is pulled. This is explained in detail in Section 5 of this report. To the extent Mr. Villani is using the term "rollover" to refer to excess material buildup on the components, there is no physical evidence of any such buildup. Moreover, neither Mr. Villani nor Mr. Hicks have explained how any such excess material can cause the pistol to fire without a trigger pull, much less demonstrated that this is possible. Mr. Villani has stated in his initial report that the sear showed an "obvious

'rollover' condition". Mr. Villani also claimed the sear was dragging on the sear housing in the "v" notch. This is another instance of designed contact being misrepresented as a defect. The rib in the springs channel of the sear housing acts as a guide for the sear springs and sear, making intended contact with both components.



Figure 4.4.3: Subject Striker Pin's Engagement Surface

Mr. Villani also stated that the striker pin showed signs of a "rollover" condition. Figure 4.4.3 shows no signs of defects in the striker pin and the radii present on the edges of the striker pin are per the design and do not constitute a defect, as was proven by the function testing. The burnishing present on the lower edge of the striker pin's engagement surface is due to the condition of the tool and the top edge of the sear's engagement surface sliding against it when the trigger is pulled.

Removing the striker assembly from the pistol showed no signs of alteration or damage. When the striker assembly is removed, the striker safety lock engages the striker pin, placing the striker pin in the blocked condition. Figure 4.4.4 shows the striker safety lock is not only blocking the striker pin, but is also pulled down to the fully engaged position, as described in the CT scan section of this report. This physical evidence completely contradicts the claim of a striker safety lock defect made by Mr. Villani in his supplemental report.



Figure 4.4.4:  The Subject Striker Assembly in the Full Blocked Condition

Lastly, Mr. Villani asserted the contact marks between the striker safety spring and the striker housing as a defect[2].  The P320 design uses the striker housing to not only locate the striker safety spring, but also to align and guide it with respect to the striker safety lock. Because the contact between the striker safety spring and the striker housing is a function of the housing acting as a spring guide, the contact occurs by design and is not a defect. When the grease was cleared away, it was easy to see the minimal nature of the contact marks, directly refuting the statements that the striker safety spring was dragging against the housing and could cause the striker safety lock to seize.  See Figure 4.4.5.  Mr. Villani has again demonstrated his failure to grasp the simple concept of designed sliding contact between components in machine design.  Mr. Villani has not demonstrated any instance

---

[2]  It is unclear if Mr. Villani is stating the spring to striker housing contact is a "defect" present in the subject pistol, as he is describing multiple other P320 pistols in his initial report.  These marks are present by design in SIG Sauer P320 pistol.  Therefore, I am assuming Mr. Villani is intending to claim the striker safety spring contact "defect" exists in the subject pistol as well.

where the striker safety on the subject pistol – or any P320 pistol – has seized or otherwise failed due to this contact, and he is disregarding the tens of thousands of dry cycles and live firings the P320 design was subjected to before being put into production.

 

Figure 4.4.5:  Contact Marks between the Striker Housing and the Striker Safety Spring

When the inspection of the pistol's internal components was completed, the pistol was reassembled and function tested again to verify the function of the firearm had not changed due to the disassembly or reassembly.  The pistol once again passed all the function tests and was proven to discharge only when the striker pin was cocked and the trigger was pulled.

5.    Incident Holster Analysis

Per Mr. Mayes's testimony, the incident shooting occurred spontaneously as the pistol was sitting at rest in his holster, which was attached to his belt.  The holster was examined separately from the pistol on August 18, 2021.  The holster was not marked with a brand name, but appeared to be consistent with a line of holster formerly produced by Bravo Concealment.  Per Bravo Concealment's web site, they no longer manufacture the subject holster.  The subject holster appeared to be made of kydex.  Kydex is a thermal form polymer that it usually shaped with a vacuum former and has become popular with many holster manufacturers in recent years due to its low cost and flexibility.  The subject holster was not the correctly shaped for the subject pistol.  The subject pistol contained a flat faced trigger.  The subject holster contained a curved trigger feature that does not align with the subject flat trigger. See Figure 5.1.  Bravo Concealment's current production holster for the SIG Sauer XCarry does not have a trigger feature, and it appears that Bravo has shifted its production to a more precise injection molded process and material.  Bravo has also added a variable tensioner to allow the user to adjust how much force is required to remove the pistol from the holster.

 

Figure 5.1:  Subject Holster vs Current Production Bravo Company Holster

It is unknown how significantly the curved trigger feature of the subject holster interacted with the flat trigger of the subject pistol, as I was not given the opportunity to examine the pistol and holster together.

When a firearm is discharged, residue and particulate from the burning propellant is expelled from the barrel along with the projectile/bullet. The inside of the subject holster did contain significant deposits of what appeared to be gunshot residue on the interior walls of the holster. See Figure 5.2.



Figure 5.2: Photos of Residue Inside the Subject Holster

When residue is expelled from the muzzle of a firearm, it typically exits in a conical dispersion pattern. Figure 5.3 shows a shadowgraph image of a bullet exiting a barrel, along with the accompanying pressure waves and gasses and particulate. The

shadowgraph clearly shows the residue has a conical trajectory, while the pressure bubble produced by expulsion of the consumed propellant is spherical.  The pressure bubble is what we perceive as the sound of the gunshot as it radiates outward from the muzzle of the gun and strikes the eardrum.



**Figure 5.3:  Shadowgraph Image of a Bullet Discharged from a Firearm**

Figure 5.4 shows the subject pistol overlayed with the subject holster.  The muzzle of the pistol sits at the end of the holster and is aligned with the muzzle opening in the end of the holster.  Given the conical dispersion pattern of propellant residue from a discharged firearm, the residue pattern observed in the subject holster is inconsistent with the pistol being fully seated in the holster.  If the pistol was fully seated in the holster when it was discharged, it would be expected that the residue concentration would be diminishing the further you got from the center of the muzzle opening.  Figure 5.2 shows the residue is concentrated in the corners.



**Residue Dispersion Pattern**

Figure 5.4:  Subject Pistol's Fit in the Subject Holster (Simulated)

Figure 5.5 shows how the residue concentrations appear to diminish up the side walls of the holster.  The observed residue pattern on the side walls of the holster strongly indicates

the pistol was only partially inserted in the holster when the pistol was discharged. With a partially inserted pistol, the conical dispersion pattern would have the opportunity to disperse radially and collect on the side walls of the holster as the residue traveled from the muzzle end of the pistol towards the muzzle end of the holster.



Figure 5.5:  Observed Residue Pattern in the Muzzle End of the Subject Holster

Figure 5.6 shows how a pistol discharged while partially inserted in the subject holster would yield a residue dispersion pattern consistent with the residue dispersion pattern observed in the subject holster. Furthermore, the discharge of the pistol as shown in Figure 5.6 is consistent with Mr. Mayes's recorded statements to law enforcement and medical personnel immediately after the shooting. See Section 1 of this report. The physical condition of the holster does not support Mr. Mayes's claim of a spontaneous discharge of the pistol while it was fully seated in his holster.



Figure 5.6:  Subject Pistol Discharged While Partially Inserted in the Subject Holster

6.    The Fallacy of "Rollover"

Mr. Villani and Mr. Hicks have stated that a condition of "rollover" exists on the engaging surfaces of the subject sear and striker (along with other components).  However, neither individual has ever presented a clear definition of what "rollover" is.  Mr. Hicks stated in his report that "rollover" may be a "combination of flashing, radiused corners, and shrinkage of the inner surface area".  The subject sear and striker engagement surfaces do not contain flash or shrinkage of their inner surfaces.  The radiused edges present on those parts are created by the tooling and are there by design.  The fact is, the term "rollover" is not an industry term and is something Mr. Villani appears to have made up and Mr. Hicks has blindly adopted, which may explain their vagueness about the term.  This supported by the lack of any cited support discussing the term "rollover" in any engineering or design publication. Neither Mr. Villani nor Mr. Hicks has provided any evidence that the subject sear or striker contain excessive material on their edges.  Furthermore, the physical

examination of the subject pistol and its components proved no excessive material was present on the edges of the subject sear or striker engagement surfaces.



Figure 6.1: "Rollover" Images Presented in the Hicks Report

Mr. Hicks's report employs images that reportedly show excess material/"rollover" around the edges of the engagement surfaces of the sear and the striker. See Figure 6.1. However, these images are simply artist renderings and have nothing to do with the Mayes pistol. Figure 6.2 shows an artist rendering presented by Mr. Hicks, compared to a CT cross section of the actual subject pistol's engagement. The artistic rendering is not using the correct striker or sear geometries, and the subject pistol shows no signs of recess in the centers of the engagement surfaces. Additionally, the artistic rendering does not make sense, as the blue color (as I understand it) is supposed to represent recessed surfaces surrounded by the elevated red surfaces, but Mr. Hicks's renderings show the blue surfaces protruding beyond the red surfaces on both the sear and the striker pin. How does a recessed surface protrude past surrounding elevated surface? This simply is not possible. The artistic rendering employed by Mr. Hicks appears to depict the exact opposite of the "rollover" condition they are claiming exists in Mr. Mayes's pistol.



Figure 6.2: Comparison of the Subject Engagement to the Hick and Villani Artistic Rendering

What Mr. Villani and Mr. Hicks do not appear to understand is the performance of a SIG Sauer P320 pistol's engagement would not be adversely affected by the center surfaces of the sear or striker being recessed relative to the surrounding edges if they were in that condition – which they are not. The sear of the P320 rotates on a pivot. When the trigger is being pulled and the sear is being rotated downward to release the striker, the engagement surface of the sear rotates in a circular fashion. Therefore, by definition, it is impossible for the sear to maintain full surface to surface contact with a striker during rotation. Full surface to surface contact/engagement between the striker and sear is not required in the P320 or any other firearm that I am aware of. The only thing that is truly required is for the engagement contact stresses to be non-yielding, and the contact force vector to not produce a discharge moment about the sear. By design, the engagement between the striker and the sear of the P320 does not produce yield stresses or induce a discharge moment/torque about the sear. When the P320's striker engages the sear, the engagement promotes the sear to rise to full engagement, even with the center engagement surfaces recessed.

 

Striker with Recessed Center Engagement Surface          Sear with Recessed Center Engagement Surface

**Figure 6.3:  Models of Striker and Sear with Extreme Recessed Engagement Surface Centers**

To better illustrate the engagement physics of the P320, I modeled a striker and sear with center engagement surfaces that have been recessed 0.015 inches relative to the radiused edges.  See Figure 6.3.  As best I can tell, these altered versions of the striker and sear represent an extreme recess – or as Mr. Villani and Mr. Hicks state, a "rollover" – condition.  Figure 6.4 shows that when the recessed striker engages the recessed sear, the fact that the striker is significantly narrower than the sear dictates the edges of the striker's engagement interface mate with the top edge of the sear's engagement interface.  See Figure 6.4B and Figure 6.4C.  The fact that the center surfaces of the engagement interfaces of the striker and sear do not touch has no effect of the contact force vector created by the engagement.  The side edges of the striker's engagement interface set up the same angle of contact that would exist if the center material was present.  Because the contact angle between the striker and sear is unchanged, the contact force vector creates the same clockwise moment/torque about the sear's pivot, promoting the sear to rise and stay in the cocked position.  See Figure 6.4.A.  Having sears and strikers with recessed center engagement interfaces does nothing to promote a SIG Sauer P320 pistol to discharge absent a trigger pull.  Mathematically, the modified engagement shown in Figure 6.4 is identical to the factory engagement of the P320 pistol.  Therefore, the performance must be identical between the two systems.  Tellingly, neither Mr. Villani nor Mr. Hicks have even attempted to demonstrate or replicate how any recess – or "rollover" – can cause or contribute to a loss of engagement in an actual P320 pistol.



Figure 6.4:  P320 Engagement with Center Recessed Engagement Surfaces

As the trigger of a P320 is pulled, the sear is forced to rotate counterclockwise and disengage the striker.  This causes the top edge of the sear's engagement interface to trace a circle relative to the pivot pin of the sear.  This means that only the top edge of the sear's engagement interface contacts the striker throughout the discharge process.  This is why the top edge of the sear on the subject pistol is burnished/bright.  See Figure 6.5.  The edge

burnishing is a function of the rotation of the sear against the striker and is designed, expected and appropriate.



Figure 6.5:  P320 Sear Rotation and Disengagement

Figure 6.5 also shows that throughout the rotation of the sear during a trigger pull, the engagement induced contact torque about the sear's pivot remains positive:

$$T_A > T_B > T_C$$

This means the sear is continuously in a regain condition due to the sear's contact with the striker. It is a common mistake for people unskilled in the art of firearms design to think the sear springs are what holds the sear in engagement with the striker. Well-designed fire controls/trigger mechanisms, such as the P320, shape the contact force between the striker and sear to induce a regain moment about the sear that will cause the sear to return to full engagement with the striker if the pressure is removed from the trigger before the firearm has discharged. After the initial engagement is made, the sear springs only serve to enhance the regain torque about the sear, they are not its source.



Figure 6.6:  P320 Sears and Strikers Equipped with Recessed Engagement Interfaces are Equivalent to the Factory Parts

This simple proof utilizing basic physics, dynamics and mathematics conclusively shows that recessing the center of the engagement interfaces of the sear and/or striker does not

affect the magnitude or direction of the contact force, nor the resulting moment/torque about the sear. Therefore, the theoretical lack of contact between the center areas of a P320 pistol's engagement interfaces would have no adverse effect on the performance of the sear or striker even if it existed in the subject pistol – which it does not. Mr. Villani's claim of "rollover" causing uncommanded discharges in SIG Sauer P320 pistols is without scientific foundation and is false. Furthermore, it is more perplexing that Mr. Hicks, who is reportedly an engineer, did not conduct such a basic analysis before supporting Mr. Villani's false assertions of "rollover". The condition of the engagement interfaces of the subject striker and sear did not contribute to or cause Mr. Mayes to shoot himself.

In a deposition Mr. Villani gave on June 18, 2021 in another case, he stated that a P320 could be made to discharge absent a trigger pull by pulling the slide up and down relative to the frame, causing the striker to move up and down relative to the sear, essentially walking the striker up and off the sear. This is a false premise for an uncommanded discharge. Per the contact vectors and sear torques discussed here, the sear will move up and down with the striker, once the slide has been initially pulled up and then cause the engagement to regain. There is no physical impetus to allow the striker pin to be vertically displaced relative to the sear beyond the gaps between the slide and the fire control units' slide rails. To physically verify this fact, multiple exemplars – in both the pre-upgrade and post-upgrade vintages – were exercised a minimum of 100 times each in a manner consistent with Mr. Villani's testimony. In none of this testing did the striker walk up and lose engagement with the sear. Mr. Villani confirmed in his deposition that he has never tested this premise (or any of his other claimed defects) nor could he cite to any external support for his hypothesis. A simple manual test easily disproves his claim, as does basic physics.

Furthermore, the SIG Sauer P320 pistols do not contain the ability for the striker pin to rise up and over the sear when the sear is in the engaged/rotated up position. Figure 6.7 shows CT images from Mr. Mayes's SIG Sauer P320 pistol. When the striker pin engages the sear, the striker pin is biased up into the striker housing (blue arrows), the striker housing is biased up into the slide (red arrows), and the slide is biased up against the fire control unit's rails (yellow arrows). Each time the slide of a P320 pistol is cycled, all of the upward

gaps between the striker assembly's components and the slide are biased out of the system.



Figure 6.7:  CT Images of Mr. Mayes's SIG Sauer P320 Pistol and Internal Component Biasing

The biasing upward of the pistol's slide assembly and its components, combined with the rotation of the sear upward to maximize engagement makes it a physical impossibility for the striker to rise above the engaged sear due to relative motion between the slide and the fire control unit. Mr. Villani's testimony on this matter is false and wholly unsupported.

7. **Misrepresentations, Inaccurate and False Statements Made by the Consultants for the Plaintiff**

    7.1. The consultants for the plaintiff have made several inaccurate and/or false statements. This section covers some of the more egregious errors not previously covered in this report. Please note that the fact that any particular statement is not specifically addressed in this report does not indicate that I agree with that statement.

    7.2. Timothy Hicks

        7.2.1. On page 2 of his report, in his discussion about the history of the SIG Sauer P320, Mr. Hicks states, "No manual safety is available to the public on available versions of this firearm".

            7.2.1.1. SIG Sauer offers P320 pistols equipped with manual safeties to the public in multiple form factors.

        7.2.2. On page 3 of his report, Mr. Hicks states, "The sear and striker pin components are both produced using a Molded in Metal (MIM) process.

            7.2.2.1. MIM is an acronym which stands for Metal Injection Molding, not Molded in Metal. This error by Mr. Hicks suggests a lack of experience with MIM.

8. **Review of Case Materials**

In the preparation of this report I have reviewed the following materials:

- Complaint;
- Subject Pistol;
- Subject Holster
- Exemplar Pistols;
- NSI Exam Materials;
- Mr. Villani's initial Report

- Mr. Villani's Supplemental Report
- Mr. Hicks's Report
- Response to Interrogatories;
- Deposition – Stephen Mayes; and
- Produced technical data package – SIG P320.

Exhibits which I may use to explain or support the opinions expressed at trial include the afore-mentioned materials along with exemplar pistols, exemplar ammunition, cutaways, computer simulations, videos and other demonstrative exhibits.

Attached are a copy of my resume, a listing of my testimony for the last four years, and expert fee schedule.

9. Conclusions

Based on my education, training, and experience in product design and firearm design, manufacture and function, my review and study of the information provided regarding the circumstances of the shooting, and my inspection and testing of the subject pistol and exemplar pistols, I offer the following opinions to a reasonable degree of engineering and scientific certainty:

- The subject P320 pistol discharged at the time of the occurrence because the trigger was pulled or otherwise depressed;
- The subject P320 pistol will not discharge after being loaded and cocked without an external stimulus inducing motion of the trigger;
- The subject P320 pistol will not discharge in the absence of a pulling, depression or motion of the trigger;
- The subject P320 pistol and its fire control components do not possess any manufacturing or design defects which are causally related to the discharge of the pistol at the time Mr. Mayes shot himself;
- No design or manufacturing defects exist in the condition and functionality of the subject P320 pistol that would cause the pistol to discharge absent a trigger pull;
- The subject P320 pistol is safe in design and manufacture for its intended and reasonably foreseeable uses;

- In its condition at the time of the shooting, the subject P320 pistol did not possess any defective or unreasonably dangerous conditions;

- All post-incident attempts to cause the subject P320 pistol to fire absent a trigger pull have failed;

- The discharge of the subject P320 pistol was caused by Mr. Mayes's failure to follow safe gun handling practices, including failure to control the direction of the muzzle and causing the trigger to be pulled or depressed;

- The subject P320 pistol was not fully seated in the holster when the incident shooting occurred, contrary to Mr. Mayes's testimony;

- Mr. Mayes actuated the trigger and discharged the subject P320 pistol while the pistol was partially inserted in the holster;

- Mr. Mayes's actions described above caused the shooting and his injury; and

- Mr. Villani and Mr. Hicks have not demonstrated a single one of their claimed "defects" in the subject pistol because no such "defects" exists.

I reserve the right to change and supplement my opinions and conclusions following my examination of any additional case materials presented, including depositions.

Date: 09-16-2021

This report was prepared and authored by:

_____
Derek L Watkins
President & Chief Engineer
Nth-Level. LLC.

# EXHIBIT 26

Nth-Level, LLC
219 Enterprise Drive
Elizabethtown, KY 42701
270.307.9996
dereklw@nth-level.com



---

**Brittany Hilton v. SIG Sauer, Inc.,**
**Expert Report – Incident and Firearm Analysis**
Prepared by:  Derek Watkins
Date:  09/15/2022

---



Figure 1.1: Subject SIG Sauer P320, 9mm (SN: 58A194116)

## 1.    Introduction & Incident Background

This report is with respect to the matter of Brittany Hilton v SIG Sauer, Inc.  According to the allegations of the Complaint, on December 1, 2020, Detective Brittany Hilton was injured by a gunshot wound to her upper right inner thigh.   Ms. Hilton was allegedly carrying her SIG Sauer P320 pistol (SN 58A194116, chambered in 9mm) in a holster in her purse.  The complaint claims the P320 discharged "without the trigger being pulled" as Ms. Hilton was standing in her office. Reportedly no persons witnessed the discharge of the pistol.

---

The plaintiff's firearm consultants have opined the subject pistol is defective and said defect(s) caused Ms. Hilton to be injured. To date, none of the plaintiff's experts have provided any analytical or empirical test data substantiating their opined defect. More specifically, during the singular exam of the subject pistol, the plaintiff's firearms consultants attending the exam (Mr. Villani & Mr. Hicks) did not perform a single function test of the pistol or physically test any of their opined theories of defect. This odd behavior is compounded by the fact that Mr. Hicks is an engineer that works in a test facility that physically tests firearms, yet Mr. Hicks declined to perform any tests of the subject pistol. Mr. Villani and Mr. Hicks did observe me physically testing their theories of defect with the subject pistol and observed the subject pistol pass each and every test. In short, the plaintiff's consultants have reached conclusions of defect that defy the laws of physics and have made such claims without any analytical or empirical proof.

## 2. Summary of Findings

The subject pistol was examined by the consultants for the plaintiff (Mr. Villani and Mr. Hicks) and me (expert for SIG Sauer) on July 14, 2022 at North Star Imaging's lab in Marlborough, MA. The pistol and its mechanical components were examined via CT scan, digital photography, force measurements and physical testing. The pistol was memorialized non-destructively via CT scan before being physically inspected and tested. Throughout the inspection no evidence of manufacturing or design defect was observed. The pistol passed all the physical function tests to which it was subjected. See Figure 2.1. The tests marked with an "*" were added to the function testing to address specific allegations of defect made by Mr. Villani and Mr. Hicks.

The examination of the subject SIG Sauer P320 revealed the pistol was fully functional but showed many scrapes and scratches on its exterior surface. Despite being subjected to the full battery of function testing, the pistol was never made to discharge absent a trigger pull. It should be noted that Mr. Villani and Mr. Hicks, consultants for the plaintiff, declined to perform any function tests on the subject P320. At no time did Mr. Villani or Mr. Hicks demonstrate any of their claimed design or manufacturing defects during the examination of the pistol. When the fire control unit was removed from the pistol and visually examined

during the inspection, it was observed that the fire control unit was in a heavily oiled condition. The fire control unit's components were observed to be in factory condition and the only way the pistol could be made to fire was to cock the pistol and then pull the trigger. No physical or empirical evidence was observed that suggested the subject pistol was capable of discharging absent a trigger pull in a manner consistent with Ms. Hilton's testimony.

| CT & 2D Radiograph | Pass | Fail |
|---|---|---|
| Sear to Striker Pin Engagement | ✓ | |
| Striker Safety Lock to Safety Lever Clearance | ✓ | |
| Striker Safety Lock to Striker Pin Engagement | ✓ | |
| Trigger Bar Spring Integrity | ✓ | |
| Sear Springs Integrity | ✓ | |
| Function Testing | Pass | Fail |
| Magazine Catch | ✓ | |
| Slide Catch | ✓ | |
| Magazine Release | ✓ | |
| Slide Release | ✓ | |
| Trigger Function | ✓ | |
| Disconnector Function | ✓ | |
| Firing Pin/Striker Function | ✓ | |
| Striker Block Function | ✓ | |
| *Slide Gap (Exercised a minimum of 100 times) | ✓ | |
| *Striker Block "Ramp" | ✓ | |
| *Dynamic Striker Block Function | ✓ | |
| *Safety Lever Return Function | ✓ | |
| Trigger Pull Actuation Force Testing | ✓ | |

Figure 2.1: Summary of the Function Tests Performed on the Subject SIG Sauer P320 Pistol.

The plaintiff's "expert" reports from Mr. Villani and Mr. Hicks make multiple incorrect statements that pre-existing design and manufacturing defects were present in the subject P320 pistol when it discharged. However, neither Mr. Villani nor Mr. Hicks have provided any proof of defective behavior in the subject pistol. The event or chain of events that caused the incident discharge has also not been established – or even attempted to be established – by Mr. Villani or Mr. Hicks. Mr. Villani and Mr. Hicks have dismissed the possibility that the trigger of the subject pistol was actuated through improper handling of

the subject pistol without any empirical data, analytical analysis or adherence to the scientific method.

All physical testing of the subject pistol failed to produce a discharge absent a trigger pull. The pistol could be made to fire only when it was cocked and the trigger was pulled. There is no physical evidence to support an allegation that the pistol fired at the time of the incident – or any other time – in any manner other than when the pistol's chamber was loaded, the striker pin was cocked, and the trigger was actuated. It is my demonstrable opinion that the physical condition of the subject P320 pistol, memorialized in the CT scan, 2D radiographs, physical testing, photographs, and microscope analysis dictates the root cause of the incident shooting was the trigger of the subject pistol was actuated, causing the pistol to discharge.

Per Ms. Hilton's testimony and claim that the pistol spontaneously discharged is in direct violation of the first law of Newtonian Physics: "An object will remain at rest or in a uniform state of motion unless that state is changed by an external force." Neither the physical condition of the pistol, nor the laws of physics support Ms. Hilton's claim of an uncommanded discharge.

## 3.)  Brief Overview of the SIG Sauer P320

The SIG Sauer P320 is a semi-automatic striker fired pistol manufactured by SIG Sauer, Inc. The P320 was first introduced to the US market in 2014 and is an evolution of the SIG Sauer P250 platform. The uniqueness of the P320 is that it employs a short displacement trigger system housed in a modular fire control unit (FCU). See Figure 3.1. The use of a modular FCU allows a single fire control system to be used in generic grip modules, enabling the user to configure the pistol to their needs. Currently, SIG Sauer manufactures over 16 different models of the P320, including a customer configurable line. The modularity of the P320 is one of the features that allowed a variant of the P320 to win the US Army's solicitation for a new sidearm in 2017, making a custom version of the P320 the standard issued sidearm of the US Army in the form of the M17 (full size) and M18 (compact).



Figure 3.1:   Select Components of the SIG Sauer P320

The short displacement trigger system of the P320 is one of the features that distinguishes it from many other striker fired pistols on the market.  Up to the 1980s, hammer fired pistols dominated the handgun market, with the most prolific model being the Colt 1911 and its clones.  The hammer fired 1911 employs a short displacement trigger and was the US Army's standard issue sidearm from 1911 to 1985.  Due to the fundamental differences between hammer fired and striker fired pistols, it has only been in the past couple of decades that striker fired pistols with short displacement triggers have become readily available in the civilian firearms market.



Figure 3.2:  Component Displacement Due to a Trigger Pull

The short displacement trigger, the modular fire control unit and the user configurable grip modules, combined with the P320's excellent reliability and performance, have made the P320 the platform of choice among multiple branches of the military and law enforcement agencies, and the pistol of choice for many consumers.  In the seven-plus years the SIG Sauer P320 has been in production, it has risen to be a market leader.

4.  Inspection and Testing of the Subject Pistol

On July 14, 2022 the subject P320 pistol was examined at North Star Imaging's lab in Marlborough, MA.  The pistol was transported to and from the inspection by an FFL holder procured by plaintiff's counsel.  The condition of the pistol was assessed non-destructively with photography, computed tomography (CT), function-testing and physical measurements.  The North Star Imaging's CT equipment is similar to the CT equipment used in hospitals, only many times more powerful.  The CT scans serve to memorialize the condition of the fire control unit's components and their relationship to one another prior to any functioning testing or disassembly of the pistol.  After the CT and x-ray analyses were completed, the pistol was evaluated with respect to its condition and functionality. The entirety of the physical examination was video recorded.

I am not fully aware of what levels of testing or disassembly of the subject pistol were performed prior to my inspection in July of 2022.  I have become aware the Chief of the Bridge City Police Department field stripped the subject pistol after the incident and dry fired it prior to sending it to SIG Sauer for evaluation.  I have also reviewed the SIG Sauer firearms examination report from December 8, 2020, that indicates the subject P320 pistol was "completely disassembled, and all parts were detail inspected." Their reported findings were consistent with my examination: the post-incident examination concluded that all firing components and all mechanical safety features were found serviceable and functioned as designed. The report also confirms that the pistol was also live fire tested and the firearm functioned as designed.  The report concluded the following:

> "Inspected pistol and found that it appears a foreign object entered the trigger guard causing the pistol to discharge. There are several zig zag markings on the trigger and trigger guards. There is finish missing on the right side of the trigger the full length of the trigger. The grip module has several diagonal markings on the right side of the frame. There is a very deep gouge in the middle of the trigger guard, where a foreign object might be expected to contact the trigger guard after the trigger has been fully depressed. The pistol was in Blackhawk CQC Holster which has a gap allowing foreign object to enter the holster. There are scuff marks and gouging on the right inside of the holster. All damage found on the pistol was recorded. Pistol inspection was video recorded."

At the July 2022 inspection, the pistol was found to be in a well lubricated condition and fully functional.   The pistol passed all function tests and discharged only with a

contemporaneous and full actuation of the trigger. Mr. Villani and Mr. Hicks, consultants for the plaintiff, were present for the inspection. However, at no point during the exam did Mr. Villani or Mr. Hicks test for any of their opined defects in the subject pistol. Throughout the exam Mr. Villani and Mr. Hicks were only observed to take photos.

When the function testing and measurements of the pistol were completed, the pistol was field stripped (partially disassembled) and examined at the component level. The pistol and its components were in a clean condition, with no overt signs of component alteration or damage observed. After the pistol was reassembled, the function tests were repeated to confirm the functionality of the pistol had not been affected by the exam. From start to finish the examination took approximately four hours.

## 4.1.   External Inspection of the Pistol

The pistol was initially verified to be unloaded and clear of ammunition. The pistol was observed to be in a well-used condition. Overt signs of damage were observed on the pistol's grip and trigger. Initial external photographs of the pistol were taken before the pistol was placed in the CT machine. While the pistol was being scanned, the subject holster and incident shell were examined.

## 4.2.   CT and 2D Radiography Review

The pistol was placed in the CT scanner without being function tested beyond verifying it was fully unloaded. The purpose of the CT scan was to nondestructively memorialize the pistol's components and examine the fire control unit for signs of adjustment, abuse, and broken or improperly manufactured parts. Examination of the CT scan can also determine if any foreign material was interfering with the pistol's function. The pistol was scanned with the slide closed, the action cocked, and an empty magazine loaded into the grip. Scanning the pistol in the fully cocked condition enables the interaction of the pistol's internal components to be examined as they would have been configured immediately prior to the incident discharge.





Figure 4.2.1:  CT Scan Image of the Subject P320's Striker Pin to Sear Engagement

The CT scan confirmed the pistol contained a post upgrade fire control unit and did not contain aftermarket parts.  Figure 4.2.1 shows a CT image slice through the approximate center of the pistol's fire control unit.  The engagement between the sear and the striker pin was measured to be approximately 0.044 inches using the CT software provided by North Star Imaging.  The subject pistol's engagement was 100% of maximum, the striker pin's engagement surface in a complete overlapping condition with the sear's mating

engagement surface. SIG Sauer specifies a minimum engagement of 0.021 inches (0.526 mm) for the P320. The measured 0.044 inches is well above the SIG standard. The CT scan confirms the striker pin to sear engagement of the subject pistol was not causally related to the incident shooting.



Figure 4.2.2: CT Image of the Sear's Rotation Engagement Stop

The subject pistol contains a post upgrade sear, which is designed to maximize the engagement between the striker pin and the sear to 100% of the available engagement and is self-compensating for dimensional tolerances. When the striker engages the sear, the sear rotates in a clockwise manner, increasing the engagement between the striker and the sear until the bottom of the striker contacts the rotation stop surface of the sear. Because the sear's rotation is stopped by the striker, the sear adaptively rotates to the striker and negates any tolerance stack that may exist between the sear assembly and the striker assembly. When the pistol is not cocked, the sear is moved into a fully rotated upward condition by the sear springs. When the sear's upward rotation is not limited by its engagement with the striker pin, its upward rotation is stopped by its contact with the

safety lever's pivot pin.  Figure 4.2.2. clearly shows no contact between the sear and the safety lever pivot pin, which means the sear has bottomed out on the striker pin and the engagement between the striker pin and the sear is at its maximum.  Any assertion or implication made by Mr. Hicks or Mr. Villani that the engagement between the subject striker and the sear is less than 100% is false.  The sear physically cannot cover/engage more of the striker's engagement surface.

The CT also showed the striker safety lock was well seated in the striker pin's mating channel and was properly aligned to block the striker pin from completing a full stroke if somehow the striker pin was released before the striker safety lock was rotated up and out of position by the safety lever.  See Figure 4.2.3.  The CT scan confirms the striker safety lock was not causally related to the incident shooting.



Figure 4.2.3:  CT Image of the Striker safety lock Sitting in the Striker Pin's Channel

Mr. Villani states in his report that the striker safety lock channel in the striker pin contains an angled surface that would cause the safety lock to rise out of position during use and defeat the blocking feature of the striker safety lock.  This assertion by Mr. Villani has been repeatedly proven false.  The CT image shown in Figures 4.2.3 and 4.2.4 clearly show no such angled surface/ramp exists.  Image A of Figure 4.2.4 is taken from Mr. Villani's report and the red zig-zag line is claimed to depict the "ramp" that will enable the striker lock to "jump" the striker's blocking surface during an uncommanded release of the striker and allow the striker to bypass the striker lock and discharge the firearm (the second failure of the compound failure needed to produce an uncommanded discharge in a SIG P320 pistol).



Figure 4.2.4:  Villani's False Claim of a Clearance Cut Acting as a Ramp

The edge of the surface Mr. Villani identifies with his red zig-zag line is actually a clearance surface and does not interact with the striker lock.  See Figure 4.2.4.  Image C of Figure

4.2.4 shows the area of interest on the striker pin's body. While the red arrows point to Mr. Villani's fictitious ramp, images D and E of Figure 4.2.4 clearly show the identified surface radially slopes down and away from the surface the striker lock rides on and prevents the edge of the striker from interacting with the striker lock by creating a clearance. It is a physical impossibility for the clearance surface identified by Mr. Villani to act as a ramp. More importantly, Mr. Villani physically had the subject striker pin and striker lock in his hands and could see the identified red zig-zag surface is a simple change in diameter and could not impart a "jumping" force to the striker lock. Mr. Villani had also witnessed me repeatedly dynamically testing the striker lock system and saw his opined defect proven false.



Figure 4.2.5: CT Image of the Trigger Bar Spring to Magazine Gap

In the past Mr. Villani had mention contact between the trigger bar spring and the pistol's magazine as a defect. The CT clearly shows the trigger bar spring of the subject P320 does not contact the magazine. See Figure 4.2.5.

The sear springs in the subject pistol were also examined via the CT scan. See Figure 4.2.6. The scan showed the springs were properly aligned in their respective guide channels and

were providing a restoration force to the sear in an unimpeded manner. The CT scan confirmed the sear springs were not causally related to the incident shooting.



Figure 4.2.6: CT Image of the Sear Springs in their Respective Channels in the Sear Housing

Mr. Villani and Mr. Hicks have also been critical of the striker pin's retention and positioning in SIG P320 pistols, asserting a "large lateral gap" exists on both sides of the striker pin that will allow the striker pin to rotate excessively from side to side. This is a false assertion. Figure 4.2.7 is of two images taken from Mr. Hicks' report in which he depicts the side gaps of the striker pin (yellow circles). At this point it should be noted that while Mr. Hicks is a mechanical engineer, he has never designed a firearm, nor a firearm component. Mr. Hicks takes measurements and performs tests for a living, both of which he did not perform at the inspection of the subject pistol. While clearance gaps do exist in the subject pistol's design, the striker pin's rotation is well restrained by the striker housing. Clearances are a necessity in firearm design, as they are essential for the management of field debris.



Figure 4.2.7:  Mr. Hick's Claimed Excessive Gaps

Mr. Hicks continues his criticism of the striker lock, the associated gaps and its ability to be missaligned by making the following false statement:

> "The misalignment and rotation will cause minimal contact between the safety lock tab and the rear vertical stop portion of the striker, thereby reducing the contact area between the two surfaces. The misalignment would allow the striker pin to continue its forward movement when the striker foot is no longer retained by the sear, leading to an un-commanded discharge."

It is a physical impossibility for simple rotation of the striker pin and/or striker lock to allow the striker lock to fail.  Figure 4.2.7 shows the rotation of the striker pin is well restrained by the striker housing and the striker housing is well restrained within the pistol's slide.  If the gaps were to be eliminated and no rotation between the parts was permitted, the assembly could become sensitive to debris or improper lubricants.  Mr. Hicks's above statement demonstrates a profound ignorance of the subject pistol's components, its design, and how the firearm functions.  The CT clearly shows Mr. Hicks and Mr. Villani's claim of the striker to be capable of being excessively rotated to be false.

Furthermore, the absence of excessive striker pin rotation is clearly demonstrable without the use of CT.  Simply removing the slide from the pistol and manually placing a side load on the striker pin shows the striker pin's movement/rotation to the right or left is consistent with other commercially available semiautomatic pistols, such as Glock, Smith & Wesson, Walther, and Canik to name a few.  Mr. Villani and Mr. Hicks have never simply applied a side load to the striker of a SIG P320 pistol to show it excessively rotates, nor can they because the design prevents it.  Mr. Villani and Mr. Hicks had ample opportunity to

test their striker rotational defect claim during the examination of the subject pistol and chose not to.  I did side load the striker during the examination and its axial rotation was negligible at best, as it is in Glock, Smith & Wesson, Walther, and Canik pistols, to name a few.  Mr. Villani and Mr. Hicks repeatedly claim the SIG P320 pistol is defective without any analytical or empirical proof.  Mr. Villani's behavior is somewhat understandable as he is completely unqualified to provide expert opinions with respect to firearm design and manufacturing.  While being deposed Mr. Villani admitted he did not even know what the scientific method is.  To be clear, Mr. Villani does not know the basic process by which all scientifically sound opinions are rendered.  Mr. Hicks, on the other hand, is an engineer and should know how to render a scientifically sound opinion, yet he has failed to substantiate any of his opinions of defect alleged against the SIG Sauer P320 with a single performance test.  In this case, Mr. Hicks did not go through the trouble of even performing a single function test on the subject pistol  before rendering his unsubstantiated opinions of defect.

In previous reports and in testimony, Mr. Hicks and Mr. Villani have stated excessive gaps exist between the slide of the pistol and the rails of its fire control unit, and these gaps will allow the striker to move excessively vertically relative to the sear and allow the SIG P320 to discharge absent a trigger pull.  However, the CT scan of the subject pistol shows this opined defect to be false.  The CT scan shows the slide is biased upward and is pressing against the rails (yellow arrows in Figure 4.2.8) and the slide cannot go any higher relative to the fire control unit.  Further examination of the CT also shows the striker and striker housing are also biased upward against the slide. The blue arrows shown in Figure 4.2.8 show the striker pin is biased upward agains the striker housing, while the red arrows show the striker housing is biased upward against the slide.  The vertical biasing of the pistol's slide components is not by chance.  When the striker engages the sear, a clockwise moment is induced in the striker (shooter's right side view).  This moment causes the striker to attempt to rise, pushing the striker up into the striker housing, the striker housing into the slide and the slide up against the rails of the fire control unit.  This biasing upward of the striker combined with the rotation of the sear means that every time the pistol is cycled the engagement between the sear and the striker is maximized and all of the

upward gaps between the sear, striker, striker housing and slide are removed. This means the engagement between the striker and sear is maximized and it is a physical impossibility for the striker to ride up and over the sear without the sear being physically rotated down.



Figure 4.2.8:  CT Images of Ms. Hilton's SIG Sauer P320 Pistol and Internal Component Biasing

Mr. Hicks and Mr. Villani's claim that relative motion between the slide and the fire control unit of the subject pistol could produce an uncommanded discharge is false and has never been analytically or physically demonstrated. Although Mr. Hicks and Mr. Villani have been adamant in the past that this excessive vertical motion defect exists in the SIG P320, neither consultant made such a claim in their reports about the shooting of Ms. Hilton. Hopefully Mr. Villani and Mr. Hicks have learned that each time the slide of a P320 pistol is cycled, all of the upward gaps between the striker assembly's components and the slide are biased out of the system. Therefore, the upward biasing of the pistol's slide assembly and its components, combined with the rotation of the sear upward to maximize its engagement with the striker pin, makes it a physical impossibility for the striker to rise above the engaged sear.

Mr. Hicks was critical of the lack of a safety lever return spring in the subject pistol, claiming the removal of the spring in the post upgrade pistol allows the safety lever to displace and disable the striker safety lock absent a trigger pull. Mr. Hicks' statements with respect to the removal of the safety lever spring clearly demonstrates an ignorance of the functionality of the safety lever in the post upgrade pistols. Figure 4.2.9 shows how the safety lever functions in the post upgrade pistols. The post upgrade safety levers are equipped with a "v" notch that the trigger bar engages. As the trigger is pulled and the trigger bar is displaced forward, the trigger bar causes the rotation of the safety lever up and into contact with the striker safety lock. As the trigger is released, the trigger bar rotates the safety lever downward and out of contact with the striker safety lock. The motion of the trigger bar positions the safety lever, eliminating the need for a dedicated spring to rotate it downward and out of contact with the striker safety lock. During the exam of the pistol I lifted and released the safety lever multiple times. Each time I released the safety lever, the trigger bar snapped the safety lever back down. Mr. Hicks's claim that the removal of the safety lever spring can cause an uncommanded discharge is false and has never been analytically or physically demonstrated possible. The dedicated safety lever spring was removed because the design of the upgraded fire controls changed the interaction between the trigger bar and the safety lever, eliminating the need for a dedicated safety lever return spring.



Figure 4.2.9: CT Image of the Safety Lever and Striker Lock System

Furthermore, it is disingenuous for Mr. Hicks to claim a dedicated spring is necessary to control the positioning of the safety lever. Figure 4.2.9 shows the striker lock is biased downward by the striker lock spring. The striker lock spring is strong enough to reset the striker safety lock and the safety lever (if ever needed). Pistols like the series 80, M1911 pistols have successfully employed this type of springless safety lever design for the past 40 years. Almost every major firearms pistol manufacturer has produced a variant of the 1911 pistol. Mr. Hicks's omission that the striker safety lock's spring must be overcome before the striker safety can displace the striker safety lock misrepresents the functionality of the striker block/lock system. Mr. Hicks's representation that when the pistol is in a

muzzle down orientation or the upside down orientation, the safety lever can deactivate the striker block/lock system by a non trigger pull induced contact between the safety lever and the striker safety lock is false. Both the trigger bar and the striker safety lock spring actively prevent this from occurring.



Figure 4.2.10: Mr. Hicks' Improper Representation of Dimensions in the Subject Pistol

Mr. Hicks also challenged the dimensional quality of several of the component features in the subject pistol. Mr. Hicks did not provide for the source of his measurements in his report, nor did he provide any type of qualification for the accuracy of his "measurements". Image A of Figure 4.2.10 is taken from Mr. Hicks' report and depicts the upper radius of the sear's engagement surface to be out of tolerance, with a reported radius of 0.18 mm. The only way Mr. Hicks could have measured that radius is via the CT scan of the subject pistol. Per Mr. Hicks' CV, he has no training with the interpretation of CTs, and this is made evident when examining his measurements. Image B of 4.2.10 shows a radius of approximately 0.18 mm super-imposed on the radius in question of the subject sear. It is easy to see Mr. Hicks's measurement exceeds the actual radius of the sear significantly. Image C of 4.2.10 shows the proper measurement of the sear radius in question as being approximately 100 microns or .1 mm, which does meet the SIG drawing specification.



Figure 4.2.11:  Mr. Hicks Improper Representation of Dimensions in the Subject Pistol

None of the measurements presented in Mr. Hicks's report are shown to have been measured by hand or reported to have been measured by the North Star Imaging software, and when the measurements are checked, they are often incorrect. For example, Mr. Hicks reports the width of the rails to be 21.6 mm (under the SIG drawing specification). I don't believe Mr. Hicks understands that this dimension is physically machined to width on each frame. While Mr. Hicks may have physically measured the rail width out of specification by over squezing the calipers and deflecting the rails during a physical measurement process, measurements via the CT software showed the rail width to be 21.712 mm and within specification. See Figure 4.2.11. Therefore, based on my review of Mr. Hicks's measurement, any and all measurements presented in his report must be viewed as false until proven correct.

Both Mr. Villani and Mr. Hicks falsely claim the engagement surface of the striker pin has excess material. True to form, neither Mr. Villani nor Mr. Hicks provide any measurements or test data that suggests the claimed extra material is present or could cause an uncommanded discharge. In Section 5 of this report I explain in detail the physics present in the subject pistol that would prevent an uncommanded discharge even if said excess material was present. In Figure 4.2.13, I show how much physical deformation of the subject striker pin's engagement surface would be necessary for an uncommanded discharge to be even theoretically possible. Image A of Figure 4.2.12 clearly shows the claimed excess material on the striker's engagement surface is not present, as no gap exists between the striker and sear, which means the striker and sear are in perfect surface to surface contact (no excess material present). Image B shows the angle of the sear's engagement surface is approximately 112.8 degrees relative to the center of the sear's pivot. This means approximately 22.8 degrees of material would need to be removed from the striker pin's engagement surface before the striker pin would theoretically start to depress the sear absent a trigger pull. The red triangle shown in image C of Figure 2.4.12 approximates how much material would need to be removed from the striker pin. Therefore, the claimed excess material Mr. Villani and Mr. Hicks say is present on the engagement surface of the striker pin would have no adverse effect on the performace of

the subject SIG P320 pistol, as the engagement surface of the subject striker pin looks nothing like the defective theoretical striker pin shown in image C of Figure 4.2.12.



Figure 4.2.12:  Striker Pin Deformation Required for the Striker to Override the Sear



Figure 4.2.13:  Striker Pin Deformation Required for the Striker Lock to Override the Striker

Similar overt deformation would also be necessary for the striker lock to override the striker pin and allow an uncommanded discharge to occur. Image A of Figue 4.2.13 shows the striker impacting the striker lock creates a clockwise moment about the striker lock's pivot and urges the striker lock to rotate down and into a locking condition with the striker. Image B of Figure 4.2.13 shows the locking surface of the striker pin would need to be at an approximate angle of 110.2 degrees relative to the bottom of the striker lock before the striker lock could start to be lifted up and over the striker pin via contact with the striker pin. This means the locking surface of the striker pin would need to be backcut to an angle of approximately 25.2 degrees before it could theoretically lift the striker lock up and out of the locking position. The red polygon shown in image C of Figure 4.2.13 shows the theoretical amount of material that would need to be removed from the striker pin to lift the striker lock out of position. Because the subject striker pin's locking surface looks nothing like the theoretical deformation required for the striker lock to fail, Mr. Villani and Mr. Hick's claim that the subject striker lock can "jump" the striker during an uncommanded discharge can be dismissed.

Analysis of the subject pistol's CT scan showed no propensity for the subject P320 to discharge absent a trigger pull. None of the fire control's components were observed to be overtly altered or damaged. The motions and interactions between the components were found to be within factory specifications. No evidence was observed that would support any of Mr. Villani's or Mr. Hicks's assertions of defect, nor have Mr. Villani or Mr. Hicks demonstrated any of their opined defects analytically or empirically.

4.3. <u>Physical Testing of the Pistol</u>

After the CT scan was completed, the pistol was function tested. The purpose of function testing is to verify the components of the pistol are interacting properly and determine if any claimed defects can be substantiated. Figure 4.3.1 documents each function test that was performed. The function tests were performed a minimum of five times before any disassembly of the pistol was performed. The pistol passed all the function tests performed. Mr. Villani and Mr. Hicks declined to function test the pistol even though this was their only opportunity to do so.

| Function Testing | Pass | Fail |
|---|---|---|
| Magazine Catch | ✔ | |
| Slide Catch | ✔ | |
| Magazine Release | ✔ | |
| Slide Release | ✔ | |
| Trigger Function | ✔ | |
| Disconnector Function | ✔ | |
| Firing Pin/Striker Pin Function | ✔ | |
| *Slide Gap (Exercised a minimum of 100 times) | ✔ | |
| *Striker Block "Ramp" | ✔ | |
| *Dynamic Striker Block Function | ✔ | |
| *Safety Lever Return Function | ✔ | |
| *Slide Gap (Exercised a minimum of 100 times) | ✔ | |

Figure 4.3.1: Summary of the Function Tests Performed on the P320 Pistol.

Four new tests were added to the standard function tests (noted with an "*" in Figure 4.3.1) to directly test the more far-fetched allegations of defect made by Mr. Villani and Mr. Hicks. Recently Mr. Villani has made the allegation that the striker contained a ramped surface which could make the striker safety lock "jump" out of position and allow the pistol to discharge absent a trigger pull. Mr. Villani has also alleged the striker pin has excessive rotation from side to side which can defeat the striker block/lock safety system. To test these allegations, the slide was removed from the pistol and a dummy round of ammunition was loaded into the chamber of the pistol. The striker was then fully retracted and released multiple times with and without side loads that induced striker rotation. The dummy round contained a primer pocket filled with modeling clay. If the striker safety lock ever failed to block the motion of the striker, the clay would record the failure with a firing pin impression in the clay. This test was designed to directly test Mr. Villani's allegation of defect. The testing proved the striker does not contain a "ramp", the mating surfaces of the striker and striker safety lock do not contain "rollover", and side loading of the striker does not defeat the striker block/lock system of the subject P320. The only way the pistol's striker could be made to leave a firing pin indent in the clay of the dummy round was to depress the striker safety lock and release the striker from the cocked position, as the pistol was designed and intended to function. See Figure 4.3.2.


Clay Primer Before Test


Striker Safety Lock Not Depressed
(No Discharge)


Striker Safety Lock Depressed
(Discharge)

Figure 4.3.2:  Striker Block Function Testing Results with Dummy Ammunition Containing Clay Primers

The test results shown in Figure 4.3.2 conclusively show the striker in the subject pistol does not have excessive rotation side to side.  The simple act of running a test for a defect does not acknowledge or in any way validate existence of the defect.  The existence of a defect is only acknowledged or verified by repeatable validating test results.  The physical testing of the subject pistol specifically disproved the unsubstantiated and untested conclusion postulated by Mr. Villani.  For the record, I do not acknowledge the existence of excessive side to side rotation of the striker in the subject pistol because it has been proven both analytically and empirically not to exist.

The slide gap test was also added to the function testing regiment in direct response to the allegations that relative motion between the slide and the fire control can cause an uncommanded discharge.  This allegation has previously been proven to be false from a design standpoint via analytical analysis (regain torque vector analysis of the sear) and empirical testing (vibration testing of pistols in different carry orientations).  The slide gap test consists of cocking the pistol, and then pulling the slide away from the fire control unit and pressing it back down on the fire control unit.  One pull and one push constitute one cycle of the test.  The subject pistol was tested a minimum of 100 times with no failures, disproving the allegations.

NRA hanging weights were employed to measure the force required to pull the pistol's trigger and discharge the firearm.  Six trigger pull forces were measured with an average trigger pull force of 5.525 pounds.  See Figure 4.3.3.  The measured trigger pulls are well

above the Sporting Arms and Ammunition Manufacturer's Institute's (SAAMI) recommended 3lb minimum

| Trigger Pull Measurements (pounds) | |
|---|---|
| No Discharge | Discharge |
| 5.50 | 5.75 |
| 5.50 | 5.75 |
| 5.50 | 5.75 |
| 5.25 | 5.50 |
| 5.25 | 5.50 |

Figure 4.3.3: Trigger Pull Force Measurements

During the function testing and throughout the examination, the pistol could only be made to discharge when the pistol was cocked and the trigger was fully pulled. The pistol never discharged absent a trigger pull or behaved in any way that would substantiate any of Mr. Villani or Mr. Hicks' assertions of defect.

## 4.4. Disassembly and Inspection

When the function testing and trigger pull measurements had been completed, the fire control unit was removed from the pistol and visually inspected. The components were relatively clean, but a significant amount of oil was present. See Figure 4.4.1. No overt signs of fire control component damage or alteration were observed.



Figure 4.4.1: Subject Fire Control Unit

The subject sear was manually depressed multiple times to verify it was moving freely and the sear springs were returning the sear with force. The sear was proven to be functioning properly. The sear had a light film of what appeared to be grease on its engagement surface. No signs of damage or alteration were observed. See Figure 4.4.2.



Figure 4.4.2:  Subject Sear's Engagement Surface

Mr. Villani and Mr. Hicks have previously asserted in their reports against SIG P320 pistols that the burnished top edge of the sear is evidence that the sear is improperly formed. Mr. Villani has used the term "rollover" – which is a self-fabricated term and is not used in product design or manufacturing – to characterize his fabricated "defect". The observed burnishing is a product of the tooling and the motion of the sear against the engagement surface of the striker pin as the trigger is pulled. This is explained in detail in Section 5 of this report.

To the extent Mr. Villani is using the fabricated term "rollover" to refer to excess material on the components, there is no physical evidence of any such excess material. SIG Sauer designed the fire control of the P320 to use as cast MIM (metal injection molded) parts. Mr. Villani and Mr. Hicks are critical of the surfaces of the parts and compare them to machined parts. Neither Mr. Hicks nor Mr. Villani have ever provided a quantitative (measurement) value for the claimed excess material. This is because the parts are within print specification and no excess material is present. The CT scan (discussed in detail above) clearly shows clean surface-to-surface contact between the striker and the sear. If

excess material was present in the subject pistol, the CT scan would clearly show it. Moreover, neither Mr. Villani nor Mr. Hicks have explained how any such excess material, if it actually existed, could cause the pistol to fire without a trigger pull, much less demonstrated that this is possible. In fact, Section 5 of this report presents a detailed analytical analysis that the claimed excess material cannot produce an uncommanded discharge.



Figure 4.4.3: Subject Striker Pin's Engagement Surface

Mr. Villani and Mr. Hicks stated in their reports that the striker pin showed signs of excess material on the striker pin's engagement surface. Figure 4.4.3 shows no signs of defects in the striker pin and the radii present on the edges of the striker pin are per the design and do not constitute a defect, as was proven by the function testing. The burnishing present on the lower edge of the striker pin's engagement surface is due to said edge sliding against the striker as the trigger is pulled. Correspondingly, the top edge of the sear's engagement surface is burnished as it slides against the striker pin when the trigger is pulled.



Figure 4.4.4: The Subject Striker Assembly in the Full Blocked Condition

Removing the striker assembly from the pistol showed no signs of alteration or damage. When the striker assembly is removed, the striker safety lock engages the striker pin, placing the striker pin in the blocked condition. Figure 4.4.4 shows the striker safety lock is not only blocking the striker pin but is also pulled down to the fully engaged position.

This physical evidence completely contradicts the claim of the striker safety lock defect made by Mr. Villani and Mr. Hicks.



Figure 4.4.5: The Striker Safety Lock Fully Engaged by the Striker Pin

As discussed earlier, the striker safety lock rotates on a pivot. See Figure 4.4.4. If the striker pin were to be theoretically released without a trigger pull, the striker pin would impact the striker safety lock above the striker safety lock's pivot, which would induce a clockwise moment about the pivot and causes the striker safety lock to rotate downward. Therefore, the harder the striker presses on the striker safety lock, the harder the striker safety lock is held in position to block/lock the striker pin. The radius on the top edge of the striker pin's engagement with the striker safety lock doesn't interact with the striker safety lock. See Figure 4.4.5. The radiused edge on the striker pin was also empirically proven to have no adverse effect on the functionality of the striker safety lock during the striker block

function testing discussed in Section 4.3. Lastly, in the past Mr. Villani has asserted the contact marks between the striker safety spring and the striker housing are evidence of a defect. The P320 design uses the striker housing to not only locate the striker safety spring, but also to align and guide it with respect to the striker safety lock. Because the contact between the striker safety spring and the striker housing is a function of the housing acting as a spring guide, the contact occurs by design and is not a defect. It was easy to see the minimal nature of the contact marks, directly refuting the statements that the striker safety spring was dragging against the housing and could cause the striker safety lock to seize. See Figure 4.4.4.



Figure 4.4.6: Brass Fragment in the Safety Lock Channel of the Subject Striker Pin

While inspecting the striker pin, it was observed it was heavily covered in oil. See image A of Figure 4.4.6. When I wiped the excess oil from the striker pin, the fragment of brass that was in the middle of the striker lock channel (see image A) was whipped into the corner of the channel (see image B). Both Mr. Hicks and Mr. Villani opined in their reports that this sliver of brass could have contributed to an uncommanded discharge, when the fact is said sliver of brass could not have interacted with the striker lock due to the gap between the striker lock and the adjacent wall the sliver of brass was attached to. See image E of Figure 4.2.4. This is another example of Mr. Hicks and Mr. Villani jumping to say an uncommanded discharge could occur, without first understanding what they are talking about. Additionally, even if the observed sliver of brass had been in the position shown in image B before the pistol was disassembled, the striker lock would have

functioned properly as the SIG P320's striker lock is designed to handle debris through its designed in clearances that Mr. Hicks has identified as defects.

When the inspection of the pistol's internal components was completed, the pistol was reassembled and function tested again to verify the function of the firearm had not changed due to its disassembly or reassembly. The pistol once again passed all the function tests and was proven to discharge only when the striker pin was cocked and the trigger was pulled.

4.5. <u>Holster and Pistol Markings</u>

Examination of the subject holster and the exterior surfaces of the pistol were examined. The interior of the holster showed many scuff marks, and its condition suggested a foreign object could have entered the holster and actuated the trigger of the pistol. See Figure 4.5.1.



Figure 4.5.1: A Sample of the Scuff marks Observed in the Subject Holster

Examination of the trigger showed scratches that were consistent with a hard object with sharp edges actuating the trigger. See Figure 4.5.2.



Figure 4.5.2:  Markings on the Subject Pistol's Trigger



Figure 4.5.3:  Markings on the Pistol's Grip Module

Both sides of the pistol's grip module had scratches that ran from the muzzle end of the module to the trigger guard.  See Figure 4.5.3.



Figure 4.5.4:  Subject Pistol in the Subject Holster

Lastly, when the subject pistol was fully inserted into the holster, the trigger was still visible and accessible.  See Figure 4.5.4.  Per the law enforcement photos and testimony from the responding officers, the pistol was in the holster, which was in Ms. Hilton's purse at the time of discharge.   The incident shell was not ejected from the pistol and the law enforcement photos show it was still fully chambered in the pistol with the slide closed. This means the motion of the slide was significantly obstructed by a foreign object, as Ms. Hilton was carrying the purse.

I was not given access to the purse or its contents for examination. The law enforcement photos of the purse show it was full of various objects with varying trigger pulling capabilities. See Figure 4.5.5. Of particular interest is the USB cable that was bridging both side of the purse. Given the condition of the pistol and the holster, the physical evidence indicates an object actuated the trigger leaving marks on the trigger and most probably the holster. The condition of the holster neither confirmed nor denied the pistol was at least partially holstered or fully holstered at the time of discharge. At this time, the only certainty about the incident discharge is the trigger was actuated, as the pistol passed all the function tests and the examination revealed no causally related conditions in the pistol.



Figure 4.5.5: Ms. Hilton's Purse

Mr. Priest, a third consultant for the plaintiff stated in his report that while it is possible to insert a small object into the trigger guard when the pistol is inserted in the subject holster, no evidence of such a manipulation is present in the materials he reviewed. It is my understanding that Mr. Priest has never personally seen or examined the subject pistol or holster. Additionally, the law enforcement photos do not contain any close-up images of the subject pistol's trigger or the interior of the holster. My review of the documents provided by law enforcement indicate their efforts were to memorialize the incident scene

and not the details of each piece of evidence. Of the 40 law enforcement photos provided, only one shows the holster, none show closeups of the trigger, and none show the pistol as it was in the purse immediately after the shooting. Of the photos that do show the pistol, the sides of the pistil's grip module clearly show damage consistent with items rubbing and dragging on the pistol.

I most adamantly disagree with Mr. Priest's conclusion that the "evidence and provided materials support, to a reasonable degree of technical certainty, that the holstered Sig Sauer P320 carried by Detective Hilton discharged without manipulation of the trigger mechanism." As best as I can tell, Mr. Priest did not review anything technical. Statements about how the shooting allegedly occurred are not technical. Photos of a shooting scene that were taken after most of the evidence had been moved or manipulated are not technical. Mr. Priest provided nothing in his report upon which to technically render an opinion. Mr. Priest has based his opinion entirely on hearsay and circumstance; and provides no explanation for why the subject pistol cannot be made to discharge absent a trigger pull.

## 5. The Fallacy of "Rollover"

Mr. Villani has previously stated on multiple occasions that a condition which he has named "rollover" exists on the engaging surfaces of the P320 pistol's sear and striker (along with other components), including in the subject pistol. However, Mr. Villani has never presented a clear definition of what "rollover" is. Mr. Villani has stated rollover was excess molding material "around its perimeter edge which can cause less contact between the positive contact surfaces". The subject sear and striker engagement surfaces do not contain flash, excess material around the edges or shrinkage of their inner surfaces. The radiused edges present on those parts are created by the tooling and are there by design. In deposition, Mr. Villani confirmed he is not claiming the radiused edges on components in the P320 pistol constitute a defect. The fact is, the term "rollover" is not an industry term and is something Mr. Villani appears to have made up. He has not cited to any publications or other relevant source that uses the term. In previous reports Mr. Hicks had adopted the term "rollover" but has backed off from that stance in this report.





Figure 5.1: "Rollover" Images Previously Presented by Mr. Hicks

Mr. Hicks and Mr. Villani have previously employed artistic renderings that reportedly show excess material/"rollover" around the edges of the engagement surfaces of the sear and the striker. See Figure 5.1. However, these images are simply artist renderings and have nothing to do with the SIG P320 pistols or subject Hilton pistol. In his latest report, Mr. Villani simply shows a photo of the subject striker pin's engagement surface with some annotation arrows to indicate the excess material/"rollover" condition. See Figure 5.2. The arrows only point to the edge radii, which Mr. Villani has testified to previously as not being a defect. Close examination of Figure 5.2 actually shows linear striations running through the center area of the striker's engagement surface. It is a physical impossibility for these striations to exist if the engagement surface was surrounded by raised excess material. Mr. Villani disproves his allegation of defect with his own photo.



Figure 5.2:  Villani's Photo of "Excess" Material on the Subject Hilton Striker

What Mr. Villani and Mr. Hicks do not appear to understand is the performance of a SIG Sauer P320 pistol's engagement would not be adversely affected by the center surfaces of the sear or striker being recessed relative to the surrounding edges if they were in that condition – which they are not.  The sear of the P320 rotates on a pivot.  When the trigger is being pulled and the sear is being rotated downward to release the striker, the engagement surface of the sear rotates in a circular fashion.  Therefore, by definition, it is impossible for the sear to maintain full surface to surface contact with a striker during rotation.  Full surface to surface contact/engagement between the striker and sear is not required in the P320 or any other firearm that I am aware of.  The only thing that is truly required is for the engagement contact stresses to be non-yielding, and the contact force vector to not produce a discharge moment about the sear.  By design, the engagement between the striker and the sear of the P320 does not produce yield stresses or induce a discharge moment/torque about the sear.  When the P320's striker engages the sear, the engagement promotes the sear to rise to full engagement, even with the center engagement surfaces recessed.



Striker with Recessed Center Engagement Surface



Sear with Recessed Center Engagement Surface

Figure 5.3:  Models of Striker and Sear with Extreme Recessed Engagement Surface Centers

To better illustrate the engagement physics of the P320, I modeled a striker and sear with center engagement surfaces that have been recessed 0.015 inches relative to the radiused edges.  See Figure 5.3.  As best I can tell, these altered versions of the striker and sear represent an extreme recess – or as Mr. Villani states, a "rollover" – condition.  Figure 5.4 shows that when the recessed striker engages the recessed sear, the fact that the striker is significantly narrower than the sear dictates the edges of the striker's engagement interface mate with the top edge of the sear's engagement interface.  See Figure 5.4B and Figure 5.4C.  The fact that the center surfaces of the engagement interfaces of the striker and sear do not touch has no effect of the contact force vector created by the engagement. The side edges of the striker's engagement interface set up the same angle of contact that would exist if the center material was present.



Figure 5.4:  P320 Engagement with Center Recessed Engagement Surfaces

Because the contact angle between the striker and sear is unchanged, the contact force vector creates the same clockwise moment/torque about the sear's pivot, promoting the sear to rise and stay in the cocked position.  See Figure 5.4.A.  Having sears and strikers with recessed center engagement interfaces does nothing to promote a SIG Sauer P320 pistol to discharge absent a trigger pull.  Mathematically, the modified engagement shown in Figure 5.4 is identical to the factory engagement of the P320 pistol.  Therefore, the

performance must be identical between the two systems.  Tellingly, neither Mr. Villani nor Mr. Hicks have even attempted to demonstrate or replicate how any recess – or "rollover" – can cause or contribute to a loss of engagement in an actual P320 pistol.  That is because it cannot.



Figure 5.5:  P320 Sear Rotation and Disengagement

As the trigger of a P320 is pulled, the sear is forced to rotate counterclockwise and disengage the striker. This causes the top edge of the sear's engagement interface to trace a circle relative to the pivot pin of the sear. This means that only the top edge of the sear's engagement interface contacts the striker throughout the discharge process. This is why the top edge of the sear on the subject pistol is burnished/bright. See Figure 5.5. The edge burnishing is a function of the rotation of the sear against the striker and is designed, expected and appropriate.

Figure 5.5 also shows that throughout the rotation of the sear during a trigger pull, the engagement induced contact torque about the sear's pivot remains positive:

$$T_A > T_B > T_C$$

This means the sear is continuously in a regain condition due to the sear's contact with the striker. It is a common mistake for people unskilled in the art of firearms design to think the sear springs are what holds the sear in engagement with the striker. Well-designed fire controls/trigger mechanisms, such as the P320, shape the contact force between the striker and sear to induce a regain moment about the sear that will cause the sear to return to full engagement with the striker if the pressure is removed from the trigger before the firearm has discharged. After the initial engagement is made, the sear springs only serve to enhance the regain torque about the sear, they are not its singular source.

This simple proof utilizing basic physics, dynamics and mathematics conclusively shows that recessing the center of the engagement interfaces of the sear and/or striker does not affect the magnitude or direction of the contact force, nor the resulting moment/torque about the sear. See Figure 5.6. Therefore, the theoretical lack of contact between the center areas of a P320 pistol's engagement interfaces would have no adverse effect on the performance of the sear or striker even if it existed in the subject pistol – which it does not. Mr. Villani's claim of "rollover" causing uncommanded discharges in SIG Sauer P320 pistols is without scientific foundation and is false. Furthermore, it is more perplexing that Mr. Hicks, who is an engineer, did not conduct such a basic analysis before supporting and adopting Mr. Villani's false assertions of "rollover". The condition of the engagement

interfaces of the subject striker and sear did not contribute to or cause Ms. Hilton's discharge.



Figure 5.6: P320 Sears and Strikers Equipped with Recessed Engagement Interfaces are Equivalent to the Factory Parts

6. **Hicks Misrepresents Testing Results**

In October of 2021, SIG Sauer conducted vibration testing on multiple SIG P320 pistols in response to the unfounded allegation made by the Mr. Hicks and Mr. Villani that vibration could induce an uncommanded discharge in a SIG P320. As expected by competent engineers, none of the pistols tested experienced an uncommanded discharge and Mr. Hicks and Mr. Villani's assertion of a vibration sensitive defect was empirically proven false. In Mr. Hicks's report on the Hilton shooting, he has claimed that SIG misrepresented the test results and several of the tested pistols experienced an uncommanded striker release and the primers of the test cartridges experienced light impacts. Mr. Hicks' allegation of impropriety by SIG Sauer is completely false.

The entirety of the vibration testing was video recorded. It is unknown if Mr. Hicks took it upon himself to review the videos, but if he had he would have seen each pistol being removed from the test vibration stands; the primed cartridge then being removed from the test pistol and inspected; and then said test cartridge then being discharged in the pistol to show both the pistol and the cartridge were capable of being discharged.



Figure 6.1: Images of Discharged Cartridges from Page 216 of the SIG Sauer Vibration Test Report

What is more disturbing to me is Mr. Hicks' inability to tell the difference between non discharged shells with a light primer impact and completely discharged shells. Mr. Hicks notes in his report that examples of the light primer impact shells can be found on page 216, 230 and 231 of the SIG Sauer Vibration Test Report. When a primed shell has not been discharged, the inside of the shell is as shiny as the outside of the shell. When a primed shell is discharged, the inside of the shell becomes coated with carbon and typically turns a dull gray in color. Reviewing the images of the shells with the disassembled test pistols in the SIG test report clearly shows the shells are discharged and if Mr. Hicks had bothered to review the video footage of the testing he would have known the shells depicted were the intentionally discharged test shells. See Figure 6.1. The inability of a person claiming to be a firearms expert not being able to tell the difference between a discharged cartridge and an undischarged cartridge is extremely disturbing.

7.  Review of Case Materials

In the preparation of this report I have reviewed the following materials:

- Complaint;
- Subject Pistol;
- Exemplar Pistols;
- North Star Imaging Exam Materials;
- Report - Mr. Villani;
- Report - Mr. Hicks;
- Report – Jonathyn Priest;
- Report – Kathy Flowers Sutton;
- Law Enforcement Photos;
- SIG Sauer Initial Pistol Examination Report
- SIG Sauer's Response to Interrogatories;
- Ms. Hilton's Response to Interrogatories;
- Deposition – Ms. Hilton; and
- Produced technical data package – SIG P320.

Exhibits which I may use to explain or support the opinions expressed at trial include the afore-mentioned materials along with exemplar pistols, exemplar ammunition, cutaways, computer simulations, videos and other demonstrative exhibits.

Attached are a copy of my resume, a listing of my testimony for the last four years, and expert fee schedule.

## 8.    Conclusions

Based on my education, training, and experience in product design and firearm design, manufacture and function, my review and study of the information provided regarding the circumstances of the shooting, and my inspection and testing of the subject pistol and exemplar pistols, I offer the following opinions to a reasonable degree of engineering and scientific certainty:

- The subject P320 pistol discharged at the time of the occurrence because the trigger was pulled or otherwise depressed;

- The subject P320 pistol will not discharge after being loaded and cocked without an external stimulus inducing motion of the trigger;

- The subject P320 pistol will not discharge in the absence of a pulling, depression or motion of the trigger;

- The subject P320 pistol and its fire control components do not possess any manufacturing or design defects which are causally related to the discharge of the pistol;

- No design or manufacturing defects exist in the condition and functionality of the subject P320 pistol that would cause the pistol to discharge absent a trigger pull;

- The subject P320 pistol is safe in design and manufacture for its intended and reasonably foreseeable uses;

- In its condition at the time of the shooting, the subject P320 pistol did not possess any defective or unreasonably dangerous conditions;

- All post-incident attempts to cause the subject P320 pistol to fire absent a trigger pull have failed;

- The discharge of the subject P320 pistol was caused by Ms. Hilton's failure to follow safe gun handling practices, including failure to control the direction of the muzzle and causing the trigger to be pulled or depressed;

- Ms. Hilton's actions described above caused the shooting and her injury; and

- Mr. Villani and Mr. Hicks have not demonstrated a single one of their claimed "defects" in the subject pistol because no such "defects" exists.

I reserve the right to change and supplement my opinions and conclusions following my examination of any additional case materials presented, including depositions.

Date: 09-15-2022

This report was prepared and authored by:

Derek L Watkins
President & Chief Engineer
Nth-Level. LLC.

# EXHIBIT 27



Nth-Level, LLC
219 Enterprise Drive
Elizabethtown, KY 42701
270.307.9996
dereklw@nth-level.com

Jimmy Jinn v. SIG Sauer, Inc.,
Expert Report – Incident and Firearm Analysis
Prepared by: Derek Watkins
Date: 08/02/2021

| Function Testing | Pass | Fail |
|---|:---:|:---:|
| Magazine Catch | ✓ | |
| Slide Catch | ✓ | |
| Magazine Release | ✓ | |
| Slide Release | ✓ | |
| Trigger Function | ✓ | |
| Disconnector Function | ✓ | |
| Firing Pin/Striker Function | ✓ | |
| Striker Safety Lock Function | ✓ | |
| Trigger Pull Actuation Force Testing | ✓ | |

Figure 2.1: Summary of the Function Tests Performed on the Subject SIG Sauer P320 Pistol.


1.    Introduction & Incident Background

This report is for the matter of Jinn v. SIG Sauer, Inc. According to the allegations of the Complaint, on July 24, 2019, Mr. Jinn was conducting tactical shooting training at a range when he was injured by a gunshot wound to his right leg. Mr. Jinn was allegedly carrying a SIG Sauer P320 pistol (SN D804351, chambered in 9mm x 19) in a holster attached to his belt prior to the shooting. The complaint claims the P320 discharged "without the trigger being pulled" as Mr. Jinn was removing the pistol from the holster.

The pistol is the property of Homeland Security. Homeland Security shipped the pistol to SIG Sauer for an evaluation.

## 2. Summary of Findings

The subject pistol was examined by SIG Sauer on January 29, 2020. The inspection was video recorded. The pistol was a "Post Upgrade" version and shown to be in a clean condition, with no overt damage or alterations observed. The pistol was first tested per the function tests listed in Figure 2.1. The subject pistol passed all the function tests. NRA (National Rifle Association) hanging weights were employed to test the trigger actuation force of the pistol. The pistol was shown to discharge at approximately five pounds.

The pistol was then field stripped, and its sub systems examined. The pistol appeared to be very clean internally, with no significant field debris observed. The trigger, trigger bar, disconnector, sear, and striker safety lever were all shown to be functioning properly. When the fire control unit was removed from the pistol and visually examined during the inspection, it was observed to be relatively clean, free of overt damage and alteration, and functioning properly. The fire control unit's components were observed to be in factory condition and the only way the pistol could be made to fire was to cock the pistol and then fully pull the trigger. No physical or empirical evidence was observed that would suggest the subject pistol was capable of discharging absent a trigger pull in a manner consistent with Mr. Jinn's complaint.

Neither the holster nor the incident ammunition were presented for review.

All physical testing of the subject pistol failed to produce a discharge absent a trigger pull. The pistol could be made to fire only when it was cocked and the trigger was pulled. There is no physical evidence to support an allegation that the pistol fired at the time of the incident – or any other time – in any manner other than when the pistol's chamber was loaded, the striker pin was cocked, and the trigger was actuated.

I personally have not been able to review/examine the subject pistol, as it has not been made available for my review. I am extremely knowledgeable of the P320 pistol's design and its history. For a P320 to discharge absent a trigger actuation, the pistol must experience a compound failure. Specifically, the sear must release the striker pin without trigger movement and the striker safety lock system must fail. The striker safety lock system is a passive safety that blocks the firing pin tip from being able to contact the primer of a loaded cartridge of ammunition. The striker safety lock system is only released when

the trigger is pulled. The act of pulling the trigger causes the striker safety lever to displace and unlock the striker safety lock. Therefore, the pistol can only discharge if the trigger has been pulled or the sear/striker connection and striker safety lock system have failed. I have not seen any credible engineering theory for how these two systems fail in the absence of broken or missing pieces.

The design of the SIG Sauer P320, combined with the video examination of the subject pistol indicates Mr. Jinn caused the trigger of the subject pistol to be pulled when he was removing the pistol from the holster.

3.)    Brief Overview of the SIG Sauer P320

The SIG Sauer P320 is a semi-automatic striker fired pistol manufactured by SIG Sauer, Inc. The P320 was first introduced to the US market in 2014 and is an evolution of the SIG Sauer P250 platform. The uniqueness of the P320 is it employs a short displacement trigger system housed in a modular fire control unit (FCU). See Figure 3.1. The use of a modular FCU allows a single fire control system to be used in generic grip modules, enabling the user to configure the pistol to their needs. Currently, SIG Sauer manufactures over 16 different models of the P320, including a customer configurable line. The modularity of the P320 is one of the features that allowed the P320 to win the US Army's solicitation for a new sidearm in 2017, making a custom version of the P320 the standard issued sidearm of the US Army in the form of the M17 (full size) and M18 (compact).



Figure 3.1:   Select Components of the SIG Sauer P320

The short displacement trigger system of the P320 is one of the features that distinguishes it from many other striker fired pistols on the market. Up to the 1980s, hammer fired pistols dominated the handgun market, with the most prolific model being the Colt 1911 and its clones. The hammer fired 1911 employs a short displacement trigger and was the US Army's standard issue sidearm from 1911 to 1985. Due to the fundamental differences between hammer fired and striker fired pistols, it has only been in the past couple of decades that striker fired pistols with short displacement triggers have become readily available in the civilian firearms market.



Figure 3.2: Component Displacement Due to a Trigger Pull

The P320 also employs a passive safety system, meaning the safety is engaged at all times when the pistol is cocked and the trigger is not being pulled. See Figure 3.2. When the trigger of the P320 is pulled, the trigger bar is pulled towards the muzzle end of the pistol. As the trigger bar is displaced, it first contacts the safety lever, causing the safety lever to rotate counterclockwise, displacing the striker safety lock and unlocking the striker pin. When the striker safety lock is in the down position, as shown in Figure 3.2, the striker pin is blocked from traveling forward and detonating the cartridge loaded in the chamber of the barrel (Figure 3.1). Once the striker safety lock has been displaced, the trigger bar contacts and rotates the sear counterclockwise, causing the sear to lose its engagement with the striker pin. When the striker pin is no longer restrained by the sear and the striker safety lock is in the unlocked position, the striker pin – which is under spring tension – is propelled forward and impacts the primed cartridge causing the pistol to discharge. Each time the pistol discharges and the pistol fully cycles, the striker safety lock will re-engage, blocking/locking the striker pin until the trigger is once again pulled. The sear also resets, catching the striker and re-energizing it under spring tension and making it ready to fire another round. If the sear does not rise back up and catch the striker foot, the P320 pistol is not cocked and is unable to fire.

The short displacement trigger, the modular fire control unit and the user configurable grip modules, combined with the P320's excellent reliability and performance, have made the P320 the platform of choice among multiple branches of the military and law enforcement agencies, and the pistol of choice for many consumers. In the seven-plus years the SIG Sauer P320 has been in production, it has risen to be a market leader.

4.    Review of Case Materials

In the preparation of this report I have reviewed the following materials:

- Complaint;

- Video of subject pistol examination;

- Exemplar Pistols;

- SIG Sauer communications with DHS;

- Armorer's Manuals;

- Plaintiff's responses to interrogatories; and

- SIG P320 technical data package.

Exhibits which I may use to explain or support the opinions expressed at trial include the afore-mentioned materials along with exemplar pistols, exemplar ammunition, cutaways, computer simulations, videos and other demonstrative exhibits.

Attached are a copy of my resume, a listing of my testimony for the last four years, and expert fee schedule.

5.    Conclusions

Based on my education, training, and experience in product design and firearm design, manufacture and function, my review and study of the information provided regarding the circumstances of the shooting, and my review of the subject pistol testing, I offer the following opinions to a reasonable degree of engineering and scientific certainty:

- The subject P320 pistol discharged at the time of the occurrence because the trigger was pulled or otherwise depressed;

- The subject P320 pistol will not discharge after being loaded and cocked without an external stimulus inducing motion of the trigger;

- The subject P320 pistol will not discharge in the absence of a pulling, depression or motion of the trigger;

- The subject P320 pistol and its fire control components do not possess any manufacturing or design defects which are causally related to the discharge of the pistol at the time Mr. Jinn shot himself;

- No design or manufacturing defects exist in the condition and functionality of the subject P320 pistol that would cause the pistol to discharge absent a trigger pull;

- The subject P320 pistol is safe in design and manufacture for its intended and reasonably foreseeable uses;

- In its condition at the time of the shooting, the subject P320 pistol did not possess any defective or unreasonably dangerous conditions;

- No evidence has been presented demonstrating that the subject P320 pistol – or any properly functioning P320 pistol – could have fired absent a trigger pull; and

- The discharge of the subject P320 pistol was caused by Mr. Jinn's failure to follow safe gun handling practices, including failure to control the direction of the muzzle and causing the trigger to be pulled or depressed.

I reserve the right to change and supplement my opinions and conclusions following my examination of any additional case materials presented, including depositions.

Date: 08-02-2021

This report was prepared and authored by:

_____
Derek L Watkins
President & Chief Engineer
Nth-Level. LLC.

# EXHIBIT 28

Nth-Level, LLC
219 Enterprise Drive
Elizabethtown, KY 42701
270.307.9996
dereklw@nth-level.com



---

Jimmy S.C. Jinn v. SIG Sauer, Inc.,

**Supplemental Expert Report – Incident and Firearm Analysis**

Prepared by: Derek Watkins

Date: 12/15/2021

---



Figure 1.1: Subject SIG Sauer P320, 9mm (SN: DB11100)

## 1.    Introduction & Incident Background

This supplemental report is with respect to a SIG Sauer P320 pistol owned by Homeland Security in the matter of Jinn v. SIG Sauer, Inc. Originally, I was informed the subject pistol was not available for examination prior to the deadline for my report, but it was my understanding it had been examined by Sig Sauer prior to the lawsuit being filed. I was provided with a video inspection of the pistol believed to be the Jinn pistol, upon which I was asked to provide my observations. See my original report on August 2, 2021. It was later determined that the P320 pistol was not the pistol used by Mr. Jinn based on documentation from Homeland Security identifying the Jinn pistol. After my initial report

had been issued, Homeland Security identified the correct pistol and made the pistol available for inspection on October 28, 2021. This report is with respect to the inspection of the subject pistol and the subsequent reports issued by the plaintiff's firearm consultants, Mr. Villani and Mr. Hicks. Mr. Hicks did not attend the inspection of the subject pistol, nor does he explicitly state he was absent from the inspection his report.

According to the allegations of the Complaint, on July 24, 2019, Mr. Jinn was conducting tactical shooting training at a range when he was injured by a gunshot wound to his right leg. Mr. Jinn was allegedly carrying a SIG Sauer P320 pistol in a holster attached to his belt prior to the shooting. The complaint claims the P320 discharged "without the trigger being pulled" as Mr. Jinn was removing the pistol from the holster.

The plaintiff's firearm consultants have opined the subject pistol is defective and said defect(s) caused Mr. Jinn to be injured. To date, neither of the plaintiff's experts have provided any analytical or empirical test data substantiating their opined defect. More specifically, during the singular exam of the subject pistol, the plaintiff's firearms consultant attending the exam (Mr. Villani) did not perform a single function test of the pistol or physically test any of his opined theories of defect. Conversely, Mr. Villani did observe me physically testing his theories of defect with the subject pistol and observed the subject pistol pass each and every test. In short, the plaintiff's consultants have reached conclusions of defect without any analytical or empirical proof.

## 2. Summary of Findings

The subject pistol was examined by the consultant for the plaintiff (Mr. Villani) and myself (expert for SIG Sauer) on October 28, 2021 at NTS Labs in Belcamp, MD. Mr. Hicks, a second consultant for the plaintiff did not attend the inspection. The pistol and its mechanical components were examined via CT scan, digital photography, force measurements and physical testing. The pistol was memorialized non-destructively via CT scan before being physically inspected and tested. Throughout the inspection no evidence of manufacturing or design defects were observed, and the pistol passed all the function tests. See Figure 2.1. The tests marked with an "*" were added to the function testing to address specific allegations of defect made by Mr. Villani and Mr. Hicks.

| CT & 2D Radiograph | Pass | Fail |
|---|:---:|:---:|
| Sear to Striker Pin Engagement | ✓ | |
| Striker Safety Lock to Safety Lever Clearance | ✓ | |
| Striker Safety Lock to Striker Pin Engagement | ✓ | |
| Trigger Bar Spring Integrity | ✓ | |
| Sear Springs Integrity | ✓ | |
| **Function Testing** | **Pass** | **Fail** |
| Magazine Catch | ✓ | |
| Slide Catch | ✓ | |
| Magazine Release | ✓ | |
| Slide Release | ✓ | |
| Trigger Function | ✓ | |
| Disconnector Function | ✓ | |
| Firing Pin/Striker Function | ✓ | |
| Striker Block Function | ✓ | |
| *Slide Gap (Exercised a minimum of 100 times) | ✓ | |
| *Striker Block "Ramp" | ✓ | |
| *Striker Block Function (bias the striker to the shooter's right) | ✓ | |
| *Striker Block Function (bias the striker to the shooter's left) | ✓ | |
| *Safety Lever Return Function | ✓ | |
| Trigger Pull Actuation Force Testing | ✓ | |

Figure 2.1: Summary of the Function Tests Performed on the Subject SIG Sauer P320 Pistol.

The examination of the subject SIG Sauer P320 revealed the pistol was fully functional and in an unaltered condition. Despite the full battery of function testing, the pistol was never made to discharge absent a trigger pull. This is consistent with the records of examination conducted by Homeland Security shortly after the accident, where the pistol was found to be functioning properly. It should be noted that Mr. Villani, consultant for the plaintiff, declined to perform any function tests on the subject P320. At no time did Mr. Villani demonstrate any of their claimed design or manufacturing defects during the examination of the pistol. When the fire control unit was removed from the pistol and visually examined during the inspection, it was observed that the fire control unit was in a lightly oiled and clean condition. The fire control unit's components were observed to be in factory condition and the only way the pistol could be made to fire was to cock the pistol and then pull the trigger. No physical or empirical evidence was observed that suggested the subject pistol was capable of discharging absent a trigger pull in a manner consistent with Mr. Jinn's testimony.

The plaintiff's "expert" reports from Mr. Villani and Mr. Hicks make multiple incorrect statements that pre-existing design and manufacturing defects were present in the subject P320 pistol when Mr. Jinn shot himself. However, neither Mr. Villani nor Mr. Hicks have provided any proof of defective behavior in the subject pistol. The event or chain of events that caused the incident discharge has also not been established – or even attempted to be established – by Mr. Villani or Mr. Hicks. Mr. Villani and Mr. Hicks have dismissed the conclusion that Mr. Jinn shot himself through improper handling of the subject pistol without any empirical data, analytical analysis or adherence to the scientific method.

All physical testing of the subject pistol failed to produce a discharge absent a trigger pull. The pistol could be made to fire only when it was cocked and the trigger was pulled. There is no physical evidence to support an allegation that the pistol fired at the time of the incident – or any other time – in any manner other than when the pistol's chamber was loaded, the striker pin was cocked, and the trigger was actuated. It is my demonstrable opinion that the physical condition of the subject P320 pistol, memorialized in the CT scan, 2D radiographs, physical testing, photographs, and microscope analysis dictates the root cause of the incident shooting was that Mr. Jinn actuated the trigger of the subject pistol and shot himself.

Per Mr. Jinn's testimony and claim that the pistol spontaneously discharged is in direct violation of the first law of Newtonian Physics: "An object will remain at rest or in a uniform state of motion unless that state is changed by an external force." Neither the physical condition of the pistol, nor the laws of physics support Mr. Jinn's claim of an uncommanded discharge.

3.)    Brief Overview of the SIG Sauer P320



Figure 3.1:   Select Components of the SIG Sauer P320

The SIG Sauer P320 is a semi-automatic striker fired pistol manufactured by SIG Sauer, Inc. The P320 was first introduced to the US market in 2014 and is an evolution of the SIG Sauer P250 platform.  The uniqueness of the P320 is that  it employs a short displacement trigger system housed in a modular fire control unit (FCU).  See Figure 3.1.  The use of a modular FCU allows a single fire control system to be used in generic grip modules, enabling the user to configure the pistol to their needs.  Currently, SIG Sauer manufactures over 16 different models of the P320, including a customer configurable line.  The modularity of the P320 is one of the features that allowed a variant of the P320 to win the US Army's solicitation for a new sidearm in 2017, making a custom version of the P320 the standard issued sidearm of the US Army in the form of the M17 (full size) and M18 (compact).



Figure 3.2:  Component Displacement Due to a Trigger Pull

The short displacement trigger system of the P320 is one of the features that distinguishes it from many other striker fired pistols on the market.  Up to the 1980s, hammer fired pistols dominated the handgun market, with the most prolific model being the Colt 1911 and its clones.  The hammer fired 1911 employs a short displacement trigger and was the US Army's standard issue sidearm from 1911 to 1985.  Due to the fundamental differences between hammer fired and striker fired pistols, it has only been in the past couple of decades that striker fired pistols with short displacement triggers have become readily available in the civilian firearms market.

The P320 also employs a passive safety system, meaning the safety is engaged at all times when the pistol is cocked and the trigger is not being pulled. See Figure 3.2. When the trigger of the P320 is pulled, the trigger bar is pulled towards the muzzle end of the pistol. As the trigger bar is displaced, it first contacts the safety lever, causing the safety lever to rotate counterclockwise, displacing the striker safety lock and unlocking the striker pin. When the striker safety lock is in the down position, as shown in Figure 3.2, the striker pin is blocked from traveling forward and detonating the cartridge loaded in the chamber of the barrel (Figure 3.1). Once the striker safety lock has been displaced, the trigger bar contacts and rotates the sear counterclockwise, causing the sear to rotate downward and lose its engagement with the striker pin. When the striker pin is no longer restrained by the sear and the striker safety lock is in the unlocked position, the striker pin – which is under spring tension – is propelled forward and impacts the primed cartridge causing the pistol to discharge. Each time the pistol discharges and the pistol fully cycles, the striker safety lock will re-engage, blocking/locking the striker pin until the trigger is once again pulled. The sear also resets, catching the striker and re-energizing it under spring tension and making it ready to fire another round. If the sear does not rise back up and catch the striker foot, the P320 pistol is not cocked and is unable to fire.

The short displacement trigger, the modular fire control unit and the user configurable grip modules, combined with the P320's excellent reliability and performance, have made the P320 the platform of choice among multiple branches of the military and law enforcement agencies, and the pistol of choice for many consumers. In the seven-plus years the SIG Sauer P320 has been in production, it has risen to be a market leader.

4.  Inspection and Testing of the Subject Pistol

On October 28, 2021 the subject P320 pistol was examined at the NTS Labs facility in Belcamp, MD.  The pistol was transported to and from the inspection by two Homeland Security agents, agent Jeffrey Browder and agent Derek Bassler.  The agents were present for the entirety of the inspection and verified the inspection was being memorialized via video throughout the inspection by agent Browder.  The condition of the pistol was assessed non-destructively with photography, computed tomography (CT), function-testing and physical measurements.  The NTS Lab's CT equipment is similar to the CT equipment used in hospitals, only many times more powerful.  The CT scans serve to memorialize the condition of the fire control unit's components and their relationship to one another prior to any functioning testing or disassembly of the pistol.  After the CT and x-ray analyses were completed, the pistol was evaluated with respect to its condition and functionality.

I am not fully aware of what levels of testing or disassembly of the subject pistol were performed prior to my inspection in October of 2021.  I have reviewed a Homeland Security firearms examination report from July 30, 2019 – less than a week after the accident – that indicates the subject P320 pistol was "completely disassembled, and all parts were detail inspected." Their reported findings were consistent with my examination: the post-incident examination concluded that "All firing components and all mechanical safety features were found serviceable and functioned as designed." The report also confirms that the pistol was function tested and "the firearm functioned as designed and exhibited no anomalies." The report concluded the following:

> "A physical examination of the firearm and all of its components revealed no modifications, anomalies or defects.  The firearm was assembled correctly and functioning as designed.  The firearm is unmodified and serviceable.  As a result, a mechanical reason for the discharge of the firearm could not be identified or duplicated."

At the October 2021 inspection, the pistol was found to be in a clean condition and fully functional.  The pistol passed all function tests and discharged only with a contemporaneous and full actuation of the trigger.  Mr. Villani, consultant for the plaintiff, was present for the inspection.  However, at no point during the exam did Mr. Villani test

for any of his opined defects in the subject pistol.  Throughout the exam Mr. Villani was only observed to take photos.  Mr. Hicks, the plaintiff's second firearms consultant, did not attend the inspection.

When the function testing and measurements of the pistol were completed, the pistol was field stripped (partially disassembled) and examined at the component level.  The pistol and its components were in a clean condition, with no overt signs of component alteration or damage observed.  After the pistol was reassembled, the function tests were repeated to confirm the functionality of the pistol had not been affected by the exam.  The Homeland Security agents then packed the pistol and transported it back with them.  From start to finish the examination took approximately four hours.

## 4.1. External Inspection of the Pistol

The pistol was initially verified to be unloaded and clear of ammunition. The pistol was observed to be in good condition and clean. No overt signs of damage or alteration were observed. Initial external photographs of the pistol were taken before the pistol was placed in the CT machine.

## 4.2. CT and 2D Radiography Review

The pistol was placed in the CT scanner without being function tested beyond verifying it was fully unloaded. The purpose of the CT scan was to nondestructively memorialize the pistol's components and examine the fire control unit for signs of adjustment, abuse, and broken or improperly manufactured parts. Examination of the CT scan can also determine if any foreign material was interfering with the pistol's function. The pistol was scanned with the slide closed, the action cocked, an empty magazine and the muzzle pointed down (as if the pistol was in a holster). Scanning the pistol in the fully cocked condition enables the interaction of the pistol's internal components to be examined as they would have been configured immediately prior to the incident discharge.



Figure 4.2.1: CT Scan Image of the Subject P320's Striker Pin to Sear Engagement

The CT scan confirmed the pistol contained a post upgrade fire control unit and did not contain aftermarket parts. Figure 4.2.1 shows a CT image slice through the approximate center of the pistol's fire control unit. The engagement between the sear and the striker pin was measured to be approximately 0.044 inches using the CT software provided by NTS Labs. The subject pistol's engagement was 100% of maximum, the striker pin's engagement surface in a complete overlapping condition with the sear's mating engagement surface. SIG Sauer specifies a minimum engagement of 0.021 inches (0.526 mm) for the P320. The measured 0.044 inches is well above the SIG standard. The CT scan confirms the striker pin to sear engagement of the subject pistol was not causally related to the incident shooting.



Figure 4.2.2: CT Image of the Sear's Rotation Engagement Stop

The subject pistol contains a post upgrade sear, which is designed to maximize the engagement between the striker pin and the sear to 100% of the available engagement and is self-compensating for dimensional tolerances. When the striker engages the sear, the sear rotates in a clockwise manner, increasing the engagement between the striker and the sear until the bottom of the striker contacts the rotation stop surface of the sear.

Because the sear's rotation is stopped by the striker, the sear adaptively rotates to sear and negates any tolerance stack that may exist between the sear assembly and the striker assembly. When the pistol is not cocked, the sear is moved into a fully rotated upward condition by the sear springs. When the sear's upward rotation is not limited by its engagement with the striker pin, its upward rotation is stopped by its contact with the safety lever's pivot pin. Figure 4.2.2. clearly shows no contact between the sear and the safety lever pivot pin, which means the sear has bottomed out on the striker pin and the engagement between the striker pin and the sear is at its maximum. Any assertion or implication made by Mr. Hicks or Mr. Villani that the engagement between the subject striker and the sear is less than 100% is false. The sear physically cannot cover/engage more of the striker's engagement surface.

The CT also showed the striker safety lock was well seated in the striker pin's mating channel and was properly aligned to block the striker pin from completing a full stroke if somehow the striker pin was released before the striker safety lock was rotated up and out of position by the safety lever. See Figure 4.2.3. The CT scan confirms the striker safety lock was not causally related to the incident shooting.



Figure 4.2.3:  CT Image of the Striker safety lock Sitting in the Striker Pin's Channel

In previous reports Mr. Villani has stated the striker safety lock channel in the striker pin contains an angled surface that would cause the safety lock to rise out of position during use and defeat the blocking feature of the striker safety lock. This assertion by Mr. Villani

has been repeatedly proven false. The CT image shown in Figure 4.2.3 clearly shows no such angled surface/defect exists.



Figure 4.2.4: CT Image of the Trigger Bar Spring to Magazine Gap

In the past Mr. Villani and Mr. Hicks mention contact between the trigger bar spring and the pistol's magazine as a defect. The CT clearly shows the trigger bar spring of the subject P320 does not contact the magazine. See Figure 4.2.4.



Figure 4.2.5: CT Image of the Sear Springs in their Respective Channels in the Sear Housing

The sear springs in the subject pistol were also examined via the CT scan. See Figure 4.2.5. The scan showed the springs were properly aligned in their respective guide channels and were providing a restoration force to the sear in an unimpeded manner. The CT scan confirmed the sear springs were not causally related to the incident shooting.



Figure 4.2.6: Mr. Hicks Improper Representation of the Striker Pin's Rotational Gaps vs the Actual Rotational Gap

Mr. Villani and Mr. Hicks are critical of the striker pin's retention and positioning in the subject pistol, asserting a "large lateral gap" exists on both sides of the striker pin that will allow the striker pin to rotate excessively from side to side. This is a false assertion. Figure 4.2.6A is an image from Mr. Hick's report in which he improperly depicts the side gaps of the sear (yellow circle). Mr. Hicks shows the foot of the striker pin surrounded by the slide

rear cap. The slide rear cap does not restrain nor is it designed to restrain the rotation of the striker pin. The striker pin's rotation is restrained by the striker housing. Figure 4.2.6B shows the rotation of the striker pin is well restrained and by the striker housing. Figure 4.2.6C shows the striker housing is well restrained within the pistol's slide. If the striker housing is well restrained from excessive axial rotation in the slide, and the striker pin is well restraind from excessive axial rotation in the striker housing; logic and physics dictates the striker pin is well restrained from excessive rotation in the slide. By depicting the striker rear cap as the as intended rotational limiter for the striker pin, Mr. Hicks is demonstrating a profound ignorance of the subject pistol's components and their design. The CT clearly shows Mr. Hicks and Mr. Villani's claim of the striker to be capable of being excessively rotated to be false.

Furthermore, the abscence of excessive striker pin rotation is clearly demonstratable without the use of CT. Simply removing the slide from the pistol and manually placing a side load on the striker pin shows the striker pin's movement/rotation to the right or left is consistent with other commercially available semiautomatic pistols, such as Glock, Smith & Wesson, Walther, and Canik to name a few. Mr. Villani and Mr. Hicks have never simply applied a side load to the striker of a SIG P320 pistol to show it excessively rotates, nore can they because the design prevents it. Mr. Villani had the opportuinty to test his striker rotational defect during the examination of the subject pistol and chose not to. I did side load the striker during the examination and its axial rotation was negligable at best, as it is in Glock, Smith & Wesson, Walther, and Canik pistols, to name a few. Mr. Villani and Mr. Hicks repeatedly claim the SIG P320 pistol is defective without any analytical or emperical proof. Mr. Villani's behavior is somewhat understandable as he is completely unqualified to provide expert opinions with respect to firearm design and manufacturing. While being deposed Mr. Villani admitted he did not even know what the scientific method is. To be clear, Mr. Villani does not know the basic process by which all scientificly sound opinions are rendered. Mr. Hicks on the other hand, is an engineer and *should* know how to render a scientificly sound opinion, yet he has failed to substantiate any of his opions of defect aleged against the SIG Sauer P320 with a single performance test. In this case, Mr. Hicks

did not go through the trouble of even attending the exam or even observing the exam remotely before rendering his unsubstantiated opinions of defect.

In his report, Mr. Hicks also states the CT shows gaps between the slide and the rails of the fire control unit, and these gaps will allow the striker to move vertically relative to the sear. See the blue circles in Figure 4.2.6A. Interestingly, Mr. Hicks's CT image shows the slide is biased upward and is pressing against the rails (the contact is located on the bottom of the slide rail producing a gap on the top of the slide rails), the slide cannot go any higher relative to the fire control unit. Further examination of the CT also shows the striker and striker housing are also biased upward against the slide. The vertical biasing of the pistol's slide components is not by chance. When the striker engages the sear, a clockwise moment is induced in the striker (shooter's right side view). This moment causes the striker to attempt to rise, pushing the striker up into the striker housing, the striker housing into the slide and the slide up against the rails of the fire control unit. This biasing upward of the striker combined with the rotation of the sear means that every time the pistol is cycled the engagement between the sear and the striker is maximized and all of the upward gaps between the sear, striker, striker housing and slide are removed. This means the engagement between the striker and sear is maximized and it is a physical impossibility for the striker to ride up and over the sear without the sear being physically rotated down. Mr. Hicks's claim that relative motion between the slide and the fire control unit of the subject pistol could produce an uncommanded discharge is false and has never been analytically or physically demonstrated.

Mr. Hicks then goes on to state, "None of the functional tests performed during the October 2021 inspection, nor any test data produced by SIG SAUER, document the result or impact of this movement". If Mr. Hicks had attended or observed the examination of the subject pistol he would have witness me physically exercising the gap between the slide rails and the fire control rails at least 100 times without failure. I directly tested Mr. Hicks opined slide rail vertical motion defect in the subject pistol and proved it to be false. Mr. Hicks has never demonstrated that such movement can cause a P320 pistol to fire without a trigger pull. SIG Sauer has also produced vibration testing of the P320 pistol in multiple orientations that exercised the motion between the slide and fire control unit

without producing a failure. Yet, Mr. Hicks falsely claims in his report that these direct tests of his opined defect have not occured. Cyclical vertical displacement between the subject fire control unit and the slide did not and cannot induce an uncommanded discharge in the subject pistol.



Figure 4.2.7: CT Image of the Safety Lever and Striker Lock System

Mr. Hicks and Mr. Villani were also critical of the lack of a safety lever return spring in the subject pistol, claiming the removal of the spring in the post upgrade pistol allows the safety lever to displace and disable the striker safety lock when the pistol is holstered. Mr. Hicks and Mr. Villani's statements with respect to the removal of the safety lever spring clearly demonstrates an ignorance of the functionality of the safety lever in the post upgrade pistols. Figure 4.2.7 shows how the safety lever functions in the post upgrade pistols. The post upgrade safety levers are equipped with a "v" notch that the trigger bar engages. As the trigger is pulled and the trigger bar is displaced forward, the trigger bar causes the rotation of the safety lever up and into contact with the striker safety lock. As

the trigger is released, the trigger bar rotates the safety lever downward and out of contact with the striker safety lock. The motion of the trigger bar positions the safety lever, it does not need a dedicated spring to rotate it downward and out of contact with the striker safety lock. During the exam of the pistol I lifted and released the safety lever multiple times. Each time I released the safety lever, the trigger bar snapped the safety lever back down. Mr. Hicks and Mr. Villani's claim that the removal of the safety lever spring can cause an uncommanded discharge is false and has never been analytically or physically demonstrated possible. The dedicated safety lever spring was removed because the design of the upgraded fire controls changed the interaction between the trigger bar and the safety lever, eliminating the need for a dedicated safety lever return spring.

Furthermore, it is disinginuous for Mr. Hicks and Mr. Villani to claim a dedicated spring is necessary to control the positioning of the safety lever. Figure 4.2.7 shows the striker lock is biased downward by the striker lock spring. The striker lock spring is strong enough to reset the striker safety lock and the safety lever (if ever needed). Pistols like the series 80, M1911 pistols have sucessfully employed this type of springless safety lever deisgn for the past 40 years. Almost every major firearms pistol manufacturer has produced a variant of the 1911 pistol. Mr. Hicks and Mr. Villani's omission that the striker safety lock's spring must be overcome before the striker safety can displace the striker safety lock misrepresents the functionality of the striker block/lock system. Both Mr. Hicks and Mr. Villani represent that when the pistol is in a muzzle down orientation in a holster, the safety lever can deactivate the striker block/lock system by non trigger pull induced contact between the safety lever and the striker safety lock. Both the trigger bar and the striker safety lock spring actively prevent this from occuring. Mr. Hicks and Mr. Villani's assertion that the safety lever can deactivate the striker block/lock system just by carrying the pistol in a holster is false and has never been analytically or physically demonstrated as possible.



**Figure 4.2.8:  CT Image of the Striker Engaging the Sear**

Mr. Villani further demonstrates his ignorance of fire control design by declaring in his report that the lateral off center engagement between the striker and the sear causes the sear to bind and retard the motion of the sear springs.  Figure 4.2.8 shows a colorized stack of multiple CT images depicting how the striker engages the sear in the subject pistol.  Mr. Villani is not an engineer, nor does he have a technical background and is misrepresenting how contact forces between parts interact with supporting pivot structures.   When calculating the contact force vector between two objects, the vector typically originates in the mathematical center of the contact area.  If the contact vector between two objects passes within the pivot joint of one of the objects, a torque perpendicular to that pivot is not created.  Simply stated, the contact force vector between the sear and the striker pin

passes within the width of the sear's pivot contact with the sear pivot pin and does not cause the sear to bind. The composite CT image in Figure 4.2.8 clearly shows the sear is not twisting or binding towards the right of the image as Mr. Villani opines. Figure 4.2.8 shows a clear gap along the right side of the sear. Mr. Villani's assertion that the subject pistol's engagement binds the sear is false and has never been analytically or physically demonstrated as possible. Off-center engagements are not uncommon in machine design and have been utilized for hundreds of years.

Analysis of the subject pistol's CT scan showed no propensity for the subject P320 to discharge absent a trigger pull. None of the imaged components were observed to be overtly altered or damaged. The motions and interactions between the components were found to be within factory specifications. No evidence was observed that would support any of Mr. Villani's or Mr. Hicks's assertions of defect, nor have Mr. Villani or Mr. Hicks demonstrated any of their opined defects analytically or empirically.

4.3.    Physical Testing of the Pistol

After the CT scan was completed, the pistol was function tested.  The purpose of function testing is to verify the components of the pistol are interacting properly and determine if any claimed defects can be substantiated.  Figure 4.3.1 documents each function test that was performed.  The function tests were performed a minimum of five times before any disassembly of the pistol was performed.   The pistol passed all the function tests performed.  Mr. Villani declined to function test the pistol even though this was his only opportunity to do so.

| Function Testing | Pass | Fail |
|---|---|---|
| Magazine Catch | ✓ | |
| Slide Catch | ✓ | |
| Magazine Release | ✓ | |
| Slide Release | ✓ | |
| Trigger Function | ✓ | |
| Disconnector Function | ✓ | |
| Firing Pin/Striker Pin Function | ✓ | |
| *Slide Gap (Exercised a minimum of 100 times) | ✓ | |
| *Striker Block "Ramp" | ✓ | |
| *Striker Block Function (bias the striker to the shooter's right) | ✓ | |
| *Striker Block Function (bias the striker to the shooter's left) | ✓ | |
| *Safety Lever Return Function | ✓ | |
| *Slide Gap (Exercised a minimum of 100 times) | ✓ | |

Figure 4.3.1:  Summary of the Function Tests Performed on the P320 Pistol.

Four new tests were added to the standard function tests (noted with an "*" in Figure 4.3.1) to directly test the more far-fetched allegations of defect made by Mr. Villani and Mr. Hicks.  Recently Mr. Villani has made the allegation that the striker contained a ramped surface which could make the striker safety lock "jump" out of position and allow the pistol to discharge absent a trigger pull.  Mr. Villani has also alleged the striker pin has excessive rotation from side to side which can defeat the striker block/lock safety system.  To test these allegations, the slide was removed from the pistol and a dummy round of ammunition was loaded into the chamber of the pistol.  The striker was then fully retracted and released multiple times with and without side loads that induced striker rotation.  The dummy round contained a primer pocket filled with modeling clay.  If the striker safety lock ever failed to block the motion of the striker, the clay would record the failure with a firing

pin impression in the clay. This test was designed to directly test Mr. Villani's allegation of defect. The testing proved the striker does not contain a "ramp", the mating surfaces of the striker and striker safety lock do not contain "rollover", and side loading of the striker does not defeat the striker block/lock system of the subject P320. The only way the pistol's striker could be made to leave a firing pin indent in the clay of the dummy round was to depress the striker safety lock and release the striker from the cocked position, as the pistol was designed and intended to function. See Figure 4.3.2.

  

Striker Biased Right      Striker Biased Left      Striker Safety Lock Depressed

Figure 4.3.2: Striker Block Function Testing Results with Dummy Ammunition Containing Clay Primers

Mr. Villani attempts in his report to convey that I acknowledge the striker has excessive side to side rotation by stating, "also acknowledged to exist by Watkins while attempting to "bias" the striker foot left or right manually during his initial examination". I ran the test to show Mr. Villani's allegations are false and the striker **does not** have excessive rotation side to side. The test results shown in Figure 4.3.2 conclusively show the striker in the subject pistol does not have excessive rotation side to side. The simple act of running a test for a defect does not acknowledge or in any way validate existence of the defect. The existence of a defect is only acknowledged or verified by repeatable validating test results. The physical testing of the subject pistol specifically disproved the unsubstantiated and untested conclusion postulated by Mr. Villani. For the record, I do not acknowledge the existence of excessive side to side rotation of the striker in the subject pistol because it has been proven both analytically and empirically not to exist.

The slide gap test was also added to the function testing regiment in direct response to Mr. Hicks' allegations that relative motion between the slide and the fire control can cause

an uncommanded discharge. This allegation has previously been proven to be false from a design standpoint via analytical analysis (regain torque vector analysis of the sear) and empirical testing (vibration testing of pistols in different carry orientations). The slide gap test consists of cocking the pistol, and then pulling the slide away from the fire control unit and pressing it back down on the fire control unit. One pull and one push constitute one cycle of the test. The subject pistol was tested a minimum of 100 times with no failures, disproving Mr. Hicks' allegations.

Hanging weights were employed to measure the force required to pull the pistol's trigger and discharge the firearm. Six trigger pull forces were measured with an average trigger pull force of 6.33 pounds. See Figure 4.3.3. The measured trigger pulls are well above the Sporting Arms and Ammunition Manufacturer's Institute's (SAAMI) recommended 3lb minimum. Typically, only five trigger pulls are measure but the pistol discharged once as the weights were being lowered, which indicates a hesitation by the operator (me) that induces a force increase that actuated the trigger. Due to the operator error, sixth trigger pull measurement was added.

| Trigger Pull Measurements (pounds) | |
|---|---|
| No Discharge | Discharge |
| 6.25 | 6.50 |
| 6.25 | 6.50 |
| 6.00 | 6.25 |
| 6.25 | 6.50 |
| 6.25 | 6.50 |
| 6.25 | 6.50 |

Figure 4.3.3: Trigger Pull Force Measurements

During the function testing and throughout the examination, the pistol could only be made to discharge when the pistol was cocked and the trigger was fully pulled. The pistol never discharged absent a trigger pull or behaved in any way that would substantiate any of Mr. Villani or Mr. Hicks' assertions of defect. Mr. Villani, the only consultant for the plaintiff in attendance at the inspection, did not attempt to test for or demonstrate any of his assertions of defect.

4.4.    <u>Disassembly and Inspection</u>

When the function testing and trigger pull measurements had been completed, the fire control unit was removed from the pistol and visually inspected.  The components were relatively clean, with a light film of oil present.  See Figure 4.4.1.  No overt signs of damage or alteration were observed.



Figure 4.4.1:  Subject Fire Control Unit

The subject sear was manually depressed multiple times to verify it was moving freely and the sear springs were returning the sear with force.  The sear was proven to be functioning properly.  The sear had a light film of what appeared to be grease on its engagement surface.  No signs of damage or alteration were observed. See Figure 4.4.2.



Figure 4.4.2:  Subject Sear's Engagement Surface

Mr. Villani and Mr. Hicks have asserted in their reports that the burnished top edge of the sear is evidence that the sear is improperly formed.  Mr. Villani uses the term "rollover" – which is a self-fabricated term and is not used in product design or manufacturing – to characterize his fabricated "defect".   The observed burnishing is a product of the tooling and the motion of the sear against the engagement surface of the striker pin as the trigger is pulled.  This is explained in detail in Section 5 of this report.

To the extent Mr. Villani is using the fabricated term "rollover" to refer to excess material on the components, there is no physical evidence of any such excess material.  SIG Sauer designed the fire control of the P320 to use as cast MIM (metal injection molded) parts. Mr. Villani and Mr. Hicks are critical of the surfaces of the parts and compare them to machined parts. Neither Mr. Hicks nor Mr. Villani have ever provided a quantitative (measurement) value for the claimed excess material.  This is because the parts are within print specification and no excess material is present.   The CT scan (discussed in detail above) clearly shows clean surface-to-surface contact between the striker and the sear.  If

excess material was present in the subject pistol, the CT scan would clearly show it. Moreover, neither Mr. Villani nor Mr. Hicks have explained how any such excess material, if it actually existed, could cause the pistol to fire without a trigger pull, much less demonstrated that this is possible.  In fact, Section 5 of this report presents a detailed analytical analysis that the claimed "rollover" cannot produce an uncommanded discharge.



Figure 4.4.3:  Subject Striker Pin's Engagement Surface

Mr. Villani also stated that the striker pin showed signs of a "rollover" condition.  Figure 4.4.3 shows no signs of defects in the striker pin and the radii present on the edges of the striker pin are per the design and do not constitute a defect, as was proven by the function testing. The burnishing present on the lower edge of the striker pin's engagement surface

is due to the condition of the tool and the top edge of the sear's engagement surface sliding against striker pin when the trigger is pulled.

Removing the striker assembly from the pistol showed no signs of alteration or damage. When the striker assembly is removed, the striker safety lock engages the striker pin, placing the striker pin in the blocked condition. Figure 4.4.4 shows the striker safety lock is not only blocking the striker pin but is also pulled down to the fully engaged position. This physical evidence completely contradicts the claim of a striker safety lock defect made by Mr. Villani and Mr. Hicks.



Figure 4.4.4: The Subject Striker Assembly in the Full Blocked Condition

Mr. Villani asserted in his report that the "presence of rounded edge on top of [of] the striker stop, can cause the tab to 'jump' up and over the stop from the force of the striker moving forward and contacting the uneven 'positive contact' surface of the safety lock tab". Mr. Villani's assertion is false, as he fails to grasp the mechanics of how the striker safety lock works or is intentionally misrepresenting how it works. The striker safety lock

rotates on a pivot. See Figure 4.4.4. If the striker pin were to be theoretically released without a trigger pull, the striker pin would impact the striker safety lock above the striker safety lock's pivot, which would induce a clockwise moment about the pivot and causes the striker safety lock to rotate downward. Therefore, the harder the striker presses on the striker safety lock, the harder the striker safety lock is held in position to block/lock the striker pin. The radius on the top edge of the striker pin's engagement with the striker safety lock doesn't interact with the striker safety lock. See Figure 4.4.5. The radiused edge on the striker pin was also empirically proven to have no adverse effect on the functionality of the striker safety lock during the striker block function testing discussed in Section 4.3.



Figure 4.4.5:  The Striker Safety Lock Fully Engaged by the Striker Pin

Lastly, in the past Mr. Villani has asserted the contact marks between the striker safety spring and the striker housing as a defect. The P320 design uses the striker housing to not only locate the striker safety spring, but also to align and guide it with respect to the striker safety lock. Because the contact between the striker safety spring and the striker housing

is a function of the housing acting as a spring guide, the contact occurs by design and is not a defect. It was easy to see the minimal nature of the contact marks, directly refuting the statements that the striker safety spring was dragging against the housing and could cause the striker safety lock to seize. See Figure 4.4.6.



Figure 4.4.6:  Contact Marks between the Striker Housing and the Striker Safety Spring

When the inspection of the pistol's internal components was completed, the pistol was reassembled and function tested again to verify the function of the firearm had not changed due to its disassembly or reassembly. The pistol once again passed all the function tests and was proven to discharge only when the striker pin was cocked and the trigger was pulled.

5.      The Fallacy of "Rollover"

Mr. Villani has stated that a condition which he has named "rollover" exists on the engaging surfaces of the P320 pistol's sear and striker (along with other components), including in the subject pistol.  However, Mr. Villani has ever presented a clear definition of what "rollover" is.  In his report, Mr. Villani stated rollover was excess molding material "around its perimeter edge which can cause less contact between the positive contact surfaces".  The subject sear and striker engagement surfaces do not contain flash, excess material around the edges or shrinkage of their inner surfaces.  The radiused edges present on those parts are created by the tooling and are there by design.  Mr. Villani previously confirmed he is not claiming the radiused edges on components in the P320 pistol constitute a defect.  The fact is, the term "rollover" is not an industry term and is something Mr. Villani appears to have made up. He has not cited to any publications or other relevant source that uses the term.  In previous reports Mr. Hicks had adopted the term "rollover" but has backed off from that stance in this report by stating a, "raised area around the periphery of the interface surface... has been referred to by others as rollover".

 

Figure 5.1:  "Rollover" Images Presented in the Hicks Report

Mr. Hicks's report employs images that reportedly show excess material/"rollover" around the edges of the engagement surfaces of the sear and the striker.  See Figure 5.1.  However, these images are simply artist renderings and have nothing to do with the subject Jinn pistol.  Figure 5.2 shows an artist rendering presented by Mr. Hicks, compared to a CT cross section of the actual subject pistol's engagement.  The artistic rendering is not using the correct striker or sear geometries, and the subject pistol shows no signs of recess in the

centers of the engagement surfaces. Additionally, the artistic rendering does not make sense, as the blue color (as I understand it) is supposed to represent recessed surfaces surrounded by the elevated red surfaces, but Mr. Hicks's renderings show the blue surfaces protruding beyond the red surfaces on both the sear and the striker pin. How does a recessed surface protrude past a surrounding elevated surface? This simply is not possible. The artistic rendering employed by Mr. Hicks appears to depict the exact opposite of the "rollover" condition he and Mr. Villani are claiming exists in Mr. Jinn's pistol.



Figure 5.2: Comparison of the Subject Engagement to the Hick and Villani Artistic Rendering

What Mr. Villani and Mr. Hicks do not appear to understand is the performance of a SIG Sauer P320 pistol's engagement would not be adversely affected by the center surfaces of the sear or striker being recessed relative to the surrounding edges if they were in that condition – which they are not. The sear of the P320 rotates on a pivot. When the trigger is being pulled and the sear is being rotated downward to release the striker, the engagement surface of the sear rotates in a circular fashion. Therefore, by definition, it is impossible for the sear to maintain full surface to surface contact with a striker during rotation. Full surface to surface contact/engagement between the striker and sear is not required in the P320 or any other firearm that I am aware of. The only thing that is truly required is for the engagement contact stresses to be non-yielding, and the contact force

vector to not produce a discharge moment about the sear. By design, the engagement between the striker and the sear of the P320 does not produce yield stresses or induce a discharge moment/torque about the sear. When the P320's striker engages the sear, the engagement promotes the sear to rise to full engagement, even with the center engagement surfaces recessed.




Striker with Recessed Center Engagement Surface      Sear with Recessed Center Engagement Surface

**Figure 5.3: Models of Striker and Sear with Extreme Recessed Engagement Surface Centers**

To better illustrate the engagement physics of the P320, I modeled a striker and sear with center engagement surfaces that have been recessed 0.015 inches relative to the radiused edges. See Figure 5.3. As best I can tell, these altered versions of the striker and sear represent an extreme recess – or as Mr. Villani states, a "rollover" – condition. Figure 5.4 shows that when the recessed striker engages the recessed sear, the fact that the striker is significantly narrower than the sear dictates the edges of the striker's engagement interface mate with the top edge of the sear's engagement interface. See Figure 5.4B and Figure 5.4C. The fact that the center surfaces of the engagement interfaces of the striker and sear do not touch has no effect of the contact force vector created by the engagement. The side edges of the striker's engagement interface set up the same angle of contact that would exist if the center material was present. Because the contact angle between the striker and sear is unchanged, the contact force vector creates the same clockwise moment/torque about the sear's pivot, promoting the sear to rise and stay in the cocked position. See Figure 5.4.A. Having sears and strikers with recessed center engagement interfaces does nothing to promote a SIG Sauer P320 pistol to discharge absent a trigger

pull. Mathematically, the modified engagement shown in Figure 5.4 is identical to the factory engagement of the P320 pistol. Therefore, the performance must be identical between the two systems. Tellingly, neither Mr. Villani nor Mr. Hicks have even attempted to demonstrate or replicate how any recess – or "rollover" – can cause or contribute to a loss of engagement in an actual P320 pistol. That is because it cannot.



Figure 5.4: P320 Engagement with Center Recessed Engagement Surfaces



Figure 5.5:  P320 Sear Rotation and Disengagement

As the trigger of a P320 is pulled, the sear is forced to rotate counterclockwise and disengage the striker.  This causes the top edge of the sear's engagement interface to trace a circle relative to the pivot pin of the sear.  This means that only the top edge of the sear's

engagement interface contacts the striker throughout the discharge process. This is why the top edge of the sear on the subject pistol is burnished/bright. See Figure 5.5. The edge burnishing is a function of the rotation of the sear against the striker and is designed, expected and appropriate.

Figure 5.5 also shows that throughout the rotation of the sear during a trigger pull, the engagement induced contact torque about the sear's pivot remains positive:

$$T_A > T_B > T_C$$

This means the sear is continuously in a regain condition due to the sear's contact with the striker. It is a common mistake for people unskilled in the art of firearms design to think the sear springs are what holds the sear in engagement with the striker. Well-designed fire controls/trigger mechanisms, such as the P320, shape the contact force between the striker and sear to induce a regain moment about the sear that will cause the sear to return to full engagement with the striker if the pressure is removed from the trigger before the firearm has discharged. After the initial engagement is made, the sear springs only serve to enhance the regain torque about the sear, they are not its singular source.

This simple proof utilizing basic physics, dynamics and mathematics conclusively shows that recessing the center of the engagement interfaces of the sear and/or striker does not affect the magnitude or direction of the contact force, nor the resulting moment/torque about the sear. See Figure 5.6. Therefore, the theoretical lack of contact between the center areas of a P320 pistol's engagement interfaces would have no adverse effect on the performance of the sear or striker even if it existed in the subject pistol – which it does not. Mr. Villani's claim of "rollover" causing uncommanded discharges in SIG Sauer P320 pistols is without scientific foundation and is false. Furthermore, it is more perplexing that Mr. Hicks, who is reportedly an engineer, did not conduct such a basic analysis before supporting Mr. Villani's false assertions of "rollover". The condition of the engagement interfaces of the subject striker and sear did not contribute to or cause Mr. Jinn to shoot himself.



Figure 5.6:  P320 Sears and Strikers Equipped with Recessed Engagement Interfaces are Equivalent to the Factory Parts

6.      The Fallacy of a Slide Motion Induced Discharge

In a deposition Mr. Villani gave on June 18, 2021 in another case, he stated that a P320 could be made to discharge absent a trigger pull by pulling the slide up and down relative to the frame, causing the striker to move up and down relative to the sear, essentially walking the striker up and off the sear.   This is a false premise for an uncommanded discharge.  Per the contact vectors and sear torques discussed Section 5, the sear will move up and down with the striker once the slide has been initially pulled up and then cause the engagement to regain.   There is no physical impetus to allow the striker pin to be vertically displaced relative to the sear beyond the gaps between the slide and the fire control units' slide rails.  To physically verify this fact, multiple exemplars – in both the pre-upgrade and post-upgrade vintages – were exercised a minimum of 100 times each in a manner consistent with Mr. Villani's testimony.  In none of this testing did the striker walk up and lose engagement with the sear.    Mr. Villani confirmed in his deposition that he has never

tested this premise (or any of his other claimed defects) nor could he cite to any external support for his claims of defect.  A simple manual test easily disproves his claim, as does basic physics.



Figure 6.1:  CT Images of Mr. Jinn's SIG Sauer P320 Pistol and Internal Component Biasing

Furthermore, the SIG Sauer P320 pistols do not contain the ability for the striker pin to rise up and over the sear when the sear is in the engaged/rotated up position. Figure 6.1 shows CT images from Mr. Jinn's SIG Sauer P320 pistol. When the striker pin engages the sear, the striker pin is biased up into the striker housing (blue arrows), the striker housing is biased up into the slide (red arrows), and the slide is biased up against the fire control unit's rails (yellow arrows). Each time the slide of a P320 pistol is cycled, all of the upward gaps between the striker assembly's components and the slide are biased out of the system.

The biasing upward of the pistol's slide assembly and its components, combined with the rotation of the sear upward to maximize engagement makes it a physical impossibility for the striker to rise above the engaged sear due to relative motion between the slide and the fire control unit. Mr. Villani's testimony on this matter is false and wholly unsupported.


7.  **Review of Case Materials**

    In the preparation of this report I have reviewed the following materials:

    - Complaint;
    - Subject Pistol;
    - Exemplar Pistols;
    - NTS Exam Materials;
    - Mr. Villani's Report;
    - Mr. Hicks's Report;
    - DHS Firearm Examination Report;
    - Response to Interrogatories;
    - Deposition – Mr. Jinn; and
    - Produced technical data package – SIG P320.

    Exhibits which I may use to explain or support the opinions expressed at trial include the afore-mentioned materials along with exemplar pistols, exemplar ammunition, cutaways, computer simulations, videos and other demonstrative exhibits.

    Attached are a copy of my resume, a listing of my testimony for the last four years, and expert fee schedule.

## 8.    Conclusions

Based on my education, training, and experience in product design and firearm design, manufacture and function, my review and study of the information provided regarding the circumstances of the shooting, and my inspection and testing of the subject pistol and exemplar pistols, I offer the following opinions to a reasonable degree of engineering and scientific certainty:

- The subject P320 pistol discharged at the time of the occurrence because the trigger was pulled or otherwise depressed;

- The subject P320 pistol will not discharge after being loaded and cocked without an external stimulus inducing motion of the trigger;

- The subject P320 pistol will not discharge in the absence of a pulling, depression or motion of the trigger;

- The subject P320 pistol and its fire control components do not possess any manufacturing or design defects which are causally related to the discharge of the pistol at the time Mr. Jinn shot himself;

- No design or manufacturing defects exist in the condition and functionality of the subject P320 pistol that would cause the pistol to discharge absent a trigger pull;

- The subject P320 pistol is safe in design and manufacture for its intended and reasonably foreseeable uses;

- In its condition at the time of the shooting, the subject P320 pistol did not possess any defective or unreasonably dangerous conditions;

- All post-incident attempts to cause the subject P320 pistol to fire absent a trigger pull have failed;

- The discharge of the subject P320 pistol was caused by Mr. Jinn's failure to follow safe gun handling practices, including failure to control the direction of the muzzle and causing the trigger to be pulled or depressed;

- Mr. Jinn's actions described above caused the shooting and his injury; and

- Mr. Villani and Mr. Hicks have not demonstrated a single one of their claimed "defects" in the subject pistol because no such "defects" exists.

I reserve the right to change and supplement my opinions and conclusions following my examination of any additional case materials presented, including depositions.

Date: 12-15-2021

This report was prepared and authored by:

Derek L Watkins
President & Chief Engineer
Nth-Level. LLC.