**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **STATE OF ILLINOIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 17 C 06260** |
| | ) | |
| **CITY OF CHICAGO,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM ORDER**

In 2017, the State of Illinois initiated this action against the City of Chicago ("the City") to enjoin the Chicago Police Department ("CPD") from engaging in conduct that undermines public trust and disproportionately harms persons of color. (Compl. [1] ¶ 2.) After months of negotiations, in 2019, the City and the State of Illinois (represented by the Office of Attorney General ("OAG")) entered into a consent decree—a comprehensive set of standards and goals—which this court adopted as an order effective March 1, 2019. (*See* Consent Decree [703].)

Chicago Police Department policies governing the use of body-worn cameras must comply with the relevant requirements of the Consent Decree, as well as the Illinois Law Enforcement Officer-Worn Body Camera Act, 50 ILCS 706/10, *et seq.* ("the Act" or the "Body Camera Act"). (*See, e.g.*, Consent Decree [703] ¶ 238.) In particular, the Act requires that officers' body-worn cameras be turned on while they are engaged in "law enforcement-related activities or encounters."

This Order addresses an ongoing dispute between the parties: Whether CPD officers are required to record communications between officers involved in a shooting or death and uninvolved supervisors who respond to the scene. Two types of conversations that occur in the immediate aftermath of an officer-involved shooting or death are at issue: first, immediately after such an event, a supervisor arrives on the scene and conducts a "Public Safety Briefing"—a short,

one-on-one exchange in which the "Reviewing Supervisor" asks the involved officer a prescribed set of questions to determine what must happen to secure public safety and the scene. Soon afterwards, a second such interview may occur. After assuming command of the scene and reviewing relevant camera footage, a CPD Street Deputy will conduct a "Walk-Through" of the scene and may deem it necessary to receive additional clarification of the incident from the involved officer. If so, the Deputy may order that officer—if available—to answer additional questions during the Walk-Through.[1] While the parties agree that involved officers must have their cameras turned on during the shooting itself, they dispute whether the Consent Decree also requires the recording of conversations that might occur during these two post-shooting communications.

In January 2024, OAG sought court resolution of this dispute. [1144] In a July 2024 Order, the court outlined reservations about the City's argument but made no final determination on the issue. (*See* Order [1190].) The parties engaged in good-faith negotiations for several months; they made progress but still remain at an impasse. In August 2025, the parties submitted updated briefing, and OAG's motion for judicial resolution is once again before the court. As explained below, the court finds that the Public Safety Briefing does not need to be recorded but that the Street Deputy Walk-Through Questions must be recorded.[2]

---

[1] To clarify, CPD policy requires the Street Deputy to conduct a "walk-through" of the scene, which may or may not include questioning of any involved officers, either because the Street Deputy does not consider it necessary or because the involved member is unavailable. (*See, e.g.*, General Order G03-06-01, Pl. Ex. 1 [1330-1], at § III.B.4 ("Any involved member in need of immediate medical treatment will seek such treatment, and thereafter, make themselves available to confer with the designated Street Deputy . . . responsible for the investigation.").) For the purposes of this order, and for ease of reference, the court uses the phrase "Street Deputy Walk-Through Questions" to refer to this questioning component of this walk-through.

[2] The parties also appear to disagree on whether, in lieu of body-worn camera footage, the reviewing supervisor should provide a written report of the Public Safety Briefing or Walk-Through. The City addressed this question in their position statement, but OAG identified this as one issue that is still under discussion between the City, CPD, and OAG. (OAG Br. [1330] at 3 n.3.) The court therefore takes no position on this question for now.

## BACKGROUND

### I. Factual Background

#### A. Public Safety Briefing

Under CPD policy, whenever an officer is involved in an incident where there is a shooting or death, the involved officers must immediately notify the City's Office of Emergency Management and Communications ("OEMC").[3] (*See* General Order G03-06-01, Pl. Ex. 1 [1330-1], at § II.A.) OEMC will then notify (1) the involved officer's immediate supervisor; (2) the "field supervisor" and "watch operations lieutenant" from the CPD district where the incident occurred; and (3) CPD's Crime Prevention and Information Center ("CPIC"). (*Id.* § II.B.)

Once notified of the incident, the district field supervisor—also referred to as the "reviewing supervisor"—proceeds immediately to the scene. (*Id.* § III.C.2.) Upon arrival, the reviewing supervisor is required, among other tasks, to conduct a "Public Safety Briefing" with the involved officer(s). (*Id.* § IV.A.3.) The Public Safety Briefing is a "one-on-one oral exchange" between the supervisor and an involved officer (*id.* § IV.A), where the supervisor asks the officer a prescribed set of questions that focus on immediate safety concerns:

1. Are you injured? If so, what are your injuries?
2. Is anyone else injured? If so, where are they located?
3. Did you fire your firearm? If so, in what direction and approximately how many rounds?
4. Did any subject fire a firearm? If so, in what direction and approximately how many rounds?
5. Are there any subjects at-large who are armed or present a public safety risk? If so:
    a. How many subjects are at-large?
    b. What was their method of flight? (e.g., foot, vehicle)?
    c. What are their descriptions, including any fleeing vehicle information?
    d. What was their direction of travel?
    e. How long ago did they flee?

---

[3] CPD General Orders "are directives that establish critical policies directly related to the core values and functions of the Department or the broad organizational policies and key practices relating to those core values." (*See* General Order G01-03, at § III.A.1.) Special Orders are "are directives that establish protocols and procedures concerning specific Department functions, operations, programs, or processes." (*Id.* at § III.A.2.)

f. What type of weapon(s) or public safety threat(s) did you observe?

6. Do you know of any perishable evidence? If so, what areas need to be secured?
7. Is there anything else that I need to know to ensure public safety, preserve perishable evidence, or secure the incident scene?

(*Id.* § IV.C.) According to General Order G03-06-01, the Public Safety Briefing is "strictly used for the on-scene supervisor's immediate assessment," to enable the supervisor to "ensure public safety, preserve perishable evidence, and secure the incident scene when a continuing threat to public safety may exist."[4] (*Id.* § IV.A.1.) The General Order disclaims that the purpose of the briefing is to investigate the incident or any associated actions or criminal activity. (*Id.* § IV.A.2.)

---

[4] The City's briefing offers two recent illustrations of how Public Safety Briefings function to serve CPD's public safety goals; the court reproduces one here. This incident took place during the summer of 2024; at the time, two CPD officers were responding to an unrelated call when they observed two armed offenders firing at a vehicle on the southwest side of Chicago.

> After discharging their weapons at the vehicle, the offenders fled on foot to a nearby grocery store parking lot. The officers also entered the parking lot. At that time, one of the offenders turned toward the officers' squad car, raised his firearm, and pointed it in their direction. One of the officers discharged his weapon, striking the offender. The second officer fired at the other offender but did not strike him. That offender fled the scene and was able to escape.
>
> Both officers exited their vehicle, placed the wounded offender into custody, and recovered his firearm. As they did so, a hostile crowd began to approach and attempted to interfere with the arrest. One individual pushed an officer, causing him to fall backward and strike the pavement. Additional officers arrived, dispersed the crowd, and secured the scene.
>
> A supervisor responded, separated the involved officers, and conducted the Public Safety Briefing with each of them. During these briefings, the supervisor learned that the officers had first observed the offenders firing at an occupied vehicle and that multiple people inside had been struck by the offenders' gunfire. One victim later succumbed to his injuries, while another was treated at the scene by responding CPD personnel and transported to the hospital for further care. The Public Safety Briefing also revealed that one of the officers had [shot at but] missed the second offender. The supervisor sent officers to canvass the path of the officer's rounds and discovered that one of his rounds had entered a nearby home, damaging a window and property. The residents were inside at the time but were uninjured. The information gathered during the Public Safety Briefing allowed for rapid deployment of resources to aid injured victims, secure multiple crime scenes, and check for potential additional victims in the path of stray rounds.

(City Br. [1329] at 13.)

While the reviewing supervisor and involved officer are conducting the Public Safety Briefing, CPD requires both to deactivate their "Department-issued recording equipment," including their body-worn cameras. (*Id.* § IV.B.) The City argues that this "brief deactivation" is "essential to fulfilling CPD's fundamental and life-and-safety obligations without infringing required officer protections or compromising safety." (City Br. [1329] at 2, 14.) Specifically, the City argues that requiring body-worn-camera recording could cause significant delay to receiving critical public safety information, because officer union representatives would insist on procedural protections for officers, such as a 24-hour notice for a non-voluntary interview, union representation, and a lawyer. (*Id.* at 8.).

Once the Briefing is complete, the supervisor then takes possession of the involved officer's body-worn camera; CPD policy requires the supervisor, however, to reactivate the supervisor's own body-worn camera and continue recording all subsequent law enforcement-related activities. (General Order G03-06-01, Pl. Ex. 1 [1330-1], at §§ IV.B.1.a, IV.B.1.b.) And any other officers on the scene who are not participating in the Briefing do not deactivate their body worn cameras; they continue recording. These officers may deactivate their cameras only when: (1) they are instructed to do so by an on-scene supervisor, or (2) at "the conclusion of the incident," which occurs when "the highest-ranking on-scene Bureau of Patrol supervisor" determines "that the scene is 'safe and secured' in circumstances involving an officer-involved death investigation, firearm discharge, or any other use of force incident." (Special Order S03-14, Pl. Ex. 3 [1330-3], at §§ V.C.1.a.4; *see also* General Order G03-06-01, Pl. Ex. 1 [1330-1], at §§ IV.B.2.a, IV.B.2.b.)

Based on the supervisor's assessment of the scene and the information gleaned from the Public Safety Briefing, the supervisor determines "when it is appropriate to declare the incident scene 'safe and secure.'" (General Order G03-06-01, Pl. Ex. 1 [1330-1], at § III.C.7.) That determination is made only "when all of the following conditions are met: all offenders are in custody or otherwise not in the area, medical aid has been requested/administered or the Chicago

Fire Department (CFD) is on the scene, the involved officers have been identified, and the crime scene has been established." (*Id.* § III.C.7.b.) Once the on-scene supervisor has made the determination that the scene is safe and secure, the supervisor notifies OEMC; an OEMC dispatcher will then announce the determination over CPD radio. (*Id.* § III.C.7.a.) Even after the supervisor is satisfied that the scene is safe and secure, the supervisor, any involved officers, and any uninvolved officers who witnessed the shooting or use of force, must, "if physically able," remain on scene until a CPD Street Deputy arrives.[5] (*Id.* §§ III.C.2.b, V.A.1, V.B.1.) The Street Deputy is a CPD officer who is at a higher rank than the field supervisor.[6] (*Id.* § II.C; *see also supra* at 2–3.)

### B. Street Deputy Walk-Through Questions

Upon arrival at the scene, the Street Deputy takes over command, and "provide[s] for the appropriate on-scene response to ensure a complete and thorough on-scene investigation of the incident conducted by the Department, including the Investigative Response Team." (General Order G03-06-02, Pl. Ex. 2 [1330-2], at § II.A.1.)

At the time of arrival, the Street Deputy confers with the supervisor who conducted the Public Safety Briefing. If, after reviewing the "available body-worn camera and in-car video system footage and relevant and available on-scene information," the Street Deputy concludes that "additional clarification" from the involved officer(s) is necessary, the Street Deputy "may conduct a walk-through" of the scene with the involved officers—referred to for the purposes of this Order as the "Street Deputy Walk-Through Questions." (*Id.* § II.A.4.) The Walk-Through Questions, like the Public Safety Briefing, consists of the Street Deputy's posing questions of the

[5] As implied in the policy, the severity of the underlying incident may create circumstances when officers are not physically able to participate in the Public Safety Briefing or Walk-Through.

[6] Formally, the Street Deputy is a "deputy chief assigned to the Street Operations Unit" of the "Office of the First Deputy Superintendent." (Pl. Ex. 1 (G03-06-01), § II.C.1.)

involved officer "outside the presence of any other individual." In the latest draft of CPD policy, this interaction is not recorded by the Street Deputy's body-worn camera. (*Id.* § II.A.4(c)(3)–(4).)

There are two key differences between the Public Safety Briefing and the Street Deputy Walk-Through Questions. First, the Public Safety Briefing is more focused; the supervisor conducting the Briefing reads only from a list of prescribed questions. The Walk-Through is broader. In conducting the Walk-Through, the Street Deputy has more flexibility and can ask any questions necessary to obtain "information needed for clarification of the incident and the immediate on-scene response." (*Id.* § II.A.4(c)(2).) Second, likely due to the broader scope of the interview, the Street Deputy must give the involved officer the following warning:

> Please be advised that you are being ordered to answer questions and give an oral report of the incident. As a result of your failure to follow this order, you may face administrative discipline. Nothing you say in response to this order may be used against you in any criminal proceeding should one arise from this incident.

(*Id.* § II.A.4(c)(1).)[7] Following the incident, the Street Deputy must provide any information learned in the Walk-Through to personnel from the CPD Investigative Response Team ("IRT") and the City's Civilian Office of Police Accountability ("COPA") once those personnel have also arrived at the scene. (*Id.* § II.B.2.)

---

[7] This script is typical of what is known as a "*Garrity* warning." In *Garrity v. New Jersey*, the Supreme Court held that "when a public official must choose between cooperating in an internal investigation or losing his job, the statements he makes during the investigation are compelled, and, as such, they cannot later be used against the official in a criminal trial." *United States v. Proano*, 912 F.3d 431, 437 (7th Cir. 2019) (citing 385 U.S. 493, 500 (1967)). As an outgrowth of *Garrity*, the Seventh Circuit has held that an officer cannot be compelled to give a potentially self-incriminating statement "unless he is first advised . . . that evidence obtained as a result of his testimony will not be used against him in subsequent criminal proceedings." *Homoky v. Ogden*, 816 F.3d 448, 453 (7th Cir. 2016) (citing *United States v. Devitt*, 499 F.2d 135, 141 (7th Cir.1974)).

The City's current position is that, despite this warning, the Walk-Through is not a *Garrity*-protected event. The City asserts that if the Walk-Through were to be recorded, *Garrity* protections might attach. (City Br. [1329] at 10–11.) The court need not decide this issue at this time; but the court notes that it shares OAG's skepticism that whether an officer's statements are recorded has any impact on whether *Garrity* protections attach. (*See* OAG Br. [1330] at 15 n.6.)

### C. COPA Walk-Through

After COPA personnel arrive at the scene, the Street Deputy must provide a briefing of the incident to COPA investigators, summarizing the incident "based on the information available at that time, without redaction or editing of known information, including but not limited to . . . walking through the incident scene[,] providing information obtained from the Public Safety Briefing conducted with the involved member(s)[;and] providing information obtained from any walk-through of the incident conducted by the Street Deputy and involved member(s)." (*Id.*) Involved officers do not participate in this "COPA Walk-Through," and both parties agree that neither the Consent Decree nor the Act requires officers to record the COPA Walk-Through on body-worn camera. (See OAG Br. [1330] at 16–17.)

## II. Procedural Background

Paragraphs 627 through 629 of the Consent Decree create a process in which OAG and the IMT review CPD policies and procedures to ensure that they comply with the Consent Decree and applicable law. (Consent Decree ¶ 627–29.) If OAG objects to a CPD policy as noncompliant, and the parties cannot resolve the disagreement via negotiations or by agreeing to a proposed resolution set forth by the IMT, paragraph 630 of the Consent Decree allows either party to move the court for resolution of the dispute. (*Id.* ¶ 630.)

In January 2024, the parties asked the court to determine whether the Consent Decree permits CPD officers to turn off their body-worn cameras during post-event interviews, which at that time were called "Public Safety Investigations." (*See generally* OAG Mot. for Jud. Resolution [1144].) The court declined to reach that question, largely due to concerns arising from the labeling of these episodes as "investigations" and confusion about their purpose. (*See* Order [1190] at 1–4.) The Body Camera Act requires that officers leave their body cameras on during "investigations;" the court questioned the City's assertion that an interview referred to as a Public Safety Investigation was not an investigation (hence not subject to the Act's recording

requirements). (*Id.*) Given the confusion, the court directed the City to revise its policies to clarify the purpose and scope of the Public Safety Investigation. (*Id.* at 3.) Specifically, the court was

> not satisfied that the Consent Decree and the Act permit the CPD to allow—let alone to require—officers to turn off their [body-worn cameras] for public safety. Before the Court will consider approving such a policy, the City and the CPD must, at minimum, clarify in clear policy language how these post-event interviews are genuinely and universally distinct from "investigations."[] If, for example, the questions are intended to address immediate public safety concerns, rather than fulfill ordinary investigative or law-enforcement purposes, the Court would expect the policy to
>
> - better define how long before or after an incident—and how close or far away from the scene—these questions can be asked without recording;
> - clarify the circumstances in which officers on the scene are prohibited from or permitted to keep their cameras on during or after the incident (and how that is defined); and
> - explain the relationship between its revised policy and language of relevant collective bargaining agreements, including terms prohibiting officers from recording "post-incident conversations," and how the policy and relevant agreements are consistent with the Act.

(*Id.* at 3–4 (citations omitted).)

The City and CPD submitted revised policies to OAG and the IMT on August 30, 2024. The parties then engaged in settlement discussions between December 2024 and June 2025. While both parties negotiated in good-faith, and made substantial progress, they were unable to reach a complete agreement on all issues. The court ordered the parties to submit written position statements on the remaining disagreements, and the issue is once again before the court.

## **DISCUSSION**

The court now turns to the question at hand: Does the Consent Decree require CPD officers to record the Public Safety Briefing and Street Deputy Walk-Through Questions?[8] The court considers each procedure below.

---

[8] The parties agree that the COPA Walk-Through is not required to be recorded. (*See* OAG Br. [1330] at 16–17.)

## I. Public Safety Briefing

The Consent Decree's body-camera requirements are based on those in a state statute, the Illinois Law Enforcement Officer-Worn Body Camera Act, making this issue one of statutory interpretation.[9] (*See* Consent Decree ¶¶ 236, 237.)

The Body Camera Act requires officers' cameras to "be turned on at all times when the officer is in uniform and is responding to calls for service or engaged in any law enforcement-related encounter or activity that occurs while the officer is on duty." 50 ILCS 706/10-20(a)(3).[10]

---

[9] The Consent Decree directs that CPD officers "assigned to patrol field duties" wear "body-worn cameras and microphones with which to record law-enforcement related activities *as outlined in the Illinois Law Enforcement Officer-Worn Body Camera Act*." (Consent Decree ¶ 237 (emphasis added).) The Consent Decree also directs CPD to require officers to "activate their cameras when responding to calls for service and during all law enforcement-related activities that occur while on duty, and to continue recording until the conclusion of the incident(s)." (Consent Decree ¶ 238(b)).

[10] The Act also enumerates certain situations that might otherwise qualify as "law-enforcement related encounters or activities" but during which officers need not have their cameras recording. These include:

- If "exigent circumstances exist which prevent the camera from being turned on," in which case "the camera must be turned on as soon as practicable";
- When the officer "is inside of a patrol car which is equipped with a functioning in-car camera";
- When the officer "is inside a correctional facility or courthouse which is equipped with a functioning camera system";
- If "the victim of a crime requests that the camera be turned off, and unless impractical or impossible, that request is made on the recording";
- If "a witness of a crime or a community member who wishes to report a crime requests that the camera be turned off, and unless impractical or impossible that request is made on the recording"; and
- When "the officer is interacting with a confidential informant used by the law enforcement agency;"
- When "an officer of the Department of Revenue enters a Department of Revenue facility or conducts an interview during which return information will be discussed or visible"; and

The Act defines “law enforcement-related encounter or activity” using a non-exhaustive list of examples:

> "Law enforcement-related encounters or activities" include, but are not limited to, traffic stops, pedestrian stops, arrests, searches, interrogations, investigations, pursuits, crowd control, traffic control, non-community caretaking interactions with an individual while on patrol, or any other instance in which the officer is enforcing the laws of the municipality, county, or State.

50 ILCS 706/10-10. Critically, the Act also includes a carve-out clause, which exempts certain categories of police activity from its recording requirement:

> "Law enforcement-related encounter [sic] or activities" does not include when the officer is completing paperwork alone, is participating in training in a classroom setting, or is only in the presence of another law enforcement officer.

*Id.*[11]

The parties dispute the reach of these provisions. The City’s position is straightforward—it asserts that because both the Public Safety Briefing and the Walk-Through are interactions that take place only between two law enforcement officers, the plain text of the carve-out clause exempts them from the recording requirement. (City Br. [1329] at 1–3.) OAG counters that the two procedures should be considered “law enforcement-related encounters” because they are aimed at apprehending and collecting evidence against individuals suspected of a crime. (OAG

---

- When “the officer is engaged in community caretaking functions,” meaning they are “performing an articulable act unrelated to the investigation of a crime,” such as “participating in town halls,” “helping a child find his or her parents,” and “providing death notifications.”

*See* 50 ILCS 706/10-20(3)–(5); 50 ILCS 706/10-10.

[11] Under the Act, “law enforcement-related encounters or activities” do not include “Community caretaking functions,” which are tasks “undertaken by a law enforcement officer in which the officer is performing an articulable act unrelated to the investigation of a crime,” including, as noted above, such functions as “participating in town halls or other community outreach, helping a child find his or her parents, providing death notifications, and performing in-home or hospital well-being checks on the sick, elderly, or persons presumed missing.” *Id*. Cameras are turned off during such activities unless “the officer has reason to believe that the person on whose behalf the officer is performing a community caretaking function has committed or is in the process of committing a crime.” 50 ILCS 706/10-20(a)(4.5).

Br. [1330] at 10.) Based on this, OAG contends that the Public Safety Briefing and Walk-Through resemble both an "interrogation" and an "investigation," and thus must be recorded under the Act. (*Id.* at 11.)

Neither party cites a decision of the Illinois courts or the Seventh Circuit interpreting the Act's definition of "law enforcement-related activities," and the court is aware of none. The court thus treats this issue of statutory construction as one of first impression.

When interpreting an Illinois statute, the role of a federal court is to "predict how the Illinois Supreme Court would decide the question." *In re Crane*, 742 F.3d 702, 707–08 (7th Cir. 2013). Under Illinois law, a court's "primary goal" when engaging in statutory construction "is to interpret and give effect to the legislature's intent." *Dynak v. Bd. of Educ. of Wood Dale Sch. Dist. 7*, 2020 IL 125062, ¶ 16, 164 N.E.3d 1226, 1231 (citation omitted). "The best indicator of the legislative intent is the language in the statute, which must be given its plain and ordinary meaning." *Id.* Statutory terms, however, "cannot be considered in isolation but must be read in context to determine their meaning"; likewise, in interpreting statutory language, courts "may consider the consequences that would result from construing the statute one way or another," and in doing so, should "presume that the legislature did not intend absurdity, inconvenience, or injustice." *Id.* If a statute is unambiguous—that is, if it is *not* subject "to more than one reasonable interpretation"—then "the statute should be applied as written." *Id.* But if the meaning of the statutory text *is* ambiguous, courts may look "beyond the statutory language and consider[] the purpose of the law, the evils it was intended to remedy, and the legislative history of the statute." *People v. Castillo*, 2022 IL 127894, ¶ 34, 215 N.E.3d 780, 786 (citation omitted).

In the court's view, the language at issue here is subject to more than one reasonable interpretation. When read in the context of the statute, it is not obvious that the phrase "only in the presence of another law enforcement officer" should be read, as the City urges, categorically, such that every conceivable instance where officers are only in each other's presence need not be recorded. *See* 50 ILCS 706/10-10. That phrase does not exist in a vacuum; it is included as

part of a list with two other exceptions, namely "when the officer is completing paperwork alone" or when the officer "is training in a classroom setting." *Id.* As the Illinois Supreme Court has explained, "[i]t is a general rule that words grouped in a list should be given related meaning, pursuant to the doctrine of *noscitur a sociis*."[12] *Dynak*, 2020 IL 125062, ¶ 22, 164 N.E.3d at 1232–33. The doctrine of *noscitur a sociis* "is particularly useful when construing one term in a list," in order "'to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to legislative acts.'" *Corbett v. Cnty. of Lake*, 2017 IL 121536, ¶ 32, 104 N.E.3d 389, 397 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)).

That doctrine undermines the City's expansive reading of the statutory text. The first two phrases of the carve-out clause—"when the officer is completing paperwork alone," or "is participating in training in a classroom setting"—describe situations where officers are engaged in administrative tasks. Such tasks are removed in time and space from the kind of activities—including "traffic stops, pedestrian stops, arrests, searches, interrogations, investigations, pursuits, crowd control, [and] traffic control"—that the Act otherwise considers to be law enforcement-related. *See* 50 ILCS 706/10-10. Reading the third phrase, "only in the presence of another law enforcement officer," to exclude from the Act *any* instance where officers are interacting only with other officers would unreasonably expand the scope of the exemption—stretching it far beyond mere administrative work. The City's interpretation would eliminate the requirement of recording whole swaths of police activity (such as the search of an uninhabited residence) that, while public facing, are often done only in the presence of other officers. Such a result would be at odds with the Act's purpose and structure.

---

[12] *Noscitur a sociis* is a Latin phrase that translates to "it is known by its associates." *Noscitur a Sociis*, BLACK'S LAW DICTIONARY (12th ed. 2024). It is a "canon of construction holding that the meaning of an unclear word or phrase, esp. one in a list, should be determined by the meaning of the words immediately surrounding it." *Id.*

But OAG's argument suffers from similar incongruity. True, the Public Safety Briefing may be characterized as an "investigation" or "interrogation" in a technical sense, but the words "investigations" and "interrogations" must also be read in the context of the list in which they appear, a list that includes "traffic stops," "pedestrian stops," "arrests," "searches," "pursuits," "crowd control," and "traffic control." These are all activities where officers commonly interact with non-officer members of the general public. Administrative interviews, internal to the police department, are quite different. Moreover, the court does not understand the Briefing to be an "investigation" of officer misconduct. The purpose of the Briefing, as the City emphasizes, is to protect public safety, preserve perishable evidence, and secure the scene—not investigate. (*See* OAG Br. [1330] at 12–14.) The short list of questions asked during the Briefing (a list which has been significantly narrowed in the parties' negotiations) all relate to these purposes, not to any subsequent internal investigation of officers or anyone else involved in the incident.

Although both parties have valid arguments, the court concludes the City is on firmer ground. Internal officer debriefings, even if undertaken as part of an effort to "investigate" an officer-involved shooting or death, are fundamentally different from the public-facing, operational police activity contemplated by the Act. The Public Safety Briefing is an internal conversation between police officers; it is attenuated from an officer's typical job responsibilities and presents little genuine risk of interaction with the public. The procedure bears a closer relationship to the administrative activities discussed in the carve-out clause than to the operational activities enumerated in the statute, each of which are core law-enforcement duties that involve investigating or interacting with someone external to CPD. Thus, the court concludes that the Body Camera Act does not require the recording of the Public Safety Briefing.[13]

[13] In so holding, the court does not rule exhaustively on the Act's scope. Future policy changes might change the Briefing fundamentally enough that it becomes one of those core, public-facing law enforcement activities that are caught within the Act's breadth. Today's holding is narrow and limited to the two specific procedures that are currently before the court, as they are currently constituted.

This conclusion appears to be confirmed in the Act's purpose and legislative history. *See Castillo*, 2022 IL 127894 ¶ 34, 215 N.E.3d at 786 (authorizing the consideration of such matters under Illinois law). When the Act was first passed in 2015, the carve-out clause applied only to situations where the officer "is completing paperwork alone or only in the presence of another law enforcement officer." ILL. PUB. ACT 099-0352 § 10 (2015). At the time of the bill's passage, its sponsor, Senator Kwame Raoul—now the Attorney General of Illinois—opined that the Act "requires cameras [to] be turned on at all times when the officer is on duty responding to calls of service and during any law enforcement-related encounter and when the officer is engaged in any law enforcement-related activity that occurs while the officer is on duty." S. Tr., 52nd Legis. Day, 99th Gen. Assemb., Reg. Sess., at 91 (Ill. 2015).

The carve-out clause was later amended in 2022 to add the "only in the presence of another law enforcement officer" language it bears today. *See* ILL. PUB. ACT 102-1104 § 30 (2022). When the Illinois Senate considered the 2022 amendment to the clause, Senator Cummingham asked Senator Peters, "for the purpose of establishing legislative intent," about the changes in the bill "regarding body cameras." S. Tr., 116th Legis. Day, 102nd Gen. Assemb., Reg. Sess., at 60 (Ill. 2022). Senator Peters responded, in relevant part, that the change served to "provide further clarification on when officers should be recording," and that "[t]he intent of the Body Worn (Worn Body) Camera Act is to capture law enforcement encounters with *members of the public*." *Id* (emphasis added). A similar exchange took place in the Illinois House of Representatives in 2022. Representative Vella asked the bill's sponsor, Representative Slaughter, whether "both police groups and advocates" were "okay with" the new language, to which Slaughter responded "Yes. It is agreed upon language simply clarifying intent . . . the intent of the Body-Worn Camera Act is to capture law enforcement encounters with members of the public." H. R. Tr., 107th Legis. Day, 102nd Gen. Assemb., Debate, at 49 (Ill. 2022).[14]

---

[14] Both Senator Peters and Representative Vella also clarified that the Act was not intended to require administrative personnel employed by law enforcement agencies to use body-

In the court's view, this legislative history, while not dispositive, appears to confirm that the Illinois General Assembly—or at least, the 2022 amendment's champions—indeed intended that the language "only in the presence of another law enforcement officer" would clarify the scope of the carve-out clause. If the legislature's intent, at least as of 2022, was to ensure that officer interactions with *members of the public* are captured by body-worn camera footage, it would make sense that the carve-out clause should reach beyond situations where officers are completing purely administrative tasks.

For example, suppose two police detectives tasked with solving an armed robbery sit down in a room at the police station and sift through all the physical evidence collected from the scene of the crime and re-read the written records of every statement given to police by witnesses to the crime. It would be difficult to argue that the detectives are not engaged in investigation of a crime or otherwise seeking to enforce the law. Yet, if the goal of the Act is to capture the interactions of law-enforcement officers with members of the public, it is reasonable to conclude that the Act does not require those detectives to record themselves during this time. Likewise, while the Briefing might be "investigative" to a certain extent, it does not involve interaction with the public. It is not subject to the recording requirement.

OAG, quoting a report from the U.S. Department of Justice, asserts that allowing "involved officers to engage in private, unrecorded conversations" with other officers in the aftermath of an officer-involved shooting can at least create the appearance that officers are colluding after the fact to concoct a version of the story. (OAG Mem. [1144] at 2.) This is a matter of genuine concern, but it does not alter the court's conclusion. The purpose of the Public Safety Briefing is to discuss incidents that are *themselves* subject to the requirement of the Body Camera Act. In the case of a shooting, for example, the shooting itself is recorded on the involved officer's body-

---

worn cameras. *See* S. Tr., 116th Legis. Day, 102nd Gen. Assemb., Reg. Sess., at 60 (Ill. 2022); H. R. Tr., 107th Legis. Day, 102nd Gen. Assemb., Debate, at 49 (Ill. 2022).

worn camera, so the importance of recording an *ex post* conversation about the shooting is minimal. This conclusion is supported by the strictly limited scope of questioning during the Briefing and the fact that the Briefing is a one-on-one exchange with an uninvolved officer.[15]

OAG also argues that the City's interpretation of the statute is at odds with CPD departmental policy. According to OAG, CPD policy requires an officer to continue recording until the "conclusion of a law-enforcement-related activity," which occurs when the scene is "safe and secured." (OAG Br. [1330] at 12.) In their view, because the supervisor conducting the Briefing has yet to determine that the scene is safe and secure, until that determination is made, all preceding activities, including the Briefing, must be recorded. Because the Body Camera Act does not require recording, this requirement must be found, if at all, in the Consent Decree. The relevant language of the Consent Decree does establish a general rule of recording "all law enforcement-related activities that occur while on duty," but it also allows CPD to make "limited exceptions" in writing to this general requirement, so long as CPD does not disturb the minimum requirements set by the Act. (Consent Decree ¶ 237, 238(b).) And as described above, there is a written exception here, as CPD has promulgated a written policy requiring officers to disable their body-worn cameras during the Briefing. (*See* General Order G03-06-01, Pl. Ex. 1 [1330-1], at § IV.B.)

For these reasons, the court concludes that the Illinois Supreme Court would hold that Body Camera Act does not require the Public Safety Briefing to be recorded. That conclusion supports the determination that the Consent Decree also does not require recording.

---

[15] There are also other safeguards in place that address OAG's concerns. For example, the Consent Decree and CPD policies require involved officers to be separated after the incident and undergo the Briefing separately, and (barring enumerated exceptions) involved officers are prevented from discussing the incident with each other under they are interviewed by COPA.

## II. Street Deputy Walk Through Questions

The court now turns to the Street Deputy Walk-Through Questions. As an initial matter, the court notes that the reasoning set forth above (that the Body Camera Act does not require the recording of the Briefing) carries the same force with respect to the Walk-Through. Like the Briefing, the Walk-Through amounts to an internal departmental investigation that is attenuated from the operational, core law-enforcement tasks that the Body Camera Act contemplates. It is conducted solely by law-enforcement officers and does not involve interaction with the public. The court predicts that the Illinois Supreme Court would conclude that the Walk-Through is also not within the scope of the Act.

That leaves the question of whether the Consent Decree independently requires recording. As discussed above, the Consent Decree's body-worn camera provision incorporates the requirements established by the Body Camera Act. (*See* Consent Decree ¶ 237.) Because the Consent Decree is designed to ensure CPD's adherence to federal and state law, the parties cannot override requirements set by the Body Camera Act, but they can impose additional requirements above and beyond those required by the Act. (*See id.*) They did just that in paragraph 488(f) of the Consent Decree, which states that "administrative interviews" must be "audio recorded and, where possible, video recorded, with COPA investigators present, except that a member may speak with his or her attorney or union representative in private." (Consent Decree ¶ 488(f).) This provision is not aimed at the Public Safety Briefing, which consists of a scripted set of questions rather than an "interview." But the Walk-Through presents a more difficult question.

A consent decree is "essentially a contract," so principles of state contract law apply in a dispute over its terms. *Holmes v. Godinez*, 991 F.3d 775, 780 (7th Cir. 2021) (citation omitted). Under Illinois law, the "'primary objective in construing a contract is to give effect to the intent of the parties,' which is best shown by the language in the contract itself." *Sterling Nat'l Bank v. Block*, 984 F.3d 1210, 1217 (7th Cir. 2021) (quoting *Gallagher v. Lenart*, 226 Ill. 2d 208, 232–33,

874 N.E.2d 43, 58 (Ill. 2007)). "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Id* (citation omitted). Courts also "construe contracts to avoid absurd results." *Stonegate Ins. Co. v. Smith*, 2022 IL App. (1st) 210931 ¶ 37, 207 N.E.3d 1070, 1079.

In this court's view, the open-ended nature of the conversation between the Street Deputy and the involved officer makes this an "administrative interview," and subject to paragraph 488's recording requirement, for three reasons. First, the Walk-Through is preceded by a *Garrity* warning, which is indicative of investigative activity. *See Garrity v. New Jersey*, 385 U.S. 498 (1967). Next, unlike the Briefing, there is less exigency associated with the Walk-Through. By the time that the Street Deputy has arrived, the scene has already been determined to be safe, the involved officer(s) has relayed pertinent public-safety information to the appropriate official, and the Street Deputy has reviewed footage. Finally, the Briefing is designed to ensure public safety by asking the involved officer urgent questions about injuries, threats to the public, and related time-sensitive matters. The Walk-Through, on the other hand, does not involve these same exigencies; the purpose is not simply to ensure that the scene is safe, but rather to begin collecting a record for an internal investigation.[16]

Because CPD has not distinguished the Walk-Through from an administrative interview, the court finds that corresponding requirements apply, including at minimum, the requirement under Paragraph 488 of the Consent Decree that the Walk-Through Questions be "audio recorded and, where possible, video recorded."[17] (Consent Decree [703] ¶ 488(f).)

---

[16] While the City argues that the Walk-Through Questions are not "treated as a *Garitty*-protected event," the policy includes this mandatory warning for the Walk-Through Questions, which the City argues "risk officer refusals, and delay the exchange while counsel is obtained." (City Br. [1329] at 11.) And unlike the broader questions in the Walk-Through, the City asserts that the "[l]imitations on the scope of the Public Safety Statement were intentionally included to keep it outside the bounds of *Garrity*." (*Id.*)

[17] In its position statement, the City referred to terms of its collective bargaining agreements related to officer administrative interviews. Consistent with this ruling, "[n]othing in this Consent Decree shall be interpreted as obligating the City or the Unions to violate (i) the

## CONCLUSION

For the reasons stated above, the court finds the following: (1) Neither this court's understanding of the Body Camera Act nor the language of the Consent Decree require the recording of the Public Safety Briefing, but (2) the Consent Decree does require recording of the Street Deputy Walk-Through Questions. As also stated above, the court does not rule exhaustively on the Body Camera Act's scope. Instead, today's holding is narrowly confined to the two specific procedures currently before the court, as they are currently constituted.

ENTER:

Dated: November 21, 2025

REBECCA R. PALLMEYER
United States District Judge

terms of the CBAs . . . unless such terms violate the U.S. Constitution, Illinois law or public policy . . . ." (Consent Decree [703] ¶ 711.)